# EXHIBIT A

ORIGINAL

1  MICHAEL SATRIS, SBN 67413
   CARRIE KOJIMOTO, SBN 152824
2  Law Offices of Michael Satris
   Post Office Box 337
3  Bolinas, CA 94924
   Telephone:    (415) 868-9200
4  Facsimile:    (415) 868-2658
   Email:        satris@earthlink.net
5
   Attorney for Petitioner
6  Donald Everett Cronk



7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF SACRAMENTO

10

11  In re the application of

12      DONALD EVERETT CRONK                No. _____ 04F06029

13

14  for a Writ of Habeas Corpus.

15

16      **PETITION FOR WRIT OF HABEAS CORPUS AND SUPPORTING**

17          **MEMORANDUM OF POINTS AND AUTHORITIES**

18

19

20

21

22

23

24

25

26

27

28

## TOPICAL INDEX

Page #

TABLE OF AUTHORITIES............................................................................ iii

I.    SUMMARY OF PETITION ..................................................... 1

II.   PARTIES................................................................................. 2

III.  STATEMENT OF FACTS ....................................................... 2

      A.  The Circumstances Of The Commitment Offense. ............... 2

      B.  Cronk's Prior Denials Of Parole......................................... 3

      C.  September 14, 2005 Parole Consideration Hearing. ............. 8

      D.  The Board's Denial Of Parole. ........................................... 13

      E.  The Arbitrariness Of The Board's Refusal To Set A Parole Date
          For Cronk............................................................................ 15

      F.  The Executive Policy And Practice Of Rare Parole Grants
          Deprived Cronk Of Due Process. ....................................... 16

      G.  General Allegations. ........................................................... 24

CONTENTIONS ................................................................................. 25

      1.   THE BOARD'S REFUSAL TO SET A PAROLE DATE FOR
           CRONK IS ARBITRARY, CAPRICIOUS, AND NOT
           SUPPORTED BY ANY EVIDENCE, IN VIOLATION OF
           SECTION 3041 AND DUE PROCESS UNDER THE
           CALIFORNIA AND UNITED STATES CONSTITUTION. .................... 25

      2.   THE REPEATED ARBITRARY REFUSAL OF THE BOARD TO
           GRANT CRONK PAROLE DESPITE THE OVERWHELMING
           EVIDENCE OF HIS EXEMPLARY REHABILITATION AND
           WHERE FURTHER INCARCERATION SERVES NO
           LEGITIMATE PENOLOGICAL PURPOSE VIOLATES CRONK'S
           RIGHT TO BE FREE OF CRUEL AND UNUSUAL
           PUNISHMENT UNDER THE STATE AND FEDERAL
           CONSTITUTIONS. ................................................................ 25

      3.   THE EXECUTIVE BRANCH'S POLICY AND PRACTICE OF
           RARELY GRANTING PAROLE TO LIFE-SENTENCED
           PRISONERS VIOLATES THE LEGISLATIVE FRAMEWORK
           UNDER PENAL CODE SECTION 3041 THAT CARRIES A
           MANDATE TO NORMALLY PAROLE MURDERERS WITH
           A REASONABLY PROPORTIONATE AND UNIFORM
           SENTENCE. ...................................................................... 25

PRAYER FOR RELIEF .............................................................................. 26

VERIFICATION OF PETITIONER ................................................................ 27

MEMORANDUM OF POINTS AND AUTHORITIES .................................... 28

ARGUMENT ................................................................................................ 28

    I.      THE BOARD'S REFUSAL TO SET A PAROLE DATE FOR CRONK IS ARBITRARY, CAPRICIOUS, AND NOT SUPPORTED BY ANY EVIDENCE IN VIOLATION OF SECTION 3041 AND DUE PROCESS UNDER THE CALIFORNIA AND UNITED STATES CONSTITUTION. .................... 28

    II.    THE REPEATED REFUSAL OF THE BOARD TO GRANT CRONK PAROLE DESPITE THE OVERWHELMING EVIDENCE OF HIS EXEMPLARY REHABILITATION AND DEMAND FOR FURTHER INCARCERATION SERVES NO LEGITIMATE PENOLOGICAL PURPOSE AND VIOLATES CRONK'S RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT UNDER THE STATE AND FEDERAL CONSTITUTIONS. ................. 41

    III.   THE EXECUTIVE BRANCH'S POLICY AND PRACTICE OF RARELY GRANTING PAROLE TO LIFE-SENTENCED PRISONERS VIOLATES THE LEGISLATIVE FRAMEWORK UNDER PENAL CODE SECTION 3041 THAT CARRIES A MANDATE TO NORMALLY PAROLE MURDERERS WITH A REASONABLY PROPORTIONATE AND UNIFORM SENTENCE. ................................................................................ 42

CONCLUSION .......................................................................................... 46

## TABLE OF AUTHORITIES

Federal Cases

*Biggs v. Terhune* (9th Cir. 2003)
    334 F.3d 910................................................................................15, 31, 42

*Blair v. Folsom State Prison* (2005)
    2005 WL 2219220......................................................................................32

*Ewing v. California* (2003)
    538 U.S. 11................................................................................................18

*Fierro v. Gomez* (9th Cir. 1996)
    77 F.3d 301...............................................................................................41

*Furman v. Georgia* (1972)
    408 U.S. 238.............................................................................................41

*Hicks v. Oklahoma* (1980)
    447 U.S. 343.............................................................................................23

*Irons v. Warden of California State Prison - Solano* (E.D. Cal. 2005)
    358 F.Supp.2d 936 ........................................................7, 22, 36, 42

*Johnson v. Finn* (2006)
    2006 WL 195159.................................................................................32, 33

*Masoner v. State,* (2004)
    2004 WL 1080176 & 1080177..................................................................22

*McQuillion v. Duncan* (9th Cir. 2003)
    342 F.3d 1012...........................................................................................22

*Saif'ullah v Carey* (2005)
    2005 WL 1555389.....................................................................................22

State Cases

*In re Alvarade* (2005)
    2005 WL 217030.......................................................................................22

*In re Capistran* (2003)
    107 Cal.App.4th 1299 ................................................................22

*In re Dannenberg* (2005)
    34 Cal.4th 1061 ...................................................18, 19, 20, 29, 44, 45

*In re DeLuna* (2005)
    126 Cal.App.4th 585 ..........................................................22, 39

*In re Foss* (1974)
    10 Cal.3d 910 ......................................................................41

*In re McGraw* (2004)
    2004 WL 2075453...................................................................22

*In re Minnis* (1972)
    7 Cal.3d 639 ...................................................................17, 45

*In re Ramirez* (2001)
    94 Cal.App.4th 549 .................................................21, 22, 29, 40, 43

*In re Rodriguez* (1975)
    14 Cal.3d 639 ......................................................................17

*In re Rosenkrantz* (2000)
    80 Cal.App.4th 409 ...............................................................22

*In re Rosenkrantz* (2002)
    29 Cal.4th 616 .........................15, 19, 21, 22, 28, 29, 30, 35, 45

*In re Samble* (2005)
    2005 WL 217030....................................................................22

*In re Scott* (2004)
    119 Cal.App.4th 871 ........................................22, 30, 34, 35, 40, 43

*In re Scott* (2005)
    133 Cal.App.4th 573 .....................................21, 30, 35, 36, 37, 40, 41

*In re Seabock* (1983)
    140 Cal.App.3d 29 .................................................................20

*In re Seymour* (2004)
    2004 WL 2749090 ...................................................................................... 22

*In re Shaputis* (2005)
    37 Cal.Rptr.3d 324 ...................................................................................... 22

*In re Singer* (2005)
    2005 WL 103537 .......................................................................................... 22

*In re Smith* (2003)
    109 Cal.App.4th 489 .................................................................................... 22

*In re Smith* (2003)
    114 Cal.App.4th 343 ........................................................................ 22, 30, 43

*In re Stanley* (1976)
    54 Cal.App.3d 1030 ................................................................................ 18, 30

*In re Stanworth* (1982)
    33 Cal.3d 176 ................................................................................................ 20

*In re Sturm* (1974)
    11 Cal.3d 258 .......................................................................................... 18, 45

*In re Weider* (2005)
    2005 WL 40042 ............................................................................................ 22

*In re Williams* (2002)
    2002 WL 31124517 ...................................................................................... 22

*People v. Johnson* (2003)
    2003 WL 1827262 ........................................................................................ 22

*People v. Morse* (1964)
    60 Cal.2d 631 ................................................................................................ 17

*Roberts v. Duffy* (1914)
    167 Cal. 629 .................................................................................................. 42

Constitutions

    United States Constitution

        Eighth Amendment ........................................................................... 16, 41
        Fourteenth Amendment...................................................................... 16

    California Constitution

        Article I, § 7 .................................................................................... 16
        Article I, § 17 .................................................................................. 16, 41

California Statutes

    Penal Code § 190........................................................................................ 20
            § 1170 ................................................................................ 19
            § 3041 ................................................................... 16, passim
            § 3041 (a)........................................................................ 19, 43
            § 3041 (b) ................................................................ 17, 19, 29
            § 3604 ............................................................................. 41

California Code of Regulations

    Title 15, § 2281 ....................................................................................... 20
          § 2400 ................................................................................ 20
          § 2402 ..................................................................... 15, 20, 28
          § 2402 (a)........................................................................ 29
          § 2402 (b)........................................................................ 28
          § 2402 (c)(1) ................................................................... 34
          § 2402 (c)(1)-(6) ............................................................ 28
          § 2402 (c)(1)(D)............................................................. 31
          § 2402 (c)(2) ................................................................... 36
          § 2402 (d)(1)-(9)............................................................ 28
          § 2402 (d)(4) .................................................................. 35
          § 2402 (d)(6) .................................................................. 36

California Rules of Court

    Rule 4.500 ............................................................................................... 26

1    MICHAEL SATRIS, SBN 67413
     CARRIE KOJIMOTO, SBN 152824
2    Law Offices of Michael Satris
     Post Office Box 337
3    Bolinas, CA 94924
     Telephone:   (415) 868-9200
4    Facsimile:   (415) 868-2658
     Email:       satris@earthlink.net
5
     Attorney for Petitioner
6    Donald Everett Cronk

7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    IN AND FOR THE COUNTY OF SACRAMENTO

10

11    In re the application of                   No. _____

12

13        DONALD EVERETT CRONK        **PETITION FOR WRIT OF HABEAS CORPUS AND SUPPORTING**

14    for a Writ of Habeas Corpus.        **MEMORANDUM OF POINTS AND AUTHORITIES**

15

16                               I.

17                       SUMMARY OF PETITION

18         1. This petition challenges the refusal of State authorities to release petitioner

19    Donald Everett Cronk on parole. Most recently, the Board of Parole Hearings, formerly

20    known as the Board of Prison Terms and hereafter as "The Board," denied Cronk parole

21    at his fifth consideration hearing on September 14, 2005. Cronk is serving a term of

22    imprisonment of 25 years to life following his conviction for first degree murder

23    committed in 1980. Now 50 years old, Cronk is in his 25th year of incarceration for that

24    offense. He has been eligible for parole since March 2, 1998. For over two decades,

25    Cronk has acknowledged that he is fully responsible for the murder and has shown deep

26    and genuine remorse. He has compiled an impeccable record in prison with exceptional

27    accomplishments and with assessments by his correctional counselors and prison

28    psychologists that he would present little or no risk if released on parole. The denial of

1  parole was contrary to administrative regulation, the Penal Code, and his rights under the

2  California Constitution and the United States Constitution to due process and equal

3  protection of the law and to be free of cruel and unusual punishment.

4

5  II.

6  PARTIES

7      2.  Petitioner Donald Everett Cronk is a prisoner of the State of California,

8  incarcerated at San Quentin State Prison, San Quentin, California, under California

9  Department of Corrections (CDC) number C-87286.

10      3.  Respondent Robert Ayers Jr. is the acting Warden of San Quentin State Prison

11  and is Cronk's legal custodian.

12  III.

13  STATEMENT OF FACTS

14      A.  The Circumstances of the Commitment Offense.

15      4.  At the 2005 parole consideration hearing, the Board recited as follows the

16  summary of the offense, which involved Cronk and another person breaking into a

17  residence and awaiting return of the victim (a jeweler) to rob him:

18          In the morning of December 19, 1980, the inmate and co-
19          defendant Glen Meyer, went to the victim's residence and
        broke into the residence by entering a backroom window.
20          The victim was James Allen, age 50. After ransacking the
        victim's home in search of personal effects and money, the
        two men laid in wait armed with an unknown caliber handgun
21          for the victim to return. When the victim returned home, he
        noticed the dwelling had been entered and drew his own
22          weapon before entering the front door. The victim surprised
        the inmate and fired several rounds, striking the inmate one
23          [sic: once] in the arm and once in the side. The inmate
        retrieved his handgun from his pocket and shot once, killing
24          the victim. After the murder, both the inmate and the co-
        defendant, Glenn Meyer, fled. Glen Meyer stopped long
25          enough to pick up the victim's gun, briefcase, and diamond
        ring the victim wore. During the interview for this report, the
26          inmate recalled the caliber weapon as a .38 Colt Special
        Detective. The inmate was arrested several months later
27          while working in a carnival in Idaho.

28  (See Appendix, Exh. 2, pp. 20-21; see also Exh. 3, p. 95.)

1    5. Cronk's cocaine addiction was a major factor in his criminal conduct. (Exh. 3,

2    p. 96.) He was introduced to cocaine by his employer at a social function celebrating

3    Cronk's promotion. (Exh. 4, pp. 107, 109; Exh. 2, pp. 19, 22.) "[Cronk] associated

4    cocaine use with success as he admired those in the company who also used it." (Exh. 2,

5    2005 transcript, p. 19; Exh. 14, p. 244.) He felt "accepted as an outsider in the upper

6    circles of the company." (Exh. 14, p. 244.) After Cronk and his wife separated and she

7    moved back to Wisconsin, Cronk's drug dependency grew "to the point where he was

8    spending all of his money" on cocaine and he began embezzling from his employer.

9    (Exh. 2, p. 19; Exh. 14, p. 244.) Cronk and Meyer "began dealing cocaine and were

10   getting large amounts of the drug fronted to them. They were unable to pay back the debt

11   incurred, and [] Cronk knew that he was likely to be harmed if he was not able to pay it."

12   (Exh. 14, p. 244.) Cronk lost his job and was ten thousand dollars in debt. (Exh. 3, p.

13   96.) Meyer proposed committing a robbery to get the money they needed. (Exh. 14, p.

14   244.) Cronk did not anticipate the fatal confrontation with Allen. (Exh. 3, p. 96.) After

15   Allen shot at Cronk several times, hitting him twice, Cronk was "operating off of instinct,

16   survival mode, fear" when he fired the gun through his coat pocket. (Exh. 2, pp. 26-27;

17   Exh. 3, p. 96.)

18       B.    Cronk's Prior Denials of Parole.

19       6. Cronk appeared for his initial parole consideration hearing on March 5, 1997.

20   (Exh.15, p. 261.) His counselor reported:

21           Cronk's overall pattern of behavior in prison, inclusive of
            disciplinary record, work accomplishments, participation in
22          self-help and religious programs as well as relationships with
            staff and inmates has been exemplary from date of reception
23          6-13-84 to present, a total of 12 years. There are no …mental
            concerns documented at this time, except to note that Cronk is
24          a drug addict in remission.

25   (Exh. 16, p. 272.) The progress reports issued during that 12-year period contain ample

26   evidence of Cronk's exemplary programming. (Exhs. 16, 19, 22, 25, pp. 274-275; 280-

27   282; 288-291; 296-297.) For example, the following entry states:

28

3

> Cronk continues to receive laudatory chronos for displaying a
> high standard of work ethics and continues to volunteer an
> enormous amount of personal time to various projects.  On 5-
> 9-92, the San Quentin Mass Choir recorded an album.  Cronk
> was instrumental in the vision to create and direct this project.
> Cronk authored the line notes for the album cover, as well as
> using his electrical and sound engineering skills.

(Exh. 19, p. 281.)  The mental health evaluations of Cronk were also positive.  (See Exhs.

17, 20, 23, 26.)  For example, the 1993 psychological evaluation concluded that "Mr.

Cronk is already showing much promise and readiness in these early stages of his

commitment."  (Exh. 20, p. 285.)  It noted:  "Mr. Cronk is one of those rare individuals

who has been able to rise above his early circumstances and make something of himself

in prison.  He is well liked by staff and relied upon for his skills and trustworthiness."

(Exh. 20, p. 285.)  The 1997 psychological evaluation reported Cronk thoughtfully

discussed the crime, which he did not blame on his cocaine use.  (Exh. 17, p. 277.)  The

psychologist stated:

> His understanding of the murder appeared comprehensive as
> evidenced by the manner in which the various elements of his
> life and drug addiction were portrayed.  He did not seem to
> view the murder simply, but as a consequence of many
> historical and situational factors combined.

(Exh. 17, p. 277.)

7.  The Board denied Cronk parole for four years, primarily based on the

commitment offense.  (Exh. 15, pp. 262, 264.)  Secondary reasons were Cronk's criminal

history, his past drug and alcohol use, and the need for additional programming in prison.

(Exh. 15, pp. 262, 264.)

8.  On December 20, 2001, Cronk appeared for his first subsequent consideration

hearing.  (Exh. 12, p. 220.)  The psychological evaluation gave a positive assessment of

Cronk's suitability and chances of success on parole:

> As Mr. Cronk's records indicate, he has made impressive
> efforts at self-rehabilitation.  He has succeeded in an
> apprenticeship program to become an electrician.  He has
> upgraded his educational level from a high school dropout to
> completion of an A.A. degree and continuation toward[s] a
> bachelor's degree.  He has participated extensively in self-
> help and substance abuse interventions.  He has also
> contributed considerable time and skills to fundraising and

1
2
3
4
5
6
7
8

> public relations efforts designed to help those in need. His accomplishments are indicative of pro-social values and interests. Mr. Cronk has been able to maintain an extended effort toward rehabilitation, with the goal of contributing to the general good. He seems to be, at this point, a sincerely altruistic person. Because his efforts at rehabilitation have come from an intrinsic motivation, he is likely to maintain his present positive social adjustment. After living in an institutional environment for approximately 20 years, he would face the challenges that would come with a radical change of environment. Given Mr. Cronk's level of job skill and education, and performance in prison, these challenges would likely be less than those for other parolees released after extended incarceration.

9   (Exh. 14, p. 249.) The psychologist noted that "Cronk has been free of disciplinary

10  actions" and "seems dedicated to avoiding violence." (Exh. 14, pp. 248, 249.) She found

11  Cronk had "no mental conditions that would constitute a major risk factor." (Exh. 14, p.

12  248.) As to the factors that led to Cronk's cocaine use, she concluded:

13
14
15
16

> The precipitous loss of his father, his early history of social isolation, and his longing to escape the poverty experienced by his family, combined with premature marriage and fatherhood made him vulnerable to fantasies of escape. It is the conclusion of this examiner that cocaine offered him such an escape and masked his sense of inadequacy.

17  (Exh. 14, p. 247.)

18      The psychologist opined that Cronk had "overcome earlier patterns of maladaptive

19  behavior that resulted in his striving to gain acceptance from more powerful males."

20  (Exh. 14, p. 248.) She praised Cronk's "proven ability to resist the negative influences of

21  incarceration" and found that his "positive adjustment in prison and successful

22  programming suggest that the maladaptive traits that expressed themselves in his

23  commitment offense and other antisocial acts do not dominate his present responses."

24  (Exh. 14, p. 247.)

25      10.  Cronk's counselor found that Cronk "does not present a risk to public safety at

26  this juncture." (Exh. 13, p. 236.) The counselor explained:

27
28

> I make this statement with the belief that cocaine addiction was responsible for Cronk's behavior during the commission of the instant offense. If this is true, and after 20 years it appears it is, then it is logical to follow that Cronk will not

5

1    behave in a similar manner when released back into society.
     He is not interested in drinking or abusing drugs from this
2    point on and so it is feasible to conclude his superlative
     behavior inside [] the institution will be continued if he is
3    released from prison.

4    (Exh. 13, p. 236.)

5         11.  The Board denied parole for one year primarily based on the commitment

6    offense.  (Exh. 12, p. 224.)  It found the offense was "carried out in an especially cruel

7    callous manner" and the "motive for the crime was inexplicable or very trivial in

8    relationship to the offense."  (*Ibid.*)  The Board's other reasons for denying parole were

9    Cronk's:  1) previous criminal record; 2) history of unstable tumultuous relationships

10   with others; 3) prior drug and alcohol use; 4) insufficient participation in self-help and

11   therapy and the need to demonstrate "recent" gains "over an extended period of time."

12   (Exh. 12, pp. 225-226.)

13        12.  On October 25, 2002, Cronk requested his second subsequent parole

14   consideration hearing be postponed because his attorney was unable to appear due to a

15   scheduling conflict; the request was granted.  (Exh. 10.)

16        13.  On January 29, 2003, Cronk appeared for his second subsequent parole

17   consideration hearing.  His counselor, who opined that Cronk would pose a minimal risk

18   to public safety if released, gave this very positive summary evaluating Cronk's

19   outstanding development:

20        Cronk has maintained an excellent program throughout his
          seventeen years of incarceration.  He has managed to use his
21        time here in a constructive fashion, constantly making
          improvements in his life and the lives of others.  He has made
22        numerous achievements and surpassed many of life['s]
          milestones despite his confinement to State Prison.  Cronk
23        continues to excel in all areas.  He has gained employable
          work skill as an Electronic Worker and is currently working
24        towards his Bachelor's Degree.  He has remained disciplinary
          free and received considerable commendations for his
25        positive programming efforts.  He maintains an excellent
          rapport with both staff and inmates.
26
          During his interview [on] October 18, 2002, he talked openly
27        and candidly about the crime and takes total responsibility for
          his involvement.  It appears that he has had sufficient time to
28        reflect on the past and come to terms with his present
          condition.  He fully understands how his involvement with

6

1
2
3
4

> drugs played an intricate part in his motivation to become
> involved in the commission of the crime. It is my genuine
> belief that had Cronk not become involved with drugs he
> might not be sitting in prison today. Cronk has taken positive
> steps in dealing with his past problem with drugs by
> becoming involved with Narcotics Anonymous.

5   (Exh. 11, p. 215.) No new psychological evaluation was conducted for the hearing.

6      14. The Board denied parole for one year primarily based on the commitment

7   offense. (Exh. 9, p. 199.) The Board found the offense "was carried out in an especially

8   cruel and calculated manner" because Cronk was armed with a weapon and lying in wait

9   for the victim to return home. (*Ibid.*) The Board also found the motive was very trivial

10  in relation to the offense. (Exh. 9, p. 200.) The Board noted Cronk's "very minimal

11  criminal history," positive programming, and broad and substantial community support.

12  (Exh. 9, p. 201.) The arbitrary denial of Cronk's liberty interest in parole is reflected in

13  the following comments by the presiding commissioner at the 2003 hearing:

14
15
16
17
18
19

> [T]here's nothing you can do about [the crime.] The crime is
> changed – I mean, you can't change the crime. The crime is
> always going to be the same. But one of the reasons [for
> denying parole] is strong opposition of the People, of the
> People of Sacramento and the victims still feel that you would
> present a threat to them if released. But you're doing the
> things you need to do. And it's hard – We're hard pressed to
> sit here and tell you additional things that you need to do
> other than you need to continue doing the things that you're
> doing. Stay on the track that you're on. And some day you
> will get a parole. But it's just not today.

20  (Exh. 9, p. 203.) Given the long passage of time since the crime during which Cronk's

21  institutional record has been exemplary, and the Board's acknowledgement that Cronk

22  has done everything he could in prison to reform himself and that the crime will never

23  change, Cronk "has no hope for ever obtaining parole except perhaps that a panel in the

24  future will arbitrarily hold that the circumstances were not that serious or the motive was

25  more than trivial." (*Irons v. Warden of California State Prison – Solano* (E.D. Cal. 2005)

26  358 F.Supp.2d 936, 947.)

27     15. On March 16, 2004, Cronk appeared for his third subsequent parole

28  consideration hearing. His counselor repeated the same positive summation about Cronk

1  as the prior counselor. (Exh. 8, p. 191.)  His report gave an impressive list of Cronk's

2  numerous self-help and therapy activities for which he received laudatory chronos. (Exh.

3  8, pp. 189-190.)  No new psychological evaluation was prepared for the hearing.

4      16.  The majority of the Board denied Cronk parole for one year, again based

5  primarily on the commitment offense. (Exh. 7, p. 178.)  It found the crime was carried

6  out in a cruel and callous manner, and for a trivial motive. (*Ibid*.)  The majority also

7  denied parole based on its findings that Cronk had "an unstable social history that

8  involved primarily drug use" and that he "has not yet sufficiently participated in

9  beneficial self-help programs." (Exh. 7, p. 179.)  The majority praised the 2001

10 psychological evaluation as "thorough" and found it was positive, yet stated it was

11 "unfortunate ... that the doctor really does not come to any conclusion" [about assessing

12 Cronk's risk to public safety] and "sort of dances around the issue." (Exh. 7, pp. 179-

13 180.)  It ordered a new psychological evaluation. (Exh. 7, p. 180.)  The dissenting

14 commissioner explained why he found Cronk suitable for parole:

15          The crime itself was extraordinarily vicious, unnecessary, but
            the person who said that he found peace with cocaine has
16          evolved into a person who would go out and contribute, in my
            opinion, to the community.
17

18 (Exh. 7, p. 182.)

19      C. September 14, 2005 Parole Consideration Hearing.

20      17.  Cronk appeared for his fourth subsequent parole consideration hearing on

21 September 14, 2005.  Both his counselor and the psychologist who evaluated Cronk

22 reported that he was deeply remorseful about the grief he caused to his victim's family.

23 (Exh. 3, p. 96; Exh. 4, p. 109.)  They found Cronk had taken full responsibility for his

24 criminal actions and was insightful about their underlying factors. (Exh. 3, p. 101; Exh.

25 4, p. 109.)  Cronk's counselor repeated the same summary given by his previous

26 counselors in the 2004 and 2002 life prisoner evaluations. (Exh. 3, p. 101.)  The

27 psychologist gave this highly positive assessment:

28

8

1    Given the stability of Mr. Cronk's mental status, his
exemplary performance while incarcerated and extensive
2    efforts at rehabilitation, no changes in Mr. Cronk's mental
health are anticipated. He has no history of mental illness and
3    no contributory mental problems. His attitude is consistently
upbeat and positive. Most importantly, he has no history of
4    violence while incarcerated, and no history of violence in the
community prior to the commission of his offense. He has
5    shown genuine remorse for his crime and takes full
responsibility for his actions. He is insightful regarding the
6    factors that led to his criminal behavior. **There would seem
to be no additional benefit that could accrue to Mr. Cronk**
7    **or to the state by his continued incarceration. Continued**
**incarceration could in fact, be detrimental to Mr. Cronk's**
8    **ability to succeed as a parolee, as it may be creating a**
**dependency on institutional resources, and requires**
9    **continued adaptation to a unique and extreme**
**environment.** While it is not possible to predict future
10   behavior with absolute certainty, based on clinical assessment
and review of Mr. Cronk's records there is no indication that
11   he represents an increased risk to the community for future
crime, were he to be paroled.

12

13   (Exh. 4, p. 109, emphasis added.)

14       18. When asked at the hearing how he felt about the offense, Cronk responded

15   that he understood, after the devastation he and his family experienced when his father

16   died, the pain and suffering he caused to Allen's family. (Exh. 2, pp. 28-29.) Cronk said

17   he has spent the last 25 years analyzing what caused his cocaine addiction and his

18   subsequent criminal behavior, and also working diligently to reform himself. (*Ibid.*)

19       19. The Board reviewed and questioned Cronk about his social and criminal

20   history. (Exh. 2, pp. 14-18; 24.) Cronk grew up in a poor Wisconsin family located in a

21   farming community. (Exh. 2, p. 14.) Cronk was devastated when his father, with whom

22   he had a very close relationship, died of a heart attack when Cronk was 17 years old.

23   (Exh. 2, p. 15; Exh. 14, p. 243.) At age 18, Cronk married his girlfriend when she

24   became pregnant. (Exh. 2, p. 15.) They moved to California, but three years later,

25   Cronk's wife and daughter moved back to Wisconsin and the marriage ended. (Exh. 2, p.

26   16; Exh. 14, p. 243.) Cronk remarried in 1987 and his second wife had a daughter in

27   1991. (Exh. 14, p. 243.) In 1994, Cronk's wife suddenly and explicably stopped coming

28   to visit him at the prison and broke off all contact with him. (Exh. 14, p. 243.) Cronk

9

1    admitted unadjudicated (and perhaps uncharged) conduct that in October 1980, he wrote
2    an unauthorized check from his brother's bank account and robbed a gas station in
3    Wisconsin, in addition to embezzling from his employer. (Exh. 2, p. 24.) Cronk had no
4    juvenile record and his only prior adult conviction was in 1975 for theft of a tape deck
5    from an auto in Wisconsin. (Exh. 3, p. 97.)

6        20.  The Board reviewed Cronk's performance in prison since his last parole
7    hearing. (Exh. 2, pp. 30-34.) Cronk had obtained an AA degree in Theology and was
8    working on getting a BA through the prison's affiliation with Ohio University. (Exh. 2,
9    p. 30; Exh. 3, p. 99.) He had graduated from Patton University with a Certificate of
10   Ministry in 2005. (Exh. 2, p. 30, Exh. 3, p. 99.) Cronk was using his education to serve
11   as the Protestant Chaplain's clerk. (Exh. 2, p. 31.) In 2004 and 2005, he was both an
12   active participant and facilitator of a counseling course called Incarcerated Men Putting
13   Away Childish Things (IMPACT). (Exh. 2, pp. 31-32; Exh. 3, p. 99.) Cronk received a
14   certificate for completing a 29-month program on domestic violence. (Exh. 2, p. 31; Exh.
15   3, p. 100.) From 2002 to the current date, Cronk trained to be a facilitator of the Man-
16   Alive Program. (Exh. 2, p. 33; Exh. 3, p. 100.) He was also involved in the Overcomers
17   Outreach program, which is a religious-oriented 12-step recovery program related to the
18   12-step program of AA, (Exh. 2, p. 33; Exh. 3, p. 99; Exh. 6, Laudatory and General
19   Chronos); the Health and Ethics Workshop Program (Exh. 3, p. 99); the Arts in
20   Corrections program (Exh. 2, p. 33; Exh. 3, p. 99; Exh.6, Laudatory and General
21   Chronos), and T.A.P.S., a national military survivor peer support network (Exh. 2, p. 33;
22   Exh. 3, p. 100.) As the Board aptly acknowledged, Cronk's "group activities are many,
23   almost awe inspiring." (Exh. 2, p. 31.) It noted that he had "been involved for a
24   significant amount of time and certainly in these last 18 months." (Exh. 2, p. 31.) Cronk
25   received 16 laudatory chronos for his participation, contributions and faithful attendance
26   in these programs. (Exh. 2, p. 31; Exh. 6, Laudatory Chronos.) He had a stellar
27   behavioral record, remaining disciplinary-free during the length of his incarceration.
28   (Exh. 2, p. 36.)

1    21. The Board reviewed "the highlights" of Cronk's most recent psychological

2  evaluation, which it found favored parole. (Exh. 2, pp. 34-35; see ¶ 17 for excerpt of

3  report read at hearing.)

4    22. The Board reviewed Cronk's parole plans. (Exh. 2, pp. 37-39.) Cronk plans

5  to live with his fiancée, Kathleen Giono, who owns her Marin County residence and

6  manages a travel agency. (Exh. 2, pp. 37-38, 43-44.) Cronk has "countless employment

7  opportunities" including being an audio engineer, an electrician, and the Marin County

8  IMPACT facilitator working with the California Youth Authority. (Exh. 2, p. 38.) Cronk

9  also had a letter offering employment as a house painter in Sacramento if he is released to

10  the county of commitment. (Exh. 2, p. 42.)

11    23. The Board stated Cronk had so many letters of support that it would not read

12  or review each letter at the hearing, and selected several letters to read for the record.

13  (Exh. 2, p. 39.) A friend of Cronk's fiancée wrote that she was willing to pledge $50.00 a

14  month to help Cronk upon his release. (Exh. 2, p. 43.) The presiding commissioner

15  remarked this was the first time he had received a pledge of financial support from a non-

16  relative. (Exh. 2, p. 43.) Cronk's two older sisters wrote letters offering emotional and

17  material support. (Exh. 2, pp. 40-41.) The pastor of the Tiburon Baptist Church, who has

18  known Cronk for over nine years through the church's involvement at San Quentin

19  Prison, wrote that his church is committed to supporting and helping Cronk upon his

20  release. (Exh. 2, p. 42.)

21    24. The Board read a letter from the victim's daughter advocating that Cronk

22  remain imprisoned for the rest of his life. (Exh. 2, pp. 56-61.) The district attorney stated

23  the victim's wife is also opposed to Cronk being released on parole and has complained

24  in the past that he has never apologized to her. (Exh. 2, p. 69.) The district attorney

25  stated that he believed Cronk when he stated that he would have written a letter of

26  apology to the family, but that he had been directed not to do so by the prison. (Exh. 2, p.

27  69.)

28

1    25. The district attorney acknowledged that Cronk "has matured very well in

2    prison" and "adjusted somewhat exceptionally, especially when compared to his peers

3    and has taken advantage of the opportunities that San Quentin has afforded him in a very

4    difficult and dangerous environment." (Exh. 2, p. 75.) However, the district attorney

5    was opposed to Cronk's release on parole, arguing that the "enormity of the crime and the

6    affect [sic: effect] upon the [victim's] family" has not changed, and that the Board must

7    accord "some deference" to the crime's impact on the family. (Exh. 2, p. 76.)

8    26. The district attorney commented on what he characterized as "some minor

9    inaccuracies" in the 2005 life prisoner evaluation and 2005 psychological evaluation.

10   (Exh. 2, p. 70.) The district attorney contended Cronk's statement as reported in the life

11   prisoner evaluation that the crime was originally planned to be a burglary did not comport

12   with the "true picture" of a detailed plan to tie the victim up and rob him. (Exh. 2, pp.

13   70-71.) The district attorney tried to discredit Cronk's assertion that he had no idea the

14   victim would be armed. (*Ibid.*)

15   27. As to the 2005 psychological evaluation, the district attorney complained that

16   the evaluator, Dr. Inaba, gave a "very distorted view" about the crime. (Exh. 2, p. 72.)

17   The district attorney stated, "She says that he was engaged in a robbery of the victim's

18   home, and the victim returned to the residence surprising the victim [sic: Cronk] and the

19   partner of [sic: in] his crime." (Exh. 2, p. 72.) The district attorney acknowledged Cronk

20   "certainly ... has been candid to a lot of details, but I think she is greatly confused or

21   minimizing when she summarizes it that way. You don't rob a home. You rob a person,

22   and he did not surprise him." (Exh. 2, p. 72.)

23   28. The district attorney also disputed Dr. Inaba's opinion that Cronk "has no

24   history of violence in the community prior to the offense." (Exh. 2, p. 73.) The district

25   attorney emphasized he was not suggesting Cronk had misled the psychologist, but stated

26   he did not think "she had a fair understanding of the complete record," citing the

27   unadjudicated robberies shortly before the Allen murder that were mentioned in the

28   probation report. (Exh. 2, p. 73.)

1       29.  The district attorney also questioned why Dr. Inaba did not include in her

2    2005 report a sentence contained in her 2001 report that "causative factors for violence

3    and criminal activity are multi determined and that violence potential is unpredictable."

4    (Exh. 2, p. 72.) He stated: "I don't understand how she can delete that since not much in

5    his life has changed between 2001 and 2005. He is still programming very well and

6    progressing, but I think that sentence she wrote before still remains true, and she deleted

7    that for a purpose." (Exh. 2, p. 72.) The district attorney also disputed Dr. Inaba's

8    opinion that Cronk has shown genuine remorse and full responsibility for the crime.

9    (Exh. 2, p. 74.)

10       30.  Cronk's attorney, Richard Fathy, who represented Cronk at trial, explained

11    that he has represented Cronk pro bono at this and the past two hearings because he has

12    been deeply impressed by Cronk's extraordinary and genuine redemption. (Exh. 2, pp.

13    78-80.) He argued the district attorney's critique that the psychologist who did the 2005

14    evaluation did not understand the gravity of Cronk's offense was "absurd," as "she heard

15    from [Cronk] probably in much more detail than we're hearing this morning of what a

16    horrible thing he did." (Exh. 2, p. 81.) Fathy asked rhetorically:

17            Has this guy in one iota of his comments suggested to you he

18            doesn't understand the gravity of what he did to the Allen
                 family, and of course, Mr. Allen first and foremost?  What do

19            you think he said to the psychiatrist or psychologist, pardon
                 me?  No, I didn't have any involvement.  It's all the cocaine's

20            fault, and it's the crime partners.  I didn't do anything.  Of
                 course, he didn't say that to her.

21    (Exh. 2, p. 81.)

22       D.  The Board's Denial of Parole.

23       31.  The Board denied Cronk parole for one year primarily based on the

24    commitment offense. (Exh. 2, p. 87.) The Board found "the offense was carried out in a

25    dispassionate and calculated manner" and that the "motive for the crime was inexplicable

26    or very trivial in relationship to the offense." (Exh. 2, p. 87.) The Board further stated

27    about basing its denial on the offense:

28

13

1

2

3

4

5

6

7

8

9

10

11

12

> All the trial attorneys here and the Deputy Commissioner is an attorney as well, went to law school as well, knows that the felony murder rule was enacted because of the inherent dangerousness of robberies, and that individuals cannot escape liability by saying, I did not mean to kill the person in the perpetration of a 211. And that's exactly what happened in this case. But even though one can disagree with the premise of having a first-degree murder on an unintentional homicide, this is not your general, I'm on the street. I'm strung out, high, and pulls a gun on somebody, and the gun goes off. I'm always wondering why people use all the guns, but anyway, the point is that no this was way beyond that. This was calculated. They had masks. They had guns. They had one guy down the street waiting for the person to come. They knew what he was wearing. They knew he had a diamond ring. They brought oil. They didn't just go to the house and take things. They waited for him to come back. The Deputy Commissioner and I just decided that this was just too heinous, I mean, too serious of an offense, and I don't necessarily believe that the inmate will always be incarcerated, but I just don't think at this stage 25 years is sufficient.

13  (Exh. 2, pp. 87-88.) The second reason the Board gave for denying Cronk parole was

14  "his escalating pattern of criminal conduct or violence," citing his involvement in

15  robberies prior to the commitment offense. (Exh. 2, p. 88.)

16      32. The Board dismissed the 2005 psychological evaluation, characterizing it as

17  "inconclusive." (Exh. 2, p. 89.) It stated:

18

19

20

21

22

23

> The District Attorney pointed out various factual assertions that make her opinion virtually worthless. We know that hypothetical question posed to an expert opinion, the facts have to be established, and the facts that she's going by doesn't [sic] seem to be the same case. She's talking about no violence before this incident, yet, we know he was involved in robberies prior to this occurring. She does not seem to – it says, though she has a vested interest, not maybe consciously but maybe subconsciously that she just didn't inspire me as an individual who did a thorough evaluation of the psychiatric factors of the inmate.

24  (Exh. 2, p. 89.) The Board requested a new psychological report be done by another

25  psychologist. (Exh. 2, p. 92.)

26      33. The third reason the Board gave for denying parole was the "3042 responses,"

27  citing the district attorney's opposition. (Exh. 2, p. 89.)

28

14

34. In addition, the Board made the following findings:

> The prisoner needs therapy, self-help, and programming in order to further face, discuss, understand, and cope with stress in a nondestructive manner, as well, to get further insight into the crime. Until further progress is made, the prisoner continues to be unpredictable and a threat to others.

(Exh. 2, p. 90.)

E. The Arbitrariness of the Board's Refusal to Set a Parole Date for Cronk.

35. To comply with due process requirements, the Board must apply its own criteria set out in California Code of Regulations, title 15, section 2402, which establishes factors tending to show that a prisoner is suitable or unsuitable for parole. The Board failed to do so. The Board's denial of parole was arbitrary and capricious in violation of federal and state due process guarantees for the further reason that it was unsupported by any evidence. (See, e.g., *In re Rosenkrantz* (2002) 29 Cal.4th 616, 657-658 & 675-677 [due process requires that denial of parole be supported by "some" evidence]; *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 915 ["In the parole context, the requirements of due process are satisfied if 'some evidence' supports the decision."].) The most recent denial is just the latest act in the Board's arbitrary and capricious consideration of Cronk for parole over the years. The denial deprives Cronk of due process because the Board arbitrarily failed to assess his parole risk based upon all the relevant factors of his individual case and because it relied on the static facts of the commitment offense and criminal history in the face of Cronk's showing over a prolonged period of exemplary behavior and rehabilitation in prison. The evidence overwhelmingly supported a finding of his suitability for parole, and there was no rational basis for concluding otherwise.

36. Cronk meets the suitability criteria in the controlling regulations:

- Cronk has no juvenile record and a minimal adult criminal record that consisted of one minor property offense, and unadjudicated conduct very close to the time of the commitment offense.

- Cronk has a stable social history. His siblings and friends have kept in contact with him throughout his 25 years of incarceration, and remain ready

15

1    and willing to help Cronk upon his release. He has developed a broad

2    network of community support.

3    • Cronk has taken responsibility for and is deeply remorseful about his crime.

4    The Life Prisoner Evaluations and Psychological Evaluations have

5    consistently found that Cronk has addressed the factors underlying the

6    crime. He has repeatedly expressed remorse for the offense at the Board

7    hearings.

8    • The crime was "the result of significant stress" that had built up as a result

9    of Cronk's cocaine addiction, the loss of his job, the break-up of his

10    marriage, and deep financial debt to drug dealers.

11    • Cronk's present age of 50 years, together with the maturity and emotional

12    growth shown in the decades since his offense, significantly reduces the

13    probability of recidivism.

14    • The Board found that Cronk has appropriate parole plans, including

15    marketable skills and several job offers.

16    • All interested parties concur that Cronk has by all available means

17    demonstrated reform and rehabilitation during his incarceration.

18    37. The Board's repeated denials of parole based on the unchangeable facts of

19    Cronk's commitment offense and other pre-commitment factors, in the face of his

20    indisputably long-standing and outstanding record of reform and rehabilitation, convert

21    his sentence of life with the probability of parole to life without the possibility of parole,

22    which both violates due process and imposes cruel and unusual punishment on him in

23    violation of the state and federal constitution. (U.S. Const., Amends 8, 14; Cal. Const.,

24    art. I, §§ 7, 17.)

25    F.    The Executive Policy and Practice of Rare Parole Grants Deprived
26          Cronk of Due Process.

27    38. Penal Code section 3041 establishes the legislative scheme for the parole of

28    murderers and other life-sentenced prisoners. Its subdivision (a) provides that "the Board

16

1  … shall normally set a parole date" at a lifer's first parole consideration hearing.  It

2  further provides that "[t]he release date shall be set in a manner that will provide uniform

3  terms for offenses of similar gravity and magnitude in respect to their threat to the public,

4  and that will comply with the sentencing rules that the Judicial Council may issue and

5  any sentencing information relevant to the setting of parole release dates.  The Board

6  shall establish criteria for the setting of parole release dates ...." Penal Code section

7  3041, subsection (b) provides that "the panel or board shall set a release date unless it

8  determines that the gravity of the current convicted offense or offenses, or the timing and

9  gravity of current or past convicted offense or offenses, is such that consideration of the

10  public safety requires a more lengthy period of incarceration for this individual, and that

11  a parole date, therefore, cannot be fixed at this meeting."

12      39.  Part of the legislative design of Penal Code section 3041 was to meld the old

13  Indeterminate Sentencing Law (ISL), which depended on individual assessments of

14  rehabilitation and risk to public safety to determine release, with the new Determinate

15  Sentencing Law (DSL), which depended on established standards of punishment tied to

16  the gravity of the offense to determine release.  "For decades before 1977, California

17  employed an 'indeterminate' sentencing system for felonies ....  An inmate's actual

18  period of incarceration within [the statutory range] was under the exclusive control of the

19  parole authority, which focused primarily, not on the appropriate punishment for the

20  original offense, but on the offender's progress toward rehabilitation.[1]  During most of

21

---

22  [1]  See, e.g., *People v. Morse* (1964) 60 Cal.2d 631, 642-643 ("The Authority does not fix
23  that period [of incarceration] pursuant to a formula of punishment, but in accordance with
   the adjustment and social rehabilitation of individual analyzed as human composite of
24  intellectual, emotional and genetic factors"); *In re Minnis* (1972) 7 Cal.3d 639, 643-645
   (The ISL "place[s] emphasis upon the reformation of the offender [and] seek[s] to make
25  the punishment fit the criminal rather than the crime," with parole authorities declaring
   that post-conviction factors are of "paramount importance."); *In re Rodriguez* (1975) 14
26  Cal.3d 639, 652 ("The Authority's power to grant parole ... enables the Authority to give
   recognition to a prisoner's good conduct in prison, his efforts toward rehabilitation, and
27  his readiness to lead a crime-free life in society.  On the other hand, this discretionary
   power also permits the Authority to retain a prisoner for the full ... term if his release
28  might pose a danger to society ....  These considerations ... are based in large measure on
   occurrences after the crime.").

1    this period, parole dates were not set, and prisoners had no idea when their confinement

2    would end, until the moment the parole authority decided they were ready for release."

3    (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1077.) "[T]he parole authority's practice

4    [was] simply to defer ... parole-release decisions until it 'developed the feeling in each

5    individual case that the prisoner was "ready to go home.' [Citation]." (*Id.* at p. 1088;

6    brackets in quote deleted.)

7         40. "This system came into disfavor for many reasons. Not the least were

8    complaints that it (1) failed to fit the punishment to the crime and (2) gave inmates no

9    advance hope of a fixed date for release, thus actually promoting disciplinary problems

10   with the prisons." (*In re Dannenberg, supra*, 34 Cal.4th at p.1088.) "[T]he parole

11   authority ... acted on its own to meet some of the reformers' criticisms. 'In April 1975,

12   Chairman's Directive 75/20 was issued creating a structure for setting parole dates based

13   on listed ranges and factors....' [Citation]." (*In re Dannenberg, supra*, 34 Cal.4th at p.

14   1089; brackets in quote deleted.) The directive further required the Board to make "every

15   effort ... to establish parole dates the first time the inmate appear[ed] for regularly

16   scheduled parole consideration." (*See In re Stanley* (1976) 54 Cal.App.3d 1030, 1034,

17   quoting the directive.) "'Following this directive, numerous hearings were conducted to

18   abolish the practice of deferring a decision on parole and to establish fixed parole dates

19   for almost all inmates.' [Citation.]" (*In re Dannenberg, supra*, 34 Cal.4th at p. 1089.)

20   Even under its earlier practice of parole deferral, however, the Board found the vast

21   majority of prisoners suitable for parole, including 90% of first-degree murderers. (*See*

22   *Ewing v. California* (2003) 538 U.S. 11 (dis. opn. of Breyer, J.), citing "Historical Data

23   for Time Served by Male Felons Paroled From Institutions 1945-1981" dated October 5,

24   1982, and prepared by the Offender Information Services, Administrative Services

25   Division, Department of Corrections; see also *In re Sturm* (1974) 11 Cal.3d 258, 262, fn.

26   2 [noting that "12½ years is currently the average term of incarceration for inmates

27   convicted of first degree murder"].)

28

1          41.  Despite these reforms, a building momentum against the seeming arbitrariness

2    and randomness of parole dates under the ISL caused the Legislature to enact the DSL,

3    set forth in section 1170 et seq., effective July 1, 1977.  In general, the change in the law

4    from the ISL to the DSL emphasized predictable and uniform terms for punishment over

5    individual assessments of rehabilitation and public safety.  The law allowed offenders

6    with determinate terms (including second degree murderers) to parole after they had

7    served the requisite determinate term regardless of whether they were rehabilitated or

8    presented a threat to public safety upon their release, and assured that the terms served

9    were uniform and proportionate to the crime as determined by the range of punishment

10    the Legislature selected for each offense.  (See Pen. Code, § 1170.)

11          42.  "But the problem of parole and term-setting standards remained for those

12    serious offenders who, under the DSL, would retain indeterminate life-maximum

13    sentences.  Section 3041 sought 'for the first time to establish specific procedures for

14    parole consideration for these offenders.'  [Citation.]  Under subdivision (a), firm parole

15    release dates, fixed in advance under principles of uniform incarceration for similar

16    offenses, would define the actual terms of imprisonment for eligible life prisoners.

17    [Citation.]  But subdivision (b) of the statute made clear that the parole authority would

18    have the express power and duty, in an individual case, to postpone the fixing of a firm

19    release date, and thus to continue the inmate's indeterminate status within his or her life-

20    maximum sentence, if it found that the circumstances of the prisoner's crime or criminal

21    history presented a continuing risk to public safety."  (*In re Dannenberg, supra,* 34

22    Cal.4th at p. 1090 (brackets, ellipsis, and italics in quote deleted).

23          43.  Pursuant to the directive in Penal Code section 3041, subdivision (a), that the

24    Board establish criteria for determining parole release, the Board promulgated regulations

25    contained in division 2, chapter 3, article 11 of the California Code of Regulations, title

26    15.  (See generally *In re Rosenkrantz, supra,* 29 Cal.4th at pp. 653-654.)  Those

27    regulations retained the so-called "suitability" criteria and nature of that decision from the

28    ISL,— i.e., whether parole of the prisoner would pose an unreasonable risk to public

19

1    safety — and changed only in that they provided for longer actual terms of confinement

2    for the life offenses. (See *In re Stanworth* (1982) 33 Cal.3d 176; *In re Seabock* (1983)

3    140 Cal.App.3d 29.) Thus, the Legislature's direction in section 3041 that a parole date

4    "normally" be set at the initial parole consideration hearing of life-sentenced prisoners

5    carried over the Board's historical practice of regularly paroling such prisoners and its

6    reformed practice of setting those parole dates in most cases at the inmate's first parole

7    consideration hearing. (See, e.g., *In re Dannenberg, supra*, 34 Cal.4th at p. 1088 ["The

8    historical circumstances in which section 3041 was enacted further illuminate the

9    statute's purpose and effect, including its use of the phrase 'shall normally set a parole

10   release date.' [Citation] … Contemporaneous court decisions and administrative

11   developments, addressing problems in the indeterminate sentencing law, further

12   influenced the final shape of Senate Bill No. 42" enacting the DSL.].)

13        44. By initiative effective November 8, 1978, the law was amended to provide for

14   longer terms of confinement for those convicted of first degree murder, with the

15   establishment of a minimum term of 25 years that could be reduced with conduct credits

16   to 16 2/3 years, as opposed to the 7 years a first degree murderer had been required to

17   serve before parole eligibility. (See Pen. Code, § 190; see also Cal. Code Regs., tit. 15,

18   § 2400.) The initiative also changed the punishment for second degree murder from a

19   determinate term of five, six, or seven years to an indeterminate term of 15 years to life,

20   with conduct credits that could reduce that minimum term to 10 years. These changes

21   left intact both the obligation of the Board to normally find prisoners suitable for parole

22   at the first parole consideration hearing and its criteria for making the suitability

23   determination. (See Cal. Code Regs., tit. 15, § 2400; compare, e.g., Cal. Code Regs., tit.

24   15, § 2281 with § 2402.) The change in law was designed simply to insure that such

25   prisoners serve the longer sentences required by the minimum terms. Thus, against a

26   norm requiring the Board to routinely set a prisoner's parole at his first consideration

27   hearing, the Legislature granted the Board power to defer the setting of a parole date in

28   the exceptional case where it was shown that the individual continued to pose an

1  unreasonable risk to public safety. (See, e.g., *In re Rosenkrantz*, *supra*, 29 Cal.4th at p.

2  683, citing *In re Ramirez* (2001) 94 Cal.App.4th 549, 559-560 & 569-570; see also *id.* at

3  p. 664 ["In sum, the governing statute provides that the Board must grant parole unless it

4  determines that public safety" would be unreasonably jeopardized by the prisoner's

5  release.].

6      45.  The Board, however, systematically denies parole to life prisoners by

7  unreasonably finding that the release of almost every life prisoner would unduly

8  jeopardize public safety.  The Board almost never sets a parole date at the prisoner's

9  initial hearing; rather, it repeatedly postpones the setting of a parole date for the

10  overwhelming majority of prisoners, and rarely grants a life prisoner a parole date no

11  matter how many times it considers the prisoner for release or how much time he has

12  served.  The Board currently grants parole to a very small percentage of eligible lifers –

13  only those who make the most compelling cases that they can be safely released.  (See,

14  e.g., *In re Rosenkrantz*, *supra*, 29 Cal.4th at p. 685 [Board granted parole to murderers

15  1% of time in its last 4800 hearings]; see also Exhibit 28, pp. 330-331, giving statistics on

16  the executive practice of parole consideration for 2004 and 2005.)

17      46.  When the Board finally does grant a prisoner a parole date, he is usually long

18  past not only his minimum parole eligibility date, but the parole release date that the

19  Board has calculated for him, so that even these prisoners are spending years more in

20  prison than called for by the uniform and proportionate term of imprisonment envisioned

21  by Penal Code section 3041.  Consequently, the Board has returned to its old, discredited,

22  and unreformed ISL practice of randomly determining the suitability of an individual

23  prisoner for parole, resulting in disparate and unpredictable terms that fail to provide for

24  uniformity and proportionality of punishment.

25      47.  Independent of but consistent with the executive's arbitrary disregard for the

26  legislative mandate for regular parole is the arbitrariness of its individual decisions.  The

27  executive regularly makes arbitrary findings to justify its refusal to release life prisoners

28  on parole.  (See, e.g., *In re Scott* (2005) 133 Cal.App.4th 573 (*Scott II*) [all Governor

21

findings arbitrary]; *In re DeLuna* (2005) 126 Cal.App.4th 585 [some Board findings arbitrary]; *In re Scott* (2004) 119 Cal.App.4th 871 (*Scott I*) [all Board findings arbitrary]; *McQuillion v. Duncan* (9th Cir. 2003) 342 F.3d 1012 [all Board findings arbitrary]; *In re Smith* (2003) 114 Cal.App.4th 343 [some Governor findings arbitrary ]; *In re Smith* (2003) 109 Cal.App.4th 489 [all Governor findings arbitrary]; *In re Capistran* (2003) 107 Cal.App.4th 1299 [some Governor findings arbitrary]; *In re Ramirez, supra,* 94 Cal.App.4th 549 [some Board findings arbitrary ]; *In re Rosenkrantz* (2000) 80 Cal.App.4th 409 [all Board findings arbitrary], *In re Rosenkrantz, supra,* 29 Cal.4th 616 [some Governor findings arbitrary]; see also *Irons v. Warden of California State Prison - Solano, supra,* 358 F.Supp.2d 936 [all Board findings arbitrary].)

48. In addition to these published decisions, numerous unpublished decisions in our state courts and in the federal district courts have found arbitrary executive action. (See, e.g., *In re Shaputis* (Cal. App. 4th District) 37 Cal.Rptr.3d 324; *In re Samble* (Cal. App. 6th District) 2005 WL 217030 [all Board findings arbitrary]; *Saif'ullah v Carey* (E.D. Cal.) 2005 WL 1555389, Magistrate's Findings and Recommendations [all Board findings arbitrary ]; *In re Weider* (Cal. App. 6th District) 2005 WL 40042 [some Board findings arbitrary]; *In re Alvarade* (Cal. App. 6th District) 2005 WL 217030 [some Board findings arbitrary]; *In re Singer* (Cal. App. 6th District) 2005 WL 103537 [all Governor findings arbitrary]; *In re Seymour* (Cal. App. 6th District) 2004 WL 2749090 [all Board findings arbitrary – twice, the second denial of parole being contrary to the court's order finding its initial denial of parole arbitrary and justifying an order for the parole of the petitioner]; *In re McGraw* (Cal. App. 5th District) 2004 WL 2075453 [all Board findings arbitrary]; *People v. Johnson* (Cal. App. 2d District) 2003 WL 1827262 [all Board findings arbitrary]; *In re Williams* (Cal. App. 2d District) 2002 WL 31124517 [all Board findings arbitrary]; *Masoner v. State,* (C. D. Cal.) 2004 WL 1080176 & 1080177 [Board's repeated denials of parole arbitrary]; see also decisions lodged herewith as Exhibit H, including *Kunkler v. Muntz,* (C.D. Cal.) No. CV 05-6473 TJH (E), filed March 16, 2006 [Governors' repeated reversals of parole grants arbitrary]; *Clay v. Kane*

22

1   (C.D. Cal.), Case No. CV 04-9663 VAP (AJW), Magistrate's Findings and

2   Recommendations filed Dec. 21, 2005 [all Governor findings arbitrary]; *In re Pintye*,

3   Santa Barbara Superior Court No. 1200602, filed Dec. 20, 2005 [all Governor findings

4   arbitrary]; *Stockton v. Hepburn*, USDC N.D. No. C 01-00913 SI, filed March 21, 2005

5   [all Board findings arbitrary]; *In re Chandler*, Amador County Superior Court No.

6   02HC0395, filed July 7, 2003 [all Board findings arbitrary]; *In re O'Connell*, Marin

7   County Superior Court No. SC126083, filed May 23, 2003 [all Governor findings

8   arbitrary]; *In re Martinez*, Los Angeles Superior Court No. BH 001857, filed March 17,

9   2003 [all Governor findings arbitrary]; *In re Schiold*, San Francisco Superior Court No.

10  4523, filed February 11, 2003 [all Governor findings arbitrary]; *In re Sanchez*, Monterey

11  County Superior Court No. HC4191, filed December 19, 2002 [all Governor findings

12  arbitrary]); *In re Bankston*, Madera County Superior Court No. MCR017693, filed Dec.

13  13, 2004 [all Board findings arbitrary]; *In re Williams*, Riverside County Superior Court,

14  Dec. 3, 2004, No. BLC 001898 (Exh. 50, pp. 666-670); *Hecker v. Alameida*, E.D. Cal.

15  No. CIV S 02 1084 LKK GGH; *In re Page*, Santa Clara County Superior Court No.

16  117731, filed Jan. 24, 2003 [some Board findings arbitrary]; *In re Mayfield*, Mendocino

17  County Superior Court No. 8425-C, filed July 14, 2000, [all Board findings arbitrary]; *In

18  re Sole*, Sonoma County Superior Court No. SCR-9772-C, filed Dec. 7, 2001 [all Board

19  findings arbitrary].)

20       49.  In sum, the executive's implementation of the parole system in California has

21  turned upside down the legislative contemplation that murderers normally be found

22  suitable for parole at their earliest eligibility and released at a time proportionate to the

23  individual's culpability.  Instead of honoring the legislative mandate to normally parole

24  murderers, the executive has arbitrarily established a policy of almost never permitting

25  parole of them.  Consequently, Cronk has not been afforded federal and state

26  constitutional due process guaranties in the course of the executive's repeated refusal to

27  grant him parole.  (See *Hicks v. Oklahoma* (1980) 447 U.S. 343 [state court's arbitrary

28

1  deprivation of a life or liberty interest granted by state statute constitutes a violation of

2  federal due process].)

3      50. The contemporary and historical recidivism rate for murderers paroled in

4  California is about 2%; the recidivism rate for other felons paroled in California recently

5  has been as high as 70% — the highest in the nation — and still remains at about 40%.

6  Older prisoners like Cronk, particularly after service of long prison terms, virtually never

7  return to prison after they parole.

8      G.    General Allegations.

9      51. Cronk has filed no previous petitions, applications or motions in any court

10  with respect to the State's refusal to release him on parole.

11      52. Cronk's custody is illegal.  It violates state statutes and regulations, the due

12  process clauses of the state and federal constitutions, and the cruel and unusual

13  prohibitions of the state and federal constitutions.

14      53. Cronk's claims in this petition are based on these allegations; the attached

15  points and authorities; and the exhibits filed with this petition.  All of these are

16  incorporated herein by reference as if fully set forth.

17

18

19

20

21

22

23

24

25

26

27

28

## CONTENTIONS

### 1.

THE BOARD'S REFUSAL TO SET A PAROLE DATE FOR CRONK IS
ARBITRARY, CAPRICIOUS, AND NOT SUPPORTED BY ANY
EVIDENCE, IN VIOLATION OF SECTION 3041 AND DUE PROCESS
UNDER THE CALIFORNIA AND UNITED STATES CONSTITUTION.

### 2.

THE REPEATED ARBITRARY REFUSAL OF THE BOARD TO
GRANT CRONK PAROLE DESPITE THE OVERWHELMING
EVIDENCE OF HIS EXEMPLARY REHABILITATION AND WHERE
FURTHER INCARCERATION SERVES NO LEGITIMATE
PENOLOGICAL PURPOSE VIOLATES CRONK'S RIGHT TO BE
FREE OF CRUEL AND UNUSUAL PUNISHMENT UNDER THE
STATE AND FEDERAL CONSTITUTIONS.

### 3.

THE EXECUTIVE BRANCH'S POLICY AND PRACTICE OF RARELY
GRANTING PAROLE TO LIFE-SENTENCED PRISONERS VIOLATES
THE LEGISLATIVE FRAMEWORK UNDER PENAL CODE SECTION
3041 THAT CARRIES A MANDATE TO NORMALLY PAROLE
MURDERERS WITH A REASONABLY PROPORTIONATE AND
UNIFORM SENTENCE.

1

<u>PRAYER FOR RELIEF</u>

2

Cronk is without remedy save by writ of habeas corpus.

3

WHEREFORE, Cronk prays that this Court:

4

1. Issue an Order to Show Cause directing Respondent to file a Return pursuant to

5

Rule 4.500, California Rules of Court;

6

2.   Declare the rights of the parties;

7

3. Order Cronk's immediate release on parole;

8

4. Invalidate the decision of the Board and order it to establish a parole date for

9

Cronk, and order respondent to release him from prison pursuant to that date;

10

5. Order parole authorities to determine parole suitability of Cronk and all life-

11

sentenced prisoners in accordance with the law and against a base that murderers

12

normally be granted a parole date when they become eligible for parole; and

13

6. Grant all other relief necessary to promote the ends of justice and redress

14

Cronk's unlawful imprisonment.

15

Dated: June 22, 2006

16

Respectfully submitted,

17

18

MICHAEL SATRIS
Attorney for Petitioner

19

20

21

22

23

24

25

26

27

28

1

## VERIFICATION OF PETITIONER

2          DONALD EVERETT CRONK declares under penalty of perjury under the laws

3  of the State of California:

4          I have read the foregoing petition for writ of habeas corpus and declare that the

5  contents of the petition are true.

6

7          DATED:  6/14/06

8

9                                         DONALD EVERETT CRONK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27

## MEMORANDUM OF POINTS AND AUTHORITIES

<u>ARGUMENT</u>

I.

THE BOARD'S REFUSAL TO SET A PAROLE DATE FOR CRONK IS ARBITRARY, CAPRICIOUS, AND NOT SUPPORTED BY ANY EVIDENCE IN VIOLATION OF SECTION 3041 AND DUE PROCESS UNDER THE CALIFORNIA AND UNITED STATES CONSTITUTION.

The specified factors that the Board must consider are stated in Penal Code section 3041 and section 2402 of Title 15 of the California Code of Regulations. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 667.)

Subdivision (b) of section 2402 provides:

> All relevant, reliable information ... shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude.

California Code of Regulations, title 15, section 2402, subdivision (d)(1)-(9) sets forth circumstances that tend to show suitability: (1) the prisoner has no record of assaultive conduct as a juvenile; (2) the prisoner has a stable social history; (3) the prisoner by word and/or deed has shown remorse for the commitment crime; (4) the prisoner committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) the prisoner committed the offense as a result of battered woman syndrome; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner is of an age that reduces the probability of recidivism; (8) the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) the prisoner has engaged in institutional activities that indicate an enhanced ability to function within the law upon release.

California Code of Regulations, title 15, section 2402, subdivision (c)(1)-(6) lists circumstances tending to show unsuitability: (1) the prisoner committed the offense in an

1  especially heinous, atrocious, or cruel manner; (2) the prisoner has a previous record of

2  violence; (3) the prisoner has an unstable social history; (4) the prisoner previously has

3  sexually assaulted another individual in a sadistic manner; (5) the prisoner has a lengthy

4  history of severe mental problems related to the offense; and (6) the prisoner has engaged

5  in serious misconduct while in prison.

6      The Board's decision must be supported by "some evidence" pertinent to the

7  "relevant standards" to comply with constitutional due process. (*In re Dannenberg*

8  (2005) 34 Cal.4[th] 1061, 1071; see also *id.* at p. 1084 [parole denial is lawful only "[s]o

9  long as the … finding of unsuitability flows from relevant criteria and is supported by

10  'some evidence' in the record"]; *id.* at p. 1095, fn. 16 ["the Board must apply detailed

11  standards when evaluating whether an individual inmate" should be granted parole]; *In re*

12  *Rosenkrantz, supra,* 29 Cal.4th at p. 638 [the evidence supporting denial of parole must

13  be "based upon the factors specified by statute and regulation"]; *id.* at p. 677 [parole

14  decision "must reflect an individualized consideration of the specified criteria and cannot

15  be arbitrary and capricious".)

16      "[I]n order to prevent the parole authority's case-by-case determinations from

17  swallowing the rule that parole should 'normally' be granted, an offense must be

18  'particularly egregious' to justify the denial of parole." (*In re Dannenberg, supra,* 34

19  Cal.4th at p. 1095, quoting *In re Ramirez, supra,* 94 Cal.App.4th at p. 570.) The Board

20  may invoke the exception and find that an offender is presently unsuitable for parole only

21  if it "reasonably believes" that the "particular circumstances" of the commitment offense

22  indicate that the individual currently poses a continuing risk to public safety. (*In re*

23  *Dannenberg, supra,* 34 Cal.4th at pp. 1071, 1084, 1088.) The Board must identify and

24  explain how particular circumstances and "factors beyond the minimum elements of the

25  crime" serve to establish a reasonable belief that the inmate presently poses an

26  "unreasonable risk of danger to society if released from prison." (See Cal. Code Regs.,

27  tit. 15, § 2402, subd. (a); see also Pen. Code, § 3041, subd. (b); *In re Dannenberg, supra,*

28  34 Cal.4th at pp. 1070, 1084, 1090, 1095 [approving denial of parole where some

1    evidence shows that the decision-maker "reasonably believes" or has a "reasonable

2    belief" that the inmate presents a "continuing public danger," "continuing risk to public

3    safety," or "continuing risk to the community at large"]; *In re Smith* (2003) 114

4    Cal.App.4th 343, 372 [finding that "the sole factor cited by the Governor — Smith's

5    entrenched desire for drugs due to long-term abuse — does not constitute some evidence

6    that Smith might start using drugs and become violent again, and therefore that he

7    *currently* poses an unreasonable risk of danger without further treatment" (italics in

8    original)].)

9        The evidence must be based on the factors specified in the regulations that bear on

10   the question of suitability for parole. (See, e.g., *In re Rosenkrantz*, *supra*, 29 Cal.4th at p.

11   638 ["The precise manner in which the specified factors relevant to parolee suitability are

12   considered and balanced lies within the discretion of the [Board], but the decision must

13   reflect an individualized consideration of the specified criteria and cannot be arbitrary

14   and capricious"].). That evidence must be considered in light of all the information about

15   the individual that relates to the regulatory factors. (See, e.g., *In re Rosenkrantz*, *supra*,

16   29 Cal.4th at p. 655 ["[E]ven before factors relevant to parole decisions had been set

17   forth expressly by statute and regulation, we concluded that 'any official or board vested

18   with discretion is under an obligation to consider *all* relevant factors, and the Board

19   cannot, consistently with its obligation, ignore postconviction factors unless directed to

20   do so by the Legislature.'" (Italics in original, brackets in quote deleted)]; *In re Scott*,

21   *supra*, 133 Cal.App.4th at pp. 590-591 ["[The Governor's] decision must reflect an

22   individualized consideration of all the specified criteria and it cannot be arbitrary or

23   capricious. [Citation.]"; *In re Stanley* (1976) 54 Cal.App.3d 1030, 1039, fn. 7 ["It is

24   enough to say that the Adult Authority must apply all the factors."].)

25       The exceedingly deferential nature of the 'some evidence' standard of judicial

26   review ... does not convert a court reviewing the denial of parole into a potted plant...."

27   (*In re Scott*, *supra*, 119 Cal.App.4th at p. 898.) As in *Scott*, this Court can "conclude not

28   simply that the evidence refutes rather than supports the findings relied upon by the

30

1  Board to deny [the applicant] parole, but that the Board has inexplicably and unjustifiably

2  ignored abundant undisputed evidence showing his suitability for release." (*Ibid.*)

3      Section 2402, subdivision (c)(1)(D) of Title 15 of the California Code of

4  Regulations sets forth the factors that support a finding the crime was committed "in an

5  especially heinous, atrocious or cruel manner":

> (A) Multiple victims were attacked, injured or killed in the
> same or separate incidents; (B) The offense was carried out in
> a dispassionate and calculated manner, such as an execution-
> style murder; (C) The victim was abused, defiled or mutilated
> during or after the offense; (D) The offense was carried out in
> a manner which demonstrates an exceptionally callous
> disregard for human suffering; and (E) The motive for the
> crime is inexplicable or very trivial in relation to the offense.

11      The Board's reasoning that the murder was especially heinous because it was

12  carried out in a dispassionate and calculated manner is capricious, because the shooting

13  impulsively occurred when Cronk, after being shot at six times and hit by gunfire twice,

14  acted out of a fear and survival instinct when he reflexively fired back at Allen.  The

15  Board's reasoning "that this was just too heinous" because Cronk and his cohorts waited

16  for Allen to come home to rob him of his diamond ring, that "[t]hey didn't just go to the

17  house and take things" (Exh. 2, p. 87) may show that the robbery was particularly

18  egregious, but that is not a basis to conclude that the murder was particularly egregious.

19  Moreover, the Board's conclusion that "at this stage 25 years [of incarceration] is

20  [in]sufficient" (Exh. 2, pp. 87-88) was divorced from the overwhelming evidence of

21  Cronk's suitability, is an arbitrary denial of Cronk's liberty interest in parole and "runs

22  contrary to the rehabilitative goals espoused by the prison system and could result in a

23  due process violation." (*Biggs v. Terhune, supra,* 334 F.3d at p 917.)  It also runs

24  contrary to Penal Code section 3041, which provides for the early setting of a parole date,

25  but permits the Board to set a term of imprisonment that accounts for the State's interest

26  in punishment.  Hence, the Board cannot defer a parole grant on the basis that the

27  prisoner has not yet served enough time as punishment for his offense — as *Dannenberg*

28  emphasized, it may defer the establishment of a term of imprisonment only if the setting

31

1  of a parole date would threaten public safety. The Board posited no reasonable

2  explanation why the offense indicates Cronk's *present* danger to the community if

3  released, for the record makes clear that he has addressed the causative factors of the

4  crime and has reformed himself.

5      The reasoning of one federal court in applying the *Biggs* rationale aptly fits this

6  case:

> Whether the facts of the crime of conviction, or other
> unchanged criteria, affect the parole eligibility decision can
> only be predicated on the "predictive value" of the unchanged
> circumstance. Otherwise, if the unchanged circumstance per
> se can be used to deny parole eligibility, sentencing is taken
> out of the hands of the judge, and totally reposited in the
> hands of the BPT. That is, parole eligibility could be
> indefinitely and forever delayed based on the nature of the
> crime even though the sentence given set forth the possibility
> of parole – a sentence given with the facts of the crime fresh
> in the minds of the judge. While it would not be a
> constitutional violation to forego parole altogether for certain
> crimes, what the state cannot constitutionally do is have a
> sham system where the judge promises the possibility of
> parole, but because of the nature of the crime, the BPT
> effectively deletes such from the system. Nor can a parole
> system where parole is mandated to be determined on
> someone's future potential to harm the community,
> constitutionally exist where despite 20 or more years of
> prison life which indicates the absence of danger to the
> community in the future, the BPT commissioners['] revulsion
> towards the crime itself, or some other unchanged
> circumstance, constitutes the alpha and omega of the
> decision. Nobody elected the BPT commissioners as
> sentencing judges. Rather, in some realistic way, the facts of
> the unchanged circumstance must indicate a present danger to
> the community if released, and this can only be assessed not
> in a vacuum, after four or five eligibility hearings, but
> counterpoised against the backdrop of prison events.

22  (*Blair v. Folsom State Prison* (E.D. Cal. 2005) 2005 WL 2219220.) The Board's

23  revulsion towards the immutable circumstances of Cronk's crime should not be allowed

24  to convert what was a life sentence with the probability of parole [the Board shall

25  "normally" grant parole] into a de facto imprisonment without the possibility of parole.

26      In *Johnson v. Finn* (E.D. Cal. 2006) 2006 WL 195159, the court found there was

27  no evidence to support the Governor's conclusions that the petitioner was unsuitable for

28

1 parole because of the offense and his failure to take sufficient responsibility for it, the

2 need for additional therapy, and unstable society history.  The court stated:

> The characterization of petitioner's crime as an execution-
> style murder is accurate.  However, … the 2001 hearing was
> petitioner's twelfth suitability hearing.  It had been 24 years
> since petitioner committed the murder.  As found by the 2001
> hearing panel, petitioner had done everything he could in
> prison to better himself.  Under these circumstances, the
> nature of the offense had lost any predictive value and the
> continued reliance on it to find petitioner unsuitable violated
> due process.  Accordingly, the court finds that the factor was
> not supported by some evidence.
>
> It would be easy to simply let the Governor's decision stand.
> The murder was extremely callous, insensitive and reflecting
> no respect for the value of human life.  A sentence of life
> without parole could easily be justified on moral grounds.
> However, the prosecutor was unwilling or unable to proceed
> with special circumstances for a life without parole sentence,
> and petitioner, not charged or convicted with special
> circumstances, was sentenced to life *with the possibility of
> parole*.  This remains the fact whether the Governor or this
> court agrees with the prosecutor's determination.  California
> law therefore requires that there be some *meaningful*
> possibility of parole.  Clearly, that sentence could not be
> transformed into a life without parole sentence, but that, in
> effect, was what the Governor did by simply relying on the
> nature of the crime – twelve hearings having transpired.
> Whether made by express words or hidden design, a decision
> to never allow petitioner to be paroled is contrary to law.
>
> As recognized by the BPT, the inhumanity of the murder will
> never change.  It will not minimize in its shockingness over
> time.  A later decision that the murder "wasn't so bad" will
> never be made, and if it were, such a decision would clearly
> be arbitrary.  Therefore, if the Governor's decision to deny
> parole based on the nature of the crime is permitted to stand,
> contrary to the parole statutes which logically measure parole
> eligibility on the reformation of the prisoner after the
> proscribed period of punishment, parole eligibility is an
> impossibility, not a possibility.

23 (*Id.*, original italics.)  Here, Cronk was similarly not charged or convicted of special

24 circumstances for the felony murder, but given a sentence that provided for parole.  Like

25 the petitioner in *Johnson*, the Board found he had done all he could to demonstrate his

26 rehabilitation and there is no reliable evidence that the offense committed 25 years ago

27 suggests his release would pose a safety risk.  The Board's repeated refusal to follow the

28

33

1   statute and regulations governing parole is illegal and deprived Cronk of a meaningful

2   opportunity for parole.

3        The Board's second reason for denying parole based on the offense, that the

4   motive was inexplicable or very trivial in relationship to the offense is equally

5   indefensible.  To begin with, as stated in *In re Scott, supra,* 119 Cal.App.4th at p. 892,

6   "[t]he Board did not indicate whether it found Scott's motive 'inexplicable' or 'very

7   trivial ...,' as it could not be both."  As explained in *Scott*:

> An "inexplicable" motive, as we understand it, is one that is
> unexplained or unintelligible, as where the commitment
> offense does not appear to be related to the conduct of the
> victim and has no other discernible purpose.  A purpose
> whose motive for a criminal act cannot be explained or is
> unintelligible, is therefore unusually unpredictable and
> dangerous.

12  (*Id.* at p. 893.)

13       Here, very clearly, Cronk's motive for the murder was not inexplicable — it was

14  to save his life after Allen spun around and fired several shots at him.  If not for the

15  underlying robbery and burglary, Cronk's action would have been a valid self-defense, a

16  motive so basic that it justifies homicide where the individual is not at fault.  Moreover,

17  Cronk's motivation for the robbery was not "materially less significant (or more 'trivial')

18  than those which conventionally drive people to commit the offense in question, and

19  therefore more indicative of a risk to danger to society if the prisoner is ordinarily

20  presented."  (*In re Scott, supra,* 119 Cal.App.4th at p. 893.)  Barring a defense of

21  necessity, which is rarely a cognizable defense for any crime, greed is generally the

22  robber's typical motive.  That the homicide occurred in the course of a robbery is what

23  elevated this crime to murder; Cronk's motive to rob does not elevate his murder to one

24  "especially heinous, atrocious, or cruel."  (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

25       Moreover, the only reasonable finding that the Board could make is that Cronk's

26  motivation favored a finding of parole suitability, for the record indisputably shows that

27  he "committed his crimes as the result of significant stress in his life," a factor in the

28  Board's governing criteria indicating the unlikelihood of reoffense, "especially if the

1   stress has built over a long period of time." (Cal. Code Reg., tit. 15, § 2402, subd.

2   (d)(4).) As in *Scott, supra*, 119 Cal.App.4th at p. 890, the evidence as indicated in his

3   psychological reports "suggest[s] the very opposite" of unsuitability for parole. Cronk

4   was struggling with his out-of-control drug addiction and the desperate financial

5   circumstances it caused, which led him to commit the robbery – and ultimately the

6   murder.

7       "[The Board] is required to consider whether the prisoner committed the crime as

8   a result of significant stress in his or her life." (*In re Rosenkrantz, supra*, 29 Cal.4th at p.

9   679.) The Board completely ignored the evidence that Cronk committed his crime while

10  he was experiencing an unusual amount of stress arising from circumstances not likely to

11  recur. This oversight distorted Cronk's overall suitability profile and deprived him of the

12  individualized consideration required by due process. (See, e.g., *In re Scott, supra*, 119

13  Cal.App.4th at p. 898.)

14      The other static factor the Board relied on to deny parole is Cronk's criminal

15  history. The design of California's parole law is to recognize change and rehabilitation

16  when it is presented and to grant a parole date on that basis. As one court noted in

17  finding that the Governor had no basis to reverse a grant of parole for factors like the

18  crime or criminal history that were now long past:

19          Reliance on such an immutable factor "without regard to or
            consideration of subsequent circumstances" may be unfair
20          [citation] and "runs contrary to the rehabilitative goals
            espoused by the prison system and could result in a due
21          process violation." [Citation.] The commitment offense can
            negate suitability only if circumstances of the crime reliably
22          established by evidence in the record rationally indicate that
            the offender will present an unreasonable public safety risk if
23          released from prison. Yet, the predicative value of the
            commitment offense may be very questionable after a long
24          period of time. [Citation.] Thus, denial of release solely on
            the basis of the gravity of the commitment offense warrants
25          especially close scrutiny.

26  (*In re Scott, supra*, 133 Cal.App.4th at pp. 594-595.)

27

28

1        The federal courts have expressed similar thoughts.  For example, in *Irons v.*

2  *Warden of California State Prison- Solano, supra,* 358 F.Supp.2d at p. 947, fn. 2, the

3  court noted:

> To a point, it is true, the circumstances of the crime and
> motivation for it may indicate a petitioner's instability,
> cruelty, impulsiveness, violent tendencies and the like.
> However, after fifteen or so years in the caldron of prison life,
> not exactly an ideal therapeutic environment to say the least,
> and after repeated demonstrations that despite the recognized
> hardships of prison, this petitioner does not possess those
> attributes, the predictive ability of the circumstances of the
> crime is near zero.

9  Here, the factors that led to Cronk's drug addiction and criminal behavior have been fully

10  addressed and resolved.  Cronk has spent over a quarter-century in the caldron of prison

11  life and has long demonstrated that he no longer possesses the maladaptive attributes that

12  set him on a criminal path and culminated in his commitment offense.

13        Under the regulations, the prisoner's previous record of violence, that "[t]he

14  prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim,

15  particularly if the prisoner demonstrated serious assaultive behavior at an early age'"

16  (Cal. Code Regs., tit. 15, § 2402, subd. (c)(2)) – tends to show him unsuitable for release.

17  The fact that a prisoner "lacks any significant history of violent crime" (*id.*, § 2402, subd.

18  (d)(6)) tends to show suitability for parole.  There is no evidence that Cronk on previous

19  occasions "inflicted or attempted to inflict serious injury on a victim."  Nor is there any

20  evidence that he "demonstrated serious assaultive behavior at an early age."  Thus, the

21  Board lacked any reasonable basis to find Cronk unsuitable under subdivision (c)(2).

22        In addition, the prior unadjudicated robberies were "so closely connected to the

23  commitment offense in time and motivation" that it was unreasonable for the Board "to

24  treat them as constituting a separate and distinct criminal history within the meaning of

25  Board regulations." (*In re Scott, supra,* 133 Cal.App.4th at p. 602.)  In *Scott*, the court

26  noted that the prior conduct the Governor considered a significant history of violent

27  crime "'occurred over a period of only three or four months, at a time when Scott was

28  under great stress, distraught and fearful.'  The Governor's indifference to the 'extreme

1    mental or emotional trauma' Scott was experiencing during the short period of time in

2    which his prior criminal acts and the commitment offense took place warps the

3    Governor's assessment of Scott's prior acts as much as it does his characterization of the

4    commitment offense." (*Id.* at pp. 602-603.) In *Scott*, the petitioner bloodied his wife's

5    nose while trying to stop her from seeing her drug-dealer/lover and used his car to ram

6    the lover's car to try to get him to pull over. The court concluded that the Governor's

7    determination that Scott did not lack a "significant history of violent crime" or his

8    implied finding that Scott had a "previous record of violence" showing unsuitability for

9    release, was not supported by any evidence. Here, the commitment offense occurred

10   December 19, 1980, and the unadjudicated robberies occurred less than two months

11   before then, starting with October 30, 1980. They were motivated by the same desire,

12   and committed under the same emotional distress of Cronk's drug-addicted debt, and loss

13   of his job, family, and friends. Applying the reasoning used in *Scott*, this Court should

14   find that the Board's reliance on the factor of significant violent criminal history to find

15   that Cronk presently poses a danger was not supported by evidence.

16        Moreover, a life prisoner with any criminal record is automatically going to have

17   an "escalating pattern of criminal conduct or violence" because the life offense is always

18   going to be greater than the earlier offenses. The murder obviously elevated the

19   seriousness of Cronk's criminal conduct, which is another circumstance that Cronk can

20   never change. Notably, however, he is free of convictions of violent criminal conduct,

21   with any past history unadjudicated and part and parcel of his addiction and other

22   stressors that culminated in the commitment offense.

23        The Board was arbitrarily dismissive of the 2005 psychological evaluation in

24   deeming it "worthless" based on the district attorney's criticisms. The district attorney

25   claimed the psychologist had a "very distorted view" about the crime simply because she

26   had written that Cronk "was engaged in a robbery of the victim's home" and that the

27   "victim returned to the residence surprising" Cronk and Meyer. First, the district

28   attorney's semantic criticism that the perpetrator robs a person and not a home to

37

1    discredit the entire report is specious. The psychologist, who also did Cronk's 2001

2    psychological evaluation, was well aware based on her interview that Cronk and his

3    crime partners intended to rob Allen at his home. (Exh. 14, p. 246.) The psychologist's

4    statement that Cronk was surprised when the victim returned was not a distortion of the

5    facts. As she accurately reported in her 2001 evaluation, because Warren never called the

6    home to alert Cronk and Meyer to Allen's approach as planned, Cronk was taken off

7    guard when he saw Allen in the front hallway. (See Exh. 14, p. 247.) The district

8    attorney criticized the psychologist's characterization of Allen's entry as a surprise to

9    Cronk, yet that is exactly how the summary of the offense recited by the Board at the

10   outset of the hearing put it. The psychologist had a fully informed understanding of the

11   factual circumstances of the offense and the Board wrongfully dismissed her assessment

12   of Cronk's suitability. Her reliance on the fact of Cronk's minimal criminal record to

13   find that he had no history of violence did not reasonably warrant the Board's dismissal

14   of her findings, for the Board itself had once reasonably described his criminal history as

15   minimal. (Exh. 9, p. 201.) Moreover, her conclusion that Cronk "seems to have

16   overcome an earlier pattern of substance abuse and antisocial behavior that led to the

17   commission of his crime" (Exh. 4, p. 108) takes into account Cronk's aberrant behavior

18   before the murder. Finally, the psychologist rightfully focused on the undisputed fact

19   that Cronk has been free of violence since the 1980 murder. That consideration of the

20   prior-commitment factors with the post-commitment ones led to her overall assessment

21   that "no additional benefit ... could accrue to Mr. Cronk or to the state by his continued

22   incarceration." (Exh. 4, p. 109.) .

23          The Board's acceptance of the district attorney's criticism that the psychologist's

24   2005 evaluation inexplicably did not contain a sentence in her 2001 report that "causative

25   factors for violence and criminal activity are multi determined and violence potential is

26   unpredictable" is also specious. The Board and district attorney ignored Dr. Inaba's

27   statement in the 2005 evaluation acknowledging "it is not possible to predict future

28   behavior with absolute certainty." (Exh. 4, p. 109.) It also overlooked the psychologist's

38

1  explanation in her 2005 evaluation why Cronk's release would not pose an unreasonable

2  risk to the community. Dr. Inaba stated that she had written in her last report "the biggest

3  risk factor appeared to be resumption of substance abuse" and "[s]ince that time Mr.

4  Cronk has continued to increase his network of support, to participate in substance abuse

5  treatment, and increase his financial resources. All of these factors would seem to further

6  decrease the risk that Mr. Cronk would return to the use of substances or criminal

7  behavior." (Exh. 4, p. 109.) Thus, there was a reasoned explanation for her revised and

8  updated assessment as well as her continued recognition that violence potential cannot be

9  predicted with certainty. In sum, the Board's discarding of the 2005 psychological report

10  because of bogus assertions by the district attorney and the Board's unsupported finding

11  that the psychologist had a "vested interest" in favor of Cronk was arbitrary and

12  capricious. The Board's order that a different psychologist evaluate Cronk because it

13  attributed a bias to Dr. Inaba in favor of him had no basis in fact. In addition,

14  notwithstanding the meritless dismissal of the 2005 report, the Board ignored the fact that

15  over the past ten years, the mental health reports by other psychologists and psychiatrists

16  were favorable for parole.

17          Next, there was not a scintilla of evidence to support the Board's finding that

18  Cronk needs therapy, self-help, and programming to deal with stress in a nondestructive

19  manner and to gain further insight into the crime. The mental health and life prisoner

20  evaluations by the CDCR unanimously conclude just the opposite. The CDCR staff

21  concur that Cronk has no mental health issues that need treatment, commend his

22  exceptional disciplinary-free record of 23 years living in the caldron of San Quentin,

23  praise his exemplary programming, and recognize his comprehensive insight into the

24  factors that led him to commit the crime. The Board's finding that Cronk was not

25  suitable for parole based on insufficient self-help and therapy deprived him of the

26  individualized consideration required by constitutional due process because there is no

27  evidence that he needed such programs. (See, e.g., *In re DeLuna* (2005) 126 Cal.App.4th

28  585, 597 [Board's finding that petitioner needs self-help and therapy programs is

1    contradicted by the record], *In re Ramirez, supra,* 94 Cal.App.4th at p. 571 ["The Board's

2    readiness to make a finding [that the prisoner needs therapy] so at odds with the record

3    supports Ramirez's claim that his parole hearing was a sham"; *In re Scott, supra,* 119

4    Cal.App.4th at pp. 896-897 [same].)

5         The Board not just minimized some of the regulatory factors that favored a finding

6    of Cronk's suitability for parole, such as his institutional programming achievements and

7    supportive parole plans, but it arbitrarily ignored other suitability factors. The Board

8    failed to consider the fact that over Cronk's 25 years of incarceration, the counselor and

9    psychological evaluations have consistently been favorable towards parole suitability.

10   The Board also failed to take into account Cronk's age and the fact that he has no

11   juvenile record. "The [Board's] indifference to this large body of evidence significantly

12   distorts the nature and gravity of [Cronk's] commitment offense and denies him the right

13   to 'individualized consideration of all relevant factors' specified in Board regulations."

14   (*In re Scott, supra,* 133 Cal.App.4th at p. 603.)

15        Finally, the Board cited the district attorney's opposition to parole. While the

16   Board must consider the statements and recommendations of the District Attorney's

17   office, the district attorney's opposition itself is only worth its substance and does not

18   constitute evidence on the matter.

19        Cronk's imprisonment for more than two decades, during which he has amassed

20   an extraordinary record of rehabilitation and good citizenship, simply cannot be ignored.

21   The record shows that the offense was the product of a confluence of events unlikely to

22   reoccur. In the time since its commission, Cronk has reformed and rehabilitated himself,

23   and has particularly addressed the causative factors that contributed to his criminal

24   conduct. He has shown that he can cope well under stressful circumstances. He has fully

25   involved himself in pro-social groups, self-help, work, and education for years and years.

26   He has confronted and addressed his substance abuse problem. In sum, he has done

27   everything parole authorities or the citizenry of California could possibly expect of him

28   to show that he is worthy of parole.

II.

THE REPEATED REFUSAL OF THE BOARD TO GRANT CRONK PAROLE DESPITE THE OVERWHELMING EVIDENCE OF HIS EXEMPLARY REHABILITATION AND DEMAND FOR FURTHER INCARCERATION SERVES NO LEGITIMATE PENOLOGICAL PURPOSE AND VIOLATES CRONK'S RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT UNDER THE STATE AND FEDERAL CONSTITUTIONS.

Arbitrary imposition of punishment may impose cruel and unusual punishment in violation of the state constitution (Cal. Const., Art. I, § 17) and the Eighth Amendment of the United States Constitution. (See, e.g., *Furman v. Georgia* (1972) 408 U.S. 238.) Punishment which serves no legitimate penological purpose can also constitute cruel and unusual punishment. (See *In re Foss* (1974) 10 Cal.3d 910, 923, 928.) Even where a particular punishment in the abstract is not cruel and unusual, the method of imposing it can be. (*Fierro v. Gomez* (9th Cir. 1996) 77 F.3d 301, 309 [method for carrying out death sentence cruel and unusual], vacated and remanded (1996) 519 U.S. 918, in light of amendments to § 3604 which governs the method of execution in California.)

Cronk was found guilty of first degree murder with the probability of parole. Release on parole, however, has only been cruelly dangled in front of him, forever out of his reach no matter the showing of his reform and rehabilitation, because the Board has determined that 25 years after the offense, he remains dangerous. In *Scott, supra*, 133 Cal.App.4th 573, the court criticized similar reasoning employed by the Governor to reverse the Board's grant of parole to Scott, who had been incarcerated for 18 years for a 1986 conviction for second degree murder. The Governor had stated the gravity of Scott's offense was a sufficient basis "'on which to conclude that his release *at this time* would pose an unreasonable public-safety risk.' (Italics added.) That statement could be repeated annually until Scott dies or is rendered helpless by the infirmities of sickness or age." (*Id.* at p. 595, fn. 8.) Here, too, the Board could invoke its mantra of the offense being especially heinous until Cronk dies behind bars or is rendered helpless by serious illness or old age.

41

1    As noted by the court in *Irons v. Warden of California State Prison - Solano,*
2  *supra,* 358 F.Supp.2d at p. 947, "continuous reliance on unchanging circumstances
3  transforms an offense for which California law provides eligibility for parole into a de
4  facto life imprisonment without the possibility of parole." Where a murderer over a
5  prolonged period of imprisonment "continue[s] to demonstrate exemplary behavior and
6  evidence of rehabilitation, denying him a parole date simply because of the nature of [his]
7  offense and prior conduct would raise serious questions involving his liberty interest in
8  parole," for "[a] continued reliance in the future on an unchanging factor, the
9  circumstance of the offense and conduct prior to imprisonment, runs contrary to the
10  rehabilitative goals espoused by the prison system" in California. (*Biggs, supra,* 334
11  F.3d at pp. 916-917.) Based on the record of Cronk's quarter century showing of
12  rehabilitation in prison, the continued refusal of the State to release him to parole has now
13  ripened into not only the due process violation that the Court in *Biggs* warned against, but
14  also into a violation of the bar against cruel and unusual punishment. The transformation
15  of the promise of parole based on rehabilitation into a mirage perpetuates a cruel hoax
16  upon Cronk and constitutes cruel and unusual punishment. (See *Roberts v. Duffy* (1914)
17  167 Cal. 629, 634 ["The purpose and object of a parole system is ... to extend[ ] to those
18  who may show a disposition to reform and whose reformation may reasonably be
19  expected, a hope and prospect of liberation from the prison walls under the restrictions
20  and conditions of a parole"].) Further imprisonment of Cronk only aggravates that cruel
21  and unusual punishment.

22    III.

23  THE EXECUTIVE BRANCH'S POLICY AND PRACTICE OF RARELY
    GRANTING PAROLE TO LIFE-SENTENCED PRISONERS VIOLATES
24  THE LEGISLATIVE FRAMEWORK UNDER PENAL CODE SECTION
    3041 THAT CARRIES A MANDATE TO NORMALLY PAROLE
25  MURDERERS WITH A REASONABLY PROPORTIONATE AND
    UNIFORM SENTENCE.
26

27    The Board's repeated refusals to grant Cronk parole is arbitrary not just because
28  there is no evidence that he currently poses a danger to society, but also because it is the

42

1   product of institutional bias that fuels a refusal to fairly assess his potential risk to public

2   safety according to the statutory framework and administrative rules adopted to

3   implement that design. In *Scott I*, the court emphasized the executive's statutory duty to

4   normally grant a murderer parole:

5         • "[Subdivision] (a) of Penal Code section 3041 provides 'One year prior to

6           the inmate's minimum eligible release date a panel ... shall ... meet with

7           the inmate and shall normally set a parole release date ...." (*In re Scott*,

8           *supra*, 119 Cal.App.4th at p. 885.)

9         • "[P]arole is the rule, rather than the exception ...." (*Id.* at p. 891, quoting *In*

10         *re Smith*, *supra*, 114 Cal.App.4th at p. 366.)

11         • "[T]he Legislature has clearly expressed its intent that when murderers ...

12           approach their minimum eligible parole date, the Board 'shall normally set

13           a parole release date.' (Pen. Code, § 3041, subd. (a).) The Board's

14           authority to make an exception ... should not operate so as to swallow the

15           rule that parole is 'normally to be granted.'" (*Ibid.*, quoting *In re Ramirez*,

16           *supra*, 94 Cal.App.4th at p. 570.)

17     Section 3041 allows the Board to deny parole only if it is shown in an individual

18   case that parole would unreasonably threaten public safety. By enacting section 3041,

19   the Legislature intended that most lifers not only would have a parole date set for them,

20   but they would have that date set early in their incarceration. A statutory system that

21   prescribes that the executive "shall normally" set a parole date before a prisoner's

22   minimum eligible parole date has been reached contemplates the routine finding of parole

23   suitability and establishment of a parole date for a murderer early in his term to assure

24   uniform punishment. The Board's denial of a parole date to Cronk this late in his term is

25   part of its systemic disregard of the mandate of section 3041 to set predictable parole

26   dates that reflect uniformity of punishment. The Board systemically fails, and failed in

27   Cronk's case, to assess a prisoner's suitability for parole against the baseline set in

28   section 3041 where parole is the norm rather than the exception.

43

1          Where parole denial is in fact the norm because it occurs in almost all of the cases

2    coming before the Board, any purported "individualized consideration" must be outside

3    the parameters required by the statute. "The possibility that the Board may not be giving

4    individualized, due consideration to parole applicants is more than hypothetical." (*In re*

5    *Dannenberg, supra*, 34 Cal.4th at p. 1104 (dis. opn. of Moreno, J.).) In Cronk's case any

6    "individualized consideration" is obviously of such a restrictive nature that it does not

7    comport with the intent of the Legislature. Had the Legislature directed in section 3041

8    that parole rarely be granted, the statute would implicitly set forth an extremely high bar

9    for a prisoner to meet before parole was allowed, and would in fact be the section the

10   Board is now implementing. But where the Legislature has directed that parole grants are

11   to be the norm and denials the exception, the Legislature has made clear that the general

12   and individualized standard to be applied in each case is a more lenient one, and that

13   more people therefore will generally be granted parole than will be denied parole.

14         The Board's denial of parole to Cronk is entitled to no deference because it was

15   yet another instance of the Board's systemic practice and policy of arbitrarily violating

16   the legislative framework that the determination of whether the parole of a murderer

17   would pose an unreasonable risk to public safety be measured against a baseline where

18   the regular or usual determination will be that there is no undue risk to public safety from

19   the prisoner's release. The Board is currently denying parole to almost all of the

20   murderers who come before it. (See Exh. 29.) A parole grant at the hearing one year

21   before a prisoner's minimum parole eligibility is almost unheard of, in derogation of the

22   explicit legislative direction in section 3041. (See Exh. 28, pp. 332- 374.) Most of the

23   parole dates given are granted long past the prisoner's minimum parole eligibility and,

24   based on the uniform terms then set, most of these prisoners are spending years more in

25   prison than called for by the term imposed. (See Exh. 28, pp. 330-374.) Thus, any parole

26   grant to a lifer by the Board is markedly "abnormal," just the opposite of the requirement

27   and intent of section 3041.

28

44

1    A murderer is entitled "to something more than mere pro forma consideration."

2  (*In re Sturm* (1974) 11 Cal.3d 258, 268.)  In addition, the Board "is under an obligation to

3  consider *all* relevant factors...."  (*In re Minnis* (1972) 7 Cal.3d 639, 645; italics in

4  *Minnis*.)  Cronk's case, where evaluations by both CDCR counselors and mental health

5  staff have consistently been favorable of parole, demonstrate that the Board's policy of

6  rare parole is not reasonably justified by its purported concern for public safety.  As

7  Justice Moreno noted, in finding the Board's practice of rarely granting parole

8  "troubling" and the incentive to give "only pro form consideration" strong:

9         Because of the [political] nature of the parole process, there is
          more than a little risk that the Board's power to deny parole
10        will at times be exercised in an arbitrary and capricious
          manner.  Failure to grant parole where parole is due wastes
11        human lives, not to mention considerable tax dollars,
          concerns that, along with public safety, unquestionably
12        motivated the Legislature when it enacted section 3041.

13  (*In re Dannenberg, supra*, 34 Cal.4th at p. 1109) (dis. opn. of Moreno, J.).)  The right to

14  an impartial and disinterested decision-maker who fairly considers the parole of a

15  prisoner under the established legislative framework is also part of the fundamental

16  guarantee against arbitrary and capricious government conduct.  (See, e.g., *In re*

17  *Rosenkrantz, supra*, 29 Cal.4th at p. 677 [parole decisions "must reflect an individualized

18  consideration of the specified criteria and cannot be arbitrary and capricious"].)

19      The Board must conform its executive function of determining parole suitability to

20  the Legislature's base requirement that it normally grant parole to life prisoners.  (See

21  Pen. Code, § 3041.)  Because the Board has acted outside the scope of the authority

22  granted it by section 3041 and failed to follow either in letter or spirit the directive of that

23  section, Cronk was unlawfully denied parole.  Any proper implementation of section

24  3041 would result in his parole.  The Board only paid "lip service" to Cronk's 25 years of

25  personal and institutional progress, and not even that to 10 years of favorable

26  psychological evaluations predicting Cronk would be unlikely to reoffend if released.

27  The Board's denial of parole to Cronk because of his offense and criminal conduct

28

45

1  despite his sterling post-offense record of rehabilitation is arbitrary and in disregard of

2  the basic premises of the ISL.

3       The practice of the Board in overwhelmingly denying parole to lifers is so at odds

4  with the legislative scheme that the court can no longer tolerate the grave injustices that

5  practice imposes.  For the foregoing reasons, the Board's denial of parole to Cronk falls

6  outside the authority granted it by section 3041, is void, and violates due process.  The

7  Court must order that the Board comport with section 3041 and decide the suitability of a

8  life prisoner against the base that a parole grant be the norm rather than the exception.

9  Because Cronk is suitable for parole as a matter of law and is long past service of a

10 uniform term proportionate to his offense, it should order him released on parole and

11 grant the other relief prayed for.

12

13                            CONCLUSION

14       Based on any or all of the foregoing reasons, this Court should grant Cronk the

15 relief he has prayed for here.

16       Dated:  June 22, 2006

17                                        Respectfully submitted,

18

19                                        MICHAEL SATRIS
                                          Attorney for Petitioner
20

21

22

23

24

25

26

27

28

1  Sacramento County Superior Court No. _____

2  *In re Donald Everett Cronk on Habeas Corpus*

3

4  ## PROOF OF SERVICE BY MAIL

5          I am a citizen of the United States and a resident of Marin County.  I am over the

6  age of eighteen years and not a party to the within above entitled action.  My business
   address is P.O. Box 337, Bolinas CA.

7

8          On June 23, 2006, I served the within **PETITION FOR WRIT OF HABEAS
   CORPUS AND SUPPORTING MEMORANDUM OF POINTS AND**

9  **AUTHORITIES and APPENDIX OF EXHIBITS** on the interested parties in said

10  action causing to be placed a true copy thereof enclosed in a sealed envelope with
    postage thereon fully prepaid in a United States Post Office box addressed to the parties

11  as follows:

12
            Office of the Attorney General           Mr. Donald E. Cronk
13          Department of Justice                    San Quentin State Prison
            Attn:  Correctional Law Section          P.O. Box C-87286
14          455 Golden Gate Avenue, Suite 11000      San Quentin, CA  94974
15          San Francisco, CA 94102                  Petitioner
            Counsel for Respondent                   (without Appendix of Exhibits)
16

17          I declare under penalty of perjury that the foregoing is true and correct and that

18  this declaration was executed on June 23, 2006.

19

20                                   _____
                                     Sabine Jordan
21

22

23

24

25

26

27

28