# EXHIBIT C
# Part 1 of 6

# COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

In re

DONALD EVERETT CRONK

on Habeas Corpus.

No. **C053979**

(Superior Court
No. 06F06029
Sacramento County)

FILED

OCT 27 2006

COURT OF APPEAL · THIRD DISTRICT
DEENA C. FAWCETT
Deputy

X = no related matters

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

MICHAEL SATRIS, SBN 67413
CARRIE KOJIMOTO, SBN 152824
Law Office of Michael Satris
Post Office Box 337
Bolinas, CA  94924
Telephone:  (415) 868-9209
Fax:            (415) 868-2658
Email:        satris@sbcglobal.net

Attorneys for Petitioner
DONALD EVERETT CRONK

RECEIVED

OCT 27 2006

Clerk, Court of Appeal
Third Appellate District

# TOPICAL INDEX

Page #

TABLE OF AUTHORITIES ............................................................iv

I.  SUMMARY OF PETITION ...........................................1

II.  STATEMENT OF FACTS...............................................3

    A.  The Circumstances of the Commitment
        Offense. ......................................................3

    B.  Cronk's Prior Denials of Parole. ............................5

    C.  September 14, 2005 Parole Consideration
        Hearing. ..............................................12

    D.  The Board's Denial of Parole................................19

    E.  The Arbitrariness of the Board's Refusal to
        Set a Parole Date for Cronk...................................21

    F.  The Superior Court's Decision on Cronk's
        Petition for Writ of Habeas Corpus
        Challenging the 2005 Denial of Parole. ...............23

    G.  The Executive Policy and Practice of Rare
        Parole Grants Deprived Cronk of Due
        Process..................................................26

    H.  General Allegations....................................35

CONTENTIONS ................................................................37

1.  THE BOARD'S REFUSAL TO SET A PAROLE
    DATE FOR CRONK IS ARBITRARY,
    CAPRICIOUS, AND NOT SUPPORTED BY
    ANY EVIDENCE, IN VIOLATION OF
    SECTION 3041 AND DUE PROCESS UNDER
    THE CALIFORNIA AND UNITED STATES
    CONSTITUTION. ..........................................37

2.    THE REPEATED REFUSAL OF THE BOARD
      TO GRANT CRONK PAROLE DESPITE THE
      OVERWHELMING EVIDENCE OF HIS
      EXEMPLARY REHABILITATION AND
      DEMAND FOR FURTHER INCARCERATION
      SERVES NO LEGITIMATE PENOLOGICAL
      PURPOSE AND VIOLATES CRONK'S RIGHT
      TO BE FREE OF CRUEL AND UNUSUAL
      PUNISHMENT UNDER THE STATE AND
      FEDERAL CONSTITUTIONS......................................37

3.    THE EXECUTIVE BRANCH'S POLICY AND
      PRACTICE OF RARELY GRANTING PAROLE
      TO LIFE-SENTENCED PRISONERS
      VIOLATES THE LEGISLATIVE FRAMEWORK
      UNDER PENAL CODE SECTION 3041 THAT
      CARRIES A MANDATE TO NORMALLY
      PAROLE MURDERERS WITH A
      REASONABLY PROPORTIONATE AND
      UNIFORM SENTENCE. ...............................................37

PRAYER FOR RELIEF.....................................................................38

NEXT FRIEND VERIFICATION........................................................39

MEMORANDUM OF POINTS AND AUTHORITIES ....................40

ARGUMENT ...................................................................................40

I.    THE BOARD'S REFUSAL TO SET A PAROLE
      DATE FOR CRONK IS ARBITRARY,
      CAPRICIOUS, AND NOT SUPPORTED BY
      ANY EVIDENCE IN VIOLATION OF SECTION
      3041 AND DUE PROCESS UNDER THE
      CALIFORNIA AND UNITED STATES
      CONSTITUTION. ...........................................................40

II.   THE REPEATED REFUSAL OF THE BOARD
      TO GRANT CRONK PAROLE DESPITE THE
      OVERWHELMING EVIDENCE OF HIS
      EXEMPLARY REHABILITATION AND
      DEMAND FOR FURTHER INCARCERATION
      SERVES NO LEGITIMATE PENOLOGICAL
      PURPOSE AND VIOLATES CRONK'S RIGHT
      TO BE FREE OF CRUEL AND UNUSUAL
      PUNISHMENT UNDER THE STATE AND
      FEDERAL CONSTITUTIONS......................................58

III.  THE EXECUTIVE BRANCH'S POLICY AND
      PRACTICE OF RARELY GRANTING PAROLE
      TO LIFE-SENTENCED PRISONERS
      VIOLATES THE LEGISLATIVE FRAMEWORK
      UNDER PENAL CODE SECTION 3041 THAT
      CARRIES A MANDATE TO NORMALLY
      PAROLE MURDERERS WITH A
      REASONABLY PROPORTIONATE AND
      UNIFORM SENTENCE. ................................................60

CONCLUSION ...................................................................65

# TABLE OF AUTHORITIES

Federal Cases

*Biggs v. Terhune* (9th Cir. 2003)
    334 F.3d 910 ................................................................................21, 45

*Blair v. Folsom State Prison* (E.D. Cal. 2005)
    2005 WL 2219220 ................................................................................49

*Clay v. Kane* (C.D. Cal. 2006)
    2006 WL 2135736 ................................................................................34

*Ewing v. California* (2003)
    538 U.S. 11................................................................................29

*Fierro v. Gomez* (9th Cir. 1996)
    77 F.3d 301 ................................................................................58

*Furman v. Georgia* (1972)
    408 U.S. 238................................................................................58

*Hicks v. Oklahoma* (1980)
    447 U.S. 343................................................................................35

*Irons v. Warden of California State Prison- Solano* (E.D. Cal. 2005)
    358 F.Supp.2d 936 ................................................................11, 34, 45, 59

*Martin v. Marshall* (N.D. Cal. 2006)
    431 F.Supp.2d 1038 & 2006 WL 2642123................................34

*Masoner v. State* (C. D. Cal. 2004)
    2004 WL 1080176 & 2004 WL 1080177................................35

*McQuillion v. Duncan* (9th Cir. 2003)
    342 F.3d 1012 ................................................................................33, 34

*Rosenkrantz v. Marshall* (C.D. Cal. 2006)
    444 F.Supp. 2d 1063 ................................................................................34

*Sanchez v. Kane* (C.D. Cal. 2006)
    444 F.Supp.2d 1049 ...................................................................34

<u>State Cases</u>

*In re Alvarade* (Cal. App. 6th District)
    2005 WL 217030 .....................................................................34

*In re Andrade* (2006)
    141 Cal.App.4th 807 ................................................................33

*In re Burns* (2006)
    136 Cal.App.4th 1318 .............................................................46

*In re Capistran* (2003)
    107 Cal.App.4th 1299 .............................................................33

*In re Dannenberg* (2005)
    34 Cal.4th 1061 ........................................................... 28, passim

*In re Davis* (1979)
    25 Cal.3d 384 .........................................................................39

*In re DeLuna* (2005)
    126 Cal.App.4th 585 ..........................................................33, 56

*In re Foss* (1974)
    10 Cal.3d 910 .........................................................................58

*In re Lee* (Oct. 17, 2006, B188831)
    ___ Cal.App.4th ___, 2006 WL 2947968 .....................33, 43, 46

*In re McGraw* (Cal. App. 5th District)
    2004 WL 2075453 ..................................................................34

*In re Minnis* (1972)
    7 Cal.3d 639 .....................................................................27, 63

*In re Ramirez* (2001)
    94 Cal.App.4th 549 ................................... 26, 32, 33, 42, 56, 61

*In re Rodriguez* (1975)
    14 Cal.3d 639 .............................................................................27

*In re Rosenkrantz* (2000)
    80 Cal.App.4th 409 ....................................................................33

*In re Rosenkrantz* (2002)
    29 Cal.4th 616 ............................................................ 21, passim

*In re Samble* (Cal. App. 6th District)
    2005 WL 217030 .......................................................................34

*In re Scott* (2004)
    119 Cal.App.4th 871 ............................ 33, 48, 49, 50, 51, 56, 61

*In re Scott* (2005)
    133 Cal.App.4th 573 ............................ 26, 33, 42, 44, 52, 57, 59

*In re Seabock* (1983)
    140 Cal.App.3d 29 ....................................................................30

*In re Seymour* (Cal. App. 6th District)
    2004 WL 2749090 .....................................................................34

*In re Shaputis* (Cal. App. 4th District 2005)
    37 Cal.Rptr.3d 324 ....................................................................34

*In re Singer* (Cal. App. 6th District)
    2005 WL 103537 .......................................................................34

*In re Smith* (2003)
    109 Cal.App.4th 489 .................................................................33

*In re Smith* (2003)
    114 Cal.App.4th 343 ......................................................33, 43, 61

*In re Stanley* (1976)
54 Cal.App.3d 1030 ........................................................28, 42

*In re Stanworth* (1982)
33 Cal.3d 176 ........................................................................30

*In re Sturm* (1974)
11 Cal.3d 258 ..................................................................29, 63

*In re Van Houten* (2004)
126 Cal.App.4th 339 ............................................................46

*In re Weider* (Cal. App. 6th District)
2005 WL 40042 ....................................................................34

*In re Williams* (Cal. App. 2d District)
2002 WL 31124517 ..............................................................34

*People v. Johnson* (Cal. App. 2d District)
2003 WL 1827262 ................................................................34

*People v. Morse* (1964)
60 Cal.2d 631 ......................................................................27

*Roberts v. Duffy* (1914)
167 Cal. 629 ........................................................................59

Constitutions

United States Constitution

Eighth Amendment....................................................23, 58
Fourteenth Amendment ..................................................23

California Constitution

Article I, § 7........................................................................23
Article I, § 17................................................................23, 58

California Statutes

Penal Code § 190 .......................................................................31
§ 1170 .................................................................29
§ 3041 ................................................... 26, passim
§ 3041 (a)...........................................26, 30, 60, 61
§ 3041 (b) .................................................26, 30, 43
§ 3042 ................................................................57
§ 3604 ................................................................58

California Code of Regulations

Title 15, Division 2, chapter 3, article 11 ...................................30
Title 15, § 2281 .......................................................................31
§ 2400 .................................................................31
§ 2402 ...........................................................21, 31, 40
§ 2402 (a)................................................................43
§ 2402 (b)................................................................40
§ 2402 (c)(1)-(6) ......................................................41
§ 2402 (c)(1) ...........................................................50
§ 2402 (c)(2) ...........................................................51
§ 2402 (d)(1)-(9).......................................................40
§ 2402 (d)(4)............................................................50
§ 2402 (d)(6)............................................................51

California Rules of Court

Rule 60 ........................................................................................2

MICHAEL SATRIS, SBN 67413
CARRIE KOJIMOTO, SBN 152824
Law Office of Michael Satris
Post Office Box 337
Bolinas, Calif. 94924
Telephone: (415) 868-9209
Fax:         (415) 868-2658
Email:       satris@sbcglobal.net

Attorneys for Petitioner


### COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

| | |
|---|---|
| In re | No. _____ |
| DONALD EVERETT CRONK | (Superior Court No. 06F06029 Sacramento County) |
| on Habeas Corpus. | |

I.

### SUMMARY OF PETITION

1.  Petitioner Donald Everett Cronk (hereafter Cronk) is a
prisoner of the State of California, incarcerated at San Quentin State
Prison, under California Department of Corrections (CDC) number
C-87286, by Acting Warden Robert Ayers, Jr.

2.  Cronk challenges the refusal of the state parole authorities to
release him on parole.  Most recently, the Board of Parole Hearings

1

(hereafter Board) denied Cronk parole at his fifth consideration hearing on September 14, 2005. Cronk is serving a term of imprisonment of 25 years to life following his conviction for first degree murder committed in 1980. (*People v. Cronk*, Sacramento County Superior Court, Case No. SAC 666128.) Now 50 years old, Cronk is in his 25th year of incarceration for that offense. He has been eligible for parole since March 2, 1998.

3. For over two decades, Cronk has acknowledged his responsibility for the murder and has shown deep and genuine remorse. He has compiled an impeccable record in prison with exceptional accomplishments and with assessments by his correctional counselors and prison psychologists that he would present little or no risk if released on parole. The denial of parole was contrary to administrative regulation, the Penal Code, and his rights under the California Constitution and the United States Constitution to due process and to be free of cruel and unusual punishment.

4. On June 29, 2006, Cronk filed a petition for writ of habeas corpus in *In re Cronk*, Sacramento County Superior Court, Case No. 06F06029, challenging the Board's repeated denials of parole. Cronk realleges and incorporates the allegations of his trial court petition by reference into this petition. The trial court petition is attached to the instant petition as Exhibit A. On August 28, 2006, the petition was denied. That order is attached to the instant petition as Exhibit B. Cronk requests, pursuant to California Rules of Court, rule 60, that the Court order the Clerk of the Sacramento County Superior Court to transmit to this Court the original superior court file, or a certified

2

copy thereof. Cronk will refer to the appendix of exhibits that was lodged with his superior court petition and associated page numbers when applicable.

## II.

## STATEMENT OF FACTS

A. The Circumstances of the Commitment Offense.

5. Cronk's commitment offense occurred when he and another person broke into a residence and awaiting return of the victim (a jeweler) to rob him. At the 2005 parole consideration hearing, the Board summarized the offense as follows:

> In the morning of December 19, 1980, the inmate and co-defendant Glen Meyer, went to the victim's residence and broke into the residence by entering a backroom window. The victim was James Allen, age 50. After ransacking the victim's home in search of personal effects and money, the two men laid in wait armed with an unknown caliber handgun for the victim to return. When the victim returned home, he noticed the dwelling had been entered and drew his own weapon before entering the front door. The victim surprised the inmate and fired several rounds, striking the inmate one [sic: once] in the arm and once in the side. The inmate retrieved his handgun from his pocket and shot once, killing the victim. After the murder, both the inmate and the co-defendant, Glenn Meyer, fled. Glen Meyer stopped long enough to pick up the victim's gun, briefcase, and diamond ring the victim wore. During the interview for this report, the inmate recalled the caliber weapon as a .38 Colt Special Detective. The inmate was arrested several months later while working in a carnival in Idaho.

3

(See Appendix of Exhibits lodged with *In re Cronk*, Sacramento County Superior Court Case No. 06F06029 (hereafter Appendix), Exh. 2, pp. 20-21; see also Exh. 3, p. 95.)

      6.  Cronk's cocaine addiction was a major factor in his criminal conduct. (Exh. 3, p. 96.) He was introduced to cocaine by his employer at a social function celebrating Cronk's promotion. (Exh. 4, pp. 107, 109; Exh. 2, pp. 19, 22.) "[Cronk] associated cocaine use with success as he admired those in the company who also used it." (Exh. 2, 2005 transcript, p. 19; Exh. 14, p. 244.) He felt "accepted as an outsider in the upper circles of the company." (Exh. 14, p. 244.) After Cronk and his wife separated and she moved back to Wisconsin, Cronk's drug dependency grew "to the point where he was spending all of his money" on cocaine and he began embezzling from his employer. (Exh. 2, p. 19; Exh. 14, p. 244.) Cronk and Meyer "began dealing cocaine and were getting large amounts of the drug fronted to them. They were unable to pay back the debt incurred, and [] Cronk knew that he was likely to be harmed if he was not able to pay it." (Exh. 14, p. 244.) Cronk lost his job and was ten thousand dollars in debt. (Exh. 3, p. 96.) Meyer proposed committing a robbery to get the money they needed. (Exh. 14, p. 244.) Cronk did not anticipate the fatal confrontation with Allen. (Exh. 3, p. 96.) After Allen shot at Cronk several times, hitting him twice, Cronk was "operating off of instinct, survival mode, fear" when he fired the gun through his coat pocket. (Exh. 2, pp. 26-27; Exh. 3, p. 96.)

B.    Cronk's Prior Denials of Parole.

7. Cronk appeared for his initial parole consideration hearing on March 5, 1997. (Exh.15, p. 261.) His counselor reported:

> Cronk's overall pattern of behavior in prison, inclusive of disciplinary record, work accomplishments, participation in self-help and religious programs as well as relationships with staff and inmates has been exemplary from date of reception 6-13-84 to present, a total of 12 years. There are no ... mental concerns documented at this time, except to note that Cronk is a drug addict in remission.

(Exh. 16, p. 272.) The progress reports issued during that 12-year period contained extensive evidence of Cronk's exemplary programming. (Exhs. 16, 19, 22, 25, pp. 274-275; 280-282; 288-291; 296-297.) For example, one entry states:

> Cronk continues to receive laudatory chronos for displaying a high standard of work ethics and continues to volunteer an enormous amount of personal time to various projects. On 5-9-92, the San Quentin Mass Choir recorded an album. Cronk was instrumental in the vision to create and direct this project. Cronk authored the line notes for the album cover, as well as using his electrical and sound engineering skills.

(Exh. 19, p. 281.)

8. The mental health evaluations of Cronk were also overwhelmingly positive. (See Exhs. 17, 20, 23, 26.) For example, the 1993 psychological evaluation concluded that "Mr. Cronk is already showing much promise and readiness in these early stages of his commitment." (Exh. 20, p. 285.) It noted: "Mr. Cronk is one of

those rare individuals who has been able to rise above his early circumstances and make something of himself in prison. He is well liked by staff and relied upon for his skills and trustworthiness." (Exh. 20, p. 285.) The 1997 psychological evaluation reported Cronk thoughtfully discussed the crime, which he did not blame on his cocaine use. (Exh. 17, p. 277.) The psychologist stated:

> His understanding of the murder appeared comprehensive as evidenced by the manner in which the various elements of his life and drug addiction were portrayed. He did not seem to view the murder simply, but as a consequence of many historical and situational factors combined.

(Exh. 17, p. 277.)

9. The Board denied Cronk parole for four years, primarily based on the commitment offense. (Exh. 15, pp. 262, 264.) Secondary reasons were Cronk's criminal history, his past drug and alcohol use, and the need for additional programming in prison. (Exh. 15, pp. 262, 264.)

10. On December 20, 2001, Cronk appeared for his first subsequent consideration hearing. (Exh. 12, p. 220.) The psychological evaluation gave a highly positive assessment of Cronk's suitability and chances of success on parole:

> As Mr. Cronk's records indicate, he has made impressive efforts at self-rehabilitation. He has succeeded in an apprenticeship program to become an electrician. He has upgraded his educational level from a high school dropout to completion of an A.A. degree and continuation toward[s] a bachelor's degree. He has participated extensively

6

in self-help and substance abuse interventions. He
has also contributed considerable time and skills to
fundraising and public relations efforts designed to
help those in need. His accomplishments are
indicative of pro-social values and interests. Mr.
Cronk has been able to maintain an extended effort
toward rehabilitation, with the goal of contributing
to the general good. He seems to be, at this point, a
sincerely altruistic person. Because his efforts at
rehabilitation have come from an intrinsic
motivation, he is likely to maintain his present
positive social adjustment. After living in an
institutional environment for approximately 20
years, he would face the challenges that would come
with a radical change of environment. Given Mr.
Cronk's level of job skill and education, and
performance in prison, these challenges would
likely be less than those for other parolees released
after extended incarceration.

(Exh. 14, p. 249.) The psychologist noted that "Cronk has been free
of disciplinary actions" and "seems dedicated to avoiding violence."
(Exh. 14, pp. 248, 249.) She found Cronk had "no mental conditions
that would constitute a major risk factor." (Exh. 14, p. 248.) As to
the factors that led to Cronk's cocaine use, she concluded:

The precipitous loss of his father, his early history
of social isolation, and his longing to escape the
poverty experienced by his family, combined with
premature marriage and fatherhood, made him
vulnerable to fantasies of escape. It is the
conclusion of this examiner that cocaine offered him
such an escape and masked his sense of inadequacy.

(Exh. 14, p. 247.) The psychologist opined that Cronk had "overcome
earlier patterns of maladaptive behavior that resulted in his striving to
gain acceptance from more powerful males." (Exh. 14, p. 248.) She

praised Cronk's "proven ability to resist the negative influences of incarceration" and found that his "positive adjustment in prison and successful programming suggest that the maladaptive traits that expressed themselves in his commitment offense and other antisocial acts do not dominate his present responses." (Exh. 14, p. 247.)

11.  Cronk's counselor found that Cronk "does not present a risk to public safety at this juncture." (Exh. 13, p. 236.)  The counselor explained:

> I make this statement with the belief that cocaine addiction was responsible for Cronk's behavior during the commission of the instant offense.  If this is true, and after 20 years it appears it is, then it is logical to follow that Cronk will not behave in a similar manner when released back into society.  He is not interested in drinking or abusing drugs from this point on and so it is feasible to conclude his superlative behavior inside [] the institution will be continued if he is released from prison.

(Exh. 13, p. 236.)

12.  The Board denied parole for one year primarily based on the commitment offense.  (Exh. 12, p. 224.)  It found the offense was "carried out in an especially cruel callous manner" and the "motive for the crime was inexplicable or very trivial in relationship to the offense."  (*Ibid.*)  The Board's other reasons for denying parole were Cronk's:  1) previous criminal record; 2) history of unstable tumultuous relationships with others; 3) prior drug and alcohol use; 4) insufficient participation in self-help and therapy and the need to demonstrate his purportedly "recent" gains "over an extended period of time."  (Exh. 12, pp. 225-226.)

8

13. On October 25, 2002, Cronk requested his second subsequent parole consideration hearing be postponed because his attorney was unable to appear due to a scheduling conflict; the request was granted. (Exh. 10.)

14. On January 29, 2003, Cronk appeared for his second subsequent parole consideration hearing. His counselor, who opined that Cronk would pose a minimal risk to public safety if released, gave this very positive summary evaluating Cronk's outstanding development:

> Cronk has maintained an excellent program throughout his seventeen years of incarceration. He has managed to use his time here in a constructive fashion, constantly making improvements in his life and the lives of others. He has made numerous achievements and surpassed many of life['s] milestones despite his confinement to State Prison. Cronk continues to excel in all areas. He has gained employable work skill as an Electronic Worker and is currently working towards his Bachelor's Degree. He has remained disciplinary free and received considerable commendations for his positive programming efforts. He maintains an excellent rapport with both staff and inmates.
>
> During his interview [on] October 18, 2002, he talked openly and candidly about the crime and takes total responsibility for his involvement. It appears that he has had sufficient time to reflect on the past and come to terms with his present condition. He fully understands how his involvement with drugs played an intricate part in his motivation to become involved in the commission of the crime. It is my genuine belief that had Cronk not become involved with drugs he

9

> might not be sitting in prison today. Cronk has
> taken positive steps in dealing with his past problem
> with drugs by becoming involved with Narcotics
> Anonymous.

(Exh. 11, p. 215.) No new psychological evaluation was conducted
for the hearing.

15. The Board denied parole for one year primarily based on
the commitment offense. (Exh. 9, p. 199.) The Board found the
offense "was carried out in an especially cruel and calculated manner"
because Cronk was armed with a weapon and lying in wait for the
victim to return home." (*Ibid.*) The Board also found the motive was
very trivial in relation to the offense. (Exh. 9, p. 200.) The Board
noted Cronk's "very minimal criminal history," positive
programming, and broad and substantial community support. (Exh. 9,
p. 201.) The arbitrary denial of Cronk's liberty interest in parole is
reflected in the following comments by the presiding commissioner at
the 2003 hearing:

> [T]here's nothing you can do about [the crime.]
> The crime is changed – I mean, you can't change
> the crime. The crime is always going to be the
> same. But one of the reasons [for denying parole] is
> strong opposition of the People, of the People of
> Sacramento and the victims still feel that you would
> present a threat to them if released. But you're
> doing the things you need to do. And it's hard –
> We're hard pressed to sit here and tell you
> additional things that you need to do other than you
> need to continue doing the things that you're doing.
> Stay on the track that you're on. And some day you
> will get a parole. But it's just not today.

(Exh. 9, p. 203.) Given the long passage of time since the crime during which Cronk's institutional record has been exemplary, and the Board's acknowledgement that Cronk has done everything he could in prison to reform himself and that the crime will never change, Cronk "has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial." (*Irons v. Warden of California State Prison-Solano* (E.D. Cal. 2005) 358 F.Supp.2d 936, 947.)

16. On March 16, 2004, Cronk appeared for his third subsequent parole consideration hearing. His counselor repeated the same positive summation about Cronk as the prior counselor. (Exh. 8, p. 191.) His report gave an impressive list of Cronk's numerous self-help and therapy activities for which he received laudatory chronos. (Exh. 8, pp. 189-190.) No new psychological evaluation was prepared for the hearing.

17. The majority of the Board denied Cronk parole for one year, again based primarily on the commitment offense. (Exh. 7, p. 178.) It found the crime was carried out in a cruel and callous manner, and for a trivial motive. (*Ibid.*) The majority also denied parole based on its findings that Cronk had "an unstable social history that involved primarily drug use" and that he "has not yet sufficiently participated in beneficial self-help programs." (Exh. 7, p. 179.) The majority praised the 2001 psychological evaluation as "thorough" and found it was positive, yet stated it was "unfortunate ... that the doctor really does not come to any conclusion" [about assessing Cronk's risk

11

to public safety] and "sort of dances around the issue." (Exh. 7, pp. 179-180.) It ordered a new psychological evaluation. (Exh. 7, p. 180.) The dissenting commissioner explained why he found Cronk suitable for parole:

> The crime itself was extraordinarily vicious, unnecessary, but the person who said that he found peace with cocaine has evolved into a person who would go out and contribute, in my opinion, to the community.

(Exh. 7, p. 182.)

### C.     September 14, 2005 Parole Consideration Hearing.

18.   Cronk appeared for his fourth subsequent parole consideration hearing on September 14, 2005. Both his counselor and the psychologist who evaluated Cronk reported that he was deeply remorseful about the grief he caused to his victim's family. (Exh. 3, p. 96; Exh. 4, p. 109.) They found Cronk had taken full responsibility for his criminal actions and was insightful about their underlying factors. (Exh. 3, p. 101; Exh. 4, p. 109.) Cronk's counselor repeated the same summary given by his previous counselors in the 2004 and 2002 life prisoner evaluations. (Exh. 3, p. 101.) The psychologist gave this highly positive assessment:

> Given the stability of Mr. Cronk's mental status, his exemplary performance while incarcerated and extensive efforts at rehabilitation, no changes in Mr. Cronk's mental health are anticipated. He has no history of mental illness and no contributory mental problems. His attitude is consistently upbeat and positive. Most importantly, he has no history of violence while incarcerated, and no history of

12

violence in the community prior to the commission
of his offense.  He has shown genuine remorse for
his crime and takes full responsibility for his
actions.  He is insightful regarding the factors that
led to his criminal behavior.  **There would seem to
be no additional benefit that could accrue to Mr.
Cronk or to the state by his continued
incarceration.  Continued incarceration could in
fact, be detrimental to Mr. Cronk's ability to
succeed as a parolee, as it may be creating a
dependency on institutional resources, and
requires continued adaptation to a unique and
extreme environment.**  While it is not possible to
predict future behavior with absolute certainty,
based on clinical assessment and review of Mr.
Cronk's records there is no indication that he
represents an increased risk to the community for
future crime, were he to be paroled.

(Exh. 4, p. 109, emphasis added.)

19.  When asked at the hearing how he felt about the offense,
Cronk responded that he understood, after the devastation he and his
family experienced when his father died, the pain and suffering he
caused to Allen's family.  (Exh. 2, pp. 28-29.)  Cronk said he has
spent the last 25 years analyzing what caused his cocaine addiction
and his subsequent criminal behavior, and working diligently to
reform himself.  (*Ibid.*)

20.  The Board reviewed and questioned Cronk about his social
history.  (Exh. 2, pp. 14-18.)  Cronk's family was poor and part of a
Wisconsin farming community.  (Exh. 2, p. 14.)  Cronk was
devastated when his father, with whom he had a very close
relationship, died of a heart attack when Cronk was 17 years old.
(Exh. 2, p. 15; Exh. 14, p. 243.)  At age 18, Cronk married his

13

girlfriend when she became pregnant. (Exh. 2, p. 15.) They moved to California, but three years later, Cronk's wife and daughter moved back to Wisconsin and the marriage ended. (Exh. 2, p. 16; Exh. 14, p. 243.) Cronk remarried in 1987 and his second wife had a daughter in 1991. (Exh. 14, p. 243.) In 1994, Cronk's wife suddenly and explicably stopped coming to visit him at the prison and broke off all contact with him. (Exh. 14, p. 243.)

21.  As to his criminal history, Cronk admitted unadjudicated conduct that in October 1980, he wrote an unauthorized check from his brother's bank account and robbed a gas station in Wisconsin, in addition to embezzling from his employer. (Exh. 2, p. 24.) Cronk had no juvenile record and his only prior adult conviction was in 1975 for theft of a tape deck from an auto in Wisconsin. (Exh. 3, p. 97.)

22.  The Board reviewed Cronk's performance in prison since his last parole hearing. (Exh. 2, pp. 30-34.) Cronk had obtained an AA degree in Theology and was working on getting a BA through the prison's affiliation with Ohio University. (Exh. 2, p. 30; Exh. 3, p. 99.) He had graduated from Patton University with a Certificate of Ministry in 2005. (Exh. 2, p. 30, Exh. 3, p. 99.) Cronk was using his education to serve as the Protestant Chaplain's clerk. (Exh. 2, p. 31.) In 2004 and 2005, he was both an active participant and facilitator of a counseling course called Incarcerated Men Putting Away Childish Things (IMPACT). (Exh. 2, pp. 31-32; Exh. 3, p. 99.) Cronk received a certificate for completing a 29-month program on domestic violence. (Exh. 2, p. 31; Exh. 3, p. 100.) From 2002 to the current date, Cronk trained to be a facilitator of the Man-Alive Program.

14

(Exh. 2, p. 33; Exh. 3, p. 100.) He was also involved in the
Overcomers Outreach program, which is a religious-oriented 12-step
recovery program related to the 12-step program of AA, (Exh. 2, p.
33; Exh. 3, p. 99; Exh. 6, Laudatory and General Chronos); the Health
and Ethics Workshop Program (Exh. 3, p. 99); the Arts in Corrections
program (Exh. 2, p. 33; Exh. 3, p. 99; Exh.6, Laudatory and General
Chronos), and T.A.P.S., a national military survivor peer support
network (Exh. 2, p. 33; Exh. 3, p. 100.) As the Board aptly
acknowledged, Cronk's "group activities are many, almost awe
inspiring." (Exh. 2, p. 31.) It noted that he had "been involved for a
significant amount of time and certainly in these last 18 months."
(Exh. 2, p. 31.) Cronk received 16 laudatory chronos for his
participation, contributions and faithful attendance in these programs.
(Exh. 2, p. 31; Exh. 6, Laudatory Chronos.) He had a stellar
behavioral record, remaining disciplinary-free during the length of his
incarceration. (Exh. 2, p. 36.)

23. The Board reviewed "the highlights" of Cronk's most
recent psychological evaluation, which it found favored parole. (Exh.
2, pp. 34-35; see ¶ 17 for excerpt of report read at hearing.)

24. The Board reviewed Cronk's parole plans. (Exh. 2, pp. 37-
39.) Cronk plans to live with his fiancée, Kathleen Giono, who owns
her Marin County residence and manages a travel agency. (Exh. 2,
pp. 37-38, 43-44.) Cronk has "countless employment opportunities"
including being an audio engineer, an electrician, and the Marin
County IMPACT facilitator working with the California Youth
Authority. (Exh. 2, p. 38.) Cronk also made back-up plans that

included an offer of employment as a house painter in Sacramento if the Board elected to parole him to the county of commitment. (Exh. 2, p. 42.)

25. The Board stated it had received so many letters of support for Cronk's release that it would not read or review each letter at the hearing, and selected several letters to read for the record. (Exh. 2, p. 39.) A friend of Cronk's fiancée wrote that she was willing to pledge $50.00 a month to help Cronk upon his release. (Exh. 2, p. 43.) The presiding commissioner remarked this was the first time he had received a pledge of financial support from a non-relative. (Exh. 2, p. 43.) Cronk's two older sisters wrote letters offering emotional and material support. (Exh. 2, pp. 40-41.) The pastor of the Tiburon Baptist Church, who has known Cronk for over nine years through the church's involvement at San Quentin Prison, wrote that his church is committed to supporting and helping Cronk upon his release. (Exh. 2, p. 42.)

26. The Board read a letter from the victim's daughter advocating that Cronk remain imprisoned for the rest of his life. (Exh. 2, pp. 56-61.) The district attorney stated the victim's wife is also opposed to Cronk being released on parole and has complained in the past that he has never apologized to her. (Exh. 2, p. 69.) The district attorney stated that he believed Cronk when he stated that he would have written a letter of apology to the family, but that he had been directed not to do so by the prison. (Exh. 2, p. 69.)

27. The district attorney acknowledged that Cronk "has matured very well in prison" and "adjusted somewhat exceptionally,

16

especially when compared to his peers and has taken advantage of the opportunities that San Quentin has afforded him in a very difficult and dangerous environment." (Exh. 2, p. 75.) However, the district attorney was opposed to Cronk's release on parole, arguing that the "enormity of the crime and the affect [sic: effect] upon the [victim's] family" has not changed, and that the Board must accord "some deference" to the crime's impact on the family. (Exh. 2, p. 76.)

28. The district attorney commented on what he characterized as "some minor inaccuracies" in the 2005 life prisoner evaluation and 2005 psychological evaluation. (Exh. 2, p. 70.) The district attorney contended Cronk's statement as reported in the life prisoner evaluation that the crime was originally planned to be a burglary did not comport with the "true picture" of a detailed plan to tie the victim up and rob him. (Exh. 2, pp. 70-71.) The district attorney tried to discredit Cronk's assertion that he had no idea the victim would be armed. (*Ibid.*)

29. As to the 2005 psychological evaluation, the district attorney complained that the evaluator, Dr. Inaba, gave a "very distorted view" about the crime. (Exh. 2, p. 72.) The district attorney stated, "She says that he was engaged in a robbery of the victim's home, and the victim returned to the residence surprising the victim [sic: Cronk] and the partner of [sic: in] his crime." (Exh. 2, p. 72.) The district attorney acknowledged Cronk "certainly ... has been candid to a lot of details, but I think she is greatly confused or minimizing when she summarizes it that way. You don't rob a home. You rob a person, and he did not surprise him." (Exh. 2, p. 72.)

30. The district attorney also disputed Dr. Inaba's opinion that Cronk "has no history of violence in the community prior to the offense." (Exh. 2, p. 73.) The district attorney emphasized he was not suggesting Cronk had misled the psychologist, but stated he did not think "she had a fair understanding of the complete record," citing the unadjudicated robberies shortly before the Allen murder that were mentioned in the probation report. (Exh. 2, p. 73.)

31. The district attorney also questioned why Dr. Inaba did not include in her 2005 report a sentence contained in her 2001 report that "causative factors for violence and criminal activity are multi determined and that violence potential is unpredictable." (Exh. 2, p. 72.) He stated: "I don't understand how she can delete that since not much in his life has changed between 2001 and 2005. He is still programming very well and progressing, but I think that sentence she wrote before still remains true, and she deleted that for a purpose." (Exh. 2, p. 72.) The district attorney also disputed Dr. Inaba's opinion that Cronk has shown genuine remorse and full responsibility for the crime. (Exh. 2, p. 74.)

32. Cronk's attorney, Richard Fathy, who represented Cronk at trial, explained that he has represented Cronk pro bono at this and the past two hearings because he has been deeply impressed by Cronk's extraordinary and genuine redemption. (Exh. 2, pp. 78-80.) He argued the district attorney's critique that the psychologist who did the 2005 evaluation did not understand the gravity of Cronk's offense was "absurd," as "she heard from [Cronk] probably in much more detail

than we're hearing this morning of what a horrible thing he did."
(Exh. 2, p. 81.) Fathy asked rhetorically:

> Has this guy in one iota of his comments suggested
> to you he doesn't understand the gravity of what he
> did to the Allen family, and of course, Mr. Allen
> first and foremost? What do you think he said to the
> psychiatrist or psychologist, pardon me? No, I
> didn't have any involvement. It's all the cocaine's
> fault, and it's the crime partners. I didn't do
> anything. Of course, he didn't say that to her.

(Exh. 2, p. 81.)

### D.    The Board's Denial of Parole.

33. The Board denied Cronk parole for one year primarily
based on the commitment offense. (Exh. 2, p. 87.) The Board found
"the offense was carried out in a dispassionate and calculated manner"
and that the "motive for the crime was inexplicable or very trivial in
relationship to the offense." (Exh. 2, p. 87.) The Board further stated
about basing its denial on the offense:

> All the trial attorneys here and the Deputy
> Commissioner is an attorney as well, went to law
> school as well, knows that the felony murder rule
> was enacted because of the inherent dangerousness
> of robberies, and that individuals cannot escape
> liability by saying, I did not mean to kill the person
> in the perpetration of a 211. And that's exactly
> what happened in this case. But even though one
> can disagree with the premise of having a first-
> degree murder on an unintentional homicide, this is
> not your general, I'm on the street. I'm strung out,
> high, and pulls a gun on somebody, and the gun
> goes off. I'm always wondering why people use all
> the guns, but anyway, the point is that no this was

19

way beyond that. This was calculated. They had masks. They had guns. They had one guy down the street waiting for the person to come. They knew what he was wearing. They knew he had a diamond ring. They brought oil. They didn't just go to the house and take things. They waited for him to come back. The Deputy Commissioner and I just decided that this was just too heinous, I mean, too serious of an offense, and I don't necessarily believe that the inmate will always be incarcerated, but I just don't think at this stage 25 years is sufficient.

(Exh. 2, pp. 87-88.) The second reason the Board gave for denying Cronk parole was "his escalating pattern of criminal conduct or violence," citing his involvement in robberies prior to the commitment offense. (Exh. 2, p. 88.)

34. The Board dismissed the 2005 psychological evaluation, characterizing it as "inconclusive." (Exh. 2, p. 89.) It stated:

The District Attorney pointed out various factual assertions that make her opinion virtually worthless. We know that hypothetical question posed to an expert opinion, the facts have to be established, and the facts that she's going by doesn't [sic] seem to be the same case. She's talking about no violence before this incident, yet, we know he was involved in robberies prior to this occurring. She does not seem to – it says, though she has a vested interest, not maybe consciously but maybe subconsciously that she just didn't inspire me as an individual who did a thorough evaluation of the psychiatric factors of the inmate.

(Exh. 2, p. 89.) The Board requested a new psychological report be done by another psychologist. (Exh. 2, p. 92.)

20

35.  The third reason the Board gave for denying parole was the "3042 responses," citing the district attorney's opposition.  (Exh. 2, p. 89.)

36.  In addition, the Board made the following findings:

> The prisoner needs therapy, self-help, and programming in order to further face, discuss, understand, and cope with stress in a nondestructive manner, as well, to get further insight into the crime. Until further progress is made, the prisoner continues to be unpredictable and a threat to others.

(Exh. 2, p. 90.)

E.    The Arbitrariness of the Board's Refusal to Set a Parole Date for Cronk.

37.  To comply with due process requirements, the Board must apply its own criteria set out in California Code of Regulations, title 15, section 2402, which establishes factors tending to show that a prisoner is suitable or unsuitable for parole.  The Board failed to do so.  The Board's denial of parole was arbitrary and capricious in violation of federal and state due process guarantees for the further reason that it was unsupported by any evidence.  (See, e.g., *In re Rosenkrantz* (2002) 29 Cal.4th 616, 657-658 & 675-677 [due process requires that denial of parole be supported by "some" evidence]; *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 915 ["In the parole context, the requirements of due process are satisfied if 'some evidence' supports the decision."].)  The most recent denial is just the latest act in the Board's arbitrary and capricious consideration of Cronk for parole over the years.  The denial deprives Cronk of due

21

process because the Board arbitrarily failed to assess his parole risk based upon all the relevant factors of his individual case and because it relied on the static facts of the commitment offense and criminal history in the face of Cronk's showing over a prolonged period of exemplary behavior and rehabilitation in prison. The evidence overwhelmingly supported a finding of his suitability for parole, and there was no rational basis for concluding otherwise.

38. Cronk meets the suitability criteria in the controlling regulations:

- Cronk has no juvenile record and a minimal adult criminal record that consisted of one minor property offense, and unadjudicated conduct very close to the time of the commitment offense.

- Cronk has a stable social history. His siblings and friends have kept in contact with him throughout his 25 years of incarceration, and remain ready and willing to help Cronk upon his release. He has developed a broad network of community support.

- Cronk has taken responsibility for and is deeply remorseful about his crime. The Life Prisoner Evaluations and Psychological Evaluations have consistently found that Cronk has addressed the factors underlying the crime. He has repeatedly expressed remorse for the offense at the Board hearings.

- The crime was "the result of significant stress" that had built up over a long period of time as a result of Cronk's

cocaine addiction, the loss of his job, the break-up of his marriage, and deep financial debt to drug dealers.

- Cronk's present age of 50 years, together with the maturity and emotional growth shown in the decades since his offense, significantly reduces the probability of recidivism.

- The Board found that Cronk has appropriate parole plans, including marketable skills and several job offers.

- All interested parties concur that Cronk has by all available means demonstrated reform and rehabilitation during his incarceration.

39.  The Board's repeated denials of parole based on the unchangeable facts of Cronk's commitment offense and other pre-commitment factors, in the face of his indisputably long-standing and outstanding record of reform and rehabilitation, convert his sentence of life with the probability of parole to life without the possibility of parole, which both violates due process and imposes cruel and unusual punishment on him in violation of the state and federal constitution.  (U.S. Const., Amends 8, 14; Cal. Const., art. I, §§ 7, 17.)

F.     The Superior Court's Decision on Cronk's Petition
       for Writ of Habeas Corpus Challenging the 2005
       Denial of Parole.

40.  In its August 28, 2006 order, the superior court ruled that "the facts of the commitment offense, the length of [Cronk's] incarceration to date, and his prior criminal and violent conduct support the denial of parole."  (Exh. B, Order at 5.)  The court found there was evidence to support the Board's finding that the crime was

23

committed in an especially heinous manner, citing the facts that

Cronk's co-defendant stole items from the victim after Cronk shot him

"and that they both fled, never calling for any help for the victim"

(Exh. B, Order at 3.)  The court reasoned the Board's determination

that Cronk had not served enough time in prison was another way of

stating that "his offense was particularly egregious as compared to

other first-degree murders, i.e., more than minimally necessary for a

first-degree murder conviction."  (Exh. B, Order at 4.)  The court

acknowledged that Cronk's prior unadjudicated robberies were close

in time to the commitment offense and motivated by his cocaine

addiction (Exh. B, Order at 3), which is the same cause of Cronk's

robbery of Allen.  However, the court rejected Cronk's contention that

it would be unreasonable to treat the prior robberies as a separate and

distinct criminal history from the offense because there was more than

one robbery victim.  (*Ibid.*, see *In re Cronk*, No. 06 F06029, pp. 36-

37.)  The court also rejected Cronk's contentions that the Board failed

to consider all the relevant evidence of factors favoring his parole

suitability and that the Board was arbitrarily dismissive of the positive

current psychological evaluation and past evaluations.  (Exh. B, Order

at 4.)  The court did not address Cronk's claim that the Board's

finding that he needs therapy, self-help and further programming to

deal with stress in a nondestructive manner and to gain further insight

into the crime was unsupported by any evidence.  Nor did it address

Cronk's key argument that the Board's repeated reliance on the

immutable factors of his commitment offense and prior criminality in

the face of his 23-year undisputable record of reform and

rehabilitation does not constitute evidence he is currently dangerous

24

or otherwise poses an unreasonable risk to public safety. (See *In re Cronk*, No. 06F06029, pp. 31-36.)

41.   The superior court's decision was erroneous because the evidence about the commitment offense that it cited does not show that the murder was particularly egregious nor does it show that Cronk, 26 years after the crime, with an undisputed record of positive institutional conduct, overwhelmingly positive assessments by prison psychologists and counselors, and realistic parole plans, is now so dangerous that his release would pose an unreasonable risk to public safety.   In particular, the court wrongly relied on the fact that Cronk's crime partner took items from the victim, which occurred after Cronk himself had collapsed outside the apartment, bleeding profusely from two gunshot wounds.   That callous act may be relevant to the crime partner and the safety risk his release on parole might pose, but it does not reliably show Cronk's current dangerousness.   Indeed, the Board did not rely on that fact or the fact that they fled the crime scene in its decision.   The court gave its own reasons why the crime was heinous, but its task is to examine whether the reasons given by the Board were supported by evidence.   The court never addressed Cronk's claim that the Board's continued reliance on the unchanging circumstances of the crime and his prior criminality, after a quarter-century of incarceration and six parole suitability hearings, violates due process because these ancient factors are no longer reliable indicators of his present and future dangerousness.   "The gravity of the commitment offense … may be a sufficient basis for denying a parole application, [only] so long as the Board does not fail to consider all other relevant

25

factors." (*In re Ramirez* (2001) 94 Cal.App.4th 549, 569; accord, *In re Rosenkrantz, supra,* 29 Cal.4th at p. 677.) Here, the superior court disregarded the most important factor of all for determining present danger: The inmate's current state of mind and functioning. In addition, the superior court's reasoning that Cronk's prior robberies are not closely related to the commitment offense because, unlike the petitioner in *In re Scott* (2005) 133 Cal.App.4th 573, 602 (*Scott II*), Cronk's prior criminal acts involved more than one victim, is an insignificant distinction that distorts what is significant: the closeness in time, motivation, and situational stress all tie the commitment offense and prior crimes together.

G.    The Executive Policy and Practice of Rare Parole
      Grants Deprived Cronk of Due Process.

42. Penal Code section 3041 establishes the legislative scheme for the parole of murderers and other life-sentenced prisoners. Its subdivision (a) provides that "the Board ... shall normally set a parole date" at a lifer's first parole consideration hearing. It further provides that "[t]he release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The Board shall establish criteria for the setting of parole release dates ...." Penal Code section 3041, subsection (b) provides that "the panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of

26

current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

43. Part of the legislative design of Penal Code section 3041 was to meld the old Indeterminate Sentencing Law (ISL), which depended on individual assessments of rehabilitation and risk to public safety to determine release, with the new Determinate Sentencing Law (DSL), which depended on established standards of punishment tied to the gravity of the offense to determine release. "For decades before 1977, California employed an 'indeterminate' sentencing system for felonies .... An inmate's actual period of incarceration within [the statutory range] was under the exclusive control of the parole authority, which focused primarily, not on the appropriate punishment for the original offense, but on the offender's progress toward rehabilitation.[1] During most of this period, parole

---

[1] See, e.g., *People v. Morse* (1964) 60 Cal.2d 631, 642-643 ("The Authority does not fix that period [of incarceration] pursuant to a formula of punishment, but in accordance with the adjustment and social rehabilitation of individual analyzed as human composite of intellectual, emotional and genetic factors"); *In re Minnis* (1972) 7 Cal.3d 639, 643-645 (The ISL "place[s] emphasis upon the reformation of the offender [and] seek[s] to make the punishment fit the criminal rather than the crime," with parole authorities declaring that post-conviction factors are of "paramount importance."); *In re Rodriguez* (1975) 14 Cal.3d 639, 652 ("The Authority's power to grant parole ... enables the Authority to give recognition to a prisoner's good conduct in prison, his efforts toward rehabilitation, and his readiness to lead a crime-free life in society. On the other hand, this discretionary power also permits the Authority to retain a prisoner for the full ... term if his release might pose a danger to society ....

dates were not set, and prisoners had no idea when their confinement would end, until the moment the parole authority decided they were ready for release." (*In re Dannenberg* (2005) 34 Cal.4[th] 1061, 1077.) "[T]he parole authority's practice [was] simply to defer ... parole-release decisions until it 'developed the feeling in each individual case that the prisoner was "ready to go home.' [Citation]." (*Id.* at p. 1088; brackets in quote deleted.)

44.  "This system came into disfavor for many reasons.  Not the least were complaints that it (1) failed to fit the punishment to the crime and (2) gave inmates no advance hope of a fixed date for release, thus actually promoting disciplinary problems with the prisons." (*In re Dannenberg, supra,* 34 Cal.4[th] at p. 1088.) "[T]he parole authority ... acted on its own to meet some of the reformers' criticisms.  'In April 1975, Chairman's Directive 75/20 was issued creating a structure for setting parole dates based on listed ranges and factors....' [Citation]." (*In re Dannenberg, supra,* 34 Cal.4[th] at p. 1089; brackets in quote deleted.)  The directive further required the Board to make "every effort ... to establish parole dates the first time the inmate appear[ed] for regularly scheduled parole consideration." (*See In re Stanley* (1976) 54 Cal.App.3d 1030, 1034, quoting the directive.)  "'Following this directive, numerous hearings were conducted to abolish the practice of deferring a decision on parole and to establish fixed parole dates for almost all inmates.' [Citation.]" (*In re Dannenberg, supra,* 34 Cal.4[th] at p. 1089.)  Even under its earlier

---

These considerations ... are based in large measure on occurrences after the crime.").

practice of parole deferral, however, the Board found the vast majority of prisoners suitable for parole, including 90% of first-degree murderers. (*See Ewing v. California* (2003) 538 U.S. 11 (dis. opn. of Breyer, J.), citing "Historical Data for Time Served by Male Felons Paroled From Institutions 1945-1981" dated October 5, 1982, and prepared by the Offender Information Services, Administrative Services Division, Department of Corrections; see also *In re Sturm* (1974) 11 Cal.3d 258, 262, fn. 2 [noting that "12½ years is currently the average term of incarceration for inmates convicted of first degree murder"].)

45. Despite these reforms, a building momentum against the seeming arbitrariness and randomness of parole dates under the ISL caused the Legislature to enact the DSL, set forth in section 1170 et seq., effective July 1, 1977. In general, the change in the law from the ISL to the DSL emphasized predictable and uniform terms for punishment over individual assessments of rehabilitation and public safety. The law allowed offenders with determinate terms (including second degree murderers) to parole after they had served the requisite determinate term regardless of whether they were rehabilitated or presented a threat to public safety upon their release, and assured that the terms served were uniform and proportionate to the crime as determined by the range of punishment the Legislature selected for each offense. (See Pen. Code, § 1170.)

46. "But the problem of parole and term-setting standards remained for those serious offenders who, under the DSL, would retain indeterminate life-maximum sentences. Section 3041 sought

29

'for the first time to establish specific procedures for parole consideration for these offenders.' [Citation.] Under subdivision (a), firm parole release dates, fixed in advance under principles of uniform incarceration for similar offenses, would define the actual terms of imprisonment for eligible life prisoners. [Citation.] But subdivision (b) of the statute made clear that the parole authority would have the express power and duty, in an individual case, to postpone the fixing of a firm release date, and thus to continue the inmate's indeterminate status within his or her life-maximum sentence, if it found that the circumstances of the prisoner's crime or criminal history presented a continuing risk to public safety." (*In re Dannenberg, supra*, 34 Cal.4th at p. 1090 (brackets, ellipsis, and italics in quote deleted).)

47. Pursuant to the directive in Penal Code section 3041, subdivision (a), that the Board establish criteria for determining parole release, the Board promulgated regulations contained in division 2, chapter 3, article 11 of the California Code of Regulations, title 15. (See generally *In re Rosenkrantz, supra*, 29 Cal.4th at pp. 653-654.) Those regulations retained the so-called "suitability" criteria and nature of that decision from the ISL,— i.e., whether parole of the prisoner would pose an unreasonable risk to public safety — and changed only in that they provided for longer actual terms of confinement for the life offenses. (See *In re Stanworth* (1982) 33 Cal.3d 176; *In re Seabock* (1983) 140 Cal.App.3d 29.) Thus, the Legislature's direction in section 3041 that a parole date "normally" be set at the initial parole consideration hearing of life-sentenced prisoners carried over the Board's historical practice of regularly

paroling such prisoners and its reformed practice of setting those
parole dates in most cases at the inmate's first parole consideration
hearing. (See, e.g., *In re Dannenberg, supra*, 34 Cal.4[th] at p. 1088
["The historical circumstances in which section 3041 was enacted
further illuminate the statute's purpose and effect, including its use of
the phrase 'shall normally set a parole release date.' [Citation] …
Contemporaneous court decisions and administrative developments,
addressing problems in the indeterminate sentencing law, further
influenced the final shape of Senate Bill No. 42" enacting the DSL.].)

48. By initiative effective November 8, 1978, the law was
amended to provide for longer terms of confinement for those
convicted of first degree murder, with the establishment of a
minimum term of 25 years that could be reduced with conduct credits
to 16 2/3 years, as opposed to the 7 years a first degree murderer had
been required to serve before parole eligibility. (See Pen. Code,
§ 190; see also Cal. Code Regs., tit. 15, § 2400.) The initiative also
changed the punishment for second degree murder from a determinate
term of five, six, or seven years to an indeterminate term of 15 years
to life, with conduct credits that could reduce that minimum term to
10 years. These changes left intact both the obligation of the Board to
normally find prisoners suitable for parole at the first parole
consideration hearing and its criteria for making the suitability
determination. (See Cal. Code Regs., tit. 15, § 2400; compare, e.g.,
Cal. Code Regs., tit. 15, § 2281 with § 2402.) The change in law was
designed simply to insure that such prisoners serve the longer
sentences required by the minimum terms. Thus, against a norm

31

requiring the Board to routinely set a prisoner's parole at his first consideration hearing, the Legislature granted the Board power to defer the setting of a parole date in the exceptional case where it was shown that the individual continued to pose an unreasonable risk to public safety. (See, e.g., *In re Rosenkrantz, supra,* 29 Cal.4th at p. 683, citing *In re Ramirez, supra,* 94 Cal.App.4th at pp. 549, 559-560 & 569-570; see also *id.* at p. 664 ["In sum, the governing statute provides that the Board must grant parole unless it determines that public safety" would be unreasonably jeopardized by the prisoner's release.].)

49. The Board, however, systematically denies parole to life prisoners by unreasonably finding that the release of almost every life prisoner would unduly jeopardize public safety. The Board almost never sets a parole date at the prisoner's initial hearing; rather, it repeatedly postpones the setting of a parole date for the overwhelming majority of prisoners, and rarely grants a life prisoner a parole date no matter how many times it considers the prisoner for release or how much time he has served. The Board currently grants parole to a very small percentage of eligible lifers — only those who make the most compelling cases that they can be safely released. (See, e.g., *In re Rosenkrantz, supra,* 29 Cal.4th at p. 685 [Board granted parole to murderers 1% of time in its last 4800 hearings]; see also Exhibit 28, pp. 330-331, giving statistics on the executive practice of parole consideration for 2004 and 2005.)

50. When the Board finally does grant a prisoner a parole date, he is usually long past not only his minimum parole eligibility date,

but the parole release date that the Board has calculated for him, so that even these prisoners are spending years more in prison than called for by the uniform and proportionate term of imprisonment envisioned by Penal Code section 3041. Consequently, the Board has returned to its old, discredited, and unreformed ISL practice of randomly determining the suitability of an individual prisoner for parole, resulting in disparate and unpredictable terms that fail to provide for uniformity and proportionality of punishment.

51. Independent of but consistent with the executive's arbitrary disregard for the legislative mandate for regular parole is the arbitrariness of its individual decisions. The executive regularly makes arbitrary findings to justify its refusal to release life prisoners on parole. (See, e.g., *In re Lee* (Oct. 17, 2006, B188831) ___ Cal.App.4th ___ [2006 WL 2947968] [Governor's findings arbitrary]; *In re Andrade* (2006) 141 Cal.App.4th 807 [Board unreasonably applied its own rule]; *In re Scott, supra,* 133 Cal.App.4th 573 [all Governor findings arbitrary]; *In re DeLuna* (2005) 126 Cal.App.4th 585 [some Board findings arbitrary]; *In re Scott* (2004) 119 Cal.App.4th 871 (*Scott I*) [all Board findings arbitrary]; *McQuillion v. Duncan* (9th Cir. 2003) 342 F.3d 1012 [all Board findings arbitrary]; *In re Smith, supra,* 114 Cal.App.4th 343 [some Governor findings arbitrary]; *In re Smith, supra,* 109 Cal.App.4th 489 [all Governor findings arbitrary]; *In re Capistran* (2003) 107 Cal.App.4th 1299 [some Governor findings arbitrary]; *In re Ramirez, supra,* 94 Cal.App.4th 549 [some Board findings arbitrary]; *In re Rosenkrantz* (2000) 80 Cal.App.4[th] 409 [all Board findings arbitrary], *In re*

33

*Rosenkrantz, supra*, 29 Cal.4th 616 [some Governor findings arbitrary]; see also *Irons v. Warden of California State Prison-Solano, supra*, 358 F.Supp.2d 936 [all Board findings arbitrary]; *Rosenkrantz v. Marshall* (C.D. Cal. 2006) 444 F.Supp. 2d 1063 [all Board findings arbitrary]; *Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049; *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, order amended at 2006 WL 2642123 [all Governor findings arbitrary, bias also found]; and *McQuillion v. Duncan, supra,* 342 F.3d 1012 (9th Cir. 2003) [all Board findings arbitrary].)

52.  In addition to these published decisions, numerous unpublished decisions in our state courts and in the federal district courts have found arbitrary executive action, including *In re Shaputis* (Cal. App. 4th District 2005) 37 Cal.Rptr.3d 324; *In re Samble* (Cal. App. 6th District) 2005 WL 217030 [all Board findings arbitrary]; *In re Weider* (Cal. App. 6th District) 2005 WL 40042 [some Board findings arbitrary]; *In re Alvarade* (Cal. App. 6th District) 2005 WL 217030 [some Board findings arbitrary]; *In re Singer* (Cal. App. 6th District) 2005 WL 103537 [all Governor findings arbitrary]; *In re Seymour* (Cal. App. 6th District) 2004 WL 2749090 [all Board findings arbitrary — twice, the second denial of parole being contrary to the court's order finding its initial denial of parole arbitrary and justifying an order for the parole of the petitioner]; *In re McGraw* (Cal. App. 5th District) 2004 WL 2075453 [all Board findings arbitrary]; *People v. Johnson* (Cal. App. 2d District) 2003 WL 1827262 [all Board findings arbitrary]; *In re Williams* (Cal. App. 2d District) 2002 WL 31124517 [all Board findings arbitrary]; *Clay v.*

34

*Kane* (C.D. Cal. 2006) 2006 WL 2135736 [all Governor findings arbitrary]; and *Masoner v. State* (C. D. Cal. 2004) 2004 WL 1080176 & 1080177 [Board's repeated denials of parole arbitrary].

53.  In sum, the executive's implementation of the parole system in California has turned upside down the legislative contemplation that murderers normally be found suitable for parole at their earliest eligibility and released at a time proportionate to the individual's culpability.  Instead of honoring the legislative mandate to normally parole murderers, the executive has arbitrarily established a policy of almost never permitting parole of them.  Consequently, Cronk has not been afforded federal and state constitutional due process guaranties in the course of the executive's repeated refusal to grant him parole.  (See *Hicks v. Oklahoma* (1980) 447 U.S. 343 [state court's arbitrary deprivation of a life or liberty interest granted by state statute constitutes a violation of federal due process].)

54.  The contemporary and historical recidivism rate for murderers paroled in California is about 2%; the recidivism rate for other felons paroled in California recently has been as high as 70% — the highest in the nation — and still remains at about 40%.  Older prisoners like Cronk, particularly after service of long prison terms, virtually never return to prison after they parole.

H.    General Allegations.

55.  Cronk's custody is illegal.  It violates state statutes and regulations, the due process clauses of the state and federal constitutions, and the cruel and unusual prohibitions of the state and federal constitutions.

35

56.  Cronk's claims in this petition are based on these allegations; the attached points and authorities; and the exhibits filed with this petition.  All of these are incorporated herein by reference as if fully set forth.

\* \* \* \* \* \*

## CONTENTIONS

### 1.

THE BOARD'S REFUSAL TO SET A PAROLE DATE FOR CRONK IS ARBITRARY, CAPRICIOUS, AND NOT SUPPORTED BY ANY EVIDENCE, IN VIOLATION OF SECTION 3041 AND DUE PROCESS UNDER THE CALIFORNIA AND UNITED STATES CONSTITUTION.

### 2.

THE REPEATED REFUSAL OF THE BOARD TO GRANT CRONK PAROLE DESPITE THE OVERWHELMING EVIDENCE OF HIS EXEMPLARY REHABILITATION AND DEMAND FOR FURTHER INCARCERATION SERVES NO LEGITIMATE PENOLOGICAL PURPOSE AND VIOLATES CRONK'S RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT UNDER THE STATE AND FEDERAL CONSTITUTIONS.

### 3.

THE EXECUTIVE BRANCH'S POLICY AND PRACTICE OF RARELY GRANTING PAROLE TO LIFE-SENTENCED PRISONERS VIOLATES THE LEGISLATIVE FRAMEWORK UNDER PENAL CODE SECTION 3041 THAT CARRIES A MANDATE TO NORMALLY PAROLE MURDERERS WITH A REASONABLY PROPORTIONATE AND UNIFORM SENTENCE.

37

## PRAYER FOR RELIEF

Cronk is without remedy save by writ of habeas corpus.

WHEREFORE, Cronk prays that this Court:

1. Issue an Order to Show Cause directing Respondent to file a Return;

2. Declare the rights of the parties;

3. Order Cronk's immediate release on parole;

4. Invalidate the decision of the Board and order it to establish a parole date for Cronk, and order respondent to release him from prison pursuant to that date;

5. Order parole authorities to determine parole suitability of Cronk and all life-sentenced prisoners in accordance with the law and against a base that murderers normally be granted a parole date when they become eligible for parole; and

6. Grant all other relief necessary to promote the ends of justice and redress Cronk's unlawful imprisonment.

Dated:  October 26, 2006

Respectfully submitted,

MICHAEL SATRIS
CARRIE KOJIMOTO

*Carrie Kojimoto*
CARRIE KOJIMOTO
Attorneys for Petitioner

## NEXT FRIEND VERIFICATION

Carrie Kojimoto declares under penalty of perjury under the laws of the State of California:

I am an attorney licensed to practice law in the State of California and have prepared this petition for writ of habeas corpus on behalf of petitioner DONALD EVERETT CRONK, and with his knowledge and approval.  I am making this verification on behalf of Cronk because he is incarcerated at San Quentin State Prison and not readily accessible to me; the matters alleged in the petition are demonstrated by the exhibits lodged herewith; and obtaining his verification would only needlessly prolong his unlawful incarceration and delay the filing of this pleading.  (See *In re Davis* (1979) 25 Cal.3d 384.)

I have read the foregoing petition for writ of habeas corpus and declare that the contents of the petition are true.

Dated:  October 26, 2006

Carrie Kojimoto

CARRIE KOJIMOTO

Attorney for Petitioner
DONALD EVERETT CRONK

39

## MEMORANDUM OF POINTS AND AUTHORITIES

### ARGUMENT

I.

THE BOARD'S REFUSAL TO SET A PAROLE DATE
FOR CRONK IS ARBITRARY, CAPRICIOUS, AND
NOT SUPPORTED BY ANY EVIDENCE IN
VIOLATION OF SECTION 3041 AND DUE PROCESS
UNDER THE CALIFORNIA AND UNITED STATES
CONSTITUTION.

The specified factors that the Board must consider are stated in
Penal Code section 3041 and section 2402 of Title 15 of the California
Code of Regulations. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 667.)

Subdivision (b) of section 2402 provides:

> All relevant, reliable information … shall be
> considered in determining suitability for parole.
> Such information shall include the circumstances of
> the prisoner's social history; past and present mental
> state; past criminal history, including involvement
> in other criminal misconduct which is reliably
> documented; the base and other commitment
> offenses, including behavior before, during and after
> the crime; past and present attitude.

California Code of Regulations, title 15, section 2402,
subdivision (d)(1)-(9) sets forth circumstances that tend to show
suitability: (1) the prisoner has no record of assaultive conduct as a
juvenile; (2) the prisoner has a stable social history; (3) the prisoner
by word and/or deed has shown remorse for the commitment crime;
(4) the prisoner committed the crime as the result of significant stress
in his life, especially if the stress has built over a long period of time;

(5) the prisoner committed the offense as a result of battered woman syndrome; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner is of an age that reduces the probability of recidivism; (8) the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) the prisoner has engaged in institutional activities that indicate an enhanced ability to function within the law upon release.

California Code of Regulations, title 15, section 2402, subdivision (c)(1)-(6) lists circumstances tending to show unsuitability: (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner has a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner previously has sexually assaulted another individual in a sadistic manner; (5) the prisoner has a lengthy history of severe mental problems related to the offense; and (6) the prisoner has engaged in serious misconduct while in prison.

The Board's decision must be supported by "some evidence" pertinent to the "relevant standards" to comply with constitutional due process. (*In re Dannenberg, supra,* 34 Cal.4[th] at p. 1071; see also *id.* at p. 1084 [parole denial is lawful only "[s]o long as the ... finding of unsuitability flows from relevant criteria and is supported by 'some evidence' in the record"]; *id.* at p. 1095, fn. 16 ["the Board must apply detailed standards when evaluating whether an individual inmate" should be granted parole]; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 638 [the evidence supporting denial of parole must be "based upon the factors specified by statute and regulation"]; *id.* at p. 677 [parole

41

decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary and capricious".) Evidence should be considered in light of all the information about the individual that relates to the regulatory factors. (See, e.g., *In re Rosenkrantz, supra,* 29 Cal.4th at p. 655 ["[E]ven before factors relevant to parole decisions had been set forth expressly by statute and regulation, we concluded that 'any official or board vested with discretion is under an obligation to consider *all* relevant factors, and the Board cannot, consistently with its obligation, ignore postconviction factors unless directed to do so by the Legislature.'" (Italics in original, brackets in quote deleted)]; *In re Scott, supra,* 133 Cal.App.4th at pp. 590-591 ["[The Governor's] decision must reflect an individualized consideration of all the specified criteria and it cannot be arbitrary or capricious. [Citation].]"; *In re Stanley, supra,* 54 Cal.App.3d at p. 1039, fn. 7 ["It is enough to say that the Adult Authority must apply all the factors."].)

"[I]n order to prevent the parole authority's case-by-case determinations from swallowing the rule that parole should 'normally' be granted, an offense must be 'particularly egregious' to justify the denial of parole." (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095, quoting *In re Ramirez, supra,* 94 Cal.App.4th at p. 570.) The Board may invoke the exception and find that an offender is presently unsuitable for parole only if it "reasonably believes" that the "particular circumstances" of the commitment offense indicate that the individual currently poses a continuing risk to public safety. (*In re Dannenberg, supra,* 34 Cal.4th at pp. 1071, 1084, 1088.) The Board

42

must identify and explain how particular circumstances and "factors beyond the minimum elements of the crime" serve to establish a reasonable belief that the inmate presently poses an "unreasonable risk of danger to society if released from prison." (See Cal. Code Regs., tit. 15, § 2402, subd. (a); see also Pen. Code, § 3041, subd. (b); *In re Dannenberg, supra,* 34 Cal.4th at pp. 1070, 1084, 1090, 1095 [approving denial of parole where some evidence shows that the decision-maker "reasonably believes" or has a "reasonable belief" that the inmate presents a "continuing public danger," "continuing risk to public safety," or "continuing risk to the community at large"]; *In re Smith, supra,* 114 Cal.App.4th at p. 372 [finding that "the sole factor cited by the Governor — Smith's entrenched desire for drugs due to long-term abuse — does not constitute some evidence that Smith might start using drugs and become violent again, and therefore that he *currently* poses an unreasonable risk of danger without further treatment" (italics in original)].)

As recently stated in *In re Lee, supra,* ___ Cal.App.4th ___ [2006 WL 2947968 *3]: "Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." "The test is not whether some evidence supports the reasons the [Board] cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." (*Ibid.*) The *Lee* court concluded: "Applying that test, we find no evidence that Lee is likely to commit another crime or that his release would unreasonably endanger the public." ([2006 WL 2947968 *4].) The court explained:

"Simply from the passing of time, Lee's crimes almost 20 years ago,
have lost much of their usefulness in foreseeing the likelihood of
future offenses than if he had committed them five or ten years ago."
([2006 WL 2947986 *6, citing *In re Scott, supra,* 133 Cal.App.4th at
p. 595].) Lee's offenses, committed in 1987, stemmed from a dispute
over a restaurant debt owed to him. The debtor's failure to pay caused
Lee significant hardship. Lee shot his intended victim several times.
The victim survived, but the victim's wife, who was struck in the head
by one of the bullets, died. Lee pleaded guilty to attempted
premeditated murder and second degree murder and admitted two
firearm enhancements. He was sentenced to 17 years to life for the
murder and life with the possibility of parole for attempted
premeditated murder. ([2006 WL 2947968 *1].)

Applying the test set forth in *Lee* here, there is no evidence that
Cronk's release currently poses an unreasonable danger to the public
and the Board posited no reasonable explanation why the offense
indicates Cronk's *present* danger to the community if released. After
25 years of extraordinary rehabilitation and six parole consideration
hearings, the Board's continued reliance on the commitment offense
and related criminality as reliable and rational predictors of Cronk's
present and future dangerousness violates due process. As stated in *In
re Scott, supra,* 133 Cal.App.4th at pp. 594-595:

> Reliance on such an immutable factor "without
> regard to or consideration of subsequent
> circumstances" may be unfair [citation] and "runs
> contrary to the rehabilitative goals espoused by the
> prison system and could result in a due process
> violation." [Citation.] The commitment offense can

44

> negate suitability only if circumstances of the crime
> reliably established by evidence in the record
> rationally indicate that the offender will present an
> unreasonable public safety risk if released from
> prison. Yet, the predicative value of the
> commitment offense may be very questionable after
> a long period of time. [Citation.] Thus, denial of
> release solely on the basis of the gravity of the
> commitment offense warrants especially close
> scrutiny.

The Board's repeated refusal to grant parole based on the offense is divorced from the overwhelming evidence of Cronk's suitability and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs v. Terhune, supra,* 334 F.3d at p. 917.)

The federal courts have expressed thoughts similar to those set forth in *Lee* and *Scott.* For example, in *Irons v. Warden of California State Prison-Solano, supra,* 358 F.Supp.2d at p. 947, fn. 2, the court noted:

> To a point, it is true, the circumstances of the crime
> and motivation for it may indicate a petitioner's
> instability, cruelty, impulsiveness, violent
> tendencies and the like. However, after fifteen or so
> years in the caldron of prison life, not exactly an
> ideal therapeutic environment to say the least, and
> after repeated demonstrations that despite the
> recognized hardships of prison, this petitioner does
> not possess those attributes, the predictive ability of
> the circumstances of the crime is near zero.

Here, the factors that led to Cronk's criminal behavior have been fully addressed and resolved. Cronk, who has spent a quarter-century in the caldron of prison life, has long demonstrated his

45

suitability for parole with his indisputably exemplary record of reform and rehabilitation.

In *Lee*, the Court of Appeal vacated the Governor's decision to reverse the Board's order granting parole. The Governor had reversed the parole grant because he found the commitment offense was "'atrocious,' involving more than the minimum conduct needed to commit his offenses," and because "Lee's admission of culpability was too recent to count much in the Governor's estimation." (__ Cal.App.4th __ [2006 WL 2947968 *3].) The Court of Appeal found Lee's crimes were not atrocious, "or at least were no more atrocious than whenever one human being kills another — and were not committed in 'an especially heinous, atrocious or cruel manner.'" (*In re Lee, supra,* __ Cal.App.4th __ [2006 WL 2947968 *4].) The court examined the nature of the violence of other murders (__ Cal.App.4th __ [2006 WL 2947968 **4-5, citing e.g., *In re Rosenkrantz, supra,* 29 Cal.4th at p. 678, *In re Dannenberg, supra,* 34 Cal.4th at p. 1095, *In re Burns* (2006) 136 Cal.App.4th 1318, pp. 1327-1328, and *In re Van Houten* (2004) 126 Cal.App.4th 339, pp. 346, 351, 366, and found "Lee's crimes do not measure against these foregoing offenses as [committed in an] 'especially heinous, atrocious or cruel manner.'" (__ Cal.App.4th __ [2006 WL 2947968 *6].) "Instead of being atrocious, Lee's conduct involved no more than was necessary to commit his crimes." (*Ibid.*)

Likewise, the murder Cronk committed did not involve more than the minimum necessary to commit first degree murder, and was not done in "an especially heinous manner" with the gratuitous cruel

violence that occurred in the first-degree murder by Van Houten. The
Board's reasoning that the murder was especially heinous because it
was carried out in a dispassionate and calculated manner is capricious,
because the shooting impulsively occurred when Cronk, after being
shot at six times and hit by gunfire twice, acted out of a fear and
survival instinct when he reflexively fired back at Allen. The Board's
reasoning "that this was just too heinous" because Cronk and his
cohorts waited for Allen to come home to rob him of his diamond
ring, that "[t]hey didn't just go to the house and take things" (Exh. 2,
p. 87) may show that the robbery was particularly egregious, but that
is not a basis to conclude that the murder was particularly egregious.
The 2005 denial highlights the fact that the Board's continued reliance
on the unchanging characterization of the commitment offense after
over two decades of incarceration to repeatedly deny parole to Cronk,
who has taken advantage of every available institutional opportunity
and successfully completed intensive one-on-one crime-related
therapy, violates his due process rights under the California and
United States Constitution.

It also runs contrary to Penal Code section 3041, which
provides for the early setting of a parole date, but permits the Board to
set a term of imprisonment that accounts for the State's interest in
punishment. Hence, the Board cannot defer a parole grant on the
basis that the prisoner has not yet served enough time as punishment
for his offense — as *Dannenberg* emphasized, it may defer the
establishment of a term of imprisonment only if the setting of a parole
date would threaten public safety.

47

"The exceedingly deferential nature of the 'some evidence'
standard of judicial review ... does not convert a court reviewing the
denial of parole into a potted plant...." (*In re Scott, supra*, 119
Cal.App.4th at p. 898.) As in *Scott*, this Court can "conclude not
simply that the evidence refutes rather than supports the findings
relied upon by the Board to deny [the applicant] parole, but that the
Board has inexplicably and unjustifiably ignored abundant undisputed
evidence showing his suitability for release." (*Ibid.*)

The reasoning of one federal court in applying the *Biggs*
rationale aptly fits this case:

> Whether the facts of the crime of conviction, or
> other unchanged criteria, affect the parole eligibility
> decision can only be predicated on the "predictive
> value" of the unchanged circumstance. Otherwise,
> if the unchanged circumstance per se can be used to
> deny parole eligibility, sentencing is taken out of the
> hands of the judge, and totally reposited in the
> hands of the BPT. That is, parole eligibility could
> be indefinitely and forever delayed based on the
> nature of the crime even though the sentence given
> set forth the possibility of parole – a sentence given
> with the facts of the crime fresh in the minds of the
> judge. While it would not be a constitutional
> violation to forego parole altogether for certain
> crimes, what the state cannot constitutionally do is
> have a sham system where the judge promises the
> possibility of parole, but because of the nature of the
> crime, the BPT effectively deletes such from the
> system. Nor can a parole system where parole is
> mandated to be determined on someone's future
> potential to harm the community, constitutionally
> exist where despite 20 or more years of prison life
> which indicates the absence of danger to the
> community in the future, the BPT commissioners[']

48

> revulsion towards the crime itself, or some other
> unchanged circumstance, constitutes the alpha and
> omega of the decision. Nobody elected the BPT
> commissioners as sentencing judges. Rather, in
> some realistic way, the facts of the unchanged
> circumstance must indicate a present danger to the
> community if released, and this can only be assessed
> not in a vacuum, after four or five eligibility
> hearings, but counterpoised against the backdrop of
> prison events.

(*Blair v. Folsom State Prison* (E.D. Cal. 2005) 2005 WL 2219220.)

The Board's revulsion towards the immutable circumstances of

Cronk's crime should not be allowed to convert what was a life

sentence with the probability of parole [the Board shall "normally"

grant parole] into a de facto imprisonment without the possibility of

parole.

The Board's second reason for denying parole based on the

offense, that the motive was inexplicable or very trivial in relationship

to the offense, is equally indefensible. To begin with, as stated in *In

re Scott, supra*, 119 Cal.App.4th at p. 892, "[t]he Board did not

indicate whether it found Scott's motive 'inexplicable' or 'very trivial

…,' as it could not be both." As explained in *Scott*:

> An "inexplicable" motive, as we understand it, is
> one that is unexplained or unintelligible, as where
> the commitment offense does not appear to be
> related to the conduct of the victim and has no other
> discernible purpose. A purpose whose motive for a
> criminal act cannot be explained or is unintelligible,
> is therefore unusually unpredictable and dangerous.

(*Id.* at p. 893.)

49

Here, very clearly, Cronk's motive for the murder was not inexplicable — it was to save his life after Allen spun around and fired several shots at him. That is a motive so basic that it justifies homicide as self-defense where the individual is not at fault, as Cronk was here by engaging in his robbery-burglary. Moreover, Cronk's motivation for the robbery was not "materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk to danger to society if the prisoner is ordinarily presented." (*In re Scott, supra*, 119 Cal.App.4th at p. 893.) Quick and "easy" acquisition of property is a robber's typical motive, as it was for Cronk here. That the homicide occurred in the course of a robbery is what elevated this crime to first-degree murder; Cronk's motive to rob does not make this felony-murder "especially heinous, atrocious, or cruel." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

Moreover, the only reasonable finding that the Board could make is that Cronk's motivation favored a finding of parole suitability, for the record indisputably shows that he "committed his crimes as the result of significant stress in his life," a factor in the Board's governing criteria indicating the unlikelihood of reoffense, "especially if the stress has built over a long period of time." (Cal. Code Reg., tit. 15, § 2402, subd. (d)(4).) As in *Scott, supra*, 119 Cal.App.4th at p. 890, the evidence as indicated in his psychological reports "suggest[s] the very opposite" of unsuitability for parole. Cronk was struggling with his out-of-control drug addiction and the

50