# EXHIBIT C
# Part 3 of 6

LAW OFFICES OF

# MICHAEL SATRIS

ASSOCIATE COUNSEL

MARGARET LITTLEFIELD

POST OFFICE BOX 337
BOLINAS, CA 94924
TEL: (415) 868-9209
FAX: (415) 868-2658
EMAIL: SATRIS@EARTHLINK.NET

ASSOCIATE COUNSEL

CARRIE KOJIMOTO

**FILED**

NOV 17 2006

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT
BY _____ Deputy

November 16, 2006

Clerk,
Court of Appeal of the State of California
Third Appellate District
900 N. Street, Suite 400
Sacramento, CA 95814

**C053979**

Re: *In re Donald Cronk,* ████

Dear Clerk:

On October 27, 2006, we filed a petition for writ of habeas corpus for our client, Donald Everett Cronk, and asked the court to request that the exhibits that were lodged with his Sacramento County Superior Court petition, *In re Cronk,* No. 06F06029, be transmitted to it. On November 9, 2006, a clerk for this court informed us by phone that our request was not granted. Enclosed are the aforementioned exhibits.

Sincerely,

*Carrie Kojimoto*

Carrie Kojimoto

cc: client

**RECEIVED**

NOV 17 2006

Clerk, Court of Appeal
Third Appellate District

### INDEX TO APPENDIX OF EXHIBITS LODGED WITH CRONK'S
### PETITION FOR WRIT OF HABEAS CORPUS

| Exh.# | Description | Page# |
|-------|------------|-------|
| | **VOLUME I** | |
| 1 | Life Prisoner Hearing Decision Face Sheet, Recommendations and Requests for 9-14-05 Parole Hearing | 1-2 |
| 2 | Transcript of Cronk's September 14, 2005 Parole Hearing | 3-94 |
| 3 | Life Prisoner Evaluation and Post-Conviction Progress Report, August 2005 Calendar | 95-105 |
| 4 | Mental Health Evaluation of Cronk for the Board of Prison Terms, June 2005 Life Hearing, dated June 30, 2005 | 106-109 |
| 5 | Re-entry Plans Upon Parole submitted to the Board by Mr. Cronk for his 2005 parole hearing | 110-132 |
| 6 | Various Chronos & Certificates | 133-172 |
| | **VOLUME II** | |
| 7 | Life Prisoner Parole Hearing Decision for Cronk's March 16, 2004, Parole Hearing | 173-184 |
| 8 | Life Prisoner Evaluation and Post-Conviction Progress Report, March 2004 Calendar | 185-194 |
| 9 | Life Prisoner Parole Hearing Decision for Cronk's January 29, 2003, Parole Hearing | 195-206 |
| 10 | Cronk's request for postponement of 12-2-02 Parole Hearing to 1-29-03 | 207-209 |
| 11 | Life Prisoner Evaluation and Post-Conviction Progress Report, December 2002 Calendar | 210-219 |
| 12 | Life Prisoner Parole Hearing Decision for Cronk's December 20, 2001, Parole Hearing | 220-229 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INDEX TO APPENDIX OF EXHIBITS LODGED WITH CRONK'S PETITION FOR WRIT OF HABEAS CORPUS

| Exh.# | Description | Page# |
|---|---|---|
| 13 | Life Prisoner Evaluation and Post-Conviction Progress Report, December 2001 Calendar | 230-240 |
| 14 | Psychological Evaluation for the Board of Prison Terms, December 2001 Lifer Hearing, dated 10-12-01 and 9-4-01 | 241-258 |
| 15 | Life Prisoner Parole Hearing Decision for Cronk's March 5, 1997, Parole Hearing | 259-267 |
| 16 | Life Prisoner Evaluation and Post-Conviction Progress Report, March 1997 Calendar | 268-275 |
| 17 | Psychological Evaluation for the Board of Prison Terms, March 1997 Lifer Calendar | 276-277 |
| 18 | Life Prisoner Documentation Hearing Decision for Cronk's June 10, 1993, Documentation Hearing | 278-279 |
| 19 | Post-Conviction Progress Report, June 1993 | 280-282 |
| 20 | Psychological Evaluation for the Board of Prison Terms, June 1993 Lifer Hearing, dated 4/27/93 | 283-285 |
| 21 | Life Prisoner Documentation Hearing Decision for Cronk's June 25, 1990, Documentation Hearing | 286-287 |
| 22 | Post-Conviction Progress Report, June 1990 | 288-291 |
| 23 | Psychological Evaluation for the Board of Prison Terms, June 1990 Documentation Lifer Hearing, dated 5/90 | 292-293 |
| 24 | Life Prisoner Documentation Hearing Decision for Cronk's May 26, 1987, Documentation Hearing | 294-295 |
| 25 | Post-Conviction Progress Report, May 1987 | 296-297 |
| 26 | Psychological Evaluation for the Board of Prison Terms, June 1987 Documentation Lifer Hearing, dated 5/14/87 | 298-299 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INDEX TO APPENDIX OF EXHIBITS LODGED WITH CRONK'S
## PETITION FOR WRIT OF HABEAS CORPUS

| Exh.# | Description | Page# |
|-------|-------------|-------|
| 27 | Probation Officer's Report | 300-329 |
| 28 | Board of Parole Hearings Lifer Parole Statistics | 330-374 |

LIFE PRISONER HEARING DECISION FACE SHEET

( ) PAROLE GRANTED — (YES)
    CDC: Do not release prisoner before
    Governor's review.

(✓) PAROLE DENIED – (NO)    1 yr    ( 9/06 )

| Records Use Only |
|---|
| Parole Release Date _____ |
|               YR    MO    DAY |
| Attach Prison Calculation Sheet |

( ) AGREED UNSUITABLE (Attach 1001A Form)  FOR: _____ YEAR(S)

( ) HEARING POSTPONED/REASON:_____

## PANEL RECOMMENDATIONS AND REQUESTS.

**The Board Recommends:**
( ) No more 115's or 128A's    (✓) Stay discipline free
( ) Work to reduce custody level    ( ) Learn a trade*        (✓) Earn positive chronos
(✓) Get self-help*                 ( ) Get therapy            ( ) Get a GED*

( ) Recommend transfer to _____
( ) Other _____

•   These programs are recommended if they are offered at your prison and you are eligible/able to participate

Penal Code 3042 Notices  (X ) Sent   Date: _____07-27-05_____

Commitment Offense(s)_____187 & 12022.5_____MURDER 1ST W/ USE OF FIREARM
                            Code(s)                       Crime(s)
                            SAC 66618                  1
                            Case #(s)                  Count #(s)

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 06-13-84 | 06-13-84 | 03-02-98 |

( ) Initial Hearing   ( X ) Subsequent (Hearing No) 4   ( ) Date of Last Hearing  03-16-04

| CDC Representative | | |
|---|---|---|
| Attorney for Prisoner  RICHARD FATHY | Address | |
| D.A. Representative  ROB GOLD | County | SACRAMENTO |

This form and the Board's decision at the end of the hearing is only proposed and **NOT FINAL**. <u>It will not become final until it is reviewed.</u>

| Chair | Date |
|---|---|
| Panel Member  *B Thompson* | Date  Sept 05 |
| Panel Member | Date  05 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD | C-87286 | SAN QUENTIN | SUB 3 | 09-14-05 |

BPT 1001 (Rev. 08-03)

**1**

## SETTING    LIFE PRISONER TERM - PAROLE DENIED

## 11. NOTE TO CDC STAFF: RECOMMENDATIONS AND REQUESTS

☒ 3.  the panel's belief that the prisoner's current mental health is an important issue. In the new full evaluation, the panel requests that the clinician specifically address the following:

   ☒ a.  the prisoner's violence potential in the free community;

   ☒ b.  the significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released;

   ☐ c.  the prisoner's psycho-sexual problems;

   ☒ d.  the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;

   ☒ e.  the need for further therapy programs while incarcerated.

   ☐ f.  other: _____

_____

_____

☐ 4.  the panel's belief that the prisoner has deteriorated psychologically and there appears to be a need for treatment. The panel bases this conclusion upon

_____

_____

_____

_____

☐ B.  (Other requests to CDC staff): _____ NOT    BY    DR

INABA

_____

Cronk, Donald                C - 287286

2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number C-87286
)
DONALD CRONK )
)
_____)

INMATE
COPY

CALIFORNIA STATE PRISON, SAN QUENTIN

SAN QUENTIN, CALIFORNIA

SEPTEMBER 14, 2005

PANEL PRESENT:

Mr. Stephen Lee, Presiding Commissioner
Ms. Joan Thompson, Deputy Commissioner

OTHERS PRESENT:

Mr. Donald Cronk, Inmate
Mr. Richard Fathy, Attorney for Inmate
Mr. Robert Gold, Deputy District Attorney (video)
Ms. Unidentified Speaker
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE
_____   No    See Review of Hearing
_____   Yes   Transcript Memorandum

Kristin Ledbetter, Peters Shorthand Reporting

3

ii

## INDEX

PAGE

Proceedings ........................................ 1

Case Factors ...................................... 16

Pre-Commitment Factors ............................ 10

Post-Commitment Factors ........................... 25

Parole Plans ...................................... 33

Closing Statements ................................ 64

Recess ............................................ 81

Decision .......................................... 82

Adjournment ....................................... 89

Transcriber Certification ......................... 90

--oOo--

```
1                  P R O C E E D I N G S

2          DEPUTY COMMISSIONER THOMPSON:  You are on

3   the record.

4          PRESIDING COMMISSIONER LEE:  All right.

5   This is a Subsequent Parole Consideration

6   Hearing for Donald Cronk.  How are you doing Mr.

7   Cronk?

8          INMATE CRONK:  Fine.  Thank you.

9          UNIDENTIFIED SPEAKER:  Can he hear us?

10         PRESIDING COMMISSIONER LEE:  CDC number

11  C-

12         DEPUTY COMMISSIONER THOMPSON:

13  (indiscernible) microphone.

14         PRESIDING COMMISSIONER LEE:  Counsel, can

15  you hear us?  Counsel, can you hear us?

16         DEPUTY COMMISSIONER THOMPSON:  And all he

17  had to do was press the button.

18         UNIDENTIFIED SPEAKER:  That's what he

19  said.

20         PRESIDING COMMISSIONER LEE:  Counsel, can

21  you hear us?

22         UNIDENTIFIED SPEAKER:  He doesn't look

23  like can.

24         PRESIDING COMMISSIONER LEE:  It should

25  just be the mute button.

26         UNIDENTIFIED SPEAKER:  Yeah.

27         ATTORNEY FATHY:  Is there a mute on the
```

2

1    --

2         DEPUTY COMMISSIONER THOMPSON:  There is a

3    mute, but he should just need to press the

4    microphone button.  It turns on if you press it.

5    It turns on.

6         UNIDENTIFIED SPEAKER:  It's on here.

7         PRESIDING COMMISSIONER LEE:  Can you hear

8    us?

9         ATTORNEY FATHY:  Do you know how to work

10   these phones?

11        UNIDENTIFIED SPEAKER:  Try to call the

12   (indiscernible).

13        DEPUTY COMMISSIONER THOMPSON:

14   (indiscernible) events (indiscernible).

15        INMATE CRONK:  I don't know if I'm

16   allowed to.

17        DEPUTY COMMISSIONER THOMPSON:  Are you

18   electronically literate?

19        ATTORNEY FATHY:  This is the guy who puts

20   on the concerts in the prison.

21        DEPUTY COMMISSIONER THOMPSON:  Oh,

22   really.  So he could probably tell us everything

23   (indiscernible).

24        PRESIDING COMMISSIONER LEE:  No, no, no,

25   no, no, no.  We're just waiting for the officers

26   to come.

27        ATTORNEY FATHY:  Here it comes.  Here it

6

3

1   comes.

2   　　　PRESIDING COMMISSIONER LEE:  Can you hear

3   us?

4   　　　DEPUTY DISTRICT ATTORNEY GOLD:  Yes, I

5   can.

6   　　　PRESIDING COMMISSIONER LEE:  Yeah.

7   　　　UNIDENTIFIED SPEAKER:  He did it.  You

8   have saved (indiscernible).  How did you do

9   that?

10  　　　INMATE CRONK:  I just pushed the mute

11  button.

12  　　　PRESIDING COMMISSIONER LEE:  I pushed the

13  mute.

14  　　　DEPUTY COMMISSIONER THOMPSON:  I pushed

15  the mute.

16  　　　PRESIDING COMMISSIONER LEE:  I pushed the

17  mute too.

18  　　　UNIDENTIFIED SPEAKER:  Okay.  We got it

19  on.

20  　　　PRESIDING COMMISSIONER LEE:  All right.

21  　　　DEPUTY COMMISSIONER THOMPSON:  Let me see

22  if it's on.

23  　　　PRESIDING COMMISSIONER LEE:  All right.

24  Let us begin.  This is the Subsequent Parole

25  Consideration Hearing for Donald Cronk, CDC

26  number C-87286.  The date of the hearing is

27  September the 14th, the year 2005.  We are

**7**

1    currently located at San Quentin State Prison.

2    The inmate was received on June 13th of 1984,

3    out of the County of Sacramento in Case Number

4    66618.   The offense was murder in the first

5    degree with the use of a firearm pursuant to

6    Penal Code Section 187.   The term was set at 27

7    years to life with a minimum eligible parole

8    date of April, no, March the 2nd, 1989.   At this

9    time, we'll make our appearances.   My name is

10   Stephen Lee, L double E, Commissioner presiding.

11          **DEPUTY COMMISSIONER THOMPSON:**   And my

12   name is Joan Thompson, T-H-O-M-P-S-O-N, and I'm

13   a Deputy Commissioner.

14          **ATTORNEY FATHY:**   My name is Richard Fathy

15   (phonetic).   I represent Mr. Cronk.

16          **INMATE CRONK:**   Donald Cronk, C-87286,

17   C-R-O-N-K.

18          **PRESIDING COMMISSIONER LEE:**   All right.

19          **DEPUTY DISTRICT ATTORNEY GOLD:**   Robert

20   Gold, Deputy District Attorney, Sacramento

21   County representing the People.

22          **PRESIDING COMMISSIONER LEE:**   And Mr. Gold

23   is appearing by video conference, and I will

24   indicate to all parties that we will treat the

25   Deputy District Attorney as though he were in

26   the room with us.   I have, gentlemen, Exhibit

27   One.   It is a checklist.   Counsels, I wish that

5

1    I could indicate to you there is a date on it,

2    but it is not.  Counsels, do you have the

3    document that is listed in Exhibit One?

4          ATTORNEY FATHY:  I believe so.

5          DEPUTY DISTRICT ATTORNEY GOLD:  Yes, I

6    do.

7          PRESIDING COMMISSIONER LEE:  Very good.

8    Is there any documents that you wish to submit

9    at this time, counsel, for the inmate?

10         ATTORNEY FATHY:  Commissioner Lee, I

11   didn't see in the file I got a number of the

12   chronos, recent chrono listings for Mr. Cronk.

13   They're just from, really, from the last hearing

14   to the present, and I would presume that either

15   I missed it somewhere, and I've made one set for

16   Mr. Gold if he had been here, but here's a set

17   for yourself if you'd like.

18         PRESIDING COMMISSIONER LEE:  Very good.

19         ATTORNEY FATHY:  And I've got a third set

20   I could send to Bob.  Do you want, do you want

21   --

22         PRESIDING COMMISSIONER LEE:  I don't

23   think that's necessary at this point in time.

24         ATTORNEY FATHY:  Bob, do you want these

25   things?

26         DEPUTY DISTRICT ATTORNEY GOLD:  You can

27   just send them later.

9

6

1          ATTORNEY FATHY:  When I get back to town,

2     I'll send you a copy.

3          DEPUTY DISTRICT ATTORNEY GOLD:  Okay.

4          ATTORNEY FATHY:  They're just the chronos

5     things for the inmate from the last year.

6          DEPUTY DISTRICT ATTORNEY GOLD:  Okay.

7          PRESIDING COMMISSIONER LEE:  Let's move

8     on.  Let's move on.

9          DEPUTY DISTRICT ATTORNEY GOLD:  Mr. Lee.

10          PRESIDING COMMISSIONER LEE:  Yes.

11          DEPUTY DISTRICT ATTORNEY GOLD:  I'm

12     sorry, I wanted to know if in your packet if you

13     had a response from Virginia Allen.  I didn't

14     see one in our folder, but I discussed with her

15     this morning that she did send one a number of

16     weeks ago.

17          PRESIDING COMMISSIONER LEE:  Okay.  Let

18     me check just to verify.

19          DEPUTY DISTRICT ATTORNEY GOLD:  It

20     indicates -- she indicated she also sent a

21     photograph with her letter.

22          PRESIDING COMMISSIONER LEE:  All right.

23     I can almost assure you I have nothing with

24     photographs.  No.  I do not.  We have a fax

25     machine, but that would not pick up any types of

26     letters, I mean, any types of photographs.

27          DEPUTY DISTRICT ATTORNEY GOLD:  I don't

10

1    have a copy of her letter with me.

2         PRESIDING COMMISSIONER LEE:  Well,

3    counsel, what do you wish to do?  Since you

4    don't have a copy, and I don't have a copy, I'm

5    going to move on without it.

6         DEPUTY DISTRICT ATTORNEY GOLD:  Okay.  I

7    would also ask, I did email Mr. Fathy a letter

8    that the daughter of the victim prepared, and I

9    was wondering if he had a copy.

10        ATTORNEY FATHY:  I get -- this is my

11   second credit.  Don, Mr. Cronk, fixed the TV,

12   and I've got the email.

13        DEPUTY DISTRICT ATTORNEY GOLD:  Okay.

14   Thank you.

15        ATTORNEY FATHY:  It's my only copy.

16        PRESIDING COMMISSIONER LEE:  Very good.

17        DEPUTY DISTRICT ATTORNEY GOLD:  I was

18   wondering -- I know that period of time is used,

19   but I was wondering if that would be made part

20   of the packet?

21        PRESIDING COMMISSIONER LEE:  Ms.

22   (indiscernible) says counsel has already had an

23   opportunity to review it, and I will go over it

24   at the appropriate time.  I don't understand why

25   we don't have copies of it.  Was it sent to the

26   Board?

27        DEPUTY DISTRICT ATTORNEY GOLD:  The

1    letter from Virginia Allen was, but apparently

2    there's been some problems in the past.  Even

3    one time Mr. Cronk received a letter that she

4    had sent, and Mr. Cronk had turned it over to

5    the officers.  As to the second letter by Ms.

6    Veragus (phonetic), she just prepared that.  She

7    was debating whether she was going to attend

8    personally or not, and then the hearing got

9    moved a day or a couple days.  She was not going

10   to be present, but she did want some remarks, so

11   she did not send it to the Board.

12           **PRESIDING COMMISSIONER LEE:**  Since the

13   first letter we don't have, you don't have any

14   information in regards to that either, I'm not

15   going to take that into account.  I will take

16   into the account the second letter.  At this

17   point in time, sir, I have a document.  It

18   appears to have your signature.  Did you go over

19   this document with your attorney before signing

20   it?

21           **INMATE CRONK:**  I did.

22           **PRESIDING COMMISSIONER LEE:**  All right.

23   Basically, it goes over your hearing procedure

24   rights, your ADA Rights, as well as your inmate

25   rights.  And at this point in time, sir, do you

26   wish me, do you wish to waive the reading of the

27   admonitions over to you?

**12**

1        INMATE CRONK:  Yes, Sir.

2        PRESIDING COMMISSIONER LEE:  All right.

3    I didn't think that you wanted me to read them.

4    You probably have heard it more times than you

5    want to hear it.  I will, however, indicate that

6    you do have a right.  That right is to be heard

7    by an impartial Panel.  Do you have any

8    objections to the Panel?

9        INMATE CRONK:  No, I do not.

10        PRESIDING COMMISSIONER LEE:  All right.

11    We will begin, we will begin a little bit

12    different.  For counsel, I do my hearings a

13    little bit differently simply because I'm not

14    smart enough, I guess, to figure out things from

15    the middle.  I start from the beginning.  I will

16    start off with your social history, and once I

17    start off with your social history, then I will

18    do, start off with your priors.  Once I finish

19    with your priors and your social history, then

20    I'll go into the facts of the case, at which

21    time then I will stop.  I will allow you an

22    opportunity to clarify anything you need to

23    clarify.  The reason is that I don't like to

24    wait until the end for you to say, oh, by the

25    way, that was all messed up in the beginning.

26    Then, I will turn it over to the Deputy

27    Commissioner.  The Deputy Commissioner will go

13

1    over your programming as well as your

2    psychological report.  Again, I will stop to

3    make any clarifications in your programming.

4    Then, we will go into your future plans which

5    are your parole plans, your letters of support

6    and your letters of opposition.  I will indicate

7    to you ahead of time that there are too many

8    letters for me to read all of them in their

9    entirety.  I will read certain ones into the

10   record.  If there are any that you choose, or

11   you wish to discuss with your attorney that you

12   want to highlight, then we will bring those up.

13   I will give you an opportunity at that time to

14   discuss them as well.  This does not stop you

15   from making your final statement.  Everyone will

16   be allowed to make their final statements, but I

17   only ask that you not be redundant since I am

18   pretty thorough in regards to going over your

19   file.  Having said that, if there's no

20   objections, we will begin.  The inmate was born

21   on December 20th, 1955.  The inmate apparently,

22   excuse me, was born in Milwaukee, Wisconsin, and

23   reared in Palmyra, I think that's how you

24   pronounce that, P-A-L-M-Y-R-A, Wisconsin.  He

25   described it as a farming community, and he grew

26   up on the family's small farm.  He had a very

27   close relationship with his father who died when

14

11

1   the inmate was 17 years old.  He was also close

2   to his mother and three siblings.  Sir, what did

3   your father die of?

4          INMATE CRONK:  Massive coronary.

5          PRESIDING COMMISSIONER LEE:  All right.

6   The inmate's mother writes that she cannot

7   believe that her son did this.  He was an

8   average student in school but outgoing and had

9   many friends.  He went into a deep depression

10  after his father passed, and at the age of 18,

11  he was married.  He lived with her mother, I'm

12  assuming his wife's mother, for awhile, but that

13  did not work, and his wife left and moved to

14  California to stay with her father.  Did you

15  divorce?

16         INMATE CRONK:  Eventually, yes.

17         PRESIDING COMMISSIONER LEE:  All right.

18         INMATE CRONK:  A few years later.

19         PRESIDING COMMISSIONER LEE:  All right.

20  After a short time, the inmate joined his wife

21  in California.  Wait a second.  This doesn't

22  make sense.  All right.  Did your mother stay in

23  Wisconsin?

24         INMATE CRONK:  Yes.

25         PRESIDING COMMISSIONER LEE:  All right.

26  And eventually, you divorced, and your wife

27  moved back to Wisconsin; is that correct?

15

12

1          INMATE CRONK:  Yes, Sir.

2          PRESIDING COMMISSIONER LEE:  How long

3    were you married?

4          INMATE CRONK:  About three years I think

5    it was.

6          PRESIDING COMMISSIONER LEE:  And why did

7    you divorce?

8          INMATE CRONK:  Well, we were, I was

9    young, and she was young, and after my father

10   died, it was my first girl, woman that I'd ever

11   had and she got pregnant, and back home it's

12   like shotgun wedding type thing, and so we

13   thought the right thing to do was get married.

14   And after several years, we realized that we

15   weren't really compatible and had no desire to

16   remain married.

17         PRESIDING COMMISSIONER LEE:  Are you

18   still in a relationship with her?

19         INMATE CRONK:  No.  I was in touch with

20   her until commitment offense.

21         PRESIDING COMMISSIONER LEE:  All right.

22   Did you have a child?

23         INMATE CRONK:  Yes.

24         PRESIDING COMMISSIONER LEE:  All right.

25   How old is your child now?

26         INMATE CRONK:  She'd be about 20.

27         PRESIDING COMMISSIONER LEE:  Do you have

16

1    any contact?

2          INMATE CRONK:  No.

3          PRESIDING COMMISSIONER LEE:  All right.

4    The inmate's mother states that prior to leaving

5    Wisconsin her son had a nervous breakdown.  In

6    the mid 1980s she received word through the

7    inmate's friend that her son had nervous

8    problems while in California.  The inmate

9    returned to Wisconsin in August of 1980.  He was

10   not able to find employment there, so he left

11   after two months.  The inmate's sister, this is

12   going to be interesting, Kebe (phonetic)

13   Kienast, K-I-E-N-A-S-T, writes that the inmate

14   is dearer to her than anyone on earth.  She was

15   four years old when he was born, and they are

16   very close.  She states that she worries about

17   his well being and believes that if given a

18   chance, he could prove himself to be an asset to

19   others.  Are you still in contact with your

20   older sister?

21         INMATE CRONK:  Yes.

22         PRESIDING COMMISSIONER LEE:  You have

23   another sister, Pamela Vetta, V-E-T-T-A.  She

24   basically indicates that you were the sort of

25   boy who all his friends and parents wanted their

26   children to emulate because he was so straight.

27   I've always known Don to be loving, truthful,

14

1    and ambitious.  Are you in touch with that

2    sister as well?

3             INMATE CRONK:  Yes, Sir.

4             PRESIDING COMMISSIONER LEE:  All right.

5    Sir, the reason why I am going through various

6    reports is because I don't believe that a single

7    report has sufficient information for me, so I

8    take things from different reports.  There is an

9    indication that you have no military service; is

10   that correct?

11            INMATE CRONK:  That's correct.

12            PRESIDING COMMISSIONER LEE:  All right.

13   You attended school in the Township of

14   Wisconsin.  This is an interesting statement.

15   You became aware of the social, economic status

16   between yourself and other students.  What does

17   that mean?

18            INMATE CRONK:  Basically, we were, you

19   know, poor.  We lived in poverty, and the other

20   kids didn't, and kids are cruel, and it became

21   patently noticeable.

22            PRESIDING COMMISSIONER LEE:  And that's

23   what you meant.

24            INMATE CRONK:  Yeah.

25            PRESIDING COMMISSIONER LEE:  All right.

26   It's not -- how do I say this.  Many of us do

27   not come from the most affluent families, and

**18**

1  unfortunately, as you've indicated, young people

2  are cruel. Substance abuse history, Mr. Cronk

3  reported experimenting with alcohol and

4  marijuana beginning at the age of 18. He

5  indicates that he tried drugs on an experimental

6  basis but was not a regular user. His employer,

7  apparently, was the one who introduced him to

8  cocaine. The owner of the company was in his

9  mid 30s and involved in elaborate parties,

10 expensive cars, and attractive women. When Mr.

11 Cronk was promoted, his employer had a

12 celebration at which time the inmate tried

13 cocaine. He believed that the drug had no

14 downsides as he was able to function normally at

15 home and at work. He associated cocaine use

16 with success as he admired those who used it in

17 the company. A year later, he became dependent

18 on the drug after his wife separated, he and his

19 wife separated. Mr. Cronk continued to work 14

20 to 15 hours a day, attending parties with

21 company people. His cocaine use increased to

22 the point where he was spending all his money on

23 drugs. He became, he began coming in late for

24 work. He also met a customer who became his

25 cocaine source. In order to finance his

26 addiction, he began stealing from the company

27 and was eventually terminated from his job.

19

1    Now, we will go into the facts of the case.

2    Counsel, at this time, will your client discuss

3    the facts of the case with us?

4         **ATTORNEY FATHY:**  Certainly, if you wish

5    so.

6         **PRESIDING COMMISSIONER LEE:**  All right.

7    At this time, sir, would you raise your right

8    hand.  Do you solemnly swear to tell the truth,

9    the whole truth, and nothing but the truth?

10        **INMATE CRONK:**  I do.

11        **PRESIDING COMMISSIONER LEE:**  All right.

12             "In the morning of December 19th,

13             1980, the inmate and Co-defendant

14             Glen Meyer, M-E-Y-E-R, went to the

15             victim's residence and broke into

16             the residence by entering a

17             backroom window.  The victim was

18             James Allen, A-L-L-E-N, age 50.

19             After ransacking the victim's home

20             in search of personal effects and

21             money, the two men laid in wait

22             armed with an unknown caliber

23             handgun for the victim to return.

24             When the victim returned home, he

25             noticed the dwelling had been

26             entered and drew his own weapon

27             before entering the front door.

20

17

1       The victim surprised the inmate

2       and fired several rounds, striking

3       the inmate one in the arm and once

4       in the side.  The inmate retrieved

5       his handgun from his pocket and

6       shot once, killing the victim.

7       After the murder, both the inmate

8       and the co-defendant, Glenn Meyer,

9       fled.  Glen Meyer stopped long

10      enough to pick up the victim's

11      gun, briefcase, and diamond ring

12      the victim wore.  During the

13      interview for this report, the

14      inmate recalled the caliber weapon

15      as a .38 Colt Special Detective.

16      The inmate was arrested several

17      months later while working in a

18      carnival in Idaho."

19  At this point in time, sir, before we go any

20  further, I think it's necessary for us to allow

21  you an opportunity to clarify anything that I

22  have said thus far.  Is there anything at this

23  time that you would like to clarify in regards

24  to the facts of the case, your social history,

25  and, or your prior history which I neglected to

26  indicate, number one, you have no juvenile

27  convictions.  You do, however, have some adult

21

18

1    convictions.  One was a theft from an auto which

2    you received a fine.  And I believe that's it.

3    The other matters were this case and something

4    that occurred while incarcerated.  So having

5    said that, is there anything you wish to clarify

6    or explain at this time?

7        INMATE CRONK:  I don't know what I could

8    add.  Essentially, the facts of the case, that's

9    exactly how it happened.  Prior to that, my

10   marriage with Mary was, like I said, we felt it

11   was the right thing to do.  We were both

12   immature, and after awhile, we realized we

13   couldn't make it work.  And also, I began using

14   cocaine, and of course, that distracted me from

15   my family, and I concentrated more on my job

16   until the cocaine became such that I began -- I

17   wasn't focused there as well.

18       PRESIDING COMMISSIONER LEE:  All right.

19   It's kind of ironic that you stole from the

20   company, from the owner, who apparently was the

21   one who introduced you to the drug in the first

22   place; is that correct?

23       INMATE CRONK:  Yes, Sir.

24       PRESIDING COMMISSIONER LEE:  All right.

25   At the height of your drug addiction, how bad

26   was it?

27       INMATE CRONK:  I can't recall exactly,

22

1  but I know that it was grams, a lot of money a

2  day, and I was just consumed with it.

3      PRESIDING COMMISSIONER LEE:  All right.

4  Why did you pick this particular individual, Mr.

5  Allen, to rob?

6      INMATE CRONK:  Well, there was a third

7  party involved.  Mr. Meyer and I actually did

8  the robbery and went into the residence, and I

9  believe the record mentions a Mr. Warren, who

10  was an associate of ours at the time, who was

11  aware of Mr. Allen.  He knew Mr. Allen.  I don't

12  know if personally, but he knew of him, that he

13  wore large diamond rings and that he carried

14  this briefcase full of money and jewels from his

15  business to his home, and the plan was, you

16  know, devised to rob him, take him of his

17  valuables.

18      PRESIDING COMMISSIONER LEE:  Well,

19  apparently, all three of you planned this to the

20  extent that you even bought oil to put on his

21  finger to take his ring off.

22      INMATE CRONK:  Yes.

23      PRESIDING COMMISSIONER LEE:  How long did

24  you plan this prior to the actual event?

25      INMATE CRONK:  Well, again, I don't

26  remember exact.  I would say within a week, the

27  plan was thought of and carried out.  I don't

23

1  recall every detail.

2       PRESIDING COMMISSIONER LEE:  Were you

3  involved with crime prior to this incident?

4       INMATE CRONK:  I was on a, just prior to

5  this incident I had, I was just, I was really

6  gone.  I was really addicted to the coke and

7  strung out, and that's all I could focus on, and

8  so yeah, I did some things that, you know, were

9  illegal.

10      PRESIDING COMMISSIONER LEE:  Well, aside

11  from stealing from your employer, what else did

12  you do?

13      INMATE CRONK:  Well, I wrote a check on

14  my brother's account that he hadn't authorized.

15  And when I Wisconsin, I did a robbery with an

16  air gun, a fake gun, to get some money at a gas

17  station.  I came back to California, and then

18  this case happened.

19      PRESIDING COMMISSIONER LEE:  Did you ever

20  at any point in time take any type of, or get

21  yourself involved in any organizations or any

22  program to get off drugs?

23      INMATE CRONK:  At one point, I went to a

24  place called the Aquarian Effort, and it was --

25  what I didn't know, it was mostly for heroin

26  addicts, but I was told that if I went there

27  that they would help.  And I went there, and

24

1    that's what I was told.  I said, well, they told
2    me that cocaine wasn't physically addicting.  It
3    was just psychological and that this was a
4    heroin treatment facility and sent me on my way
5    essentially.
6         **PRESIDING COMMISSIONER LEE:**  All right.
7    Okay.  Well, obviously, it didn't go as you
8    anticipated.  Why did you wait for him to come?
9    There was nothing in the house there worth
10   stealing?
11        **INMATE CRONK:**  Well, I wasn't sure; we
12   weren't sure.  It was assumed that since Mr.
13   Allen brought his briefcase and his valuables
14   home with him every night that there would be a
15   safe in the house or that there would be
16   valuables, so we were going to go into the home
17   and look for those, secure those, and then wait
18   for Mr. Allen to come home.  Mr. Warren was
19   supposed to call us at a pay phone down the
20   street and let us know he was coming so that we
21   would have the element of surprise.
22        **PRESIDING COMMISSIONER LEE:**  No cell
23   phones in those days, huh?
24        **INMATE CRONK:**  No.
25        **PRESIDING COMMISSIONER LEE:**  And he did
26   not do that.  You were surprised when he came
27   in, and he actually shot you in the side and in

25

1    the shoulder, I mean, in the arm?

2         INMATE CRONK:  The arm and the middle of

3    my torso, yes.

4         PRESIDING COMMISSIONER LEE:  All right.

5    Unfortunately, it didn't stop there.  If it had

6    stopped there, you probably would be out among

7    the populace at this point, but you then pulled

8    your weapon.  You had it in your pocket?

9         INMATE CRONK:  Yes, Sir.

10         PRESIDING COMMISSIONER LEE:  So it wasn't

11    out at the time that he came in?

12         INMATE CRONK:  No.

13         PRESIDING COMMISSIONER LEE:  And you shot

14    him.  You shot him only once.

15         INMATE CRONK:  Yes, Sir.  Can I add

16    something?

17         PRESIDING COMMISSIONER LEE:  Sure.

18         INMATE CRONK:  I don't think I would have

19    been walking the streets had it stopped there,

20    Mr. Lee.  He fired at me six times and hit me

21    two.  I went down, and I shot through the coat

22    pocket, and what I learned later, of course, I

23    didn't know that then.  It was just seconds, you

24    know, a flash, a roar, and it's over.  But what

25    I learned later in the police reports is he

26    emptied the gun and that he was reaching for

27    another gun, and in that interval is when I shot

 1    one time.  At that time, I was operating off of

 2    instinct, survival mode, fear.

 3         **PRESIDING COMMISSIONER LEE:**  At this

 4    point in time, well, let me ask you about that.

 5    How do you feel about the fact that the victim,

 6    apparently is walking into his home with his own

 7    possessions, and he finds people, apparently in

 8    his house, not only ransacking his house but

 9    with an intent or were intending to rob him?  Do

10    you think his actions were unreasonable?

11         **INMATE CRONK:**  No, Sir.  I would have

12    done the same thing.

13         **PRESIDING COMMISSIONER LEE:**  How do you

14    think at this point in time, how do you feel

15    about this case?  Mr. Allen, I guess you knew

16    met him.  You knew about him, but you really

17    didn't know him very well.  He died

18    unfortunately.  You've had some time to think

19    about this.

20         **INMATE CRONK:**  I've had a lot of time to

21    think about it, and as the years go by,

22    sometimes I wish I didn't have to think about it

23    so much, but I do.  And I've thought about, how

24    do I express, who do I feel in my heart, how do

25    I put that into words, and no matter what I say

26    and no matter, you know, what I write, it always

27    seems inadequate.  I don't know, at least not

*27*

1   any words that I know, that's in my vocabulary.
2   I don't know how to say what I feel exactly.  I
3   know there's times that I wish that I can't
4   believe it was me, that I'm the one that killed
5   Mr. Allen, that I pulled the trigger, but I'm,
6   you know, brought back to reality, and of course
7   it was me, and I just, I just, I don't know what
8   to do.  I don't know what I can do.  I've tried
9   to do everything I can to make Mr. Allen's death
10  not in vain.  I can never repay.  I can never
11  bring him back obviously.  I've worked very hard
12  throughout the years to try and find out and
13  figure out why was I there that night?  Why was
14  I so addicted to cocaine.  Everybody used
15  cocaine at the time.  They didn't get addicted.
16  What was wrong with me?  And I've spent these
17  last 25 years identifying those things and
18  seeking answers and seeking therapy and help in
19  an attempt to understand who I was then.  And it
20  never gets easier, and it never eases the pain.
21  You read in the record about my father dying
22  when I was 17, and I'd like to tell you that,
23  you know, we lived, we were poor, and we lived
24  in a rural community, and so I didn't have a lot
25  of little friends around, and so my father was
26  my mentor and my best friend.  And we spent
27  hours and hours together, every day, all day,

28

1    working together on the farm, and when he died,

2    it was such a shock to me that it devastated me,

3    and I'll never forget the anger I felt and the

4    pain that I felt or the sorrow that my mother

5    and sisters and brothers and how it just upset

6    our lives and turned everything upside down, and

7    I recall that when I think about Mr. Allen, and

8    I read what Mrs. Allen wrote and what the

9    daughter wrote, and I understand that.  They may

10   never appreciate that fact that I understand

11   that, and I don't blame them, but I understand

12   what I did to that family.  And when I think

13   about I'm the one that did it, that I brought

14   that same suffering and pain that my family and

15   I suffered at the loss of my father, it's really

16   hard to reconcile that with myself.  I would of

17   never, in my right mind, I would of never

18   brought that upon anybody, another human being,

19   and yet I did, and I have to accept that fact,

20   and I do accept that fact, and I have spent

21   these years trying to live with that.  And it

22   isn't easy, and I don't think it will ever

23   become easy.

24            **PRESIDING COMMISSIONER LEE:**  All right.

25   At this time, Deputy Commissioner, I'll turn it

26   over to the Deputy Commissioner.  Deputy

27   Commissioner will discuss with you your

29

1    programming while you've been incarcerated as

2    well as your psychiatric report.

3          DEPUTY COMMISSIONER THOMPSON:    Thank you.

4    We're looking at a period from your last hearing

5    which was March the 16th of 2004 to today,

6    September the 14th, 2005.    You have been housed

7    throughout this period at San Quentin and remain

8    so housed at this point in time.    You're in the

9    general population.    You have a Medium A

10   Custody.    Your classification score as all

11   lifers apparently is 19.    Your academics, you

12   have participated throughout in various

13   programs.    The San Quentin College Program for

14   one, you've achieved an AA degree over this

15   period of time.    You're working on your BA, and

16   the AA was apparently in Theology, and you also

17   have a certificate of completion in Ministry

18   from Patton State College as well.    As far as

19   work, I think you have been essentially the

20   Lieutenant's clerk in West Watch throughout this

21   period.    Is that still true?

22         INMATE CRONK:    No.    Now, I am the

23   Protestant Chaplain's clerk.

24         DEPUTY COMMISSIONER THOMPSON:    So you

25   remained in the clerk field.

26         INMATE CRONK:    Yes, Ma'am.

27         DEPUTY COMMISSIONER THOMPSON:    But now

30.

1    it's the Protestant Chaplain.   Okay.   Your group

2    activities are many, almost awe inspiring.   You

3    have been involved for a significant amount of

4    time and certainly in these last 18 months.

5    Counsel provided me with some documentation that

6    I just went through.   You've received 16

7    laudatory chronos for your participation and

8    your contributions and your faithful attendance.

9    You have received 13, what they call

10   participation chronos.   You've been involved

11   most recently in Impact, Trust, and Overcomers'

12   Outreach, but you have been in also the Marin

13   Abused Women's Auxiliary Program, I believe.

14          **INMATE CRONK:**  Domestic Violence.

15          **DEPUTY COMMISSIONER THOMPSON:**   Domestic

16   Violence, and I'm sure, Narcotics Anonymous and

17   Alcoholics Anonymous and more others that I

18   wouldn't know.   The Impact and Trust,

19   especially, you got certifications from.

20   Impact, I believe it was for Men Putting Away

21   Childish Things.

22          **INMATE CRONK:**  Yes, Ma'am.

23          **DEPUTY COMMISSIONER THOMPSON:**   There were

24   two completions, two courses of counseling.

25          **ATTORNEY FATHY:**   If I may, I wrote down

26   the title, Incarcerated Men Putting Away

27   Childish Things.

31

1              DEPUTY COMMISSIONER THOMPSON:   Things,

2   okay.

3              ATTORNEY FATHY:   I would never remember

4   that title.   That's why I wrote it down.

5              DEPUTY COMMISSIONER THOMPSON:   Truly.

6   Yes.   And I remember the Men Putting Away

7   Childish Things.   Thank you, counsel.   And as

8   far as disciplinaries, it appears you've only

9   had one counseling chrono in your entire career

10  in the Department of Corrections which is

11  amazing, and I think you received some laudatory

12  chronos for your ability to observe the rules

13  and regulations.   It doesn't appear that you've

14  had any one on one type of psychiatric

15  counseling, or at least if you did, I didn't

16  find it.   Have you participated in that?

17             INMATE CRONK:   Well, most of the programs

18  that I'm in are pretty extensive, and in this,

19  since the last hearing, only the times that I

20  spent with the psychiatrist for this report.

21             DEPUTY COMMISSIONER THOMPSON:   In that,

22  in that group setting?

23             INMATE CRONK:   Right.   But throughout the

24  years, the past 20 years, certainly I've spent

25  time with Dr. Bruce and Dr. Du Pre (phonetic),

26  and I've had actually extensive therapy

27  sessions.

32

1    **DEPUTY COMMISSIONER THOMPSON:**    One on one

2    counseling in other parts of your incarceration.

3    **INMATE CRONK:**    Yes.

4    **DEPUTY COMMISSIONER THOMPSON:**    But not

5    within this last 18 months per se.

6    **INMATE CRONK:**    No.  No, Ma'am.

7    **DEPUTY COMMISSIONER THOMPSON:**    Okay.

8    Almost without exception, I'm sure these groups

9    deal with those kinds of issues, Impact and Man

10    Alive and Trust and Overcomers' Outreach.  So in

11    a way, you've been doing it all along, not

12    always necessarily on a one on one basis.

13    **INMATE CRONK:**    Right.

14    **DEPUTY COMMISSIONER THOMPSON:**    All right.

15    I don't think that the psych, your Board report

16    was not particularly making a comment as I

17    remember it.  You have, also, before I move on,

18    you've done Art in Corrections, and you have

19    done the National Military Survivor Peer Support

20    Network.  I believe they call that CAFS

21    (phonetic).  And I think that's the main

22    programs that you have participated in at great

23    length.  And always in a positive vein as far as

24    laudatory chronos, participation chronos, or

25    facilitation chronos which there also were five

26    of among the others as I've already mentioned.

27    In the summary, I believe it does speak to it.

33

1  It says, if Cronk is considered for parole, it

2  would be recommended that he continue to

3  participate in Narcotics and Alcoholics

4  Anonymous, which I'm sure would be positive

5  recommendations.  And he has, he fully

6  understands how his involvement with drugs

7  played a big role in the commitment offense and

8  frankly getting into the correctional system.  I

9  don't believe there's anything else admittedly

10  in the Reader's Digest, compacted, but hopefully

11  accurate.  Is there anything you want to bring

12  up that I haven't touched on as to your post or

13  your institutional adjustment in the period

14  we're looking at?

15     **INMATE CRONK:**  No.  I think it's all on

16  the record.  I think it's all there.

17     **DEPUTY COMMISSIONER THOMPSON:**  It's all

18  there.  Good.  Well, I'm glad.  All right.  Then

19  in the psychiatric area, there was an interview

20  that you have alluded to that was done, I

21  believe, and it says June of 2005, and I believe

22  that was in preparation for this hearing.  And

23  it's essentially a positive evaluation.  It says

24  there is Cocaine Dependency in Institutional

25  Remission on what they call Axis I which is the

26  diagnostic and statistical manual DSM.  On Axis

27  II, there was No Diagnosis of any physical

34

31

1    condition and (indiscernible) that was observed.

2    On Axis III, it says you have had Hepatitis and

3    Degenerative Disc Disease as physical issues.

4    On Axis IV, which is Stressors, Your Commitment

5    Offense and the Alienation from your Family

6    Members are seen as stressors for you.  Your

7    Global Assessment of Functioning is at 85 which

8    is a very positive number.  It says, there is no

9    evidence that Mr. Cronk was suffering from any

10   mental or psychiatric disorder or symptoms at

11   the time of the commitment offense.  He has no

12   history of serious mental disorder or

13   psychiatric condition that might be predictions

14   or precursors in that sense predisposing him to

15   violent behavior.  He does not at the present

16   time have any mental disorder or condition that

17   might place him at an increased risk for violent

18   offenses.  In a confined setting, they feel like

19   you have a low risk of violence.  You have a

20   nonviolent and productive manner in any

21   controlled setting, and if you were in the

22   community, they rate you at a low risk for

23   violence or violent behavior.  And let's see, it

24   would not, your release to the community would

25   not elevate the community's risk for your acting

26   out and thereby causing harm in the community.

27   At the very last, it says there is no indication

35

1  that he represents an increased risk to the

2  community for violence were he to be released.

3  I take it you have read this report which is

4  much more detailed, but those would be the

5  highlights that I saw.  Did I leave out

6  something you wanted specifically or especially

7  to include?

8         **INMATE CRONK:**  No.  I think you covered

9  it.

10         **DEPUTY COMMISSIONER THOMPSON:**  Well, I

11  thank you for that.  I have no questions.  Do

12  you have any Mr. Lee?

13         **PRESIDING COMMISSIONER LEE:**  No.

14         **DEPUTY COMMISSIONER THOMPSON:**  Then I

15  will return it to the Chair.  Thank you very

16  much.

17         **PRESIDING COMMISSIONER LEE:**  Before I go

18  into your parole plans, I do want to just

19  clarify one thing.  You did have one, a single

20  128(a) in 1984.  I guess it was a disrespect or

21  disobeying guards.  What was that about?

22         **INMATE CRONK:**  I think it was in the

23  visiting room, and I had called the officer an

24  ass because I thought he was, and he wrote that

25  up.

26         **PRESIDING COMMISSIONER LEE:**  Well, why

27  did you think he was an ass?  Maybe he was.

1    **INMATE CRONK:**  Well, that's what I

2    thought, he was, and you know that I'm an

3    inmate, and I should of, you know, kept my mouth

4    shut, but I told the truth, and he wrote me up,

5    and he has the right to do that.

6    **PRESIDING COMMISSIONER LEE:**  What did he

7    do?

8    **INMATE CRONK:**  I don't even recall now

9    it's been so long.  I know I see him often.  I

10   believe I -- what was his name?  It escapes me

11   now, but it was just one of those situations.  I

12   can't remember the particulars.

13   **PRESIDING COMMISSIONER LEE:**  All right.

14   I have decided I will probably go through the

15   inmate's parole plans as opposed to those in the

16   Board packet since they may not be as up to

17   date.  The inmate wishes to reside with his

18   fiancée, Kathleen Giono.  Is that how you say

19   her name?

20   **INMATE CRONK:**  Giono.

21   **PRESIDING COMMISSIONER LEE:**  Giono,

22   G-I-O-N-O, and I have a letter from her that I

23   will go to shortly.  Apparently, the inmate and

24   Ms. Giono intend to get married after or once he

25   is released.  They've known each other since

26   1991; is that correct, sir?

27   **INMATE CRONK:**  Yes, Sir.

**37**

1      **PRESIDING COMMISSIONER LEE:**  All right.

2  And the letter seems to indicate that she has

3  her own residence.  She apparently manages a

4  travel agency and things of that nature; is that

5  correct?

6      **INMATE CRONK:**  Yes, Sir.

7      **PRESIDING COMMISSIONER LEE:**  All right.

8  If you live there, where would you work?

9      **INMATE CRONK:**  Well, I've got a number of

10 possibilities.  One would be I would be the

11 Marin County Impact Facilitator working with the

12 CYA.  We just got another contract with CYA, and

13 I don't know if you read in there, but me and my

14 fellow lifers, we designed this group and wrote

15 this program out, and they are facilitating in

16 Fresno and Stockton and various areas already,

17 and it's a paid position.  Additionally, I'm an

18 electrician.  I went through the apprenticeship

19 and completed it.  I'm also an audio engineer

20 and have many contacts in that field, so --

21      **ATTORNEY FATHY:**  And he fixed the tele-

22 conferencing.

23      **INMATE CRONK:**  And between Kathleen, and

24 she's lived in San Anselmo all her life and my

25 church in Tiburon, I've got countless employment

26 opportunities.  And some of them have written

27 letters stating such.  The problem is that, you

1  know, this is ended. We don't know if and

2  whenever I may be released, and so it's

3  difficult for them to say, oh, on such and such

4  a day, he'll become CEO of my corporation and

5  all will be good, and that's impossible. I can

6  just assure that finding employment and getting

7  a meaningful job while I establish myself really

8  isn't going to be an issue for me. I have many

9  skills. I also intend to start my own business

10  eventually, but that would be some time down the

11  road.

12      **PRESIDING COMMISSIONER LEE:** All right.

13  However, you do have a residence if you were

14  required to go back to Sacramento. You would

15  stay with Chris Shirley, S-H-I-R-L-E-Y. You

16  have two sisters, Kebe, again -- I don't know

17  exactly how to spell her, pronounce her name, as

18  well as Pamela. Both, of course, have offered

19  you places to stay; however, they are in

20  Wisconsin as well. Sir, at this point in time,

21  I guess the best thing for us to do is go

22  through your letters of support. We will

23  initially go to, and again, I've indicated this

24  earlier that I will not read each letter or go

25  through each letter since there are too many at

26  this point in time, but as far as your sister

27  goes, I have a letter from both sisters. The

39

1    first one I will read is from your sister, Kebe.

2    Is it Kebe?

3            **INMATE CRONK:**  Kebe.

4            **DEPUTY COMMISSIONER THOMPSON:**    Kebe.  And

5.   she basically indicates that you are remorseful.

6    She's your older sister.  She has prayed for you

7    all her life.  She basically indicates that she

8    wishes you to have an opportunity to be released

9    so that you can prove that you can be a part of

10   society, and she apologizes for writing because

11   her typewriter is broken, and she's in -- I have

12   no idea how to say this either, W-A-U-K-E-S-H-A,

13   Waukesha.

14           **INMATE CRONK:**  Waukesha.

15           **PRESIDING COMMISSIONER LEE:**    Waukesha,

16   Wisconsin.  I wish these letters were in order,

17   but unfortunately, they're not, so we're going

18   to have to flip a little bit.  I don't want to

19   skip your other sister.  Your other sister is

20   Pamela Vetta.  She also wrote a letter.  She

21   indicates that my husband and I have been

22   married for 30 years and have much to offer in

23   regards to employment, housing, and

24   transportation for --

25           **DEPUTY DISTRICT ATTORNEY GOLD:**  Mr. Lee.

26           **PRESIDING COMMISSIONER LEE:**   Yes.

27           **DEPUTY DISTRICT ATTORNEY GOLD:**   Would it

40

1  be possible to speak more into the microphone

2  because I'm having trouble hearing.

3      PRESIDING COMMISSIONER LEE:  Is that

4  better?

5      DEPUTY DISTRICT ATTORNEY GOLD:  Yes.

6      UNIDENTIFIED SPEAKER:  Excuse me, Mr.

7  Lee, but it's this microphone.

8      PRESIDING COMMISSIONER LEE:  Let me move

9  it down (indiscernible).

10     UNIDENTIFIED SPEAKER:  Thank you.

11     PRESIDING COMMISSIONER LEE:  How is that?

12  Is that better?

13     DEPUTY DISTRICT ATTORNEY GOLD:  Thank

14  you.  Yes.

15     PRESIDING COMMISSIONER LEE:  Okay.  I am

16  referring to the inmate's oldest sisters, and

17  she wrote a letter indicating that her husband

18  and she have been married for 30 years and have

19  much to offer in regards to employment, housing,

20  and transportation.  She does not give an

21  address, but I know she also lives in Wisconsin

22  as well.  She indicates that she herself is a

23  recovering alcoholic, very active in the 12 Step

24  Program.  I am, of course, a sponsor for many

25  like myself.  Don has continued upgrading his

26  educational, his education, getting

27  certificates, teaching self-help groups, and

41

1    remains disciplinary-free.  The next letter is

2    from the Tiburon Baptist Church.  It is from the

3    Pastor, Barry Stircker, S-T-I-R-C-K-E-R.

4         "For several years, I have written

5         letters in support of the inmate.

6         I have known the inmate for over

7         nine years through my involvement

8         with programs in the prison.  It

9         appears that Tiburon's Baptist

10         Church does a big deal of outreach

11         in the San Quentin facility.  Our

12         church is willing to commit to the

13         inmate, the support and assistance

14         necessary for his transition into

15         life outside.  I am certain that

16         he well have a vital and

17         substantial support and that he is

18         ready for the next stage of his

19         life.  Our church sponsors an AA

20         group that meets weekly in our

21         facility."

22    The next letter is from Chris McCarthy.  He

23    knows the inmate through a mutual friend by the

24    name of Chris Shirley.  He indicates that he

25    will hire the inmate if the inmate is released

26    to Sacramento County as a house painter.  The

27    next letter is from Patricia Cabral.  She

42

1   apparently is a friend of the inmate's fiancée,

2   Kathleen Giono.  She basically has indicated

3   that she would be willing to pledge 50 dollars a

4   month for his release.  What do you know about

5   Ms. Cabral, sir?

6          **INMATE CRONK:**  I don't know much.  She's

7   come to visit me, and she's a very lifelong

8   friend of Kathleen's.

9          **PRESIDING COMMISSIONER LEE:**  Is she an

10  older lady?

11         **INMATE CRONK:**  In her 50s.

12         **ATTORNEY FATHY:**  That's young.

13         **PRESIDING COMMISSIONER LEE:**  I don't want

14  to go there.  But I guess that's not often that

15  I have someone who will actually pledge an

16  amount for an inmate.  This is the very first

17  time I've actually ever seen it, outside of a

18  relative.  Okay.  And she, of course, is not in

19  California.  She is in Eugene, Oregon.  The next

20  letter is an important letter.  The next letter

21  I will read portions of because it is from the

22  inmate's fiancée.  It is dated January of 2005.

23         "I was born and have lived in San

24         Anselmo, Marin County all my life.

25         I own a home and manage a travel

26         agency in the town of Corte

27         Madera.  I have friends and family

43

1     and contacts in the community, and

2     combined with Donald's skills,

3     finding meaningful employment will

4     be no problem. I met the inmate

5     in 1991 and slowly developed a

6     deeply caring, loving, and serious

7     relationship with him. We plan to

8     be married upon his release."

9 How did you come to meet your fiancée?

10     **INMATE CRONK:** It was during an album

11 recording project that I was on with the Gospel

12 Choir of San Quentin which was released, and she

13 was involved in that and came into the prison.

14     **PRESIDING COMMISSIONER LEE:** Okay. And

15 what was she doing? She was singing or

16 something?

17     **INMATE CRONK:** No. Just a part of the

18 community that came in that was interested. It

19 was quite a large event at the time and the

20 first time in the State of California that it

21 had ever happened, and so it drew a lot of

22 people, a lot of supporters, a lot of media, and

23 hoopla.

24     **PRESIDING COMMISSIONER LEE:** Okay. The

25 next letter is from Losier (phonetic) McDonald,

26 and it basically --

27     **ATTORNEY FATHY:** Who is it?

44

1           **PRESIDING COMMISSIONER LEE:**    McDonald, it

2     indicates that,

3               "I was a TV producer for the . . .

4               Southern Baptist Radio and

5               Television Commission until my

6               retirement three years ago.    We

7               and three other religious groups

8.              made programs each year for NBC

9               and ABC to use as their religious

10              affairs programming, and I

11              produced NBC's show for ten years.

12              Don was singled out by officials

13              at San Quentin as one who

14              practiced what he preached, and

15              after researching three potential

16              stories, I chose Don.    It was a

17              story which showed the practical

18              difference God makes in a prison,

19              in a person's life when it is

20              genuine, where there is a genuine

21              and continuing commitment.    Former

22              Dallas Cowboy football coach, the

23              late Tom Landry, hosted the

24              program and was impressed with the

25              obvious difference in Don."

26    He apparently lives in Fort Worth, Texas.    He's

27    saying basically he wishes us to consider

1    paroling the inmate.  Cal Jackson is an

2    individual who knows the inmate,

3              "Don Cronk has certainly improved

4              himself while incarcerated.  He

5              has a perfect record with no

6              disciplinary action taken against

7              him.  He has received a GED, an

8              Associate of Arts from Patton

9              University, and is now working on

10             a Bachelors degree from Ohio

11             University.  I met Don through the

12             Garden Chapel Program and was

13             taken by his profound faith in

14             Jesus Christ.  He is an

15             outstanding Christian, one who

16             lives by and obeys the word of

17             God.  He helps his fellow inmates

18             by doing various Bible studies

19             with them in his cellblock and

20             living out the truth he speaks and

21             teaches in his daily life."

22    Sir, there seems to be mention in these letters

23    about your religious beliefs.  Did that occur

24    once you were incarcerated?

25             INMATE CRONK:  In 1989 to be exact.

26             PRESIDING COMMISSIONER LEE:  In 1989.

27    Excuse me.  That was 18 years after your

**46**

1    imprisonment?

2         INMATE CRONK:  No.

3         PRESIDING COMMISSIONER LEE:  Excuse me,

4    eight, nine years.

5         INMATE CRONK:  About nine, yes, Sir.

6         PRESIDING COMMISSIONER LEE:  Nine years,

7    and what occurred in 1989?

8         INMATE CRONK:  You know, I was talking

9    with Mr. Fathy this morning, and I really can't

10   put my finger on any one thing.  I just know

11   that at that point in my life, I began to, I

12   don't know, grow up perhaps and get in touch

13   with reality and the reality and gravity of my

14   situation.  And I didn't know anything about

15   God.  In fact, I thought very little about God.

16   He took my father the way he did, and so I

17   didn't have much respect for the man.  But a

18   change began, and I wish I could, I wish I knew

19   the formula.  I wish I knew how to sell that or

20   patent that, whatever, but I don't know, and I

21   started going to the chapel, and I'd listen to

22   the choir sing, and I'd listen to the pastor

23   preach, and I just remember that there was

24   something there.  There was something there for

25   me, and I realized that no matter what I'd done

26   and no matter how despicable a person I had

27   become that I didn't have to remain that way,

47

1   and that whether society or the Allen family or
2   anyone else ever forgave me, Christ said he
3   would, and I needed that.  I needed that to
4   begin my healing and my journey.  And so I
5   remained there, and eventually, I gave my life
6   over to Christ, and I've been active 100 percent
7   ever since, and I teach, and I preach, and I've
8   gotten my ministry certification.  I've put a
9   lot, a lot, a lot work in it, many, many years
10  because I believe it, and I live it, and I'll
11  die with it.

12         **PRESIDING COMMISSIONER LEE:**  I find this
13  interesting, and I find this interesting I
14  recently heard a statistic that came through the
15  Board that individuals who have experiences in
16  prison are just as likely, if not more likely,
17  to have problems once released than others.
18  That seems to be amazing because one seems to
19  think that individuals who have spiritual
20  awakenings of sorts in prison would, one just
21  naturally assumes that they would do better.  It
22  appears that when people go out, things don't
23  turn out the way that they expect.  I think that
24  maybe they expect life to be a lot different
25  because of the fact of their religious
26  experiences, but when they go out, they find
27  that there is still rejection.  There is still

48

1    unfairness, injustice, difficulties.  It is a

2    (indiscernible).  I'm just curious.  How do you

3    respond to that?

4         **INMATE CRONK:**  I see it in here.  I've

5    been here a long time.  I see the guys come in,

6    and I see the ones that generally give their

7    lives to Christ, and there is a change, and

8    there's always going to be some that are

9    peripheral.  They hang on.  It's like their

10   seeking.  It's like they want, but they don't, I

11   don't know if they're ready to fully commit, and

12   all I could say on my behalf is that this is

13   fully what I intend to do upon my release.  I

14   mean, instead of straying from it, I'm intending

15   to gravitate toward it, between the Impact and

16   the Domestic Violence and the Overcomers which I

17   will facilitate and begin in Tiburon.  I do

18   preach, I speak, and I just -- if I could, if I

19   could, you know, give to you that the redeeming

20   quality and the gracefulness of Christ that he's

21   given me that has given me a positive outlook

22   for life and for future.

23        **PRESIDING COMMISSIONER LEE:**  I understand

24   that, but sometimes you go out, and the

25   organization that wanted to hire no longer has

26   the funds to hire you.  People don't want to

27   hear you speak anymore.  You have to figure a

49

1    way to make the bills.  You have a family.  You

2    have responsibilities.  You and your wife don't

3    get along.  Sometimes the life that you project

4    while you are in here doesn't work out, out

5    there, that maybe some promises are made for not

6    this life but the next, how do you respond to

7    the fact that it may be a lot tougher out there

8    than you anticipate right now?

9        **INMATE CRONK:**  I do anticipate it.  I

10    believe my greatest challenge is upon my

11    release.  This has been stressful.  It's been

12    trying, but it's all been in preparation.  As I

13    said earlier, I can't bring Mr. Allen back, but

14    I thought that perhaps I could become a better

15    person, and in that process I did discover

16    Christ, and then with that, I've gone and I've

17    reached others and brought others to the same

18    realization.

19        **PRESIDING COMMISSIONER LEE:**  Yes.  You're

20    dancing around the subject.

21        **ATTORNEY FATHY:**  (indiscernible) do you

22    know what the Commissioner is asking is look,

23    this is a more protected environment in a lot of

24    respects than outside, so what happens, what do

25    you think will happen or what's your plan to

26    deal with the normal, pardon my vernacular,

27    crap, that happens in life, when you and Kathy

1    have a fight, or when a work thing that you know

2    you're good at, you can do a great job, they

3    fire you?  And obviously, his concern is what do

4    you see happening when life is --

5         INMATE CRONK:  Yeah.  I understand.

6         PRESIDING COMMISSIONER LEE:  You don't

7    have the luxury to self-medicate any further,

8    because the other rest of us, we have that

9    option, but I assure you, sir, if you get a date

10   from this Commissioner, and you touch alcohol or

11   you touch drugs, you'll be back in the cue very

12   quickly.  So the thing is that how would you

13   respond just as your attorney indicated?

14        INMATE CRONK:  Yeah.  I understand now.

15   I'm sorry.  I received the question wrong.  I

16   think the difference now, today for me than 25

17   years ago is I have the tools to put into

18   practice what I have learned and what I do

19   preach.  If I need a job, I know how to research

20   Monster dot com and go to EDT and go around and

21   network and ask and beat the pavement if I have

22   to and get a job.  I'll work.  I'm not too

23   proud.  After an experience like this, there's

24   not much room for ego.

25        ATTORNEY FATHY:  But what will sustain

26   you when it is a rotten day?

27        INMATE CRONK:  My belief, my faith, I

1    mean, I don't need anyone else for that.    I

2    don't need this place for that.    I have a belief

3    system now.    He in fact will sustain me and

4    bring me through whatever hardships I have.

5    People will have arguments.    Kathleen and I may

6    not get along always and some days.    I

7    understand that.    I know how to seek out

8    counseling.    I know where to ask.    I know who to

9    ask.    Twenty-five years ago I would of cared

10   less.    I had all the answers.    I knew

11   everything, and that is no longer the case.    As

12   far as drugs or alcohol, I've made it -- if I,

13   if you could just know, I know what drugs and

14   alcohol do, and I know what they did to me.    And

15   I can't revisit them ever again, and I

16   understand that.    I watch these guys come in and

17   out of here in Orange.    They leave and they come

18   back.    They leave and come back.    Almost every

19   single time it's because of drugs and alcohol.

20   If I had my way, it would be banned from

21   society.

22          **PRESIDING COMMISSIONER LEE:**    It is.

23          **INMATE CRONK:**    But there are -- well, I

24   mean, the alcohol especially, I mean.    But

25   there's many people that can use things

26   responsibly as you were saying, and that's fine.

27   I'm not one of them, and my life's work includes

**52**

1    the 12 Steps.  That's why it's an Overcomers,
2    and it's the practices and the principles that
3    we apply to daily life.  There's drugs here.
4    There's alcohol.  Okay.  Yesterday, they just
5    busted about 30 gallons of alcohol in our
6    housing unit.  It's here everyday.  I don't use
7    it.  I don't seek it.  I don't need it.  When I
8    was a young individual involved in cocaine, I
9    was seeking that enlightenment, and I was
10   seeking that medication, that escape.  I didn't
11   like who I was.  I didn't like the hand I'd been
12   dealt, and ultimately, I end up in prison.
13   Well, guess what, that was the hand I was dealt,
14   and that's --. I had to learn to like myself.
15   And it took a lot of years.  I was in the county
16   jail for over three years, and I want to tell
17   you, sir, that had they released me at that
18   point, I was done with criminality.  If we just
19   want to talk about committing a crime, I was
20   finished.  That jail experience was enough for
21   me at that time.  But I can tell you today that
22   I thank God, I thank God that I was held
23   accountable and that I came to this prison and
24   spent the next 22 years of my life because I
25   look who I am now.  I look who -- I'm not proud
26   of what I did, but I'm pleased with who I'm
27   becoming, and it hasn't been easy, and it is a

1    struggle, and no matter what I do or where I go

2    or what I say, I'm always going to be the

3    murderer of Mr. James Allen.  And I don't take

4    that lightly, and I don't ever forget that, and

5    I know that we sit in here and everything is

6    black and white, and we can go back 20 years, 30

7    years, and of course, things look and sound a

8    certain way, and I recoil at some of what you

9    read.  But that was then, and this is now, and I

10   understand, you know, the decision you have to

11   make here.  I understand.  I appreciate that.

12          PRESIDING COMMISSIONER LEE:  You've got a

13   life sentence.  You were sentenced to 25 years

14   to life plus three years for the weapons

15   enhancement.

16          INMATE CRONK:  Yes, Sir.

17          PRESIDING COMMISSIONER LEE:  It is

18   conceivable that you may spend the rest of your

19   life in jail.

20          INMATE CRONK:  Yes, Sir.

21          PRESIDING COMMISSIONER LEE:  Or in prison

22   I should say.  What are you going to do?

23          INMATE CRONK:  Well, I'm going to do what

24   I've been doing because it's what I've come to

25   know.  It's the -- you know, I want to tell you

26   I think I had any values.  I don't think I had

27   moral values or ethics when I was out.  I mean,

54

1   I certainly wasn't taught well as a young kid on
2   a poor farm and then I made all the wrong
3   choices, but I did with what I had to work with.
4   And if I have to stay in here, I mean, I'm
5   human, I have hope, I have goals that I'd like
6   to see, but if I stay in here and I continue to
7   do the work that I've been doing, then that's
8   the way it is, then that will have to sustain
9   me.  I have no other choice.  I'm not going to
10  commit suicide.  I'm not going to give up.  With
11  my luck, I'll live to be 106, but if that is the
12  case, that is the case.  And if I thought that
13  my spending eternity in here would somehow, you
14  know, bring Mr. Allen back or help the Allen
15  family in some way, then I would be first in
16  line to sign up for that, but I don't believe
17  that.  I don't believe that.  I believe that I
18  can accomplish more and do -- if I can do any
19  good for anybody, for society, for the Allen
20  family I certainly can do it from a position,
21  when I'm in a position to do so, I'm limited
22  here.  My hands are tied.  What we say isn't
23  believed.  Everything is a manipulation.  It's
24  just a game.  It's hard to live with too.  And
25  when you're pulling your heart and your guts out
26  to somebody and whether it's in this kind of a
27  hearing or one of the groups or the victims'

1 groups or whatever I'm working with, you know,

2 I've got to every morning just pray and for

3 strength to do get up and do it again because I

4 know that. I've not going to be deceived. I'm

5 not going to be, you know, people are skeptical

6 and cynical. But you know, that's what I

7 brought on myself. That's my position, and just

8 by the grace of God he's given me that strength

9 and that outlook. No, Mr. Lee, I don't want to

10 die in prison. I really, I don't. And it would

11 be my hope that I would be released someday. I

12 don't know if anyone ever deserves it. I killed

13 Mr. Allen. It was a life sentence.

14          **PRESIDING COMMISSIONER LEE:** All right.

15 At this point in time, I will tell you that

16 there are 3042 Notices. 3042 Notices are

17 notices sent out to various organizations and

18 individuals who have special interest in your

19 case. There has been a response. Obviously,

20 the District Attorney, the Deputy District

21 Attorney, will indicate the position of the

22 People in regards to your suitability for

23 parole. I will however read at this point in

24 time a letter. This is a letter from a next of

25 kin. Well, let me just read this.

26          "September 12th, 2005, Dear Members

27          of the Panel, although I have

**56**

1    chosen not to attend the hearing,

2    I do not wish my absence to be

3    mistaken for indifference or

4    apathy.  My stance on the outcome

5    of the proceedings is and always

6    will be that the inmate should

7    remain incarcerated for the

8    duration of his life.  After

9    today, I will no longer give

10    energy to this trauma of my past.

11    I choose instead to live in the

12    present moment.  My personal

13    journey continues to be one of

14    striving toward transformation in

15    life.  Personally, I find the

16    revisiting evil and

17    counterproductive to the healing

18    process.  Over and over again, we

19    are asked each year to address the

20    issue of parole in the

21    perpetrators of this violent

22    crime.  My father was an only

23    child, and his mother still lives

24    today, nearly 99 years old.  In

25    all probability, my father would

26    be here with us today at the age

27    of 75 to share milestones, his

57

1     wisdom, love, support, caring, to

2     know his ten grandchildren. There

3     can be no understanding the fact

4     that the life of our family was

5     irreversibly and forever taken by

6     the actions of the inmate. A

7     little over a year ago in an

8     attempt to put several

9     incongruities to rest, I chose to

10    review my father's murder case

11    file, viewing, excuse me, crime

12    scene photos for the first time,

13    reading parole transcripts, and

14    carefully reviewing statements and

15    evidence in the case. Not

16    surprisingly, it became apparent

17    to me that my father suffered the

18    common fate of countless silent

19    victims who had no voice and

20    therefore was not justly

21    represented. More disturbing to

22    learn was the process that our

23    clearly overburdened legal system

24    was forced to (indiscernible)

25    expedite closure of this case.

26    This worked out unfortunately in

27    favor of the defendant who

58

1      benefited from being sentenced to
2      a much lesser offense than, much
3      lesser offense as a result of a
4      plea bargain.  I encountered
5      statements made by the inmate
6      which were clearly in conflict
7      with the evidence and photographs
8      on file.  Distortions and untruths
9      claimed by the inmate were evident
10     time and time again.  I found it
11     disheartening to learn that these
12     untruths actually gained a form of
13     validity over the ensuing years,
14     bias and self-motivated statements
15     made in order to attempt to
16     minimize his actions and intent
17     during the commission of the
18     offense in order to lessen the
19     degree of accountability.  In my
20     opinion, showing genuine remorse
21     for this crime or being fully
22     accountable for one's actions is
23     not demonstrated by someone who
24     spins the truth to gain advantage
25     and usage, excuse me, and uses the
26     passage of time to cloud and
27     diminish the degree of

59

1    responsibility he is accountable

2    for.  I uphold my belief that the

3    vibration of truth resonates

4    eternally in its purest form

5    throughout the universe and cannot

6    be altered.  It can be said that

7    ever education comes with a price,

8    and the price of Donald Cronk's

9    education was more than excessive.

10    It was paid for with my father's

11    life and the suffering of

12    countless others and the enormous

13    expense to our society.  If

14    enlightenment has truly been

15    outcome of his crime, I cannot

16    comprehend how Donald Cronk could

17    ever believe in his heart that his

18    debt has been paid in full and is

19    worthy of parole.  Given the fact

20    that a life was taken for nothing

21    more than a paltry and pathetic

22    motive, I believe that the inmate

23    should be expected to repay his

24    debt to the fullest amount

25    possible in his lifetime.  I

26    respectfully ask that he be held

27    accountable to our society by his

```
 1              peers and be denied parole for the

 2              duration of his life."

 3   Counsel, though I've indicated I do not wish to

 4   take into account the other letter since counsel

 5   for the inmate, you, and I do not have that

 6   letter, if there is any clarification in regards

 7   to discrepancies mentioned by Ms. Carole Allen

 8   Veragus, I would ask that you address them if

 9   that is possible.  Having said that, do you have

10   any questions of the inmate at this time?

11             DEPUTY DISTRICT ATTORNEY GOLD:  Yes.

12             PRESIDING COMMISSIONER LEE:  All right.

13   Would you address your questions to the Panel,

14   and sir, you answer the questions to the Panel.

15             DEPUTY DISTRICT ATTORNEY GOLD:  Do I

16   address them to you, Mr. Lee?

17             PRESIDING COMMISSIONER LEE:  Yes.

18             DEPUTY DISTRICT ATTORNEY GOLD:  Okay.  I

19   would ask if you could ask Mr. Cronk with

20   respect to the offense, how long it was that he

21   and Mr. Meyer waited inside the residence from

22   the time that they broke in, for Mr. Allen to

23   return.

24             PRESIDING COMMISSIONER LEE:  You may

25   answer.

26             INMATE CRONK:  I'm not clear on the exact

27   amount of time, 30 minutes perhaps, 45 minutes.
```

**61**

1    I'm not sure.

2          PRESIDING COMMISSIONER LEE:   The next

3    question.

4          DEPUTY DISTRICT ATTORNEY GOLD:   I would

5    ask if you could ask Mr. Cronk, since it was

6    close to Christmas time, were there some

7    decorations on the door such as some bells that

8    did cause you to be aware that he was at the

9    door and opening the door when Mr. Allen

10   arrived.

11         INMATE CRONK:   I was aware of the bells

12   and which would have been a warning for me to

13   take cover.  We were going to surprise Mr. Allen

14   as he walked through the door.  I didn't hear

15   the bells if they rang, or I wouldn't have

16   walked just right into him through the kitchen.

17         DEPUTY DISTRICT ATTORNEY GOLD:   Mr. Lee,

18   could you ask the Mr. Cronk if he was the only

19   one that had a gun with him, and why was his gun

20   loaded?

21         INMATE CRONK:   I was the only one that

22   had a gun, and it was handed to me when we got

23   in Mr. Meyer's vehicle to go to Mr. Allen's

24   residence.  Mr., I don't know where Mr. Meyer

25   got the gun or how long he'd had it, and he gave

26   it to me, and I put it in my pocket, and I

27   remember him saying to me, just in case.

1      **DEPUTY DISTRICT ATTORNEY GOLD:**   Mr. Lee,

2   could you ask Mr. Cronk if since he was aware

3   through the planning that had been taking place

4   that Mr. Allen had a very valuable ring and.had

5   valuables in a briefcase that he carried, and

6   because of the nature of his business, dealing

7   with valuables, did he expect that he would

8   probably be armed, and there was going to be an

9   armed confrontation by you waiting for him with

10   designs to take the ring off his finger.

11      **INMATE CRONK:**   No.  I didn't anticipate

12   anything like that.  I mean, I wasn't, I was

13   working with two guys in this.  They were ex-

14   convicts, and Mr. Warren is the main planner

15   behind this thing, and I allowed myself to be

16   talked into going along because it seemed like

17   an easy enough thing, in and out, a lot of

18   money.  Mr. Meyer, my co-defendant, as I said is

19   an ex-felon, and he's a very large muscle-bound

20   man.  And in the police report you'll see that

21   he also carried a club, and the club was to be

22   the main weapon used as to intimidate Mr. Allen.

23   We wore gloves and masks and had the baby oil

24   because we knew once he was taped up, the ring

25   probably wouldn't come off.  And had we heard

26   the bells or if Mr. Warren would have called,

27   again, for whatever it's worth, we were going to

63

1    hide as Mr. Allen came into his residence.   That

2    never occurred.   I didn't know that Mr. Allen

3    would be armed.   I didn't know the full nature

4    of his business, and I didn't give it any

5    thought whatsoever.

6        **DEPUTY DISTRICT ATTORNEY GOLD:**   Mr. Lee,

7    could you ask Mr. Cronk not just with respect to

8    this offense, more philosophically, you indicate

9    din Wisconsin you did a robbery.   In some of

10   your reports in your packet, there's reference

11   that you had done another robbery with Mr. Meyer

12   preceding the offense with Mr. Allen.   Why is it

13   that you are a person that would rob people as

14   opposed to someone that would steal from

15   buildings, avoiding people?   Why is it that you

16   take money from people?

17       **INMATE CRONK:**   Well, I was introduced to

18   robbery by Mr. Meyer, and I'm not shirking

19   responsibility.   He didn't hold the gun to my

20   head and make me do any of the things, but

21   that's what he did, and that's why he'd been in

22   prison a few times, and he was a very

23   charismatic guy and a convincing guy, and we're

24   both destitute now and hooked on coke, and it

25   seemed like the easiest thing to do.   He'd never

26   had any problems before with confrontations

27   apparently, although he'd been arrested at some

**64**

1   point in his past, and I followed his lead so to

2   speak.

3          **DEPUTY DISTRICT ATTORNEY GOLD:**   I just

4   have a couple more questions.   Mr. Lee, could

5   you ask Mr. Cronk who it was that removed the

6   ring from Mr. Allen after he was shot?

7          **INMATE CRONK:**   Well, that's clear in the

8   record over and over again.   Mr. Meyer did.

9   When I was shot, I was thrown to the floor, and

10  when I shot back, this whole thing takes second,

11  five, six, seven seconds, I don't know how long,

12  and I ran out the door, and I ran across the

13  street until I collapsed.   I didn't even know

14  that I'd been hit yet.   It happened so quickly,

15  I couldn't explain why I was on the floor, but

16  my mind was still trying to reconcile how was

17  Mr. Allen in the house?   The phone didn't ring.

18  The bells didn't ring.   So I'm outside.   Mr.

19  Meyer stopped and picked up the guns and the

20  jewels and took the ring off and walked out the

21  door, got in his vehicle, and drove around up

22  and down the street until he found me laying

23  against a power pack next to some apartment

24  building.

25          **DEPUTY DISTRICT ATTORNEY GOLD:**   Mr. Lee,

26  could you ask Mr. Cronk when is the last time

27  that you have done some AA and NA training there

65

1    at Quentin?

2         INMATE CRONK:   I taught the class last

3    Thursday night and tomorrow night is my next

4    class, and I'm the facilitator of it, 12-Step

5    program.

6         PRESIDING COMMISSIONER LEE:   Anything

7    further?

8         DEPUTY DISTRICT ATTORNEY GOLD:   Just one

9    question in one area, do you recall, could you

10   ask Mr. Cronk, Mr. Lee, back in 2003 there was a

11   profile of you that appeared in the San

12   Francisco Chronicle, and the article covered

13   your transformation of your life at San Quentin,

14   but it also covered the Allen's family's

15   destruction since the commission of the crime,

16   and it had a parallel of how you have somewhat

17   been prospering, and they have somewhat been

18   suffering, and you wrote a letter to the

19   reporter the day after the article appeared

20   accusing her of ambush journalism and that she

21   never mentioned that she was going to interview

22   the victim's family and tell their story, and

23   you expressed anger to her, and I wanted to know

24   why, knowing the way that you feel about Christ

25   and the victim's family, why would you be angry

26   at the reporter that she would share with the

27   readers the consequences of your offense?

66

1          **INMATE CRONK:** Mr. Gold, we went over

2    this last year in depth. I don't know why

3    you're bringing it up again, but I'll answer the

4    question. I wasn't angry that the reporter

5    highlighted my crime or showed the Allen's side

6    of the story. The problem with it was is that

7    that's not what the story was to be about at

8    all. If you recall, Mr. Crittendon in the

9    prison public relations office had brought these

10   people to me and said this was going to be a

11   different kind of story, a story about

12   rehabilitation only, and I have been interviewed

13   countless times throughout the years and been on

14   television and different things, and I've always

15   asked one thing of the reporters and that is not

16   to drag the Allen family through whatever it is

17   they're going to do about me. Say what you want

18   about me, but I don't have the right or the

19   permission to involve the Allen family, and so I

20   have in my way, accept this for what you will,

21   tried to protect them from any of that. I've

22   never had a negative thing happen like that,

23   although, I've had my crime detailed and laid

24   out there, my family history, for the whole

25   world to see. That doesn't bother me at all. I

26   didn't have the right to drag the Allen family

27   through this. I didn't know what they were

67

1  going through.  I don't know what a reporter is

2  going to do when they go and ask these

3  questions, and I didn't want, I had no

4  permission to authorize that, and I had asked

5  her specifically, and she assured me, no, this

6  is about rehabilitation in prison, and that's

7  all.  Six months later, the article comes out,

8  and it had nothing to do with what she told us

9  it had to do with.  Mr. Crittendon was also

10  upset about that, and that's who I asked

11  permission to write the reporter.

12        **DEPUTY DISTRICT ATTORNEY GOLD:**  Thank

13  you, Mr. Lee.

14        **PRESIDING COMMISSIONER LEE:**  Thank you.

15  Counsel, do you have any questions of your

16  client?

17        **ATTORNEY FATHY:**  I have no questions of

18  my client.

19        **PRESIDING COMMISSIONER LEE:**  All right.

20  We'll go to statements at this time.  Counsel

21  for Sacramento, you may be heard.

22        **DEPUTY DISTRICT ATTORNEY GOLD:**  Thank

23  you.  Commissioners, you did read the letter

24  from Mr. Allen's daughter.  I did want though to

25  mention that there are certain statements of Mr.

26  Allen's wife in the probation report that is

27  part of the record, and I think it's part of the

1    record --

2         **PRESIDING COMMISSIONER LEE:**  Go right

3    ahead.

4         **DEPUTY DISTRICT ATTORNEY GOLD:**  Okay.

5    Virginia Allen, like her daughter, is also very

6    much opposed to Mr. Cronk's release.  I think

7    she has stated in the past that he has never

8    apologized or expressed remorse to her.  To Mr.

9    Cronk's credit, I believe that he would if she

10   asked because he has said he would but he has

11   been directed by the prison not to, but Ms.

12   Allen has been completely devastated from the

13   crime that this crime even until today.  When we

14   spoke this morning she indicated that she pays a

15   lot of attention to the people harmed by Katrina

16   because she understands what it's like to lose

17   every single thing that you have.  The day that

18   her husband was murdered was one day before her

19   wedding anniversary, and six days before

20   Christmas, and the holidays are a terrible time

21   for her and always will be.  She was in a family

22   where he husband was the patriarch of their

23   family, that she was very much dependent on in

24   those periods of time when the husband worked,

25   and financially, she was wiped out and has never

26   really recovered and lives somewhat of a meager

27   existence in Sacramento, and she had been

69

1    married at that time almost 27 years.   So I

2    wanted those views expressed.   Briefly, I wanted

3    to comment on some of the documents that you had

4    referred to, some minor inaccuracies.   In his

5    life prisoner evaluation, the most recent one in

6    August of 2005 on page two, Mr. Cronk indicates

7    that he wants the record to reflect that he

8    originally planned the crime as a burglary only,

9    but I think if you look at more of the documents

10    contained in the complete record, that's not

11    consistent with the true picture.   In the

12    probation report which is at the back of the

13    packet, in his report it's mentioned that plans

14    about this particular crime had been discussed

15    on various occasions by Mr. Meyer and others

16    including Mr. Cronk since the summer of 1980 and

17    that the plan involved to rob him in his home

18    sometime before, and that the day before the

19    crime, Mr. Cronk and his two defendants actually

20    followed the victim from his place of work to

21    where his lived.   So I think the record ought to

22    be very clear that although there may have been

23    a fleeting moment, let's just do a burglary, in

24    reality, this was a very detailed plan to rob a

25    person and not a place, and there's a big

26    difference between a burglar and a robber.

27    Also, the plan was to assault the victim, tie

70

1   him up, remove his ring, and everything else

2   that they knew he carried, and to that effect,

3   they brought gloves, they brought some cord to

4   tie him up, a billy club, some baby oil, and a

5   loaded gun. And while Mr. Cronk indicates that

6   he had no idea that the victim would be armed,

7   that there would be some resistance, I think

8   commonsense, especially when you have experience

9   with robbing people as he had had, you know

10  people are going to react in very different

11  ways. You're going to be prepared yourself to

12  kill somebody if they're trying to kill you.

13  And I think it's likely that an owner of the

14  type of business he had with the bags he had is

15  going to be armed, especially when they come

16  into their home and people are there, they're

17  going fight for their lives. And that is an

18  extremely serious planning of an enormous crime

19  that Mr. Cronk had done. With respect to the

20  psychiatric evaluation, the most recent one

21  conducted by Dr. Inaba on June 30th, I'm not

22  sure if it's a she or a he.

23      INMATE CRONK: She.

24      DEPUTY DISTRICT ATTORNEY GOLD: It's a

25  she. Michael (indiscernible), she indicates on

26  page three that the inmate's version, a

27  characterization of the offense, it's a very

71

1   distorted view.  She says that he was engaged in

2   a robbery of the victim's home, and the victim

3   returned to the residence surprising the victim

4   and the partner of his crime.  I don't think

5   that's what Mr. Cronk told her.  I think he

6   certainly he has been candid to a lot of

7   details, but I think she is greatly confused or

8   minimizing when she summarizes it that way.  You

9   don't rob a home.  You rob a person, and he did

10  not surprise him.  They were waiting for him,

11  and they knew that there was going to be some

12  confrontation, and maybe they thought they would

13  be able to take more advantage of him, but it

14  wasn't like they were doing a burglary, and the

15  homeowner came home and caught them in their

16  plan or design.  She also states in the report

17  that with respect to his risk of violence on

18  page three, in past reports she authored

19  including the most recent one that she had done

20  in October of 2001, she has a sentence that

21  causative factors for violence and criminal

22  activity are multi determined and that violence

23  potential is unpredictable.  She's deleted that

24  from this report.  I don't understand how she

25  can delete that since not much in his life has

26  changed between 2001 and 2005.  He is still

27  programming very well and progressing, but I

72

```
 1    think that sentence she wrote before still
 2    remains true, and she deleted that for a
 3    purpose.  Also, she indicated on page four in
 4    her conclusion, it's the third paragraph, in her
 5    opinion most importantly she writes, he has no
 6    history of violence in the community prior to
 7    the commission of this offense.  That's not
 8    true.  I'm not suggesting that Mr. Cronk
 9    deceived her, but I don't thing that she had a
10    fair understanding of the complete record
11    because in the probation report on page 10, 17,
12    line 17 through 19, there's a discussion that he
13    committed robberies with Mr. Meyer in Sacramento
14    prior to this offense where he and Mr. Meyer
15    would rob liquor stores and bars.  In the
16    probation report on page 18, lines five through
17    23, there's a summary of three robberies, with a
18    gun, may have been a replica gun, I don't know,
19    but it is indicated there were three armed
20    robberies, a restaurant market type stores in
21    Wisconsin in the fall of 1980.  Mr. Meyer wasn't
22    with him on those.  And also, in a prior report
23    that she had authored in October of '01 on page
24    five, she indicates that prior to the offense of
25    Mr. Allen, he and Mr. Meyer robbed someone of
26    600 to 700 dollars at gunpoint and were never
27    questioned or arrested and that Mr. Cronk
```

73

1    learned that crime was an easy way out.   So I

2    greatly dispute that she says he has no violence

3    in his background prior to this offense.    I

4    don't dispute that he's violence free since.

5    Also, with respect to violence, he did have two

6    chains in his cell which was alluded to, in the

7    Sacramento County Jail which he explained, and

8    he was smuggling drugs at that time, but he has

9    not done so at San Quentin.   I agree with that.

10    The one other thing I'll take issue with, again,

11    her summary on page four, is her opinion.   It's

12    more opinion than fact that he showed genuine

13    remorse and full responsibility.   I think only

14    perhaps God and Mr. Cronk can truly speak to

15    that but the letter that he wrote that I alluded

16    to complaining to the reporter about ambush

17    journalism and portraying the victim's side, I

18    think shows that he has not fully come to terms

19    with the fact that the victim's family still

20    have power over his release, and he's somewhat

21    upset or frustrated with the victim's family

22    gets a voice into the situation about his fate.

23    That's natural, but I don't think it ought to be

24    denied, and I don't think it's fully consistent

25    with true remorse.   And the fact that he says,

26    well, I just thought that this was going to be a

27    promotional story for me about rehabilitation

74

1    which would assist him in his parole plans, and

2    he speaks to that in the letter as well, whose

3    family is going to see this article as well, and

4    the family is going to be upset as well that

5    here he is with the media blowing his horn for

6    him, and they were never spoken to.  So I would

7    just ask that that be considered.  I'm going to

8    have just a couple of more remarks.  I think

9    some things in life change and some do not.  Mr.

10   Cronk has changed.  We don't question.  We don't

11   deny.  He has greatly matured.  Time out?

12         **DEPUTY COMMISSIONER THOMPSON:**  Yes.

13   Please.  I need to change the tapes.

14         **DEPUTY DISTRICT ATTORNEY GOLD:**  All

15   right.  Thank you.

16         [Thereupon, the tape was turned over.]

17         **DEPUTY COMMISSIONER THOMPSON:**  They are

18   fine now.  You can continue.

19         **DEPUTY DISTRICT ATTORNEY GOLD:**  Thank

20   you.  The People don't deny that Mr. Cronk has

21   matured very well in prison.  He's adjusted

22   somewhat exceptionally, especially when compared

23   to his peers and has taken advantage of the

24   opportunities that San Quentin has afforded him

25   in a very difficult and dangerous environment.

26   We acknowledge that.  But what hasn't changed is

27   the enormity of the crime and the affect upon

75

1    the family.   In some sense it has changed

2    because for the family it continues to be a

3    tremendous loss to them that has diminished over

4    the years.   I'm not going to go into all of the

5    affects of it, but within the family subsequent

6    to the killing of the father, who was the

7    patriarch of their family, there has been

8    divorce.   There has been a suicide.   There has

9    been economic destruction for them, just

10   tremendous suffering and pain particularly at

11   times when there should be joy, the first of

12   grandchildren, holidays, things like that, and

13   not all of those can be placed at the hands of

14   Mr. Cronk, but they are all wrapped up in the

15   destruction that Mr. Cronk brought to this

16   family, and they have weakened them and scarred

17   them tremendously.   And I think that the Panel

18   and society should take into account the

19   enormity of how a crime affects a family as well

20   as how that family within a greater community

21   suffers.   You somewhat have to take the victims

22   as you find them and accord some deference to

23   that in your consideration, whether that's

24   fishing (indiscernible) or the gravity of the

25   circumstances of the crime or the potential for

26   violence in the future or the risk to the

27   community.   It is there because this was a good

76

1  family that was totally torn apart by a man who

2  could have been just continuing to embezzle from

3  the employer who was employing him in a

4  nonviolent way that chose to directly confront

5  people which he has done in the past. And in

6  conclusion, the irony somewhat at this stage in

7  life is that Mr. Allen's life was taken when Mr.

8  Allen was 50 years old, and as Mr. Cronk nears

9  his 50th birthday, he is seeking to kind of have

10  a new life where he blossoms and prospers. And

11  that to the family and I think to society based

12  upon the gravity and the circumstances of this

13  particular crime is not just. Thank you.

14        **PRESIDING COMMISSIONER LEE:** Thank you

15  for your comments. At this point in time, Mr.

16  Fathy.

17        **ATTORNEY FATHY:** Thank you,

18  Commissioners. The comment -- I'll start just

19  by responding briefly to the comments made by

20  Mr. Gold. There was virtually not one mention

21  by him of any of the specific accomplishments

22  that he did. There was general reference that

23  we don't dispute Mr. Cronk has changed. It's

24  not just change. The people who wrote these

25  things use words like exceptional,

26  extraordinary, amazing, and they do so from a

27  very jaundiced point of view. They don't do it

74

1    for Mr. Cronk's point of view of trying to get
2    out because he wants to start his life over at
3    age 50.   They do it as professionals in the
4    penal system, who see all kinds of behavior.   I
5    am astounded at what he has been able to do, not
6    posturing for a reporter or trying to perform
7    for this hearing today.  These come, his
8    behavior is extends over, well, this
9    transformation began in 1989.   It's 16 years
10   later.   He's been in custody over 24 years,
11   going on 25.   It is extraordinary.   And the
12   prosecution pays virtually no attention to that
13   other than the gratuitous, oh, he's changed.
14   No, he's not just changed.   He's done something
15   that is absolutely remarkable, which leads me to
16   my second comment.   Why am I here?   This won't
17   be reflected in a transcript, but I'm in a
18   business suit.   The business suit cost about
19   1,000 dollars from Nordstrom's on sale.   I
20   charge 300 dollars an hour to do any work as a
21   private attorney.   I'm here not for the money.
22   I'm getting no money from Mr. Cronk, his
23   girlfriend, or anyone else, nor would I accept
24   the money.   I'm here because I was a public
25   defender approximately 30 years ago.   I did a
26   number of murder cases, capital cases, et
27   cetera.   I saw horrible behavior over and over

78

1    again.   I've kept in touch with one person from
2    my public defender past which ended about 27
3    years ago.   That gentleman sits to my right.
4    That would be Mr. Donald Cronk.   The reason I
5    have and the reason I've come here and the
6    reason I point out the extraordinary things said
7    about him is Donald Cronk is for me a model.
8    I'm not his, I'm not related to him by blood,
9    marriage, or adoption.   I just told you I have
10   no economic connection to him.   He said to me
11   earlier this morning that he prayed for me, and
12   I laughed because I'm not religious.   Jesus
13   Christ has not found his way into my heart.   I'm
14   not a Buddhist.   I'm not a -- I'm a lapsed
15   Armenian Orthodox who's very cynical, not an
16   Atheist, but I look at this man and think, he
17   personifies the word redemption.   And I've just
18   told you, I'm not religious.   I mean that in a
19   secular fashion.   People can redeem themselves.
20   I believe that.   The comments by the prosecutor
21   would suggest otherwise because of course the
22   horrible crime he committed will never heal with
23   the family.   There ought not to be a parole
24   system.   They are not going to ever feel
25   anything but disgust and anger and hurt from
26   their husband, their father's, their friend's
27   murder in his own home.   But with that, there's

79

76

1    another concept that I believe in, and that is,

2    no matter how horribly you have behaved, you can

3    redeem yourself.    It can't be cheesy.    It can't

4    be hypocritical.    It can't be temporary.  · It

5    must be heartfelt.    It must be on a level

6    appropriate with what you are trying to redeem.

7    And I think he's done that.    I correspond with

8    Mr. Cronk once a year.    We're not pen pals, and

9    it's at Christmas.    He sends me a note, and I

10    write him.    And for the last three years I've

11    come here.    I've never visited until I'd come to

12    the prison for the hearing, I think it was three

13    years ago, and it was because of what I've just

14    said to you.    If the parole system meant

15    anything to anyone who really believed in it, my

16    nonprofessional view is this person should be

17    out of the prison system doing something further

18    for redemption that he can't do here.    And it's

19    obviously easy to say, well, he wants to get out

20    because he just wants out of this horrible

21    institution.    Well, of course, that's true.    But

22    this is an extraordinary person that believes

23    what he's just told you.    He's going to go out,

24    and he's going to do more benefit on the outside

25    than he can inside.    There's two reports in

26    front of you, one in August from the counselor,

27    the other dated June from the psychologist, the

```
 1   doctor.  I don't know how you could write a
 2   report more laudatory of this person.  You know,
 3   the psychiatric report ends by saying he should
 4   be in prison.  And the comment from the
 5   prosecutor is she didn't, you know, somehow
 6   understand the gravity of the offense.  Well,
 7   that's absurd.  Has this guy in one iota of his
 8   comments suggested to you he doesn't understand
 9   the gravity of what he did to the Allen family,
10   and of course, Mr. Allen first and foremost?
11   What do you think he said to the psychiatrist or
12   the psychologist, pardon me?  No, I didn't have
13   any involvement.  It's all the cocaine's fault,
14   and it's the crime partners.  I didn't do
15   anything.  Of course, he didn't say that to her.
16   She heard from him probably in much more detail
17   than we're hearing this morning of what a
18   horrible thing he did.  It's the same person he
19   saw three years earlier.  Yes.  Mr. Allen died
20   at age 50, and Mr. Cronk will be 50 in December
21   of 2005.  The irony is obvious.  That has
22   nothing to do with whether or not Mr. Cronk is
23   suitable for parole.  It's ironic.  It's not a
24   legal factor.  I believe that if Mr. Cronk could
25   kill himself and bring this man to life he would
26   do that.  And that would probably create a
27   problem because he's a Christian, but I think he
```

81

1   would do that.  That is how much I believe that

2   this fellow means what he says.  I don't think

3   you see a lot of people who represent someone 30

4   years ago or 25 years ago, whatever it's been,

5   show up at these hearings, not paid, not

6   connected by some, you know, not a member of his

7   church.  That has to be unusual.  It's certainly

8   -- I've never heard of that, and I would urge

9   you to consider setting a parole date for this

10  gentleman and allow him to live out his faith

11  outside the institution.

12          **PRESIDING COMMISSIONER LEE:**  Thank you,

13  sir.  Mr. Cronk.

14          **INMATE CRONK:**  I just want to, I just

15  want to say that I'm just sorry we all have to

16  be here today.  I can't change what happened,

17  and I wasn't born a murderer.  But in the last

18  few months of 1979 through 1980, I don't know

19  what happened.  I just went from average Joe to

20  the most despicable person that I've ever known,

21  and I can't explain that.  And all those things

22  that Mr. Gold talked about happened in that

23  period, that downward spiral, and they're all

24  horrible, and it's all terrible, and I don't

25  even know what's the truth anymore, 30 years

26  ago, 25 years ago, or however long ago.  I've

27  just done all I can do.  I don't know what else

1    there is left to do.  And whatever the outcome
2    of this hearing today, I just thank you all for
3    being here, and I'm so sorry.  I'm sorry for the
4    Allen family.  I read her letter, and I know
5    that.  I have her last letter.  And I read it
6    every once in a while because it connects me to
7    life, and it just makes me strive that much
8    harder.  I know the Allen family will probably
9    never forgive me.  That would be much too much
10   to expect, and I fully appreciate her desire for
11   me to stay in here forever, and like as Mr.
12   Fathy said, if I thought that that would somehow
13   serve justice and bring Mr. Allen back and heal
14   the Allen family and all the horrible, terrible
15   things that I've don't, then I would sign up for
16   that.  But it isn't true, and it isn't ever
17   going to be true, and I believe that I can
18   contribute to men and individuals that are on
19   that downward spiral that I found myself on.
20   And it is my hope to one day work with folks
21   like that.  See, when we're in that position, we
22   don't listen to the professionals.  We don't
23   listen to the psychiatrists.  We don't listen to
24   the lawyers and the cops, the parents.  We don't
25   listen.  But we do listen to people that have
26   been there, that have been through it, that have
27   risen above it and made their way out, and

83

80

1    there's something that they can't deny when I'm
2    standing there loving them and trying to get
3    them to change their behavior and start to make
4    the right choices.  You see, I'm not getting
5    rich off of this.  I'm not getting headlines and
6    banners.  I'm there because that's what I
7    believe because nobody needs to suffer like Mr.
8    Allen and the Allen family.  We haven't
9    mentioned my family.  My family likewise
10   suffered.  My mother was in sheer agony over
11   this, and I've got to tell you, I was so
12   relieved my father was dead by the time this
13   happened because I wouldn't have been able to
14   face him.  And there's nobody that's more
15   appalled at what I did than I am.  But there's
16   nobody that's punished me anymore than I have.
17   The prison system hasn't done it.  Anybody can
18   do time.  You can do that in here, but try to do
19   it as an upstanding citizen.  Try to do it with
20   the faith that nobody else believes in.  Try to
21   do it without the drugs and the medication or
22   the alcohol.  I've lost family members in here.
23   I've had to go through stress and pressures.  I
24   didn't resort to drugs.  I didn't resort to
25   violence.  I didn't resort to anything.  I
26   prayed about it.  I went to church.  I got with
27   the people that are likewise faith based, and it

84

1   gets me through it.  Society has nothing to fear

2   from me today or ever.  And again, I apologize

3   to everyone for my actions 25, 26 years ago.

4   And I can't change it, and I never will be able

5   to, but I can assure you that I am a changed

6   person.  I did change what I could, and I will

7   continue to strive to do my best whether I'm

8   released this year or not for ten years.  If

9   we're sitting here in ten years, and you will

10  get the same chronos, and you will get the same

11  reports, and you'll hear the same thing from me

12  because that can't change now either.  And so, I

13  thank you.

14          **PRESIDING COMMISSIONER LEE:**  Thank you.

15  At this time, we're going to recess.  We'll call

16  everyone back once we've made a decision.  Thank

17  you.

18                      **R E C E S S**

19                       --oOo--

20

21

22

23

24

25

26

27

```
 1          CALIFORNIA BOARD OF PAROLE HEARINGS
 2                   D E C I S I O N
 3          DEPUTY COMMISSIONER THOMPSON:   There you
 4   are.   You're on the record.
 5          PRESIDING COMMISSIONER LEE:   Counsel, can
 6   you hear us?
 7          DEPUTY DISTRICT ATTORNEY GOLD:   Yes.
 8          PRESIDING COMMISSIONER LEE:   All right.
 9   We have all returned back to the hearing room.
10   The Panel has reviewed all information received
11   from the public and relied on the following
12   circumstances in concluding that the prisoner is
13   not suitable for parole and would pose an
14   unreasonable risk of danger to society or a
15   threat to public safety if released from prison.
16   I'm not one to spend a lot of time on
17   deliberations.   That's just the way I am, but
18   this case, I'd have to admit, was very difficult
19   for me.   First and foremost is Mr. Fathy's
20   statement.   I've represented a lot of
21   individuals in life cases and others, and I'm
22   not sure I actually have even come to a hearing
23   for an inmate.   So that impressed me.   And this
24   job is one of the strange jobs in life where you
25   have to deal with people's nightmares, and this
26   is always someone's nightmare.   And I had to
27   DONALD CRONK   C-87286   DECISION PAGE 1   9/14/05
```

86

1    listen to the daughter trying to put this aside

2    to move on, and I was unable unfortunately to

3    hear from the wife who has not been able walk

4    away, but the Deputy Commissioner and I have

5    discussed it.  But my job is to balance two

6    things, and that is punishment and

7    rehabilitation, and both advocates are very good

8    at what they do.  The prosecutor's job is to not

9    only do justice but also to represent the will

10   of the People, and I think he has done that

11   well.  And counsel for the inmate has brought up

12   that the inmate has changed and is

13   rehabilitated.  How do you balance off the

14   punishment and the rehabilitation?  I can tell

15   you honestly that I have no crystal ball, and I

16   have no Solomon-like wisdom.  All I can tell you

17   at this point in time is that this offense was

18   such that I just do not believe that the inmate

19   has done a sufficient amount of time.  And he's

20   being denied because the offense was carried out

21   in a dispassionate and calculated manner.  The

22   motive for the crime was inexplicable or very

23   trivial in relationship to the offense.  All the

24   trial attorneys here and the Deputy Commissioner

25   is an attorney as well, went to law school as

26   well, knows that the felony murder rule was

27   **DONALD CRONK   C-87286   DECISION PAGE 2   9/14/05**

1  enacted because of the inherent dangerousness of

2  robberies, and that individuals cannot escape

3  liability by saying, I did not mean to kill the

4  person in the perpetration of a 211. And that's

5  exactly what happened in this case. But even

6  though one can disagree with the premise of

7  having a first-degree murder on an unintentional

8  homicide, this is not your general, I'm on the

9  street. I'm strung out, high, and pulls a gun

10  on somebody, and the gun goes off. I'm always

11  wondering why people use all the guns, but

12  anyway, the point is that no this was way beyond

13  that. This was calculated. They had masks.

14  They had guns. They had one guy down the street

15  waiting for the person to come. They knew what

16  he was wearing. They knew he had a diamond

17  ring. They brought oil. They didn't just go to

18  the house and take things. They waited for him

19  to come back. The Deputy Commissioner and I

20  just decided that this was just too heinous, I

21  mean, too serious of an offense, and I don't

22  necessarily believe that the inmate will always

23  be incarcerated, but I just don't think at this

24  stage 25 years is sufficient. The other reason

25  for the denial is his escalating pattern of

26  criminal conduct or violence. The inmate

27  **DONALD CRONK   C-87286   DECISION PAGE 3   9/14/05**

1  readily admits that the man who he was at that

2  time was clearly out of control.  He failed to

3  profit from, well, strike that.  The inmate was

4  involved in robberies prior to this incident.

5  One of the things that very much bothered both

6  Commissioner and myself was the psychological

7  report dated June the 30th, 2005, by Dr. Inaba.

8  And it is in the best light, inconclusive.  The

9  District Attorney pointed out various factual

10  assertions that make her opinion virtually

11  worthless.  We know that hypothetical question

12  posed to an expert opinion, the facts have to be

13  established, and the facts that she's going by

14  doesn't seem to be the same case.  She's talking

15  about no violence before this incident, yet, we

16  know he was involved in robberies prior to this

17  occurring.  She does not seem to -- it says,

18  though she has a vested interest, not maybe

19  consciously but maybe subconsciously that she

20  just didn't inspire me as an individual who did

21  a thorough evaluation of the psychiatric factors

22  of the inmate.  The other reason for the denial

23  is 3042 responses.  The District Attorney's

24  Office of Sacramento County is in opposition as

25  well as -- didn't I have a letter from -- I

26  thought I had another letter as well, maybe not.

27  **DONALD CRONK  C-87286  DECISION PAGE 4  9/14/05**

86

1   Anyway, nonetheless, the Panel makes the

2   following findings:  The prisoner needs therapy,

3   self-help, and programming in order to further

4   face, discuss, understand, and cope with stress

5   in a nondestructive manner, as well, to get

6   further insight into the crime.  Until progress

7   is made, the prisoner continues to be

8   unpredictable and a threat to others.  However,

9   the prisoner should be commended for the

10  following:

11          **DEPUTY COMMISSIONER THOMPSON:**  He should

12  be commended for having helped himself

13  academically, that he's still going for a

14  Bachelors degree, has an Associate.  He did get

15  the Ministry Certification.  He has been a

16  longtime participant and member in the AA

17  program and received laudatory chronos for his

18  participation and his attendance, that he has

19  been in other programs, Overcomers Outreach,

20  Trust, Impact, and Domestic Violence groups, all

21  of which he has been commended for his

22  participation, and in instances, facilitation of

23  such groups, and that perhaps most commendable

24  of all for which he did receive a laudatory

25  chrono is the fact that in his entire

26  incarceration, he only has one counseling

27  **DONALD CRONK  C-87286  DECISION PAGE 5    9/14/05**

90

1   chrono, and it was by Officer Grant, by the way,

2   in case you didn't get the name.  It's drifted

3   back to you.  And he was given a laudatory

4   chrono for the fact of that behavior, so all of

5   those factors certainly indicate a change and

6   movement toward acceptance and understanding,

7   and hopefully, non-repetition of anything of

8   that nature.  I think all of those things are

9   commendable and should be recognized.

10          **PRESIDING COMMISSIONER LEE:**  These

11   factors of positive aspects, however, do not

12   outweigh the factors of unsuitability.

13   Obviously, the inmate is a good candidate.  I

14   look forward to the opportunity, if available,

15   to hear his case again.  I cannot make any

16   promises, nor will I, but I look forward to that

17   time, if I do get to hear his case again.  And I

18   hope that by what you indicated earlier, that

19   you continue on all the things that you are

20   doing and that you're not going to change will

21   be the case.  Nonetheless, at this point in

22   time, the denial will be for one year.  You have

23   exactly one year.  The Panel recommends

24   remaining disciplinary-free, continue to upgrade

25   vocationally, educationally.  Obviously, you're

26   still trying to get your Bachelors degree from

27   **DONALD CRONK   C-87286   DECISION PAGE 6    9/14/05**

91

88

1  Ohio University, and continue to participate in

2  self-help and therapy programming.  Counsel,

3  it's your choice; the Board packets will not

4  automatically request a new psychological

5  reports.  I think that the inmate will have the

6  same problem that he faced today if he comes

7  back a year from now because the psychological

8  report has errors which the District Attorney

9  will point out again.  Do you wish at this time

10  to have me request a new report by another

11  psychologist?

12       **ATTORNEY FATHY:**  Yes.

13       **PRESIDING COMMISSIONER LEE:**  All right.

14  This is the second time -- a new psychological

15  report is going to be requested by another

16  psychologist.  Deputy Commissioner, is there

17  anything else?

18       **DEPUTY COMMISSIONER THOMPSON:**  No, except

19  that I wish him success and continued good

20  programming.

21       **PRESIDING COMMISSIONER LEE:**  Good luck,

22  sir.

23       **INMATE CRONK:**  Thank you.

24       **PRESIDING COMMISSIONER LEE:**  Counsel of

25  Sacramento County, please, make sure that all

26  information before the next hearing is submitted

27  **DONALD CRONK  C-87286  DECISION PAGE 7    9/14/05**

92

89

1  to the Panel.  I'd like to make sure that that

2  doesn't fall through the cracks again.

3        DEPUTY DISTRICT ATTORNEY GOLD:   Thank

4  you.

5        PRESIDING COMMISSIONER LEE:  Thank you.

6        DEPUTY DISTRICT ATTORNEY GOLD:   I'm going

7  to turn the mute on.

8        PRESIDING COMMISSIONER LEE:  Very good.

9        DEPUTY DISTRICT ATTORNEY GOLD:   Okay.

10               --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23  PAROLE DENIED ONE YEAR

24  THIS DECISION WILL BE FINAL ON:_____JAN 1 2 2006_____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  DONALD CRONK  C-87286  DECISION PAGE 8   9/14/05

93

90

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, KRISTIN LEDBETTER, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 89, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF DONALD CRONK, CDC NO. C-87286, ON SEPTEMBER 14, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 3, 2005, at Sacramento, California.

KRISTIN LEDBETTER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

94

3

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2005 CALENDAR

Cronk, Donald Everett

C-87286

I.    COMMITMENT FACTORS

A.    LIFE CRIME:

Murder 1st, PC187, Assault with a Deadly Weapon (.38-caliber) PC12022.5. Sacramento County Superior Court Case Number SAC666128. The victim's name was James Allen, age 50. Sentenced to 25 years to life with a two-year enhancement for a total term of 27 years to life. Cronk's minimum eligible parole date (MEPD) is 3/2/98.

1.    Summary of Crime:

On the morning of 12-19-80 Donald Cronk and codefendant Glen Meyer went to the victim's residence and broke into the residence by entering through the bathroom window. After ransacking the victim's home in search of personal effects and/or money, the two men layed in wait, armed with an unknown caliber handgun for the victim to return. When the victim returned home he noticed the dwelling had been entered and drew his own weapon before entering the front door. The victim surprised Cronk and fired several times, striking Cronk once in the arm and once in the side of the torso. Cronk retrieved his handgun from his pocket and shot once, killing the victim. After the murder both Cronk and his codefendant, Glen Meyer, fled. Glen Meyer stopped long enough to pick up the victim's gun, briefcase and a diamond ring the victim wore. During the interview for this report, Cronk recalled the caliber of the weapon as a .38 caliber Colt Detective Special. Both Cronk and the codefendant fled in opposite directions. Cronk was arrested several months later while working for a carnival in Idaho. He offered no resistance while being taken into custody.

2.    **Prisoner's Version:**

Cronk stated the whole incident was because of his involvement with cocaine. He stated, "Cocaine destroyed me". He had a good job with a waterbed warehouse in Sacramento and began using cocaine. He eventually started embezzling from his former employer in an effort to increase his supply of cocaine. He was in debt approximately ten thousand dollars when he lost his job. Thereafter, he became involved with property and theft related offenses with Mr. Terry Warren and Mr. Meyer. It was through Meyer that he learned of the potential for financial gain as a result of robbing the victim. Cronk claims that he, Warren, and Meyer formed a conspiracy to rob the victim. In their original plan, they agreed to break into his residence and wait for him to return with money from his business. The trio had knowledge that the victim carried large amounts of cash, gold coins, and other valuable property in his suitcase, and a rather large diamond ring on his finger. They went to the residence armed with a Billy-club like bat, the aforementioned .38 caliber weapon and baby oil to slip the ring off the deceased victim's finger. They agreed Warren would remain down the street and telephone the victim's phone to alert Cronk and Meyer of the victim's approach. For reasons unbeknownst to Cronk, the victim was able to arrive home without their notification. The victim was also able to enter the residence and surprise Cronk and Meyer while in the process of ransacking his home. The victim fired approximately six rounds at Cronk, two of which hit him. Cronk fell to the ground and drew his own weapon firing it from the hip. The single shot fired by Cronk struck the victim in the chest causing his death in approximately four to five minutes. Cronk fled and expected to be shot as he ran down the sidewalk. Cronk was bleeding profusely and lay down in some high grass across the street from the apartment complex. A short while later, Meyer came by in his truck, picked up Cronk and took him to Warren's house. Cronk states the events after the instant offense are blurred as he was in a tremendous amount of pain. Cronk acknowledges his part in the crime and accepts full responsibility. Cronk expressed deep regret for his actions and stated that he is deeply sorry for the victim's family and the grief that he has caused them. He does want the record to reflect he had originally planned this crime as a burglary only. He indicated he never dreamed it would end up in a murder.

3. <u>Aggravating/Mitigating Circumstances</u>:

A.   <u>Aggravating Circumstances</u>:

> The prisoner actively planned (or was a willing participant) in the planning of the crime.
> The murder was committed by lying in wait.
> The prisoner had the opportunity to cease but continued with the crime.
> The prisoner used a weapon (.38 caliber pistol).
> The circumstances of the crime created potential for serious injury to others.

B.   <u>Mitigating Circumstances</u>:

> The subject has minimal or no history of criminal behavior.

B.   <u>MULTIPLE CRIME(S)</u>:

This is Cronk's only commitment offense.

II.   <u>PRE-CONVICTION FACTORS</u>:

A.   <u>Juvenile Record</u>:

Cronk had no juvenile convictions.

B.   <u>Adult Convictions/Arrests</u>:

<u>9/11/75</u>- Arrested by Waukesha, Wisconsin Police for Theft from an Auto. Cronk was convicted on 12/9/75 and ordered to pay a $209 fine to the court.

<u>7/16/81</u>-Arrested by Sacramento Sheriff's Office for Homicide. Cronk was convicted of Murder in the 1st degree on 6/13/84 and sentenced to State Prison for a period of 27 years to Life (Instant Offense).

<u>5/20/82</u>-Charged by Sacramento Sheriff's Office for possession of narcotics in a jail facility and possession of a dangerous weapon. The charges were dismissed by Sacramento Superior Court.

C.    Personal Factors:

Cronk was born on 12/20/55 to the parents of Donald and Marilyn Cronk. His father and mother are both deceased. Cronk was married to Mary Kreil in 1973. From this marriage one child, Kristen Cronk was conceived. This marriage ended in divorce in 1980. Cronk was remarried to Linda Hartman in 1987. From this marriage one child Samantha Cronk was born. This marriage ended in divorce. The POR indicates that the highest grade Cronk completed was the 11th grade. Records indicate that Cronk received his GED certificate through the American Correspondence Academy in Wisconsin. Cronk never served in the military. The POR indicates that Cronk was employed with Labries Waterbeds in Sacramento, California as a service manager from 1977 until 1980. Prior to this he was employed with Jason & Sons in Sacramento as a warehouse manager for 7 months in 1976. Case records indicate that Cronk started using cocaine in 1979 in high doses and abused alcohol. At the time of the instant offense he was using cocaine by smoking cocaine free-base at a very high dose level of 5 or 6 grams per day and drinking two to four six packs of beer per day.

III.    POST-CONVICTION FACTORS:

A.    Special Accommodations/Disability:

No special accommodations or adaptive services were required for the purpose of effective communication as required per Armstrong Remedial Plan II.

B.    Custody History:

Cronk was received by the California Department of Corrections (CDC) on 06/13/84, at Northern Reception Center-California Medical Facility (NRC-CMF). While at NRC-CMF he was placed in restricted housing due to possible enemy concerns with the EME, BGF, and NF Prison gangs. Cronk appeared before the Institutional Classification Committee (ICC) on 6/21/84 due to his housing in T-Restricted. Cronk was retained in T-Restricted housing per his own request due to documented friction with prison gang elements while in Sacramento County Jail due to his involvement in drug smuggling activities. The case was referred to the Districted Attorney's office for prosecution. (This case was eventually dismissed by Sacramento Superior Court on 7/26/83). Cronk was retained in T-Restricted housing pending transfer to a general population program facility. Cronk was endorsed for transfer to San Quentin (SQ) on 7/31/84. Cronk was initially placed in Administrative Segregation (Ad/Seg) due to his prior placement at NRC-Ad/Seg. Cronk was released from Ad/Seg

and granted Close B custody. He was initially placed on the vocational waiting list and was subsequently assigned to the laundry department. Cronk was placed on Ad/Seg status on 10/31/85 pending investigation into a conspiracy to aid Inmate Thomas and Inmate Reach in an escape attempt. After a thorough investigation of case factors, it was determined that Cronk was not involved in the escape attempt. Cronk was subsequently removed from Ad/Seg status and placed in his former program. Cronk was removed from his assignment to the laundry department and was reassigned to the Vocational Electronic Program in 1986. Cronk's custody remained at Close B until 02/09/88, when it was lowered to Medium A. Cronk's classification score has been 0 since 05/27/93. Cronk has completed the Vocational Electronic Program at San Quentin in 1990. After completing the Vocational Electronics class, Cronk worked in the Inmate Day Labor (IDL) as an apprentice electrician. Since that time Cronk has held primarily clerical positions. Work supervisor's reports have consistently rated Cronk above average to exceptional. Numerous laudatory chronos are noted in his central file. Cronk custody remains at Medium A with a classification score of 19. It should be noted that the increase in points is non-adverse in nature, and is a result of a change in the California Department of Corrections scoring system. He was assigned to the Reception Center as the West Block Lieutenant's Clerk. Cronk went before UCC on 7/8/04 for his annual and has 19 points with Medium A custody. He's currently the protestant chaplain's clerk.

C.    **Therapy & Self-Help Activities:**

Cronk has been involved in the following therapy and self-help activities per the laudatory chronos, which appear in his central file since his last Board Hearing:

- Overcomers Outreach: 12/30/04, 3/31/05, 6/30/04, 3/30/04, and 9/30/04 for the completion of the 1st, 2nd, 3rd and 4th quarter for the past year and a half.
- Health and Ethics Workshop Programs: 3/24/05, 2/24/05, 3/10/05, 2/10/05, and 2/17/05.
- 
- I.M.P.A.C.T. facilitator 3/1/04, 4/19/04, 6/28/04, 7/26/04, 10/18/04, 1/3/05, 2/14/05, and 3/21/05.
- I.M.P.A.C.T participant: Cronk received 5 chrono's date 7/26/04 for the 1st, 2nd, 3rd, and 4th quarter.
- San Quentin College Program (Ohio University) 6/20/05 for participating in the Bachelors of Arts program for a year. 6/20/05 received a certificate from Ohio University to completing the course of Non-Violent communications. Graduated from Patton University with a Certificate of Ministry dated 6/16/05. Also received a chrono for completing courses on 5/18/05, 1/26/04, 10/6/04, and 6/24/04.

CRONK, DONALD      CDC#C-87286           SAN QUENTIN                 AUGUST 2005

99

- Arts and Corrections soundboard set up for outside entertainment, 5/19/04, 6/18/04, 7/6/04, and 10/18/04.
- T.A.P.S.- National military survivor peer support network : 11/5/04.
- Man-Alive Program facilitator training, 2002-present.   He's also received a certificate of appreciation by the Vietnam Veterans Group of San Quentin dated 12/4/04.

Cronk has received laudatory chronos for being able to follow the rules and regulations of the Department of Corrections dated: 2/2/05 and 4/18/05.  He's also received a letter of recognition for his participation in the I.M.P.A.C.T. program dated 6/20/05.   Cronk has also received a certificate for participating in a 29 month program for Marin Abused Womens Services Mankin Mens Program.

D.    **Disciplinary History:**

CDC 128A Custodial counseling 06/29/88 refusing to follow orders.

E.    **Other:**

None

IV.    **FUTURE PLANS:**

A.    **RESIDENCE:**

Cronk is hopeful of transferring his parole to Marin County. He has been offered housing by Ms. Kathleen Giono, his fiancée, 1628 San Anselmo Ave., San Anselmo, Ca.  94960  (415) 458-3565. In the event that the parole transfer request is denied Cronk has been offered housing by Mr. Chris Shirley 4833 9th Ave. Sacramento, Ca 95820-1520 (916) 457-7131. Letters confirming these housing offers are contained in Cronk's central file #2. Furthermore Cronk's two older sisters, Kevee Lynn Kienast and Pamela Vetta, have both offered housing employment and financial assistance in the event of his parole.

B.    **EMPLOYMENT:**

Cronk has received letters of employment from prospective employers in Marin, and Sacramento areas. Marin County employment offers are Redwood Empire Electrical Training Trust (Union Sponsor), 1700 Corby Ave., Suite F, Santa Rosa, Ca.  95407 (707) 523-3837 and Illuminata Films 26A Varda Landing, Sausalito, Ca.  94965 (415) 331-2663. In the Sacramento area employment offers are McCarthy Painting, 5409 S

Street, Sacramento Ca. 95819 (916) 451-8888 and Metcalf Electric, 1531 47th St., Sacramento, Ca 95819 (916) 456-6862. The letters verifying all offers of employment are located in Cronk's central file #2.

## V.  USINS STATUS:

Not applicable, Cronk is an American citizen born in Wisconsin.

## VI.  SUMMARY:

**A.** Cronk has maintained an excellent program throughout his twenty- (20) years of incarceration. He has managed to use his time here in a constructive fashion, constantly making improvements in his life and the lives of others. He has made numerous achievements and surpassed many of life milestones despite his confinement to State Prison. Cronk continues to excel in all areas. He has gained employable work skill as an Electronic Worker and is currently working towards his Bachelors Degree. He has remained disciplinary free and received commendation for his positive programming efforts. He maintains an excellent rapport with both staff and inmates. Cronk had talked openly and candidly about the crime and takes total responsibility for his involvement. It appears he has had sufficient time to reflect on the past and come to terms with his present condition. He fully understands how his involvement with drugs played an intricate part in his motivation to become involved in the commission of the crime. Cronk has taken positive steps in dealing with his past problem with drugs by becoming involved with Alcoholics and Narcotics Anonymous. If Cronk is considered for parole it would be recommended he continue to participate in Narcotics and Alcoholics anonymous.

**B.** Prior to release from prison, Cronk is encouraged to maintain his exemplary programming efforts, and remain disciplinary free.

**C.** This report is based on a thorough review of Cronk's central files and a personal interview with the Inmate on 6/21/2005

**D.** Cronk was given the opportunity to examine his central file on 6/21/05. Refer to CDC 128B dated 6/21/05.

**E.** Cronk denies any disabilities or needs per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communications.

_M. GARCIA, CCI_
M. GARCIA, CCI

_V. KELLEY, CCI_
V. KELLEY, CCI

_CCIII and C & PR_
CCIII and C & PR
C. BELSHAW

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    STATE OF CALIFORNIA

- ☐ DOCUMENTATION HEARING
- ☑ PAROLE CONSIDERATION HEARING
- ☐ PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 1-16-04 TO 1-16-05 | | | **Placement**: San Quentin, level II, general population. **Custody/Classification**: Medium A, Classification score is 19. On 3-25-04 subject appeared for UCC for Post Board. No program changes noted. **Academics**: Pastoral Care and Counseling 6-24-04, Church Leadership and Administration 10-6-04 **Work Record**: Assigned as the West Block Lt. Clerk, no work reports noted. **Group Activities**: AIC 5-19-04, AIC 6-18-04, AIC 7-6-04, Man Alive 10-15-04, AIC 10-18-04, and VVGSQ 11-5-04 **Psychiatric Treatment**: None noted. **Prisoner Behavior**: Disciplinary free at this time. **Other**: On 3-16-04 subject appeared before the BPT for his parole hearing, parole was denied for one year. |

CORRECTIONAL COUNSELOR SIGNATURE                    _Steven CCI_                    DATE  7/6/05

CRONK, DONALD          C-87286          CSP-SQ                    AUGUST 2005

BPT 1004 (REV.7/86)

**103**

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | ... | |
| 1-17-05 TO PRESENT | | | **Placement:** San Quentin, level II, general population.<br><br>**Custody/Classification:** Classification scoe19, custody Medium A. There is no classification action noted during this time frame.<br><br>**Academics:** Old Testament Survey 5-18-05. Certificate in Ministry Patton College 6-16-05, 6-20-05 Non Violent Communication. . Participant Ohio State 6-20-05.<br><br>**Work Record:** Remains assigned as a Lt. Clerk, no work reports noted.<br><br>**Group Activities:** IMPACT 3-21-05, Health/Ethics Programs: 3-24-05, 2-24-05, 3-10-05, 2-10-05, and 2-17-05. Over Comers Outreach 3-31-05.<br><br>**Psychiatric Treatment:** None noted.<br><br>**Prisoner Behavior:** Excellent disciplinary free.<br><br>**Other:** None noted. |

CORRECTIONAL COUNSELOR SIGNATURE    _Shaw CCI_    DATE 7/6/05

CRONK, DONALD                    C-87286                CSP-SQ                        AUGUST 2005

BPT 1004 (REV.7/86)

**104**

ORDER:

☐ BPT date advanced by _____ _____ months.    ☐ BPT date affirm. .without change.
☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify _____

_____

☐ Schedule for Progress hearing on appropriate institutional calendar.

CRONK, DONALD          C-87286          CSP-SQ                    AUGUST 2005

4

CRONK, DONALD        ა7286                                    June 30, 2005

# MENTAL HEALTH EVALUATION
# FOR THE BOARD OF PRISON TERMS
# JUNE 2005 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

I. Identifying Information:  Mr. Cronk is a 49 year old first termer, who is serving a 27 year to life sentence for 1st degree murder in 1980.  He is serving the 21st year of his term as an inmate at San Quentin Prison.  The report is based on a review of Mr. Cronk's central files, medical record and a face to face interview conducted in the mental health offices of San Quentin State Prison.  Mr. Cronk was informed of the limits of confidentiality in that information provided would be included in a report to the Board of Prison Terms.  Only the inmate and the examiner were present during the interview.  Mr. Cronk stated that he understood the purpose of the interview and was able to communicate effectively without requiring any special assistance or adaptive measures.

II. Developmental History:
No change of information.  Refer to previous evaluations.

III. Educational History:
Since the time of the last evaluation, Mr. Cronk has taken coursework in theology at Patton University where he completed his AA degree.  He is presently enrolled in a correspondence program at Ohio University for completion of a Bachelor's degree.

IV. Family History:
No change of information.  Refer to previous evaluations.

V. Psychosocial Development and Sexual Orientation:
No change of information.  Refer to pervious evaluations.

VI. Marital History:
Mr. Cronk continues to be single following his divorce from his second wife.  He is involved in a supportive relationship with a woman who lives in a community adjacent to the prison.  She visits on a regular basis and has offered to assist Mr. Cronk with housing and other forms of support.  The woman is divorced and has no children.  She is employed and owns a home in Marin County, California.

CRONK, DONALD       87286

June 30, 2005

VII. Military History:
No additional information.  Refer to previous evaluations.

VIII. Employment and Income History:
No additional information.  Refer to previous evaluations.

IX. Substance Abuse History:
No additional information.  Refer to previous evaluations.

X. Psychiatric and Medical History:
No additional information.  Refer to previous evaluations.

XI.  Plans if Granted Release:
If released to the community, Mr. Cronk plans to continue with many of the activities that he has been involved with while incarcerated.  He plans to combine his work with the IMPACT Program with his work in Christian ministry.  He also plans to continue to pursue his educational goals, with an immediate goal of completing work on his Bachelor's degree when he can afford to do so.  Mr. Cronk has many supporters in the community whom he has come to know through his extensive volunteer efforts as an inmate.  Mr. Cronk plans to be an active member of the Tiburon Baptist Church and will seek pastoral guidance for any life problems that he may encounter.  He anticipates either living with a woman friend, with whom he has a romantic relationship, in her home in Marin County, or else living in a property owned by her.  If paroled to Sacramento County, he would be able to maintain himself financially for a period of time, while seeking employment.  Mr. Cronk is willing to comply with any and all conditions of parole.

## CLINICAL ASSESSMENT

XII. Current Mental Status/Treatment Needs:
A. **Mental Status Examination**
Mr. Cronk appeared to be his stated age of 49.  He was well-groomed and dressed in standard CDC issued inmate clothing.  He has a neatly trimmed beard and wears glasses.  He presented as cooperative and friendly.  He was socially appropriate and comes across as eager, polite, and considerate.  He appeared to be fully alert, and was oriented in all spheres.  His thought was coherent, linear and logical with no evidence of thought disorder.  Speech was clear, organized and articulate.  Thought content was appropriate with no bizarre content, or paranoid or delusional ideation.  His intellectual functioning appeared to be in the average to above average range.  Affect was stable and mood was euthymic.  There was no evidence of disabling anxiety or depressed mood.  He denied any thoughts of self-harm or harm to others.  He reported that appetite and sleep were normal.  His judgement appeared to be adequate and he demonstrated capacity for insight.

CRONK, DONALD        57286                                        June 30, 2005

**B. Clinical Diagnosis and Level of Functioning:**

AXIS I:       304.20 Cocaine Dependence (in full remission)
AXIS II:      V71.09 No Diagnosis or Condition
AXIS III:     Hepatitis C, degenerative disk disease
AXIS IV:      Stressors: Life Sentence; alienation from family members
AXIS V:       Current Global Assessment of Functioning
              GAF = 85

**C. Current Level of Care:**  Not applicable, as Mr. Cronk has no current mental disorder.
**D. Treatment Activities:**  Not applicable, as Mr. Cronk has no current mental disorder.
**E. Medications::**  Not applicable, as Mr. Cronk has no current mental disorder.
**F. Prognosis:**  Not applicable, as Mr. Cronk has no current mental disorder.

## XIV.  Assessment of Dangerousness
**A. Inmate's Version of the Offense**
Mr. Cronk was engaged in the robbery of the victim's home.  The victim returned to the residence surprising Mr. Cronk and his partner in the crime.  Mr. Cronk was shot by the victim and hit 3 times. He used the gun in his possession to fire back, killing the man.  Mr. Cronk was a habitual user of cocaine at the time.  He was in financial difficulty due to his drug use.  Mr. Cronk's present accounting of the events on the day of the crime, and of his behavior at the time of the crime is entirely consistent with the version of the crime reported to this examiner during the previous evaluation.  It is also consistent with past disclosures to other parties, and with information from law enforcement.

As stated previously, there is no evidence that Mr. Cronk was suffering from any mental disorder or symptoms at the time of the commission of his offense. He has no history of serious mental disorder or any psychiatric condition that might predispose him to violent behavior.  He does *not* at the present time, have any mental disorder or condition that might place him at increased risk for violent or criminal behavior.

**B. Risk of violence in a controlled setting:**
As stated in the previous evaluation by this examiner, Mr. Cronk has been free not only of violent behavior, but of any disciplinary actions during his entire period of incarceration.  He continues to use his time in prison to participate in an array of self-help, volunteer and educational activities including substance abuse treatment, higher education, peer education, religious education, and music production assistance.  Based on his record of past behavior, Mr. Cronk could be expected to continue to live in a non-violent and productive manner in any controlled setting.
**C. Risk of violence if released into the community**
As stated in the previous evaluation of Mr. Cronk from October 12, 2001, Mr. Cronk does not have a mental condition that causes him to be mentally ill, require treatment, or that would cause him to be at increased risk of committing another violent offense.  Additionally, he seems to have overcome an earlier pattern of substance abuse and antisocial behavior that lead to the commission of his crime.  Other historical factors such as a lack of previous violence, psychopathy, or early criminal behavior remain as factors associated with a low

CRONK, DONALD    _-87286                                    June 30, 2005

risk of violent behavior. Also as significant positive factors, Mr. Cronk has a feasible plan for parole, a network of social support, marketable employment skills and a proven ability to manifest and utilize resources toward the completion of positive goals. He is willing to comply with the conditions of parole, accept help from others, and consistently seeks appropriate assistance from prosocial individuals for solving problems. He has shown remarkable resilience in the face of daily challenges.

In the last report, I stated that the biggest risk factor appeared to be resumption of substance abuse which could jeopardize Mr. Cronk's ability to meet his financial obligations. Since that time Mr. Cronk has continued to increase his network of support, to participate in substance abuse group treatment, and increase his financial resources. All of these factors would seem to further decrease the risk that Mr. Cronk would return to the use of substances or criminal behavior. Mr. Cronk is aware of the dynamics of substance abuse and relapse potential for anyone who has had a substance abuse problem.

Given the stability of Mr. Cronk's mental status, his exemplary performance while incarcerated and extensive efforts at rehabilitation, no changes in Mr. Cronk's mental health are anticipated. He has no history of mental illness and no contributory mental problems. His attitude is consistently positive and upbeat. Most importantly, he has no history of violence while incarcerated, and no history of violence in the community prior to the commission of his offense. He has shown genuine remorse for his crime and takes full responsibility for his actions. He is insightful regarding the factors that led to his criminal behavior. There would seem to be no additional benefit that could accrue to Mr. Cronk or to the state by his continued incarceration. Continued incarceration could, in fact, be detrimental to Mr. Cronk's ability to succeed as a parolee, as it may be creating a dependency on institutional resources, and requires continued adaptation to a unique and extreme environment. While it is not possible to predict future behavior with absolute certainty, based on clinical assessment and review of Mr. Cronk's records there is no indication that he represents an increased risk to the community for violent crime, were he to be paroled.

Michel Lynn Inaba, Ph.D.
CDC Contract Psychologist
License # Psy15977

109

5

# R E – E N T R Y   P L A N S   U P O N   P A R O L E

Donald Cronk

2005

TABLE OF CONTENTS

Summation of Parole Plans

Goals and Objectives

Achievement and Status Overview

Resume

Electrical Union Support Verification

Letters of Employment

Response from Community Outreach (Sacramento/Marin)

Letters of Support (Wisconsin, Marin, Sacramento)

Psychiatric Report - New report ordered at 2004 hearing

CDC Progress Report

LIFE CRIME STATISTICS

| | |
|---|---|
| Date of Crime: | December 19, 1980 |
| Date of Arrest: | July 3, 1981 |
| Sentence Date: | June 1984 |
| Sentence: | 25 to Life + 2 Year Enhancement for Weapon |
| Matrix Range: | 28-29-30 Years |

| | |
|---|---|
| Initial BPT Hearing: | March 1997 - 4 Year Denial |
| Subsequent BPT Hearing #1: | December 2001 - 1 Year Denial |
| Subsequent BPT Hearing #2: | December 2003 - 1 Year Denial |
| Subsequent BPT Hearing #3: | March 2004 - 1 Year Denial |
| Subsequent BPT Hearing #4: | 2005 - SEPT. 14 1 YEAR DENIAL |

**111**

SUMMATION OF PAROLE PLAN

Donald E. Cronk

Refer to supporting documentation attached.

1   Report to parole officer upon release to community.

    A)   Confirm address and telephone numbers of residence
    B)   Obtain and verify all conditions of parole
    C)   Submit to alcohol/drug testing
    D)   Request assistance/suggestions from parole officer

2   Residence - refer to attachments

    A) Marin:    Ms. Kathleen Giono (Fiancee)
               1628 San Anselmo Avenue
               San Anselmo, CA  94960
               Telephone (415) 458-3565

    B) Wisconsin:   Mr. David Cronk    (Brother)
               3295 Vinland Road
               Oshkosh, WI  54901

               Mrs. Kevee Kienast (Sister)
               220 Collins Street
               Waukesha, WI  53186

               Mrs. Pamela Vetta (Sister)
               1741 Oakdale Drive
               Waukesha, WI  53189

3   12 Step Programs - refer to attachments

    A) Sacramento:  Chris Shirley - N.A. Sponsor
               Norman Metclaf - A.A. Sponsor

    B) Marin:    Barry Stricker - Tiburon Baptist Church
               Marin County N.A. @ (415) 499-0900

4   Friends/Family Support - refer to attachments

    A) Sacramento:  Chris Shirley, Finances, Employment Aide
               Richard Fathy, Attorney/Legal Guidance
               Norman Metcalf, Employment
               Chris McCarthy, Employment

Summary of Parole
Cronk, Donald
Page -2-

    B) **Marin:**  Kathleen Giono, Residence/Finances/Guidance
                 Barry Stricker, Pastor/Church Support/12 Step Program
                 Carol Jackson, Financial/Living assistance

    C) **Wisconsin:**  David Cronk, Brother
                   Kevee Kienast, Sister
                   Pamela Vetta, Sister

5  Employment - refer to attachments

    A) Sacramento:  Metcalf Electric, 1531 47th St., Sac, CA 95819
                  McCarthy Painting, 5409 "S" St., Sac, CA 95819

    B) Marin:  Redwood Empire Electrical - Union Sponsor (707) 523-3837
             Tiburon Baptist Church - agreed to assist with employment

6  Community Services - responses to my letters of inquiry

    A) Sacramento: - refer to attachments (Unchanged)

        Employment Development Department (Employment Opportunites)
        Meadowview Community Action (Employment training)
        Community Connection Resource Center (Substance abuse counseling)
        Broadway Career Center (Employment Placement/training)
        Breining Institute College for Addictive Disorders

    B) Marin: - refer to attachments (Unchanged)

        Dept. Health & Human Services (Social Services)
        Dept. Alcohol & Drug Services (12 Step Sponsorship)
        Dept. Marin Employment Connection (Employment/training)
        Marin Regional Occupational Program (Employment/training)
        Masters Institute (Personal desire for current technology training)

## GOALS and OBJECTIVES of PAROLE – 2005

I do not know if I can "earn" the right to parole but I believe I have acquired through hard work and a clean record the opportunity to be given a second chance. I have punished myself far more than society asked, the justice system imposed, or the harshness of prison could invoke.  I have worked hard to confront and then correct the physical and psychological factors which contributed to my past decline and to ensure I will not allow myself to sink to that depth again.  I am continually and painfully reminded of the life of Mr. James Allen which I took 24 years ago.  Often I am amazed I so easily succumbed to peer pressure and cheap desperation.  I blame only myself and now, only I can strive to meet the challenges set before me.  I embrace these challenges with a clear mind, a changed heart and the desire to one day "give back" what I stole from society so long ago.

As I re-enter society I am aware of my responsibility to do well, for my victims, for society, for myself and for those who supported me all these years. I embrace whatever God grants me and in Him I am confident.

My primary residence will be in San Anselmo California.  I plan to be married once I am released to Kathleen Maria Giono (see letter), a life long resident of San Anselmo and who owns her own home.  If for some reason I am not allowed to parole to San Anselmo, Kathleen is prepared to provide whatever assistance is necessary where ever I must live until my parole can be transferred.  Upon granting of parole, every detail can and will be offered in advance to all necessary authorities.

I am a skilled electrician, completing my indentured apprenticeship while in prison.  I have a current employment offer in this field of work (see letter). I am also a talented audio engineer with many contacts in this field of employment.  I have mixed (produced) the sound for almost all of the prison's musical concerts for the past 20 years.  I was also a co-producer on the Gospel Choir CD that was recorded in San Quentin and went on to sell many thousands of copies.  I intend to start my own sound production company several years after my release.  I have no doubt of the viability of this company and the income generated will not only support my household, but will offer employment to at least three other qualified employees.

**114**

Goals and Objectives (cont)
Page -2-

I am also a skilled clerical worker with over ten years experience and am well versed in Microsoft computer applications and most other office equipment. I am able to organize and work efficiently under pressure. My typing skills are above average.

As another option, I may enroll in a Technical College in order to become current and proficient in the field of computer related technology. I have contacted several and ITT Technical Institute appears to be the most appropriate given my situation. I have kept abreast of current technologies, and my main supporter in Sacramento is currently employed in this field for many years and has offered to assist me in my training and employment (see letter) should I choose this field as my career. In the meantime, I will continue to complete my B.A. Degree through Ohio University.

All in all, given my diversified skills, my academic accomplishments, my many community supporters, friends and contacts, combined with a sincere desire to seek out purposeful employment, my ability in securing full time well paying employment will not be a major obstacle even with the current financial crisis burdening California.

I have made the 12 Step Recovery process a part of my life. I am aware this is a life time commitment and I am eager to take my message of hope and recovery to others. For almost 10 years I have attend two meetings a week and co-facilitate the Overcomers 12 Step Program. I intend to seek this type of recovery program once free as it is Christian based. I have several 12 Step sponsors waiting my release who have offered to sponsor me (see letters).

I will continue to facilitate the Project IMPACT program (see attachments) on the outside as I currently do in prison. This is a program that was born in San Quentin and was designed by inmates who have changed their lives and want to help others do the same. I have written several sessions and find this type of work very rewarding. There is dire need for this type of mentoring on the outside where this program is now being offered.

In addition, I am being trained to facilitate the ManAlive domestic violence prevention program sponsored by the Marin Abused Women Services (see attached). I have been involved in this program for over 30 months and will supplement my income doing this teaching on the outside.

115

Goals and Objectives (cont)
Page -3-

Most importantly, I have given over the control of my life to Jesus Christ.
In spite of my surroundings I have learned to care about myself and deal
appropriately with life's trial of surmounting difficulties with a clear mind
and body.  Through Christ I have learned to accept and recognize my weakness's
and my strengths.  I accept myself and other people as they are and can appreciate
the importance of the 'now' of life.  I have come to understand myself and what
drives me.  I see my faults and the excuses that have short circuited my life.
I have gained self understanding and forgiveness.

Most of all I am not afraid to seek help when I feel overwhelmed.  I have
learned how to communicate my emotions and am not afraid to admit I need help.
I know where to seek out whatever assistance I may need with the tools I learned
in my Christian and other self-help programs.  I can accept life disappointments
and have endured many, sober and gracefully.  I look forward to the day I am
a free man.  While I may always be ashamed of what I did so long ago, I am proud
of the person I have become.

I will be an active member of Tiburon Baptist Church (see letter) and will
spend many hours a week interacting with the pastor and participating in the
many life changing studies offered, one of them being A.A.  I have become a God
fearing man and in all my thoughts and actions, it is not other men I must please,
it is the Lord Himself.  I am accountable to God and will continue to serve Him.

While I am aware of the many difficulties before me, I anticipate no problems
while on parole.  I do not have a problem with authority, male or female and
get along well with all prison staff.  I have nothing to hide nor anything to
hide from.  My life is obviously an open book and I like it that way.  I want
all to know, to see for themselves, who I was and who I have become.  This is
also an effective and powerful testimony of the power of Christ in a broken life.
I thank God for His forgiveness, mercy and grace.

116

ACHIEVEMENT and STATUS OVERVIEW

Cronk, Donald

1981 – 2005

## EDUCATION

| | | |
|---|---|---|
| 2002 – Present | Patton University Theology III | Graduated |
| 2002 – Present | Ohio Univeristy Bachelor Degree | Enrolled |
| 2002 | Patton College Theology II | Completed |
| 2002 | Patton College Theology I | Completed |
| 2000 | A.A. Degree Patton College | Graduated W/Honors |
| 1996 – 1998 | Biblical Counseling Foundation | Certificate |
| 1993 | High School Equivalency | (GED) |

## VOCATIONAL – Completed I.B.E.W. Electrician's Apprenticeship

| | | |
|---|---|---|
| 1988 – 1990 | IDL Renovation Project | (1900 Hours) |
| 1986 – 1989 | Indentured Apprenticeship | (2000 Hours) |

## HELPING SELF & OTHERS

| | |
|---|---|
| 2005 – Present | Non-Violent Communication (16 week program) |
| 2005 – Present | T.R.U.S.T. – Active Participant |
| 2002 – Present | Project IMPACT (Facilitator – Protestant Chapel) |
| 2002 – Present | Man Alive Facilitator Training (Domestic Violence) |
| 2001 | Discipleship Bible Study – 1 year course |
| 2001 – Present | Centerforce Peer Health Educator |
| 1999 – Present | Overcomers 12 Step Program (Christian) |
| 1998 – 2002 | Alcoholics Anonymous |
| 1995 – 1997 | Biblical Life Principles |
| 1995 – Present | Biblical Evangelism |
| 1994 | Self Esteem Therapy w/Dr. Dupree, Ph.D. |
| 1994 – 1998 | Narcotics Anonymous |
| 1991 – 1992 | Recording Engineer/Producer – Gospel CD Produced |
| 1990 – 1991 | Toastmasters International |
| 1991 | S.Q. Museum Association |
| 1991 | Alternatives to Violence |
| 1991 | Self Help Video Produced (Dr. Bruce, Ph.D.) |
| 1989 – Present | Audio Engineer/All San Quentin Events |
| 1989 – Present | Kairos Prison Ministries |
| 1989 – 1993 | Outstanding Victim Advocate |
| 1988 – 1990 | S.Q. Husbands & Wives Group (Founding Member) |
| 1988 – Present | Church Member |

## AWARDS & RECOGNITION

| | |
|---|---|
| 1993 | Muscular Dystrophy Association |
| 1992 – 1993 | San Quentin Gospel Choir Recording |
| 1992 | Radio Show (Stop the Violence) w/Madonna & Huey Lewis |
| 1991 | National Education Drug Abuse Video |
| 1990 | McDonalds Gospel Fest (2nd Place) |
| 1990 | Angel Award (Set Free TV Documentary) w/Tom Landry |
| | won American Correctional Association Highest Honor |

## DISCIPLINARY

| | |
|---|---|
| 1984 – Present | Single CDC-128B Disrespect |
| 1981 – 1984 | Single Infraction County Jail - Dismissed |

117

ACHIEVEMENT and STATUS OVERVIEW
Cronk, Donald
Page -2-

## PSYCHOLOGICAL EVALUATIONS

| | |
|---|---|
| 2005 | Report ordered by BPT Legal Dept. LTR Rc'd 10/04 |
| 2001 | Positive report by Dr. Michel Inaba, Ph.D. |
| 1997 | Positive report by Dr. Stephanie Lee, Ph.D. |
| 1993 | Positive report by Dr. Randall Bruce, Ph.D. |
| 1990 | Positive report by Dr. William Sullivan, Ph.D. |
| 1987 | Positive report by Dr. Michael Roudebush, Ph.D. |

## CORRECTIONAL COUNSELOR PROGRESS REPORTS

| | |
|---|---|
| 2005 | |
| 2004 | Positive report by CCI Garcia |
| 2002 | Positive report by CCI Keese |
| 2001 | Positive report by CCI Ballachey |
| 1997 | Positive report by CCI Edwards |

118

R E S U M E
2 0 0 5

DONALD EVERETT CRONK
\* P.O. BOX C-87286   SAN QUENTIN, CALIFORNIA   94974 \*

OBJECTIVE

I will accept an entry-level or higher position.  Will  work
for minimum pay for 30 days while I prove my abilities and worth
to your company.

OVERVIEW

I am an energetic, personable and well organized individual.
I offer a strong work ethic and a broad range of experience
at varying levels of skill in diversified fields; additional
qualifications include:

I possess communications skills with the ability to establish
rapport with company clients and management.  I have good
computer orientation using Microsoft Word for Windows and other
Microsoft applications. (No programming skills)  I am detail
oriented with the ability to accept growing responsibilities
in a high pressure environment.  Quick learner with the ability
to work with minimal direction.

EXPERIENCE

Public speaker/facilitator W/Power Point for ManAlive Domestic
Violence prevention program
Public speaker/facilitator W/Power Point for Project IMPACT
Male Accountability program
Apprentice electrician residential/construction (4000 hours).
Clerical, typing (45 WPM), filing, telephone, data management,
organization, daily scheduling.
Computer experience, most Microsoft applications
Retail sales/warehouse/delivery, promoted to service manager
Audio Engineer – live concert events/recording; well versed
with extensive hands on experience.
Fork lift, heavy farm equipment, and medium truck driving
experience, 20 plus years.

EDUCATION

Currently enrolled in Ohio University Bachelors Degree Program
Currently enrolled in Patton University  Ministry Program
Currently enrolled in ManAlive Violence Facilitator Training.
A.A. Degree Patton College – graduated w/honors 3.68
Peer Health Education Counselor – Certified
Biblical Counseling Foundation – Certified
High School Equivalency – GED

VOCATIONS & SKILLS

Indentured Electrical Apprentice I.B.E.W.-
Electricians Union, Local 551-Santa Rosa, California (4000)
hours
Assistant recording engineer/co-producer Gospel CD – marketed
and sold over 30,000 copies
Head audio engineer for all San Quentin musical events
Toastmaster's International Gavel Club (public speaking)

REFERENCES

Available upon request

**119**

April 28, 2005

*responded*
*4/29/05*

Mr. Donald E. Cronk
San Quentin Prison
San Quentin, CA 94974

Dear Don,

Thank you for your fabulous and heartwarming letter regarding the prospect of employment upon your release from San Quentin! I appreciated learning more about your testimony and particularly enjoyed hearing about your vision of a bright and productive future. I am praying for you toward that end; in fact, in case you are not already aware, we pray for you every Wednesday night in our prayer meeting at Tiburon Baptist Church (TBC) where I am a member, along with Barry, Carol, Craig and the wonderful Kathleen. Your name is also on our ongoing prayer list, which is circulated among many prayer teams who meet regularly within our church.

Regarding employment with my company, *info*USA, your resume includes many marketable skills, which would make you an excellent candidate for several positions here and with other employers. While I am not permitted, per company policy, to hold a position open for a prospective candidate without a specific availability date, I welcome your application upon your release. One caution is that our policy is to conduct a criminal background check, using an outside firm, and depending upon the positions we have available at the time of your application, your history may preclude you from positions within our company, a publicly-held corporation, for three to seven years.

That said, what Carol Jackson and I are seeking to do is to identify private employers within Marin County, and elsewhere in California, for whom a criminal history would not prohibit a prospective hire. We have several private business owners within our church with whom we will be in discussion to see if we can develop a network of employers willing to give men such as you the opportunity to obtain gainful employment. So, please do not be discouraged!

Given your interest in sound mixing, please begin praying that we can make a connection with one of the local employers who could use someone with your gifts and talents (i.e. Lucas Film, Pixar Studios, etc.). I have a vision for establishing a program for parolees to have job offers upon their parole. Due to the stringent criminal history background check requirements in many public companies and educational institutions, this endeavor will require significant prayer and intervention by God in order to open the hearts of business owners and their insurance companies. Please share with me any specific ideas or suggestions you have toward this end so we can collaborate in making this vision a reality. I am confident God will make a way and suspect it will be a matter of hard work and prayer in the meantime.

On a personal note, I wanted to let you know that I am the Inimitable Kathleen Giono's deacon at TBC and you have made a wise choice in her as a future spouse. Not only is she absolutely

Page 1 of 2

120

adorable and has the best hair of anyone in our entire church, she is a woman of godly character and grace. I will be praying for your joyful future together.

As for your journey toward continued healing and recovery, let me applaud your efforts and your walking with Jesus on this path. As one who has been clean and sober for 17 years, I look upon the circumstances around your incarceration and say, "But for the grace of God go I." Many times as my family at TBC and I have talked about our brothers at San Quentin, we are very aware that so many of us could be in your shoes and that the only thing separating us, for the time being, are walls. Be encouraged you as you continue to pursue truth and grace and as you seek to serve God by serving those around you.

Please keep in touch as you think of ways that Carol and I can work toward helping you and others get jobs upon parole. I will circulate your resume as appropriate among my colleagues who will be anxious to help you. Again, I think the important work we can do immediately is to pray and ask God to show us just where he wants you to serve and who we need to connect with to make that happen. TBC has established a transition fund to help parolees and Carol and I would like to supplement that support with employment connections.

Thank you again for sharing your testimony, vision and especially your time with me. I look forward to working with you in the days ahead to help you transition to the opportunities that await you. You can write to me via Carol Jackson and TBC and I will be in touch as well.

May God's grace and peace be yours in abundance. Your sister in Christ,

*Susan Prnjak*

Susan Prnjak

KATHLEEN GIONO
1628 SAN ANSELMO AVENUE
SAN ANSELMO, CA. 94960
415 458-3565 or 415 454-4687

San Quentin State Prison                          01 Jan 2005
Main Records Department                           RE: DONALD CRONK
Attn:  Board of Prison terms                           C87286
San Quentin, Ca. 94964

Dear Members,

I was born and have lived in San Anselmo, Marin County, California all my life.  I own a home in
San Anselmo and manage a travel agency in the town of Corte Madera.  I have many friends,
family and contacts in the community, as such combined with Donald's skills, finding meaningful
employment will create no problem.

My friendship with Donald Everett Cronk started in 1991 and slowly developed into a deeply
caring, loving and serious relationship.  We plan to be married upon his release.  We will be
living at the above address.  I am able to provide a most stable and healthy living environment.  I
look forward to the experiences of helping Don ease back into society.  I will encourage the
ongoing meetings Don attends of N.A. and A. A., realizing these are life long commitments.  I
can provide transportation until Don can obtain his drivers license and car.

In the event Don must parole to Sacramento, I will be there for Don in whatever capacity he
needs me.  I can easily help him financially whether it be to secure housing, to purchase a vehicle,
or with general living expenses.

Don has proven to be a wonderful devoted Christian who will continue to live his life serving
God.  He led me to Tiburon Baptist Church and my becoming a Christian.  Don desires to also
become a member of this church and is welcomed by Dr. Barry Stricker and his congregation.
We both have plans to be involved and serve the church in whatever ministry they need us.

Don has my support and the support of his Wisconsin family and friends in Marin County.
Everyone is aware of his crime, and feels he has become a fine, serious adult who has more than
paid his debt and is ready to be a productive member of society.  Don has managed to remain
clean, upbeat and healthy in spite of his years of incarceration.  Don made the best of his situation
by finishing high school and completing a college degree, as well as many certificates and
honors.  He has many accolades from teachers, staff and members of the prison system, all which
can be provided upon request.

Please consider Donald Cronk's release.

Sincerely,

Kathleen M. Giono
Kathleen Giono

122



**TIBURON**
Baptist Church

December 8, 2004

Board of Prison Terms
1515 K Street, Suite 600
Sacramento, CA 95814

To Whom It May Concern:

For several years, I have written letters of support on behalf of Donald E. Cronk (C-87286), an inmate at San Quentin State Prison. I have known Donald for over nine years through my involvement with programs at the prison. Donald has been a student in classes that I have taught through both the Protestant Chapel and Patten University. His work in the university courses over the past years has been exceptional. The more time I spend with Donald, the more convinced I am that he would be a strong contributing member of society if he could be granted release from San Quentin.

I have spent a great deal of time with Don and have observed him in a variety of settings. In every situation, he has demonstrated to me the highest integrity. He is self-aware and he continues to work hard to grow and learn. He is responsible, forthright, and honest. I do not know all the details of his life, but I am aware of the circumstances that led to his incarceration. He demonstrates both deep remorse and a genuine desire to make himself a productive member of society. I am convinced that Donald is ready to take his place as a productive member of our community.

Our church is willing to commit to Donald the support and assistance necessary for his transition to life outside. I am certain that he will have vital and substantial support, and that he is ready for the next stage of his life. In particular, our church can offer him assistance with transportation, education, job training, and accountability and support groups. Our church also sponsors an A.A. group that meets weekly in our facility.

Thank you for the opportunity to write a letter of support for Donald. If I might be of further assistance, please feel free to call me.

Sincerely,

Barry Stricker, Ph.D.
Pastor

445 Greenwood Beach Rd., Tiburon, CA 94920
(415) 388-3900 • e-mail: tbcmarin@pacbell.net

123

January 15, 2005

San Quentin State Prison
Parole Board
San Quentin, Ca. 94964

RE: Donald E. Cronk, C87286 3—95

To Whom It May Concern:

The year 2005 and once again I have been asked by Don Cronk to write on his behalf. I always feel it is a privilege and a pleasure to do so and it is my sincere hope that this year 2005 will be the year that this board will see fit to grant this man a parole. I am sure if you read his statements from his supporters you will find that Donald Cronk is a changed man and also truly sorry and regrets the crime that caused him to be incarcerated over twenty years. He certainly has served his time and in my opinion he should be given the opportunity to show society and the State of California that he is prepared and ready to take his place in society and lead a productive and healthy role.

Don Cronk has certainly improved himself while incarcerated in San Quentin. He has a perfect record with no disciplinary action taken against him. He has received a GED, an Associated of Arts from Patten University and is now working on a Bachelors Degree from Ohio University. He knows how important an education is not only to obtain a job but to keep his mind alert and active in the society he wishes to join.

I first met Don through the Garden Chapel program at San Quentin and was taken by his profound faith in Jesus Christ. He is an outstanding Christian—one who lives by and obeys the word of God. He helps his fellow inmates by doing various Bible Studies with them in the cellblock and living out the truths he speaks and teaches in his daily life.

Don has many people who can and will help him with employment and with housing but until a date is given there is no way for him to take that job or secure housing. Don does have a Church family that are waiting for him to parole and with God's help we will be able to help him on that road to a new beginning.

Thank you for taking the time to read this letter. It is my sincere hope and prayer that you will recommend this fine gentleman and my friend Don Cronk for parole. I know the State of California will be proud of his service to the community in which he will serving once he is given a chance.

Sincerely,

Carol Jackson
%Tiburon Baptist Church
445 Greenwood Beach Road
Tiburon, Ca. 94920

124

*Rosser McDonald*
*3032 San Marcos*
*Fort Worth, Texas 76116*

January 3, 2005

Board of Prison Terms

Dear Sirs,

I am writing in support of parole for San Quentin Inmate Donald Cronk (#C-87286).

I met Don 15 years ago and have kept up with him through correspondence and occasional visits through the years. I have been impressed with his consistent dedication to learning and living as an upstanding and productive man. His educational advancement speaks for itself.

I met Don while researching stories for a TV documentary. I was a TV Producer for the Southern Baptist Radio and Television Commission (until retirement 3 years ago). We, and 3 other religious groups, made programs each year for NBC and ABC to use as their "religious affairs programming" and I produced the NBC shows for 10 years. Don was singled out by officials at San Quentin as one who "practiced what he preached" and after researching 3 potential stories I chose Don. It was a story which showed the practical difference God makes in a person's life when there is a genuine and continuing commitment. The contrast between the kind of life that gets you into prison and being a committed Christian was clear. Former Dallas Cowboy Football Coach, the late Tom Landry, hosted the program and was impressed with the obvious difference in Don.

As I stated, I have maintained the friendship Don and I made during the production of that program and his faith has grown and helped him to be an honest, productive citizen in the difficult circumstances of prison.

Since I live 1500 miles away and am retired, I am not in a position to commit to finding employment, housing and other sponsor type activities. I do agree to contribute $400 to a fund for supporting Don while getting established in the free world. I also can help to find a good, solid church in the area where he locates through my long association with the Southern Baptist Denomination.

I appreciate your willingness to serve in this important position. I thank you for giving consideration of a parole for Donald Cronk, and I pray for wisdom and insight in your deliberations.

Sincerely,

Rosser McDonald

125

**mccarthy painting**
phone: 916-451-8888
fax   : 916-453-0606

5409 s street
sacramento, ca. 95819

December 19th, 2004

Board of Prison Terms

Dear Sirs,

    I know Donald Cronk through correspondence and the relationship of a mutual friend named Chris Shirley. I am writing this letter to inform you that I will employ Donald Cronk as a house painter if he is available. The job would be full time and permanent. The wage would be ten dollars per hour. If he lives nearby I would be able to give him a ride to work. If you require any further information, please do not hesitate to call.

                    Sincerely,

                    Chris McCarthy

126