# EXHIBIT C
# Part 5 of 6

- San Quentin College Program (Patton College) 10/1/96-12/6/01. Certificate of Completion granting Peer Educator Status 04/12/01. Associates of Arts Degree 05/01 from Patten College.
- Participated in the Man-alive Phase I Program 8/02.
- Evangelism And Outreach 6/24/03
- Biblical Theology 1/7/03
- Arts and Corrections soundboard set up for outside entertainment, 6/24/03-7/8/03-8/8/03-9/29/03-10/22/03.
- Cronk is currently enrolled in the BA Degree program through Ohio University since 2002.
- Man-Alive Program facilitator training, 2002-present.

D.     **Disciplinary History:**

CDC 128A Custodial counseling 06/29/88 refusing to follow orders.

E.     **Other:**

None

IV.     **FUTURE PLANS:**

A.     **RESIDENCE:**

Cronk is hopeful of transferring his parole to Marin County. He has been offered housing by Ms. Kathleen Giono, his fiancée, 1628 San Anselmo Ave., San Anselmo, Ca. 94960 (415) 458-3565. In the event that the parole transfer request is denied Cronk has been offered housing by Mr. Chris Shirley 4833 9th Ave. Sacramento, Ca 95820-1520 (916) 457-7131. Letters confirming these housing offers are contained in Cronk's central file #2. Furthermore Cronk's two older sisters, Kevee Lynn Kienast and Pamela Vetta, have both offered housing employment and financial assistance in the event of his parole.

B.     **EMPLOYMENT:**

Cronk has received letters of employment from prospective employers in Marin, and Sacramento areas. Marin County employment offers are Redwood Empire Electrical Training Trust (Union Sponsor), 1700 Corby Ave., Suite F, Santa Rosa, Ca. 95407 (707) 523-3837 and Illuminata Films 26A Varda Landing, Sausalito, Ca. 94965 (415) 331-2663. In the Sacramento area employment offers are McCarthy Painting, 5409 S Street, Sacramento Ca. 95819 (916) 451-8888 and Metcalf Electric, 1531

47th St., Sacramento, Ca 95819 (916) 456-6862. The letters verifying all offers of employment are located in Cronk's central file #2.

## V.    USINS STATUS:

Not applicable, Cronk is an American citizen born in Wisconsin.

## VI.    SUMMARY:

A. Cronk has maintained an excellent program throughout his nineteen- (19) years of incarceration. He has managed to use his time here in a constructive fashion, constantly making improvements in his life and the lives of others. He has made numerous achievements and surpassed many of life milestones despite his confinement to State Prison. Cronk continues to excel in all areas. He has gained employable work skill as an Electronic Worker and is currently working towards his Bachelors Degree. He has remained disciplinary free and received commendation for his positive programming efforts. He maintains an excellent rapport with both staff and inmates.

During his board report interview on December 11, 2003, he talked openly and candidly about the crime and takes total responsibility for his involvement. It appears that he has had sufficient time to reflect on the past and come to terms with his present condition. He fully understands how his involvement with drugs played an intricate part in his motivation to become involved in the commission of the crime. It is my genuine belief that had Cronk not become involved with drugs he might not be sitting in prison today. Cronk has taken positive steps in dealing with his past problem with drugs by becoming involved with Alcoholics and Narcotics Anonymous.

Considering the commitment offense, the almost non-existent prior criminal record, his prison adjustment, and psychiatric reports, I believe that Cronk would pose a minimal degree of threat to public safety if released from prison at this time.

B. Prior to release from prison, Cronk is encouraged to maintain his exemplary programming efforts, and remain disciplinary free.

C. This report is based on a thorough review of Cronk's central files and a personal interview with the Inmate on 12/11/2003

D. Cronk took the opportunity to examine his central file on 12/11/03. Refer to CDC 128B dated 12/11/03.

CRONK, DONALD        CDC#C-87286            SAN QUENTIN            MARCH 2004

M. RUIZ, CCI

C. ARTHUR, CCI

C. BELSHAW

**LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

- ☐ DOCUMENTATION HEARING
- ☐ PAROLE CONSIDERATION HEARING
- ☐ PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 9/1/01 TO 8/31/02 | | | **Placement:** Cronk remained at San Quentin in the General Population. **Custody/Classification:** Custody remains at Medium A with a classification score of 0 points. **Academics:** Cronk continued to participate in the San Quentin College Program. **Work Record:** Cronk continued his assignment as the Reception Center Gym Clerk. **Group Activities:** Cronk continued to participate in AA/NA meetings and the Overcomer's Outreach Program **Psychiatric Treatment:** None noted during this review period. **Prisoner Behavior:** Remained disciplinary free during this review period. **Other:** None |
| 9/1/02 TO 9/1/03 | | | **Placement:** Cronk remained at San Quentin in the General Population. **Custody/Classification:** Custody remains at Medium A with a classification score of 19 points. It should be noted that the increase of classification score is non-adverse, and due to a change in the Department of Corrections scoring system. **Academics:** Continued to participate in the San Quentin College Program. **Work Record:** Cronk continued his assignment as the Reception Center Gym Clerk. **Group Activities:** Cronk continued to participate in AA/NA meetings and the Overcomer's Outreach Program. Cronk completed an 18-week Phase I Man-Alive Program and the Phase II of the program. Cronk is currently a facilitator in training. **Psychiatric Treatment:** None noted during this review period. **Prisoner Behavior:** Remained disciplinary free during this review period. **Other:** None |

CORRECTIONAL COUNSELOR SIGNATURE _M Ruiz_   DATE _1/16/04_

CRONK, DONALD    CDC#C-87286    CSP-SQ    MARCH, 2004

193

PT 1004 (REV. 7/86)

POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 09/01/03 TO PRESENT | | | **Placement:** Cronk remained at San Quentin in the General Population. |
| | | | **Custody/Classification:** Custody remains at Medium A with a classification score of 19 points |
| | | | **Academics:** Continues to participate in the San Quentin College Program, and is attending Ohio University's BA program |
| | | | **Work Record:** Cronk continues his assignment as the Reception Center Gym Clerk. |
| | | | **Group Activities:** Cronk continues to participate in AA/NA meetings and the Overcomer's Outreach Program. Cronk is currently a facilitator in training for the Man-Alive Program. |
| | | | **Psychiatric Treatment:** None noted during this review period. |
| | | | **Prisoner Behavior:** Remained disciplinary free during this review period. |
| | | | **Other:** None |

CORRECTIONAL COUNSELOR SIGNATURE _M Ruiz_      DATE 1/16/04

**ORDER:**
- ☐ BPT date advanced by _____ months.
- ☒ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify _____

- ☐ Schedule for Progress hearing on appropriate institutional calendar.

CRONK, DONALD          CDC#C-87286          CSP-SQ          MARCH, 2004

PT 1004 (REV. 7/86)

194

9

BOARD OF PRISON TERMS                                              STATE OF CALIFORNIA
## LIFE PRISONER DECISION FACE SHEET

### PERIOD OF CONFINEMENT
*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ................................................ | | | |
| Date Life Terms Begins ......................................................... | + | | |
| At Large Time .................................................................. | + | | |
| PAROLE DATE ................................................................... | = | | |

### MISCELLANEOUS

*Parole denied one (1) year.*

Panel Recommendations and Requests:
_____ Become  ✓ Remain Disciplinary Free.
_____ Work Towards Reducing His/Her Custody Level.
_____ Upgrade _____ Vocationally _____ Educationally.
_____ Participate In  ✓ Self-Help (and)  ✓ Therapy.
_____ Transfer To _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES  ☒ SENT   (Date) ___ 12-09-02

COMMITMENT OFFENSE

| 187, & 12022.5 | MURDER 1ST W/USE OF FIREARM |
|---|---|
| (Code Section) | (Title) |
| SAC- 66618 | 1 |
| (Case Number) | (Count Number) |

| Date Received by CDC | DATE LIFE TERM BEGINS | Controlling MEPD |
|---|---|---|
| 06-13-84 | 06-13-84 | 03-02-98 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL   ☒ SUBSEQUENT (Hearing No.) 2 | 12-20-01 |

Department Representative

| Counsel for Prisoner | Address |
|---|---|
| RICHARD FATHY | |

| District Attorney Representative | County |
|---|---|
| ROB GOLD | SACRAMENTO |

### PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date |
|---|---|
| B. Cullen(?) | 1-29-03 |
| Concurring (Name) | Date |
| J. Webb(?) | |
| Concurring (Name) | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD | C-87286 | SAN QUENTIN | SUBSEQUENT | 01-29-03 |

BPT 1001 (Rev. 1/91)

195

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

I.    (X) PAROLE DENIED *One (1) year.*

      If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, Including the reasons for denial of parole, within 30 days of the hearing.

II    ( ) PAROLE GRANTED

    A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____Months

| Case No. | Count No. | Offense |
|---|---|---|

    B.  Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + _____Months

    C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + _____Months

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

    D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____Months

    E.  Postconviction Credit From _____ To _____ - _____Months

    F.  Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____Months

    The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

    You will not engage in any conduct specified in BPT §2461. Such conduct may result in rescission or postponement of your parole date.

III   If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| Name | | Date |
|---|---|---|
| Name | | Date |
| Name | | Date |

| Name | CDC Number | Institution | Hearing Date |
|---|---|---|---|
| CRONK, DONALD | C-87286 | SAN QUENTIN | 01-29-03 |

BPT 1005 (Rev. 8/1/81)

196

BOARD OF PRISON TERMS                                                    STATE OF CALIFOR

# LIFE PRISONER PAROLE CONSIDERATION HEARING CHECKLIST

☐     Initial Hearing     *"ITEMS MARKED "IN 'C' FILE" FOR BOARD OF PRISON TERMS COMMISSIONERS ONLY*

☒     Subsequent Hearing

All life prisoner hearing packets are to be divided into the following seven major categories. Within each category, similar documents should be filed together in reverse chronological order. Beginning with the most recently dated document.

1. ☒    **Cumulative Case Summary**

2. ☒    **Board Reports (All)**

3. ☒    **Psychiatric Reports (All)**

4. ☒    **Prior Decisions (AA, CRB, BPT)**

5. ☒    **Notices and Responses, including:**
   - ☒   Notices and Responses (This hearing only)
   - ☐   Officials' Letter
   - ☐   Fearful Letters **IN "C" FILE CONFIDENTIAL FOLDER**
   - ☒   Support Letters
   - ☐   _____

6. ☒    **Legal Documents, including:**
   - ☒   Probation Officer's Report
   - ☐   Arrest Reports, if any
   - ☒   Abstract of Judgement
   - ☐   Charging Documents
   - ☐   Appellate Decisions
   - ☒   Sentencing Transcripts
   - ☐   1203.01 P.C. Statement
   - ☐   _____
   - ☐   _____
   - ☐   _____

7. ☒    **Miscellaneous,** including:
   - ☒   Crime Partner's Parole Decision, if any **IN "C" FILE CONDIFENTIAL FOLDER**
   - ☒   Notice of Hearing Rights (This hearing only)
   - ☐   Disciplinary Reports and Incident Reports (All) **IN "C" FILE DISCIPLINARY SECTION**
   - ☒   Confidential Folder **IN "C" FILE**
   - ☐   Other, non-specified, but pertinent information developed since date of last hearing
   - ☐   _____
   - ☐   _____

The transcript of the prior hearing, if any, is to be included in the life prisoner-hearing packet but not indexed.

Checklist and packet reviewed for completeness ___G. H. O'Gan___ CCRM,   Date ___1-28-03___
         G. O'Gan, CCRS

| NAME: | CDC NUMBER | INSTITUTION |
|---|---|---|
| CRONK, DONALD | C-87286 | SAN QUENTIN STATE PRISON |

**197**

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING          ☒ SUBSEQUENT HEARING

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| CRONK, DONALD | C-87286 |
| DATE OF HEARING | LOCATION |
| 01-29-03 | SAN QUENTIN STATE PRISON |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS | COUNTY |
|---|---|---|
| 06-13-84 | 06-13-84 | SACRAMENTO |

| OFFENSE | CASE NUMBER |
|---|---|
| MURDER 1ST W/ USE OF FIREARM | SAC 66618 |

| COUNT NUMBER(S) | PENAL CODE SECTION(S) VIOLATED |
|---|---|
| 1 | 187, & 1022.5 |

| TERMS | MEPD |
|---|---|
| 27 TO LIFE | 03-02-98 |

## OTHER COMMITMENT OFFENSES OR STAYED COUNTS

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| *Welch* | *Webb* | |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY?) _____

☒ ATTORNEY    RICHARD FATHY _____

☒ DEPUTY D. A. _____ ROB GOLD _____    COUNTY OF  SACRAMENTO

☐ OTHERS _____

## STATEMENT OF FACTS

☒ THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☒ THE STATEMENT OF FACT IS

   ☒ QUOTED FROM THE BOARD REPORT, DATED _____ , PAGE(S) _____

   ☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

   ☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

**198**

BPT 1000 (Rev. 8/90)

82

1            CALIFORNIA BOARD OF PRISON TERMS

2                      D E C I S I O N

3            PRESIDING COMMISSIONER WELCH:  Now we're

4    ready.  Okay, the Panel did review all the

5    information received from the public and relied on

6    the following circumstances in concluding that the

7    prisoner is not suitable for parole at the present

8    time.  And reasons for this, the offense was

9    carried out in an especially cruel manner.  It was

10   carried out in a callous manner.  And the reason I

11   say that, according to the reports, the prisoner

12   and his crime partner went to the victim's home,

13   ransacked his home and laid in wait for the

14   prisoner to come home -- I mean for the victim to

15   come home.  And the prisoner was armed with a

16   weapon and he did use the weapon.  The offense was

17   carried out in a calculated manner.  By that I

18   mean the prisoner actually went to the house.  He

19   laid in wait and he was armed with a weapon.  The

20   offense was carried out in a manner that

21   demonstrates an exceptionally callous disregard

22   for a human being.  And I would think in a well

23   organized society, a human being would -- a

24   person, man or woman, would have a reasonable

25   expectation that they could go to their home and

26   that they could enter into their home and that

27   DONALD CRONK  C-87286   DECISION PAGE 1   1/29/03

**199**

83

1    their home would be a place of safety. And there
2    would not be someone in there lying in wait and
3    armed with a weapon. The motive for the crime is
4    inexcusable. And it's very trivial in
5    relationship to the offense that was committed.
6    By that I mean the prisoner and his crime partner
7    went into Mr. Allen's home to take his personal
8    goods, and Mr. Allen lost his life. The
9    conclusions were drawn from the Statement of Facts
10   wherein on 12-19-1980, the prisoner and his crime
11   partner, Mr. Meyer, went to the home of Mr. Allen.
12   According to the records, they ransacked the home
13   and they lied and they waited for the prisoner --
14   I mean for the victim to come home. And once the
15   victim arrived home, he noticed something was not
16   right. He pulled his weapon, entered the home,
17   and he saw the prisoner and fired his weapon. And
18   the prisoner was injured and the prisoner shot
19   back and as a result, Mr. Allen lost his life.
20   The prisoner had a very minimal criminal history.
21   There was only one arrest that the Panel could
22   find and that was per the prisoner's testimony for
23   taking a cassette from a vehicle and for which he
24   received probation. But the prisoner did fail to
25   profit from society's attempt to correct his
26   criminality through adult probation. But in the
27   DONALD CRONK  C-87286   DECISION PAGE 2   1/29/03

200

1    prisoner's own defense, he had a very minimal
2    criminal history.  And thus that makes this crime
3    more perplexing because there's not a lengthy
4    criminal history there.  Under unstable social
5    history, when the Panel looked at it, certainly
6    based on the prisoner's testimony, his drug use
7    was certainly an unstable social factor.  The
8    prisoner has programmed in a commendable manner.
9    He had participated in self-help programs.  He has
10   a positive disciplinary history.  He has received
11   very few disciplinaries.  The recent psychiatric
12   report dated 10-21-01 by Dr. Inaba, I-N-A-B-A,
13   shows that the prisoner is making positive
14   progress and on the right track.  His level of
15   dangerousness to the community is decreasing.  The
16   prisoner's parole plans, the prisoner have a lot
17   of parole plans.  He have a lot of support in the
18   community is what I should say.  And the support
19   extends over an extended period of time.  The
20   prisoner does have a job offer.  There are some
21   concerns about the prisoner's -- some concerns
22   about the prisoner's residential plan if he were
23   to live with his -- a prior associate that was
24   involved in the drug culture.  But overall the
25   prisoner does have a lot of support in the
26   community.  He has support from people in all
27   DONALD CRONK  C-87286    DECISION PAGE 3    1/29/03

1    walks of life.  People that are very successful.

2    That have proven that they can be productive

3    citizens.  And they are offering the prisoner

4    their support.  The Hearing Panel notes that in

5    response to Penal Code 3042 notices indicate an

6    opposition to a finding of suitability.  That

7    specifically the Deputy District Attorney spoke

8    in opposition of a finding of suitability and

9    also it's noted that there was two letters

10   presented by the District Attorney today, not in

11   the Panel's file, but presented by the District

12   Attorney from the family.  And they voiced an

13   opposition of  finding of suitability also.  A

14   strong opposition to a finding of suitability.

15   The Panel makes the following findings:  We

16   recommend that the prisoner continue in the mode

17   that he's in.  To continue to participate in the

18   self-help programs, continue to make the same kind

19   of progress that he's making, continue to remain

20   disciplinary free.  Until the Board feels that

21   enough progress is made, then we still feel that

22   the prisoner is not suitable for parole.  However,

23   the prisoner has made significant strides during

24   his incarceration.  One has to look at the

25   positive support letters that he's received, his

26   education achievements, his achievements through

27   DONALD CRONK  C-87286    DECISION PAGE 4    1/29/03

86

1    the chapel to participation in the program headed

2    up by Chaplain Smith at this institution.   The

3    prisoner's participation in the 12-step programs,

4    certainly all of those kinds of things is a credit

5    to the prisoner.   However, those positive aspects

6    of his behavior does not outweigh the factors of

7    unsuitability.   Parole is going to be denied for

8    one year.   And that one year -- And another reason

9    for this -- One of the reasons for the one year

10   denial is the crime that was committed.   And

11   during that -- but there's nothing you can do

12   about that.   The crime is changed -- I mean, you

13   can't change the crime.   The crime is always going

14   to be the same.   But one of the reasons is strong

15   opposition of the People, of the People of

16   Sacramento and the victims still feel that you

17   would present a threat to them if released.   But

18   you're doing the things that you need to do.   And

19   it's hard -- We're hard pressed to sit here and

20   tell you additional things that you need to do

21   other than you need to continue doing the things

22   that you're doing.   Stay on the track that you're

23   on.   And some day you will get a parole.   But it's

24   just not today.   But I do feel that you are making

25   -- that you've been a very good prisoner and that

26   you affected some people's lives in a positive

27   DONALD CRONK  C-87286     DECISION PAGE 5   1/29/03

**203**

1    way.  And I don't want you to be discouraged or

2    deterred because I really feel that if you

3    continue in the mode -- on the mode that you're

4    on, that you'll get a parole date.  And I would

5    suggest that I think it's Mr. Shirley?

6           INMATE CRONK:  Uh-hmm.

7           PRESIDING COMMISSIONER WELCH:  The person

8    that engaged in -- He seems like a very good

9    support source for you, but he may not be -- he

10   may not be the person that you want to put down as

11   a place that you want to live because of your

12   prior drug activity.  And that's one of the things

13   that the issues -- the issues that the District

14   Attorney raised.  You might want to look at

15   alternative places of residence.  And with that,

16   Mr. Cronk, I wish you good luck.  Mr. Webb, do you

17   have any comments?

18          DEPUTY COMMISSIONER WEBB:  I'd just like to

19   say one thing.  And that is that in relationship

20   to your parole plans, not taking a look at you

21   need to alter them because it would be a derelict

22   in one's responsibility to release you to the same

23   scenario that gave you 20 years.  So we going to

24   have to make the changes.  It just don't work.  In

25   particular, you've been dealing drugs, and your

26   drug usage because that's what landed you in

27   DONALD CRONK   C-87286    DECISION PAGE 6    1/29/03

204

88

1    prison with the life crime.   I commend you for all

2    the things you've done.   You've done a good job,

3    but you need different parole plans.   Alternative

4    parole plans because we release you back out to

5    the same scenario that landed you the life crime

6    and you kill somebody else, what happens?  Think

7    about it.   But good luck to you. That's all I

8    have.

9        PRESIDING COMMISSIONER WELCH:  Okay,

10   Mr. Cronk, good luck to you.

11        INMATE CRONK:   Thank you.

12        PRESIDING COMMISSIONER WELCH:   Your welcome.

13                    --o0o--

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED ONE YEAR

26   FINAL DATE OF DECISION_____APR 2 9 2003_____

27   DONALD CRONK   C-87286   DECISION PAGE 7   1/29/03

205

89

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Sandy Tillman, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 88, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of DONALD CRONK, CDC No. C-87286 on JANUARY 29, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 17, 2003, at Sacramento County, California.

Sandy Tillman
Transcriber
**CAPITOL ELECTRONIC REPORTING**

206

10

BOARD OF PRISON TEAMS
LIFE PRISONER HEARING - EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

_____

| CDPR Signature | Date |
|---|---|

### *FOR BOARD OF PRISON TEAMS USE ONLY*

## DECISION / ORDER

### WAIVER OF RIGHT TO ATTEND HEARING

1. ☐ Request is denied.

   ☐ Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. ☐ Request is denied.

   ☒ Request is granted. Grant based on a finding of good cause. Place on _____ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. ☐ Request is denied.

   ☐ Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:

   ☐ One-year denial    ☐ Two-year denial*    ☐ Three-year denial**

   \* The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

   \*\* In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

   ☐ Good cause based on the reasons given by the prisoner.

Other comments (if applicable): _____

_____

_____

_____

Signature of BPT Commissioners

1. _Carol S Daly_    Date _10-29-02_

2. _____    Date _____

BPT Action Taken At:    ☒ BPT Headquarters    ☐ Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| CROMIS, DONALD | C-87286 | SQ | Stip #2 12/02 | 12-2-02 |

207

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
LIFE PRISONER HEARING - EX     RAORDINARY ACTION AND DECISION            BPT 1001A (Rev. 10/89)

| ACTION TYPE (select one) | ☐ Waiver of Appearance | ☒ Request for Postponement | ☐ Waiver of Parole Consideration Hearing- Stipulation of Unsuitability |
|---|---|---|---|

| HEARING TYPE (select one) | ☒ Parole Consideration | ☐ Progress | ☐ Rescission | Hearing Date 12-2-02 |
|---|---|---|---|---|

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ **I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.**

☐ **I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.**

   ☐ **I will employ counsel to represent me at the hearing.**

   ☐ **I cannot afford counsel and wish counsel appointed to represent me.**

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☒ **I hereby request that the hearing indicated above be Postponed to** *Attorney is unavailable*
**The reasons for my request for a postponement are stated below** *for the scheduled Hear ...*

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ **I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.**

   ☐ **One-year Denial**   ☐ **Two-year Denial**   ☐ **Three-year Denial**

**PRISONER'S REASON(S) FOR REQUEST:**
**(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat X Incomplete, etc.)**

_____

_____

_____

_____

| | | |
|---|---|---|
| Signature of Prisoner *Donald Cronk* | Date 10/25/02 |
| Signature of Attorney (if applicable) | Date 208 |
| Signature and Title of Witness (CDC) *T. Keller, CCI* | Date 10/25/02 |

| NAME CRONK, DONALD | CDC NUMBER C-87286 | INSTITUTION SQ | CALENDAR Sub A2 12/02 | DATE 12-2-02 |
|---|---|---|---|---|

PAGE 02                              CSP SQ                    4154555184    10/29/2002 13:16

LAW OFFICES OF
## RICHARD G. FATHY
A PROFESSIONAL CORPORATION
555 UNIVERSITY AVENUE, SUITE 257
SACRAMENTO, CALIFORNIA 95825
TELEPHONE (916)921-2535
FAX (916)921-1198

October 10, 2002

Board of Prison Terms
1515 K Street, Suite 600
Sacramento, CA 95814

**BY FAX (322-9961)
AND REGULAR MAIL**

Attention:   Linn Austen
             BPT Hearing Coordinator

Re:   **Donald Everett Cronk**
      **C87286**

Dear Ms. Austen:

I will be representing Mr. Cronk at his parole hearing. I understand Mr. Cronk's hearing is currently scheduled for December 2, 2002, in San Quentin. Unfortunately, I have a trial that will likely not conclude by December 2. Given my calendar, I request that Mr. Cronk's parole hearing be continued until 8:30 a.m. on January 29, 2003.

Please advise.

Thank you.

LAW OFFICES OF RICHARD G. FATHY
A Professional Corporation

RICHARD G. FATHY

RGF:rs

209

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
DECEMBER 2002 CALENDAR

Cronk, Donald Everett                                                                C-87286

## I.    COMMITMENT FACTORS

### A.    LIFE CRIME:

Murder 1st, PC187, Assault with a Deadly Weapon PC12022.5, Count-1. Case Number SAC666128, sentenced to serve a base term of 25 years to life with a two-year enhancement for a total term of 27 years to life. The victim's name was James Allen, age 50.

### 1.    Summary of Crime:

On the morning of 12-19-80 Donald Cronk and codefendant Glen Meyer went to the victim's residence and broke into the residence by entering through the bathroom window. After ransacking the victim's home in search for personal effects and/or money, the two lay in wait armed with an unknown caliber handgun for the return of the victim. The victim returned home eventually and, observing some sign that the dwelling had been entered drew his own weapon before entering the front door. The victim surprised Cronk and fired several times, striking Cronk once in the arm and once in the side of the torso. Cronk retrieved his handgun from his pocket and shot once killing the victim. After the murder, both Cronk and his codefendant Glenn Meyer, fled but Glenn Meyer stopped long enough to pick up the victim's gun, briefcase, and to remove a diamond ring that the victim wore. During the interview for this report Cronk seems to recall the caliber of the weapon was a .38 caliber Colt Detective Special. Both Cronk and his codefendant fled in opposite directions. Cronk was arrested several months later while working in a carnival in Idaho. He offered no resistance while being taken into custody.

### 2.    Prisoner's Version:

Cronk stated the whole incident was because of his involvement with cocaine. He stated "Cocaine destroyed me". He had a good job with a waterbed warehouse in Sacramento and then began using cocaine. He eventually started embezzling from his former employer in an effort to increase his supply of cocaine. He was in debt approximately ten thousand dollars when he lost his job. Thereafter, he became involved with property and theft related offenses with Mr. Terry Warren and Mr. Meyer. It was through Meyer that he learned of the potential for financial gain as a result of robbing the deceased victim. In relation to the Instant Offense, Cronk claims that he, Warren, and Meyer formed a conspiracy to rob the victim.

In their original plan they agreed to break into his residence and lay in wait with him to return with money from his business. The trio had knowledge that the victim carried with him large amounts of cash, gold coins, other valuable property in his suitcase, and a rather large diamond ring on his finger. They went prepared to the residence with a billy-club like bat, the aforementioned .38 caliber weapon and baby oil to slip the ring off the deceased victim's finger. They agreed Warren would remain down the street and ring the victim's phone to alert Cronk and his codefendant Meyer of the victim's approach. For reasons unbeknownst to Cronk, the victim was able to arrive at his home without their notification. The victim was also able to enter the residence and surprise Cronk and Meyer while in the process of ransacking his home. The victim fired approximately six rounds at Cronk, two of which hit him. Cronk fell to the ground and drew his own weapon firing it from the hip. The single shot fired by Cronk struck the victim in the chest causing his death in approximately four to five minutes. Cronk then fled and expected to be shot as he ran down the sidewalk. Cronk was bleeding profusely and lay down in some high grass across the street from the apartment complex. A short while later, Meyer came by in his truck, picked up Cronk and took him to Warren's house. Cronk states the events after the instant offense are blurred in as much as he was in a tremendous amount of pain. Cronk acknowledges his part in the crime and accepts full responsibility. Cronk expressed deep regret for his actions and stated that he is deeply sorry for the victim's family and the grief that he has caused them. He does want the record to reflect he had originally planned this crime as a burglary only. He indicated he never dreamed it would end up as it did, as a murder.

3. **Aggravating/Mitigating Circumstances:**

    A.    **Aggravating Circumstances:**

          ➤ The prisoner had the opportunity to cease but continued with the crime.

          ➤ The planning with which the crime was carried out indicated premeditation.

          ➤ Use of a weapon.

    B.    **Mitigating Circumstances:**

          ➤ No significant prior record.

B.    **MULTIPLE CRIME(S):**

This is Cronk's only commitment.

## II.    PRE-CONVICTION FACTORS:

A.    **Juvenile Record:**

Cronk had no contact with juvenile authorities.

B.    **Adult Convictions/Arrests:**

9/11/75- Arrested by Waukesha, Wisconsin Police for Theft from an Auto. Cronk was convicted on 12/9/75 and ordered to pay a $209 fine to the court.

7/16/81-Arrested by Sacramento Sheriff's Office for Homicide. Cronk was convicted of Murder in the 1st degree on 6/13/84 and sentenced to State Prison for a period of 27 years to Life (Instant Offense).

5/20/82-Charged by Sacramento Sheriff's Office for possession of narcotics in a jail facility and possession of a dangerous weapon. The charges were dismissed by Sacramento Superior Court.

C.    **Personal Factors:**

Cronk is a 47 year old, white first termer received by the Department of Corrections on 6/13/84 to serve a 27 year to Life term for Murder in the 1st Degree with use of a firearm. **Family Background:** Cronk was born on 12/20/55 to the parents of Donald and Marilyn Cronk. His father is deceased and his mother currently resides in Wisconsin. **Marriages:** Cronk was married to Mary Kreil in 1973, from this marriage one child was conceived, Kristen Cronk. This marriage ended in divorce in 1980. Cronk was remarried in to Linda Hartman in 1987. From this marriage one child was born, Samantha Cronk in April of 1991. This marriage ended in divorce **Education:** The POR indicates that the highest grade completed was the 11th grade. Records indicate that Cronk received his GED certificate through the American Correspondence Academy in Wisconsin. **Military:** None **Employment:** The POR indicates that Cronk was employed with Labries Waterbeds in Sacramento, California as a service manager from 1977 until 1980, prior to this he was employed with Jason & Sons in Sacramento as a warehouse manager for 7 months in 1976. **Substance Abuse:** Case records indicate that Cronk started using cocaine in 1979 in high doses and abused alcohol primarily as a depressant. At the time of the instant offense he was using cocaine by smoking cocaine free-base at a very high dose level of 5 or 6 grams per day and drinking two to four six packs of beer per day.

III.    **POST-CONVICTION FACTORS:**

A.    **Special Accommodations/Disability:**

No special accommodations or adaptive services were required for the purpose of effective communication as required per Armstrong Remedial Plan II.

B.    **Custody History:**

Cronk was received by the California Department of Corrections (CDC) on 06/13/84, at Northern Reception Center-California Medical Facility (NRC-CMF). While at NRC-CMF he was placed in restricted housing due to possible enemy concerns with the EME, BGF, and NF. Cronk appeared before the Institutional Classification Committee (ICC) on 6/21/84 due to his housing in T-Restricted. Cronk was retained in T-Restricted housing per his own request due to documented friction with prison gang elements while in Sacramento County Jail due to his involvement in drug smuggling activities. The case was referred to the Districted Attorney's office for prosecution. (This case was eventually dismissed by Sacramento Superior Court on 7/26/83) Cronk was retained in T-Restricted housing pending transfer to a general population program facility. Cronk was endorsed for transfer to San Quentin (SQ) on 7/31/84. Cronk was initially placed in Administrative Segregation (Ad/Seg) due to his prior placement at NRC-Ad/Seg.   Cronk was released from Ad/Seg and granted Close B custody. He was initially placed on the Vocational Compositioning waiting list; he was subsequently assigned to the laundry department.  Cronk was placed on Ad/Seg status on 10/31/85 pending investigation into a conspiracy to aid Inmate Thomas and Inmate Reach in an escape attempt.  After a thorough investigation of case factors, it was determined that Cronk was not involved in the escape attempt. Cronk was subsequently removed from Ad/Seg status and placed in his former program. Cronk removed from his assignment to the laundry and reassigned to the Vocational Electronic Program in 1986. Cronk's custody remained at Close B until 02/09/88, when it was lowered to Medium A. Cronk's classification score has been 0 since 05/27/93. Cronk has completed the Vocational Electronic Program at San Quentin in 1990. After completing the vocational electronics class, Cronk worked with the Inmate Day Labor (IDL) project as an apprentice electrician. Since that time Cronk has held primarily clerical positions. Work supervisor's reports have consistently rated Cronk above average to exceptional. Numerous laudatory chronos are noted in his central file. Cronk custody remains at Medium A. He is currently assigned to the Reception Center as the West Block Lieutenant's Clerk.

**C.**    Therapy & Self-Help Activities:

Cronk has been involved in the following therapy and self-help activities per the laudatory chronos which appear in his central file:

Competency Certificate for the program of Electrical Construction and Maintenance 5/29/87, Certificate of Completion Electrical Construction and Maintenance Apprenticeship 12/15/89, Alcoholics Anonymous/Narcotics Anonymous 1/14/88-7/05/01, Alternatives To Violence Project-West Program (32 hours) 12/02/91, Kairos Prison Ministry Week-End 03/15/93, Victim's Awareness Program 8/21/96 and 5/6/93, High School Equivalency Certificate 07/27/93, Self-Esteem Enhancement (12 weeks) 3/94, Certificate of Achievement from the Institute In Basic Life Principles for completing the Basic Seminar 05/07/95, Certificate of Completion in Biblical Concepts of Evangelism 05/28/95, Certificate of Completion in Project Impact 07/10/99, Overcomers OutReach-12 step recovery 7/11/02, 7/1/01, 10/3/01, and 3/30/01, San Quentin College Program (Patton College) 10/1/96-12/6/01, Certificate of Completion granting Peer Educator Status 04/12/01, Associates of Arts Degree 05/2001 from Patten College, Participated in the Man-alive Phase I Program 8/02.

Cronk is currently enrolled in the B.A. Degree program during the Fall 2001. He is currently participating in Phase II of the Man-Alive Program.

**D.**    Disciplinary History:

CDC 128A Custodial Counseling: 06/29/88 Refusing to follow orders.

**E.**    Other:

None

## IV.    FUTURE PLANS:

**A.**    RESIDENCE:

Cronk is hopeful of transferring his parole to Marin County. He has been offered housing by Ms. Kathleen Giono, 1628 San Anselmo Ave., San Anselmo, Ca. 94960 (415) 458-3565. In the event that the parole transfer request is denied Cronk has been offered housing by Mr. Chris Shirley 4833 9th Ave. Sacramento, Ca 95820-1520 (916) 457-7131. Letters confirming these housing offers are contained in Cronk's central file #2.

B.    **EMPLOYMENT:**

Cronk has received letters of employment from prospective employers in Marin, and Sacramento areas. Marin County employment offers are Redwood Empire Electrical Training Trust (Union Sponsor), 1700 Corby Ave., Suite F, Santa Rosa , Ca. 95407 (707) 523-3837 and Illuminata Films 26A Varda Landing, Sausalito, Ca. 94965 (415) 331-2663. In the Sacramento area employment offers are McCarthy Painting, 5409 S Street, Sacramento Ca. 95819 (916) 451-8888 and Metcalf Electric, 1531 47th St., Sacramento, Ca 95819 (916) 456-6862. The letters verifying all offers of employment are located in Cronk's central file #2.

V.    **USINS STATUS:**

Not applicable, Cronk is an American citizen born in Wisconsin.

VI.    **SUMMARY:**

A. Cronk has maintained an excellent program throughout his seventeen (17) years of incarceration. He has managed to use his time here in a constructive fashion, constantly making improvements in his life and the lives of others. He has made numerous achievements and surpassed many of life milestones despite his confinement to State Prison. Cronk continues to excel in all areas. He has gained employable work skill as an Electronic Worker and is currently working towards his Bachelors Degree. He has remained disciplinary free and received considerable commendations for his positive programming efforts. He maintains an excellent rapport with both staff and inmates.

During his interview in October 18, 2002, he talked openly and candidly about the crime and takes total responsibility for his involvement. It appears that he has had sufficient time to reflect on the past and come to terms with his present condition. He fully understands how his involvement with drugs played an intricate part in his motivation to become involved in the commission of the crime. It is my genuine belief that had Cronk not become involved with drugs he might not be sitting in prison today. Cronk has taken positive steps in dealing with his past problem with drugs by becoming involved with Narcotics Anonymous.

Considering the commitment offense, the absence of a prior criminal record, his prison adjustment, and psychiatric reports, I believe that Cronk would pose a minimal degree of threat to public safety if released from prison at this time.

**B.** Prior to release from prison, Cronk is encouraged to maintain his exemplary programming efforts, and remain disciplinary free.

**C.** This report is based on a thorough review of Cronk's central files and a personal interview with the Inmate on 10/18/02.

**D.** Cronk declined to examine his central file on 10/18/02. Refer to CDC 128B dated 10/18/02.

Prepared by:                     Reviewed by:                     Reviewed by:


_T. Keesee, CCI_                 _H. Hammond, CCI_                _R. Brau, C&PR (a)_

- [ ] DOCUMENTATION HEARING
- [ ] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 9/1/01<br>TO<br>8/31/02 | | ⟋ | **Placement:** Cronk remained at San Quentin in the General Population.<br><br>**Custody/Classification:** Custody remains at Medium A with a classification score of 0 points.<br><br>**Academics:** Cronk continues to participate in the San Quentin College Program.<br><br>**Work Record:** Cronk continues his assignment as the Reception Center Gym Clerk.<br><br>**Group Activities:** Cronk continues to participate in AA/NA meetings and the Overcomer's Outreach Program<br><br>**Psychiatric Treatment:** None noted during this review period.<br><br>**Prisoner Behavior:** Remained disciplinary free during this review period.<br><br>**Other:** None |
| 9/1/02<br>TO<br>10/18/02 | | | **Placement:** Cronk remains at San Quentin in the General Population.<br><br>**Custody/Classification:** Custody remains at Medium A with a classification score of 0 points.<br><br>**Academics:** Continues to participate in the San Quentin College Program.<br><br>**Work Record:** Cronk continues his assignment as the Reception Center Gym Clerk.<br><br>**Group Activities:** Cronk continues to participate in AA/NA meetings and the Overcomer's Outreach Program. Cronk completed an 18 week Phase I Man-Alive Program and is currently participating in Phase II of the program.<br><br>**Psychiatric Treatment:** None noted during this review period.<br><br>**Prisoner Behavior:** Remained disciplinary free during this review period.<br><br>**Other:** None |

CORRECTIONAL COUNSELOR SIGNATURE _Kessler_    DATE 10/18/02

**CRONK, DONALD**        CDC#C-87286        CSP-SQ            DECEMBER 2002

BPT 1004 (REV.7/86)

218

☐ BPT date advanced by _____ _____ months.   ☐ BPT date affi.' without change.

☐ PBR date advanced by _____ months.   ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

_____

☐ Schedule for Progress hearing on appropriate institutional calendar.

CRONK, DONALD        CDC#C-87286        CSP-SQ        DECEMBER 2002

12

*1 yr denial*

BOARD OF PRISON TERMS
## LIFE PRISONER DECISION FACE SHEET

STATE OF CALIFORNIA

### PERIOD OF CONFINEMENT
*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ................................................................ | | | |
| Date Life Terms Begins ........................................................................ | | | |
| At Large Time ...................................................................................... | + | | |
| PAROLE DATE ...................................................................................... | = | | |

### MISCELLANEOUS

*1 year denial*

**Panel Recommendations and Requests:**

_____ Become _____✓ Remain Disciplinary Free.
_____ Work Towards Reducing His/Her Custody Level.
_____ Upgrade _____✓ Vocationally _____✓ Educationally.
___✓_ Participate In _____✓ Self-Help (and) _____✓ Therapy.
_____ Transfer To _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES ☒ SENT (Date) __11-2-01__

COMMITMENT OFFENSE

| 187, 12022.5 | MURDER 1ST W/ USE OF FIREARM |
|---|---|
| (Code Section) | (Title) |
| SAC-66618 | 1 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 6-13-84 | 6-13-84 | 3-2-98 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL  ☒ SUBSEQUENT (Hearing No.) __1__ | 3-5-97 |

Department Representative

| Counsel for Prisoner | Address |
|---|---|
| RICHARD FATHY | 555 UNIVERSITY AVE, SUITE 257 SACRAMENTO, CA |
| District Attorney Representative | County |
| TIMOTHY FRAWLEY | SACRAMENTO |

### PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a __proposed__ decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date |
|---|---|
| Ernest M Moore | 12-20-01 |
| Concurring (Name) | Date |
| R Cater | |
| Concurring (Name) | Date |
| | 220 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD | C-87286 | SAN QUENTIN | SUB | 12-20-01 |

BPT 1001 (Rev. 1/91)

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

*1 year denial*

I.  [X]  **PAROLE DENIED**

If this proposed decision denying parole is approved, the Board will send you a copy of the approved
decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  **PAROLE GRANTED**

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|---|---|---|

B. Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + _____ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

E. Postconviction Credit From _____ To _____ − _____ Months
                                     (Date)                (Date)

F. Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed
pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days.
At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-
ponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed
decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be
scheduled for a new hearing, as appropriate.

**PANEL HEARING CASE**

| Name | Date |
|---|---|
| *[signature]* | |
| Name | Date 12-20-01 |
| *[signature]* | |
| Name | Date |
| | |

221

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| RONK, DONALD | C-87286 | SQ | 12-20-01 |

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION HEARING CHECKLIST

☐    Initial Hearing

*"ITEMS MARKED "IN 'C' FILE" FOR BOARD OF PRISON TERMS COMMISSIONERS ONLY*

☒    Subsequent Hearing

All life prisoner hearing packets are to be divided into the following seven major categories. Within each category, similar documents should be filed together in reverse chronological order. Beginning with the most recently dated document.

1.   ☒   **Cumulative Case Summary**

2.   ☒   **Board Reports (All)**

3.   ☒   **Psychiatric Reports (All)**

4.   ☒   **Prior Decisions (AA, CRB, BPT)**

5.   ☒   **Notices and Responses, including:**

     ☒   Notices and Responses (This hearing only)

     ☐   Officials' Letter

     ☐   Fearful Letters **IN "C" FILE CONFIDENTIAL FOLDER**

     ☒   Support Letters

     ☐   _____

6.   ☒   **Legal Documents, including:**

     ☒   Probation Officer's Report

     ☐   Arrest Reports, if any

     ☒   Abstract of Judgement

     ☐   Charging Document

     ☐   Appellate Decisions

     ☒   Sentencing Transcripts

     ☐   1203.01 P.C. Statement

     ☐   _____

     ☐   _____

     ☐   _____

7.   ☒   **Miscellaneous, including:**

     ☒   Crime Partner's Parole Decision, if any **IN "C" FILE CONDIFENTIAL FOLDER**

     ☒   Notice of Hearing Rights (This hearing only)

     ☐   Disciplinary Reports and Incident Reports (All) **IN "C" FILE DISCIPLINARY SECTION**

     ☒   Confidential Folder **IN "C" FILE**

     ☐   Other, non-specified, but pertinent information developed since date of last hearing

     ☐   _____

The transcript of the prior hearing, if any, is to be included in the life prisoner hearing packet but not indexed.
Checklist and packet reviewed for completeness _____ CCRM _____ Date 12-11-01

222

S. Paris, CCRM

NAME: CRONK, DONALD

CDC NUMBER: C-87786

INSTITUTION: SAN QUENTIN STATE PRISON

STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING     ☒ SUBSEQUENT HEARING

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| CRONK, DONALD | C-87286 |

| DATE OF HEARING | LOCATION |
|---|---|
| 12-20-01 | SAN QUENTIN STATE PRISON |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| 6-13-84 | 6-13-84 | SACRAMENTO |

| OFFENSE | CASE NUMBER |
|---|---|
| MURDER 1ST W/USE OF FIREARM | SAC-66618 |

| COUNT NUMBER(S) | PENAL CODE SECTION(S) VIOLATED |
|---|---|
| 1 | 187, 12022.5 |

| TERMS | MEPD |
|---|---|
| 27- LIFE | 3-2-98 |

## OTHER COMMITMENT OFFENSES OR STAYED COUNTS

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | _____ | _____ | _____ | _____ | _____ |
| ☐ | _____ | _____ | _____ | _____ | _____ |
| ☐ | _____ | _____ | _____ | _____ | _____ |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| Moore | Cater | |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY?) _____

☐ ATTORNEY  *Timothy Framley Richard Fathy*

☐ DEPUTY D.A.  *Timothy Frawley*     COUNTY OF  *Sacramento*

☐ OTHERS _____

## STATEMENT OF FACTS

☒ THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON *3-5-97* , PAGES *5* THROUGH *18*

☐ THE STATEMENT OF FACT IS

☐ QUOTED FROM THE BOARD REPORT, DATED _____ , PAGE(S) _____

☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT 1000 (Rev. 8/90)

223

70

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    PRESIDING COMMISSIONER MOORE:    Let the

4    record show that all interested parties have

5    returned to the room and the time is approximately

6    10:40 hours.    Donald Cronk, CDC Number C-87286.

7    The Panel has reviewed all information received

8    from the public and relied on the following

9    circumstances in concluding that the prisoner is

10    not suitable for parole and would pose an

11    unreasonable risk of danger to society or a threat

12    to public safety if released from prison.    The

13    committing was carried out in an especially cruel

14    callous manner.    The offense was carried in a

15    manner, which demonstrates an exceptionally

16    callous disregard for human suffering.    The motive

17    for the crime was inexplicable or very trivial in

18    relationship to the offense.    These conclusions

19    are drawn from the Statement of Facts wherein the

20    prisoner and his crime partners after an extensive

21    planning they robbed, they went to rob the victim

22    of his valuables.    They went to victim's

23    residence.    They lie in wait for the victim to

24    return to his residence.    When the victim entered

25    the residence and confronted the criminals a

26    gunfight occurred with the prisoner being shot and

27    DONALD CRONK  C-87286  DECISION PAGE 1    12/20/01

224

1    then the victim being shot in turn by the prisoner

2    killing the victim.   The prisoner and his crime

3    partners then left the residence stealing the

4    valuables worth approximately $100,000.   The

5    prisoner left the state and was arrested some

6    seven months later.   Previous record, the prisoner

7    has an escalating pattern of criminal conduct.

8    Starting at age 20, kind of a late age, car theft.

9    He also committed three robberies and a forgery.

10    The robberies were done at gunpoint.   However,

11    that's what the record shows but the prisoner's

12    denies -- He admits only doing one in Wisconsin

13    and one here in the State of California.   He has a

14    history of unstable tumultuous relationships with

15    others.   Beginning with alcohol and drugs, the

16    usage beginning at a fairly early age of life

17    around the age of 20.   The abuse became a problem

18    for him, losing his job, not being able to support

19    his habit, contributed possibly to this life

20    crime.   He failed to profit from society's

21    previous attempts to correct his criminality,

22    county jail time.   His institutional behavior has

23    been positive.   No disciplinaries, no 115s,

24    although he had one 128 chrono and one general

25    chrono is some concern with not following the

26    rules in the visiting hall although it was done as

27    DONALD CRONK  C-87286  DECISION PAGE 2   12/20/01

72

1    a general chrono.  He has not sufficiently

2    participated in self-help and therapy.  You have

3    positive parole plans.  3042 Notices indicate an

4    opposition to a finding of parole suitability.

5    Specifically the District Attorney's office of

6    Sacramento County had a representative present

7    here today who was in opposition as well as a

8    letter from the victim's wife who was in

9    opposition to a finding of parole suitability at

10    this time.  The Panel makes the following findings

11    that the prisoners gains are still recent and he

12    must demonstrate this over an extended period of

13    time these gains.  Nevertheless, he should be

14    commended.  He's participated in numerous self-

15    help programs, basic life principles, a peer

16    educator status, Biblical concepts of evangelism,

17    project impact, alternatives to violence, advanced

18    alternatives to violence, self-esteem enhancement,

19    worked in day labor program receiving positive

20    reports there.  You've got a vocational

21    certification, electrical construction and

22    maintenance, finished your apprenticeship program.

23    You're in Patton College program.  You've got an

24    AA degree and now you're starting your BA program,

25    just starting in this fall semester.  But these

26    positive aspects of your behavior do not outweigh

27    DONALD CRONK  C-87286  DECISION PAGE 3  12/20/01

226

73

1   the factors of unsuitability.  It's only a one-

2   year denial, sir.

3           INMATE CRONK:  Thank you, Sir.

4           PRESIDING COMMISSIONER MOORE:  A one-year

5   denial and as we've told you we commend you.

6   You've been positive but we recommend to you to

7   continue to remain disciplinary free, continue to

8   work if it's available to you and you have the

9   ability to do it, you have the desire to do it, at

10  least you've expressed that desire to finish your

11  education and to continue in self-help and therapy

12  programming.  Commissioner Cater, comments?

13          DEPUTY COMMISSIONER CATER:  I'd like to make

14  a few comments.  Mr. Cronk, your hearing with only

15  a one-year denial is certainly difficult for you.

16  Last time it was a four-year denial.  That's a

17  marked improvement over prolonging your stay in

18  prison.  You know that I don't have to tell you

19  that but we did fully acknowledge your commendable

20  progress within the prison system.  Certainly,

21  your escalating crime pattern and robbery people

22  at gunpoint is what criminals do and yes, that was

23  many years ago and it culminated in the lying in

24  wait death of the victim here.  You pointed out

25  for us and as few are able to do put yourself in

26  our shoes and I acknowledge that you have an

27  DONALD CRONK  C-87286  DECISION PAGE 4   12/20/01

227

74

1  appreciation for the job at hand for us.  You have

2  a job and we have a job and we take our roles very

3  seriously.  The crime itself it was calculated.

4  It was planned.  It was sophisticated at least in

5  some respects but quite unsophisticated in others

6  and we're trying to come to grips with that from

7  our side of the table but to repeat you've done

8  very, very well and I'm impressed with your

9  accomplishments.  Thank you.

10       PRESIDING COMMISSIONER MOORE:   This

11  concludes our Hearing.  Good luck to you, sir.

12  The time is 10:45 hours.

13                    --oOo--

14

15

16

17

18

19

20

21

22

23

24

25  PAROLE DENIED ONE YEAR

26  EFFECTIVE DATE OF THIS DECISION_____JAN 1 6 2002

27  DONALD CRONK   C-87286   DECISION PAGE 5    12/20/01

228

75

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CHARLA MCCOLLUM, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 74, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, at SAN QUENTIN, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of DONALD CRONK, CDC No. C-87286, on DECEMBER 20, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated January 7, 2002, at Sacramento County, California.

Charla McCollum
Transcriber
**CAPITOL ELECTRONIC REPORTING**

13

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
DECEMBER 2001 CALENDAR

Cronk, Donald Everette                                                    C-87286

## I.    COMMITMENT FACTORS

### A.    LIFE CRIME::

Murder 1st, PC187, Assault with a Deadly Weapon PC12022.5, Count-1. Case Number SAC666128, sentenced to serve a base term of 25 years to life with a two- year enhancement for a total term of 27 years to life. The victim's name was James Allen, age 50.

#### 1.    Summary of Crime:

On the morning of 12-19-80 Donald Cronk and codefendant Glen Meyer went to the victim's residence and broke into the residence by entering through the bathroom window. After ransacking the victim's home in search for personal effects and/or money the two lay in wait armed with an unknown caliber handgun for the return of the victim. The victim returned home eventually and, observing some sign that the dwelling had been entered drew his own weapon before entering the front door. The victim surprised Cronk and fired several times; striking Cronk once in the arm and once in the side of the torso. Cronk retrieved his handgun and shot once killing the victim. After the murder both Cronk and his codefendant fled the residence and attempted to treat Cronk's gunshot injuries. While interviewing Cronk for this crime he seems to recall the caliber of the weapon was a 38 caliber Colt Detective Special. Both Cronk and his codefendant fled in opposite directions. Cronk was arrested several months later while working in a carnival in Idaho. He offered no resistance while being taken into custody.

#### 2.    Prisoner's Version:

Cronk stated the whole incident was because of his involvement with cocaine. He stated "Cocaine destroyed me". He had a good job with a waterbed warehouse in Sacramento and then began using cocaine. He eventually started embezzling from his former employer in an effort to

CRONK, DONALD EVERETTE        C-87286        CSP-SQ        DECEMBER 2001

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing
December 2001 Calendar

increase his supply of cocaine. He was in debt approximately ten thousand dollars when he lost his job. Thereafter, he became involved with property and theft related offenses with Mr. Terry Warren and Mr. Meyer. It was through Meyer that he learned of the potential for financial gain as a result of robbing the deceased victim. In relation to the Instant Offense, Cronk claims that he, Warren, and Meyer formed a conspiracy to rob the victim. In their original plan they agreed to break into his residence and lay in wait with him to return with money from his business. The trio had knowledge that the victim carried with him large amounts of cash, gold coins, other valuable property in his suitcase, and a rather large diamond ring on his finger. They went prepared to the residence with a billy-club like bat, the aforementioned .38 caliber weapon and baby oil to slip the ring off the deceased victim's finger. They agreed Warren would remain down the street and ring the victim's phone to alert Cronk and his codefendant Meyer of the victim's approach. For reasons unbeknownst to Cronk, the victim was able to arrive at his home without their notification. The victim was also able to enter the residence and surprise Cronk and Meyer while in the process of ransacking his home. The victim fired approximately six rounds at Cronk, two of which hit him. Cronk fell to the ground and drew his own weapon firing it from the hip. The single shot fired by Cronk struck the victim in the chest causing his death in approximately four to five minutes. Cronk then fled and expected to be shot as he ran down the sidewalk. Cronk was bleeding profusely and lay down in some high grass across the street from the apartment complex. A short while later, Meyer came by in his truck, picked up Cronk and took him to Warren's house. Cronk states the events after the instant offense are blurred in as much as he was in a tremendous amount of pain. Cronk acknowledges his part in the crime and accepts full responsibility. Cronk expressed deep regret for his actions and stated that he is deeply sorry for the victim's family and the grief that he has caused them. He does want the record to reflect he had originally planned this crime as a burglary only. He indicated he never dreamed it would end up as it did, as a murder.

**CRONK, DONALD EVERETT**          C-87286          CSP-SQ    **DECEMBER 2001**

231

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing
December 2001 Calendar

3.   Aggravating/Mitigating Circumstances:

A.   Aggravating Circumstances:

Cronk plotted this crime over a long period of time. He had ample opportunity to abort the plan but he did not. Cronk actively sought possible accomplices for this crime and that he reportedly discussed the plotting/planning with numerous individuals, several of whom became accomplices before and/or after the fact, including a juvenile female. The crime was planned. Cronk was armed with a weapon and reasonably should have known the crime had the potential for serious injury to the victim. Cronk and his codefendant were laying in wait for the victim armed with a deadly weapon. He, by Cronk's own admission, was under the influence of cocaine at the time of the crime and as Cronk fled, crossing state lines to avoid arrests and/or prosecution, he was arrested on 7-1-81 by FBI agents in Rupert, Idaho, using the alias Donald Allen Palmer. During his interview, Cronk acknowledged possession of forged documents and identification cards supporting his false identify.

B.   Mitigating Circumstances:

None are described in the Probation Officer's report dated 5-15-84. Commissioner is referred to Probation Officer's report pages 23, 24 and 25 for information submitted by "special" investigation agencies, which may or may not quality as mitigating circumstances in this case.

A.   MULTIPLE CRIME(S):

This is Cronk's only commitment.

II.   PRE-CONVICTION FACTORS:

A.   Juvenile Record:

Cronk has no record of juvenile criminal behavior.

CRONK, DONALD EVERETTE          C-87286          CSP-SQ          DECEMBER 2001

232

3

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing
December 2001 Calendar

**B.**   **Adult Convictions:**

The Instant Offense is Cronk's first contact with the legal community.

**C.**   **Personal Factors:**

In relation to the sociological factors that may have contributed to commission of the crime, Cronk was brought up in a family that was certainly not poor but one that never quite had enough money to meet the expectations of Cronk's friends and/or peers. As a result, Cronk felt "cheated" in as much as he was never able to afford nice clothes, a car, or other accruements essential to a teenager's self worth. Add to this mixture an overbearing religious fanatic of a mother, Cronk indicates he felt destined to leave the home early. At age 16 Cronk experienced a traumatic event by witnessing his father collapse on the front lawn of a massive heart attack. Cronk, accompanied by his hysterical sister, drove 60 miles in the family car to the closest hospital. Although his father stayed alive for approximately 48 more hours, the death of his father at that particular age in Cronk's life was the deciding factor in his decision to abandon his faith in god. Cronk related that his father was instrumental in his life providing not only friendship but also a mentoring role as the child grew up. When his father died, Cronk's world fell apart. Cronk indicated he dropped out of school shortly thereafter and sought to work to help the family financially. At about the same time, Cronk met and fell in love with the first woman that he had ever had a sexual relationship with. He impregnated her and they married later that year. The stress from being a husband and new father proved to be too much for Cronk and he separated from his first wife several years after the relationship had begun. Cronk indicates he was never violent or mentally unstable but felt that the world had more to offer him than working at International Harvester in the factory with a woman that he barely knew, let alone loved. Eventually, Cronk left Wisconsin and came to the Sacramento area where he met Tom LeBrea and started working for LeBrea in a waterbed warehouse venture. Cronk indicates he enjoyed LeBrea's company and it was the same LeBrea who introduced him to cocaine. Eventually, he began abusing cocaine to the point where he was addicted. Cronk then rationalized embezzling from the Waterbed Warehouse by turning his back on religion. He rationalized the theft-related behavior by assuring himself it was only a temporary fix for his poor finances.

**CRONK, DONALD EVERETTE**      C-87286      **CSP-SQ**      **DECEMBER 2001**

4

233

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing
December 2001 Calendar

III.    **POST-CONVICTION FACTORS:**

A.    Special Accommodations/Disability:

None noted or claimed.

B.    Custody History:

From 6-13-84 to 6-12-84 Cronk was received at CRC/CMF on 6-13-84 for Initial Classification. He was subsequently transferred to San Quentin and placed in MCU under Close-B custody. On 8-21-84 and was placed on San Quentin General Population under Close-B Custody. On 9-1-84 he was assigned to Industries. On 10-6-84 he was reassigned to Laundry and was graded as an exceptional worker on his CDC 101. Between 1-11-85 and 3-25-85 Cronk was out to court twice and returned to the San Quentin General Population where he was reassigned to the Laundry both times. He did not participate in any self-help group, nor did he receive any laudatory chronos during this period. Disciplinary history was and continues to be clear. 6-13-85 to 6-12-86: During this period, 5-27-87 to 6-12-88 Cronk remained at San Quentin under Close-B Custody in the General Population. He continued in his assignment in the Laundry and between 12-11-85 and 4-24-86 Cronk was in and out of the institution and the local hospital suffering from acute cervical disk problems. On 4-24-86 he was assigned to Vocational Electric partly because of his interest in electronics, but also because of the ongoing back problems he was experiencing at the time. On 10-4-87 Cronk was married to Linda Hartman in a Christian marriage ceremony at San Quentin. He remained very much in love with Linda Hartman and is interested in returning to her side at one point during his life. From 6-12-86 to present Cronk has remained at San Quentin and participated in Alcoholics Anonymous while gaining his certificate of compliance, high school diploma, and numerous laudatory chronos for his participation in both self help groups and educational endeavors.

C.    Disciplinary History:

Cronk has never received a CDC-115 but does have two CDC 128 counseling chronos, the first of which is 8-28-97, where he was in violation of CCR 317G

CRONK, DONALD EVERETTE        C-87286        CSP-SQ        DECEMBER 2001

234

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing
December 2001 Calendar

excessive contact in the Visiting Room. He was kissing a female visitor against departmental policy. The other CDC 128 also revolves around Cronk's behavior during a visit. In that scenario, Cronk became angry with the author of the 128 after he was informed his visit was terminated.

**D.** **Therapy and Self Help Activities:**

Cronk has involved himself with AA, 12 Step Recovery, received his GED and high school diploma. He is poised to begin earning his Liberal Arts Degree through correspondence and has consistently remained active in the church receiving numerous laudatory chronos for his positive participation. Cronk also does not hesitate to represent the inmate population to local media efforts to the best of his ability. He has been recognized on numerous occasions for presenting a socially acceptable image of inmates to the media.

**D.** **Other:**

None

**IV.** **FUTURE PLANS:**

**A.** **Residence:**

Upon release, Cronk intends to resume living with his wife, Linda Hartman/Cronk, at the following address: 2099 Black Wood Drive, San Pablo, Calif., Zip Code 94806. Mrs. Cronk's phone number is (415) 724-9675. Cronk intends to initiate parole transfer consideration in as much as his commitment offense is Sacramento and his wife and he intend to live in Alameda County. He is aware this will require casework assistance. If and when the time arises he is to initiate said paperwork. During the interview, Cronk displayed numerous personal letters from his wife stating that she was in fact encouraging him to return to her home to resume their lives together.

**B.** **EMPLOYMENT:**

Cronk has no concrete plans for employment, however, based on his successful completion of the Electricians Apprentice Program, the

CRONK, DONALD EVERETTE          C-87286          CSP-SQ          DECEMBER 2001

235

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing
December 2001 Calendar

likelihood that he will gain employment in the chosen field of electronics is high. He has displayed a work ethic that is admirable and should be recognized as a positive and realistic step toward gain to employment should he be allowed to reenter society.

## V.    USINS STATUS:

Not applicable, Cronk is an American citizen born in Wisconsin.

## VI.    SUMMARY:

A.    Cronk does not present a risk to public safety at this juncture. I make this statement with the belief that cocaine addiction was responsible for Cronk's behavior during commission of the instant offense. If this is true, and after 20 years it appears it is, then it is logical to follow that Cronk will not behave in a similar manner when released back into society. He is not interested in drinking or abusing drugs from this point on and so it is feasible to conclude his superlative behavior inside the inside the institution will be continued if he is released from prison.

B.    Prior to release from prison Cronk could benefit from obtaining his Bachelor of Arts degree in Liberal Arts from a correspondence college. Cronk could also benefit from continuing to learn speaking Spanish as well as engaging in meditation practices so as to reach new levels of relaxation in a holistic manner.

C.    This report is based on an interview with Cronk lasting approximately four hours and a complete review of the central file lasting three hours.

D.    The prisoner was afforded an opportunity to examine the central file on 9-1-01 as evidenced by the request for file Olson Review sheet dated 9-1-01 contained in his file and signed by him.

CRONK, DONALD EVERETTE       C-87286          CSP-SQ       DECEMBER 2001

236

Prepared by:                    Reviewed by:                    Reviewed by:


_Ballachy_                      _(signature)_                   _W. Jepperson_
S. Ballachey, CCI               H. Hammond, CCII                W. Jeppeson, C&PR (a)


CRONK , DONALD EVERETTE        C-87286        CSP-SQ        DECEMBER 2001

237

8

BOARD OF PRISON TERMS
## LIFE PRISONER:  POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

### INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | PBT | PBR | |
| 06-12-96 TO 12-31-96 | | | **Placement:** CSP-SQ II<br><br>**Custody/Classification:** Med. A, Classification score –0-.<br><br>**Academics:** Participated in SQ's college program and excelled academically.<br><br>**Work Record:** Reception Center, Captain's Clerk., excellent work record: numerous laudatory chrono's noted<br><br>**Vocational:** None noted.<br>**Group Activity:** Involved in A.A. and Victim's Awareness.<br><br>**Psychiatric Treatment:** None noted.<br>**Disciplinary Behavior:** Clear.<br><br>**Other:** None noted. |
| 01-01-97 TO 12-31-97 | | | **Placement:** CSP-SQ II.<br><br>**Custody/Classification:** Med. A, Classification Score –0-.<br><br>**Academic:** Attended SQ's college program with academic excellence.<br><br>**Work Record:** Reception Center, Captain's Clerk. With excellent work record, with numerous laudatory chrono's noted.<br><br>**Vocational:** None noted.<br><br>**Group Activity:** Involved in A.A. and Victim's Awareness programs.<br><br>**Psychiatric Treatment:** None Noted.<br><br>**Disciplinary Behavior:** Received 128-B dated 08-28-97 for excessive kissing of female visitor in Main Visiting.<br><br>**Other:** None noted. |

CORRECTIONAL COUNSELOR SIGNATURE

DATE

*238*

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD EVERETTE | C-87286 | CSP-SQ | SUBSEQUENT | 12-2001 |

BPT 1004 (REV. 7/86)

BOARD OF PRISON TERMS
**LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**                    STATE OF CALIFORNIA

- ☐ DOCUMENTATION HEARING
- ☒ PAROLE CONSIDERATION HEARING
- ☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | PBT | PBR | |
| 01-01-98 TO 12-31-98 | | | **Placement:** CSP-SQ II<br><br>**Custody/Classification:** Med. A, Classification score –0-.<br><br>**Academics:** None noted.<br><br>**Work Record:** excellent work record: numerous laudatory chrono's noted<br><br>**Vocational:** None noted.<br><br>**Group Activity:** Involved in A.A. and Victim's Awareness.<br><br>**Psychiatric Treatment:** No psychiatric concerns noted.<br><br>**Disciplinary Behavior:** Clear.<br><br>**Other:** None noted. |
| 01-01-99 TO 12-31-99 | | | **Placement:** CSP-SQ II.<br><br>**Custody/Classification:** Med. A,<br><br>**Academic:** Attended SQ's college program.<br><br>**Work Record:** Excellent work record, with numerous laudatory chrono's noted.<br><br>**Vocational:** None noted.<br><br>**Group Activity:** Involved in A.A.<br><br>**Psychiatric Treatment:** No psychiatric concerns noted.<br><br>**Disciplinary Behavior:** Clear.<br><br>**Other:** None noted. |

CORRECTIONAL COUNSELOR SIGNATURE

*W. Jeffery*                                                    DATE  11-14-0

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD EVERETTE | C-87286 | CSP-SQ | SUBSEQUENT | 12-2001 |

BPT 1004 (REV. 7/86)

239

BOARD OF PRISON TERMS
## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 01-01-00 TO 12-31-00 | | | **Placement:** CSP-SQ II |
| | | | **Custody/Classification:** Med. A, Classification Score –0–. |
| | | | **Academics:** Attending SQ college program. |
| | | | **Work Record:** Excellent work chrono's noted. |
| | | | **Vocational:** None noted. |
| | | | **Group Activity:** Involved in A.A. |
| | | | **Psychiatric Treatment:** None noted. |
| | | | **Disciplinary Behavior:** Clear. |
| | | | **Other:** Cronk continues to comply with San Quentin's program behavior expectations. |
| 01-01-01 TO Present | | | **Placement:** CSP-SQ II |
| | | | **Custody/Classification:** Med. A, with classification score of –0–. |
| | | | **Academics:** Continues to aggressively purse academic excellence. |
| | | | **Work Record:** None noted. |
| | | | **Vocational:** None noted. |
| | | | **Group Activity:** Involved in A.A. |
| | | | **Psychiatric Treatment:** None noted. |
| | | | **Disciplinary Behavior:** Clear. |
| | | | **Other:** None. |

**ORDER:**

☐ BPT date advanced by _____ months.

☐ PBR date advanced by _____ months.

☐ BPT date affirmed without change.

☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD EVERETTE | C-87286 | CSP-SQ | SUBSEQUENT | 12-2001 |

**240**

BPT 1004 (REV. 7/86)
ADDENDA

PERMANENT

14

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### DECEMBER 2001 LIFER HEARING
### SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

### I. IDENTIFYING INFORMATION:

Mr. Cronk is a 45 year old, divorced, Caucasian male. His date of birth is 12-20-55. His conviction date was 3-23-84. He is serving a 25-year to life sentence for Murder in the First Degree. Mr. Cronk has been in custody at San Quentin State Prison since 8-13-84. His CDC number is C87286.

### II. DEVELOPMENTAL HISTORY:

Mr. Cronk was not aware of any abnormalities in his perinatal experience or early development. He was not aware of any drug or alcohol use by his mother while she was pregnant with him. As far as he knows, he was not born prematurely and had a normal course of development in infancy. Mr. Cronk denied any history of firesetting as a juvenile, and had no history of enuresis. He denied any history of physical or sexual abuse. He reported that he never mistreated or harmed animals and was involved in the care of many farm animals. He recalled a time when his pony became ill with lockjaw. His family was advised, by the veterinarian that the animal should be put to death. Mr. Cronk did not want to sacrifice the pony and made a decision with his father to try to save the animal. Mr. Cronk stated, "He was my pony and he (his father) wasn't going to let that happen." They were able to save the animal, even though it required Mr. Cronk to spend many hours administering medication, and nursing the pony back to health. The family also raised dogs, cats, rabbits, chickens and horses.

### III. EDUCATION:

Mr. Cronk attended school in his local Township in Wisconsin. He was in regular education classes and was reported to be a good student in elementary school. He dropped out of school at the beginning of his junior year, primarily because he didn't feel that he fit in socially. He was aware of differences in socioeconomic status between himself and other students. As a younger child, he had only associated with other children from farm families. In high school, he couldn't afford to participate in student activities and the rural school had few extracurricular activities. He left school and found employment as a mechanic.

Mr. Cronk completed his GED on 7-27-93, while in prison. He has continued to pursue higher education while incarcerated. He has completed his Associate Arts degree and continues to take college level coursework, through the San Quentin College Program. He is now beginning coursework to complete a Bachelor's degree in Liberal Arts.

## IV. FAMILY HISTORY:

Mr. Cronk was born in Milwaukee, Wisconsin and grew up in a farming community, Palmyra, Wisconsin. Mr. Cronk is the youngest of three children, having two older sisters. He describes being especially close to his sister, Pamela when he was growing up. He has another sister, Kevee Lynn, with whom he has remained in contact. He and his siblings were raised in an intact family, until the time of his father's death. Mr. Cronk was 17 years old, and in high school when his father died of a heart attack. Previous psychological evaluations indicated that Mr. Cronk was deeply affected by his father's death, as he admired his father and had a close relationship with him.

Mr. Cronk describes his father as hardworking, as he ran the family farm and also was a machinist. Mr. Cronk assisted his father with running the farm and with his small engine repair business. Mr. Cronk fondly describes working with his father and learning mechanical skills from him. They also went hunting together, which was a common father-son activity in the rural area in which the family lived. Mr. Cronk owned a weapon for hunting purposes from a young age. His father was an avid fisherman, as well as a recreational hunter. Mr. Cronk and his father also spent time watching movies and fixing farm machinery together. Mr. Cronk looked up to his father and felt his father was supportive of him, and a good parent. His father drank beer occasionally, but was not believed to have any problems with alcohol abuse.

Mr. Cronk's mother apparently was chronically depressed and overweight. She also had numerous physical ailments that required frequent medical visits. Mr. Cronk helped her as much as possible after his father's death. He found it difficult to have a normal social life as an adolescent as his mother was hyper-critical and he did not feel comfortable having friends visit. His mother also died of cardiac-related disease.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Mr. Cronk first developed a social life outside of his family when he entered high school. He noticed girls were attractive and wanted to go on dates with them. He had always found it easy to know and get along with girls, because of having older sisters. He described himself as shy and lacking in confidence, as he felt he lacked the economic recourses needed to impress girls. His clothing was out of date and he was overweight. He participated in group activities with other adolescents, which primarily consisted of informal gatherings where local youth would gather cars, socialize, and listen to music. There was some experimentation with alcohol and marijuana.

Mr. Cronk became involved with his first girlfriend after his father's death. He had known the girl, Mary, five or six months before they dated. Mr. Cronk became sexually active with his girlfriend and she became unintentionally pregnant. He told his family and a decision was made for the couple to marry. Mr. Cronk's history contains no evidence to suggest anything other than normal sexual development with normal sexual interests and behaviors.

Cronk, Donald    C-87286         2         San Quentin BPT          10-12-01

242

## VI. MARITAL HISTORY:

Mr. Cronk has been married twice. His first marriage took place at age 19, when his 18-year-old girlfriend became pregnant. The couple had one daughter, Kirsten. Mr. Cronk and his wife were living with his mother-in-law and received an offer from his wife's father to join him in California. Mr. Cronk looked forward to being away from his mother who had become increasingly depressed and hyper-religious after her husband's death. The couple left Wisconsin with their young child and Mr. Cronk found employment in California. The marriage ended in divorce after Mr. Cronk's wife returned to Wisconsin with their daughter. He does not have a relationship with his grown daughter.

Mr. Cronk's second marriage, to Linda Hartman, took place in 1987 at San Quentin Prison. Mr. Cronk met his second wife through his mother. The relationship began through correspondence and then regular visits. Ms. Hartman expressed a desire to marry Mr. Cronk and he felt flattered that she wanted to marry him. The couple became active in organizing a support group for incarcerated husbands and their wives at San Quentin. The couple worked together to organize fundraisers and special events for the couples and their children, such as a Thanksgiving meal and Christmas gathering. The couple had a daughter, Samantha who was born 4-29-91. For several years Mrs. Cronk brought Samantha to visit Mr. Cronk weekly. The couple was very involved in the San Quentin Husbands and Wives group. Over time, Mr. Cronk noticed a change in his relationship with his wife during these visits. Then one day in 1994, she just stopped coming. He continued to wait for her to contact him or to resume visits, but she never did and has not contacted him to offer any explanation. Mr. Cronk filed for divorce without any direct contact with his wife. He has not had any contact with his daughter since Linda's visits ceased. Mr. Cronk seems puzzled by his ex-wife's behavior, and has some sense that she may have been seeking to have a child. He does not seem to have any hostile feelings toward her. He has some hope of having a relationship with his daughter one day. Because of the nature of his crime, he is respectful of the fact that his daughters may not want him to be a part of their lives. For that reason, he does not actively pursue contact with them.

## VII. MILITARY HISTORY:

Mr. Cronk does not have any military experience

## VIII. EMPLOYMENT:

Mr. Cronk had worked for International Harvester and as a manager for a waterbed company prior to incarceration. He describes himself as a conscientious and hardworking person who has always been able to succeed because of those traits. He believes he developed those traits as a young man, working alongside his father on the family farm. He has a good sense of organization and is quickly able to master work responsibilities and make contributions above what is required to complete an assignment.

Mr. Cronk has obtained vocational training while in CDC. After an initial assignment to the prison laundry, Mr. Cronk was assigned to vocational electrical work. On 5-19-87, he completed the Vocational Electrician Program. He became a member of the International Union of Electrical Workers, Local #551. In 1988, he worked as part of the renovation crew on the San Quentin Renovation Project. In 1989, he entered the Electrician's Indentured Apprenticeship Program. His level of skill would appear to render him employable. A C-128 written on 12-27-88, by the Electrical Foreman states that Mr. Cronk is "an experienced and qualified electrician, equal to any union street electrician." He further stated that Mr. Cronk "...will have no problem obtaining employment either through his union or independently, as any electrical employer will recognize that S/I is professional material. I would not hesitate to hire S/I at any time for any job required."

Records indicate that Mr. Cronk used his electrical and organizational skills to co-produce a charitable fundraising recording of the San Quentin Gospel Choir. A complete review of vocational training and skills obtained by Mr. Cronk and their application while incarcerated, is beyond the scope of this report.

## IX. SUBSTANCE ABUSE HISTORY:

Mr. Cronk reported experimenting with alcohol and marijuana beginning at 18 years of age. He admits to trying most drugs on an experimental basis, but was not a regular user. His employer, who had a fast-growing waterbed business, introduced Mr. Cronk to cocaine. The owner of the company was in his mid-thirties and lived a life that involved elaborate parties, expensive cars and attractive women. When Mr. Cronk was promoted to service manager, his employer had a celebration at which Mr. Cronk was first offered cocaine. He remembers feeling euphoric and accepted as an insider in the upper circles of the company. Initially the drug helped him increase his ability to meet the demands of his job. He believed that the drug had no downside, as he was able to function normally at home and at work. He associated cocaine use with success as he admired those in the company who also used it. A year later, he had become dependent on the drug. His wife separated from his and moved back to stay with her mother in Wisconsin. Mr. Cronk continued working 14–15 hours a day and attended parties with company people. His cocaine use increased to the point where he was spending all of his money on the drug. He began coming in late for work. At this time, he also met a customer who became his cocaine source. In order to finance his cocaine addiction, he began stealing from the company and was eventually terminated from his job. Mr. Cronk and his confederate, Mr. Meyer began dealing cocaine and were getting large amounts of the drug fronted to them. They were unable to pay back the debt incurred, and Mr. Cronk knew that he was likely to be harmed if he was not able to pay it.

Mr. Cronk stated that he became aware "that his life was going to the bottom." He sought help from a crisis center in Sacramento where he stayed for 2 days. He remembers being told that he had a psychological dependence on cocaine, as there was no physical dependence on the drug. He did not seek further treatment. He was very worried about the debt and had been cut off from his supply of cocaine, when Mr. Meyer proposed that they commit robberies in order to get the money they needed. Mr. Meyer

instructed Mr. Cronk on how to commit a robbery and provided him with a gun. Mr. Cronk believed that no one would be harmed and was surprised to learn how easy it was to intimidate others with a weapon. He initially felt terrified, as he had never been threatening to anyone in his life, was slightly built and looked young. That changed when he produced a gun and "was taken seriously." The two men were able to raise $600 to $700 in a robbery and were never questioned or arrested. To Mr. Cronk, crime began to "look like an easy way out." He trusted Mr. Meyer and was able to maintain his cocaine addiction and other financial responsibilities.

Mr. Cronk has attended Narcotics Anonymous and Alcoholics Anonymous in prison. He also participates in a Christian-based substance abuse treatment program, Overcomers Outreach. Mr. Cronk is thoroughly familiar with the philosophy of 12-step programs, and recognizes the destructive role cocaine has played in his life. He recognizes that drugs would be available to him in the community, if he were to parole and is committed to maintaining his drug-free status. He has been able to refuse drugs offered to him in prison.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

Mr. Cronk has no significant history of mental health treatment. Mr. Cronk took an overdose of aspirin at age 17 or 18 and acknowledges that he was deeply confused, angry and depressed after his father's death. That was the only time he remembers feeling a sense of despair or hopelessness.

He has not been eligible for mental health services through the Mental Health Service Delivery System (MHSDS), as he does not have symptoms of a serious mental disorder. After entering San Quentin Prison, Mr. Cronk was referred for evaluation by a staff psychiatrist, due to his offense. He was seen in November and December of 1984, and had complaints of anxiety, poor sleep and tension. His symptoms were assessed to be secondary to sentencing concerns and adjustment to prison. He was prescribed medication for anxiety, with noted improvement of symptoms by February of 1984. Medication was continued for several months. Mr. Cronk asked to be put back on medication in December 1984, for recurrent symptoms of tension and poor sleep. He has not sought or required any mental health treatment since that time.

Mr. Cronk's medical history is significant for degenerative disk surgery and Hepatitis C. He has no other significant medical conditions.

## XI. PLANS IF GRANTED RELEASE:

Mr. Cronk states that he would stay with a friend who is in recovery from substance abuse, if he is granted parole. Mr. Cronk has many skills and a number of contacts that would allow him to be employable in the community. He would need to finish his apprenticeship as an electrician by working one year in the community. He has many letters of support in his file, which indicate that he is an exemplary worker. He would continue with substance abuse treatment. Mr. Cronk has become an active Christian and would continue to be involved with a church in his community.

Cronk, Donald    C-87286        5        San Quentin BPT            10-12-01

245

## XII. CLINICAL ASSESSMENT

### A. Current Mental Status Examination

Mr. Cronk was seen in a staff office in his housing unit at San Quentin. His manner was cooperative, pleasant and friendly. He was neatly groomed and dressed in clean, institution-issued uniform. His physical appearance was unremarkable and his posture was relaxed. No abnormal movements were noted. He was familiar with the process of Board review, and remains moderately hopeful that the Board will give him serious consideration for a parole date. Mr. Cronk spoke freely and spontaneously, and his thoughts were linear and well organized. His speech was normal in rate, volume and clarity. There was no evidence of a thought disorder or paranoid or delusional beliefs. Thought content was appropriate, and there was no evidence of bizarre or violent thought patterns. He denied experiencing perceptual disturbances such as visual, auditory or tactile hallucinations at the present time, or in the past. He was fully alert throughout the interview and was oriented to time, person and place. He described his sleep and appetite as good. His mood was stable and euthymic. Affect was full range and appropriate to the topic discussed. He became tearful when discussing his feelings of sorrow about the harm he caused his victim and the victim's family. He denied any thoughts of wanting to harm himself or others. Judgment and insight were assessed to be good.

### B. Clinical Diagnoses and Level of Functioning

| | | |
|---|---|---|
| Axis I: | V71.09 | No Diagnosis or Condition |
| | 304.20 | Cocaine Dependence (in Full Remission) |
| | V71.01 | Adult Antisocial Behavior (Prior History) |
| Axis II: | V71.09 | No Diagnosis or Condition |
| Axis III: | | Hepatitis C, Degenerative disk condition |
| Axis IV: | | Incarceration, Alienation from family members |
| Axis V: | | GAF = 90 |

**C. Current Level of Care:** Not applicable, as Mr. Cronk has no current mental disorder.
**D. Treatment Activities:** Not applicable, as Mr. Cronk has no current mental disorder.
**E. Medications:** No present psychiatric medications.
**F. Prognosis:** Not applicable, as Mr. Cronk has no current mental disorder.

## XIII. REVIEW OF LIFE CRIME:

### A. Inmate's Version of the Offense

The following is a summary of the account of his offense, given to the present examiner by Mr. Cronk. Mr. Cronk had been using cocaine excessively and engaging in armed robberies to obtain money to support his cocaine addiction. His partner in crime, Mr. Meyer, aka "Butch" introduced him to another man, Terry Warren who was planning to rob a merchant, Mr. Allen, who owned a jewelry and coin business. The man took valuables from his store to his condo every evening. The 3 men decided to rob him in his home as other locations were too risky. The plan was to club him, tie him up and to take the contents of his brief case and an $80,000 ring that he wore. Mr. Cronk and Mr. Meyer entered the condo and began to look for valuables.

Cronk, Donald    C-87286    6    San Quentin BPT    10-12-01

246

The third man was stationed outside and was to call the condo when he saw Mr. Allen approach. No phone call came and Mr. Cronk was exiting the kitchen when he saw Mr. Allen standing inside the front door of the condo with a gun drawn. Mr. Allen fired 6 shots, 3 of which wounded Mr. Cronk. Mr. Allen reached for another weapon. Mr. Cronk had a gun in the pocket of his jacket and shot at Mr. Allen who fell to the floor. Mr. Cronk fled from the condo. Mr. Meyer came down from the second floor of the condo and saw the victim. He took the contents of Mr. Allen's case and the ring from his finger and walked out to his car. He picked up Mr. Cronk and returned to his home where Mr. Cronk was given first aid and Mr. Warren made arrangements for the men to hide out.

Mr. Warren had connections in Las Vegas that he used to arrange for medical treatment, false identification, food and housing, and sale of the items taken in the robbery. Mr. Cronk had not known of any of these connections in Las Vegas, as he previously had only committed smaller cash robberies. Mr. Cronk and Mr. Meyer took their share of the cash and left. Mr. Warren was then stopped by the police on another matter and gave the police the information about Mr. Cronk and Mr. Meyer's role in the killing of Mr. Allen. Mr. Meyer took a plea shortly after his arrest. Mr. Cronk was prosecuted for First Degree Murder with Use of a Firearm. Mr. Cronk feels that he had the benefit of an exceptional Court appointed attorney. He acknowledges his responsibility in the crime, but denies that there was ever any intent to kill Mr. Allen. In Mr. Cronk's words, at the time, he was "guilty of using drugs, lying, cheating and robbery, but meaning to kill, no." His remorse and sense of responsibility seem quite genuine.

B. Relevance of mental condition to life crime/criminal behavior:

The diagnoses given to Mr. Cronk in this evaluation, indicate that he *does not* have a mental condition in which his perception of reality, thought processes, affective states, impulse or behavioral control are significantly impaired. It would also appear that Mr. Cronk had no history of serious antisocial or maladaptive behavior prior to his involvement with cocaine. The precipitous loss of his father, his early history of social isolation, and his longing to escape the poverty experienced by his family, combined with premature marriage and fatherhood made him vulnerable to fantasies of escape. It is the conclusion of this examiner that cocaine offered him such an escape and masked his sense of inadequacy. Unfortunately, he continued his involvement with cocaine and antisocial influences, until he no longer had any ability to make constructive decisions. His positive adjustment in prison and successful programming suggest that the maladaptive traits that expressed themselves in his commitment offense and other antisocial acts, do not dominate his present responses. He has been able to use his time in prison to learn a skilled trade, gain higher education, contribute to the function of the prison, raise money for charitable causes, and develop programs to benefit other inmates and the institution. Mr. Cronk is very modest about these achievements and his proven ability to resist the negative influences of incarceration.

Mr. Cronk does not have a mental condition that causes him to be mentally ill or require treatment or would cause him to be at increased risk of committing another violent offense. He seems to have overcome earlier patterns of maladaptive behavior that resulted in his striving to gain acceptance from more powerful males. Mr. Cronk was using illegal drugs and participating in a drug subculture at the time of the offense. There is no evidence from his life history that he engaged in any seriously antisocial behavior prior to his involvement with drugs. In fact, his lack of exposure to influences outside of his family may have restricted normal social development. As he has made an optimal adjustment to life in prison, it is highly possible that Mr. Cronk would be able to function well in a non-correctional setting. As with all life-term inmates, he is vulnerable to over-adaptation to the structure of institutional life. He would need to be provided opportunities for self-determination, long-term employment, and non-institutional social support in order to be adequately prepared for parole.

Mr. Cronk acknowledges that he was wrong to commit his offense and that he caused serious harm to his victim's family and takes responsibility for ending the victim's life. He wishes to be forgiven by society, his family and the victim's family, and at the same time feels no entitlement to forgiveness. He further understands that the positive gains he has made in his life while incarcerated have come at the cost of the victim's life. Mr. Cronk expresses gratitude for the insight and personal understanding he has gained and for the positive support that he has received from others during his incarceration. He states that he would like to be able to use what he has gained to benefit others, and his performance in prison demonstrates his intention and willingness to do so. His remorse seems to be genuine.

## XIV. Assessment of Dangerousness:

A. <u>Within controlled setting:</u> During his entire period of incarceration, Mr. Cronk has been free of disciplinary actions. He has been able to use his time in prison to learn a skilled trade, gain higher education, contribute to the function of the prison, raise money for charitable causes, and develop programs to benefit other inmates and the institution. Mr. Cronk is very modest about these achievements and his ability to resist the negative influences of incarceration. His values and outlook are pro-social and he actively seeks out ways to make positive contributions. There is no record of his committing any acts of aggression toward others during his incarceration.

B. <u>If released to the community:</u> ~~Since causative factors for violence and criminal activity are multi-determined, violence potential is unpredictable. Mr. Cronk does not have a mental condition that causes him to be mentally ill or require treatment or would cause him to be at increased risk of committing another violent offense.~~ He seems to have overcome earlier patterns of maladaptive behavior that resulted in his striving to gain acceptance from more powerful males. There is no evidence from his life history that he engaged in any seriously antisocial behavior prior to his involvement with drugs. He presently has no mental condition that would constitute a major risk factor for further violent offenses, by altering his perception of reality or level of behavioral or impulse

Cronk, Donald    C-87286        8        San Quentin BPT        10-12-01

**248**

control. Resumption of substance abuse, however, would be a major risk factor in increasing the potential for criminal activity.

C. Significant risk factors/precursors to violence:

Mr. Cronk seems dedicated to avoiding violence. He has been free of violent behavior during incarceration. The most significant risk factor would be resumption of substance abuse which could jeopardize Mr. Cronk's ability to meet his financial obligations. He has a realistic understanding of the risk of relapse for anyone who has had a serious substance abuse problem. He is clear that he would seek treatment and acknowledges that this was difficult for him to do as a younger man.

Clinician Observation/Comments/Recommendations:

As Mr. Cronk's records indicate, he has made impressive efforts at self-rehabilitation. He has succeeded in an apprenticeship program to become an electrician. He has upgraded his educational level from a high school dropout to completion of an A.A degree and continuation toward a bachelor's degree. He has participated extensively in self-help and substance abuse interventions. He has also contributed considerable time and skills to fundraising and public relations efforts designed to help those in need. His accomplishments are indicative of pro-social values and interests. Mr. Cronk has been able to maintain an extended effort toward rehabilitation, with the goal of contributing to the general good. He seems to be, at this point, a sincerely altruistic person. Because his efforts at rehabilitation have come from an intrinsic motivation, he is likely to maintain his present positive social adjustment. After living in an institutional environment for approximately 20 years, he would face the challenges that would come with a radical change of environment. Given Mr. Cronk's level of job skill and education, and performance in prison, these challenges would likely be less than those for other parolees released after extended incarceration.

It is recommended that case factors other than mental disorder be considered to determine eligibility for parole to the community at this time.

Michel L. Inaba, PhD, Psy #15977.
CDC Contract Psychologist

10-12-01
Date Signed

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## DECEMBER 2001 LIFER HEARING
## SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

### I. IDENTIFYING INFORMATION:

Mr. Cronk is a 45 year old, married, Caucasian male. His date of birth is 12-20-55. His conviction date was 3-23-84. He is serving a 25-year to life sentence for Murder in the First Degree. Mr. Cronk has been in custody at San Quentin State Prison since 4-16-90. His CDC number is C87286.

### II. DEVELOPMENTAL HISTORY:

Mr. Cronk was not aware of any abnormalities in his perinatal experience or early development. He was not aware of any drug or alcohol use by his mother while she was pregnant with him. As far as he knows, he was not born prematurely and had a normal course of development in infancy. Mr. Cronk denied any history of firesetting as a juvenile, and had no history of enuresis. He denied any history of physical or sexual abuse. He reported that he never mistreated or harmed animals and was involved in the care of many farm animals. He recalled a time when his pony became ill with lockjaw. His family was advised, by the veterinarian that the animal should be put to death. Mr. Cronk did not want to sacrifice the pony and made a decision with his father to try to save the animal. Mr. Cronk stated, "He was my pony and he (his father) wasn't going to let that happen." They were able to save the animal, even though it required Mr. Cronk to spend many hours administering medication and nursing the pony back to health. The family also raised dogs, cats, rabbits, chickens and horses.

### III. EDUCATION:

Mr. Cronk attended school in his local Township in Wisconsin. He was in regular education classes and was reported to be a good student in elementary school. He dropped out of school at the beginning of his junior year primarily because he didn't feel that he fit in socially. He was aware of differences in socioeconomic status between himself and other students. As a younger child, he had only associated with other children from farm families. In high school, he couldn't afford to participate in student activities and the rural school had few extracurricular activities. He left school and found employment as a mechanic.

Mr. Cronk completed his GED on 7-27-93 while in prison. He has continued to pursue higher education while incarcerated. He has completed his Associate Arts degree and continues to take college level coursework through the San Quentin College Program. He is now beginning coursework to complete a Bachelor's degree in Liberal Arts.

### IV. FAMILY HISTORY:

Cronk, Jerry    C-87286    1    San Quentin BPT    9-4-01

250

Mr. Cronk was born in Milwaukee, Wisconsin and grew up in a farming community, Palmyra, Wisconsin. Mr. Cronk is the youngest of three children, having two older sisters. He describes being especially close to his sister, Pamela when he was growing up. He has another sister, Kevee Lynn with whom he has remained in contact. He and his siblings were raised in an intact family, until the time of his father's death. Mr. Cronk was 17 years old and in high school when his father died of a heart attack. Previous psychological evaluations indicated that Mr. Cronk was deeply affected by his father's death, as he admired his father and had a close relationship with him.

Mr. Cronk describes his father as hardworking, as he ran the family farm and also was a machinist. Mr. Cronk assisted his father with running the farm and with his small engine repair business. Mr. Cronk fondly describes working with his father and learning mechanical skills from him. They also went hunting together, which was a common father-son activity in the rural area in which the family lived. Mr. Cronk owned a weapon for hunting purposes from a young age. His father was an avid fisherman, as well as a recreational hunter. Mr. Cronk and his father also spent time watching movies and fixing farm machinery together. Mr. Cronk looked up to his father and felt his father was supportive of him and a good parent. His father drank beer occasionally, but was not believed to have any problems with alcohol abuse.

Mr. Cronk's mother apparently was chronically depressed and overweight. She also had numerous physical ailments that required frequent medical visits. Mr. Cronc helped her as much as possible after his father's death. He found it difficult to have a normal social life as an adolescent as his mother was hyper-critical and he did not feel comfortable having friends visit. His mother also died of cardiac-related disease.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Mr. Cronk first developed a social life outside of his family when he entered high school. He noticed girls were attractive and wanted to go on dates with them. He had always found it easy to know and get along with girls because of having older sisters. He described himself as shy and lacking in confidence as he felt he lacked the economic recourses needed to impress girls. His clothing was out of date and he was overweight. He participated in group activities with other adolescents, who primarily consisted of informal gatherings where local youth would gather cars, socialize and listen to music. There was some experimentation with alcohol and marijuana.

Mr. Cronk became involved with his first girlfriend after his father's death. He had known the girl, Mary, five or six months before they dated. Mr. Cronk became sexually active with his girlfriend and she became unintentionally pregnant. He told his family and a decision was made for the couple to marry. Mr. Cronk's history contains no evidence to suggest anything other than normal sexual development with normal sexual interests and behaviors.

## VI. MARITAL HISTORY:

Cronk, Jerry    C-87286.        2.        San Quentin BPT        9-4-01

251

Mr. Cronk has been married twice. His first marriage took place at age 19, when his 18 year old girlfriend became pregnant. The couple had one daughter, Kirsten. Mr. Cronk and his wife were living with his mother-in-law and received an offer from his wife's father to join him in California. Mr. Cronk looked forward to being away from his mother who had become increasingly depressed and hyper-religious after her husband's death. The couple left Wisconsin with their young child and Mr. Cronk found employment in California. The marriage ended in divorce after Mr. Cronk's wife returned to Wisconsin with their daughter. He does not have a relationship with his grown daughter.

Mr. Cronk's second marriage, to Linda Hartman, took place in 1987 at San Quentin Prison. Mr. Cronk met his second wife through his mother. The relationship began through correspondence and then regular visits. Ms. Hartman expressed a desire to marry Mr. Cronk and he felt flattered that she wanted to marry him. The couple became active in organizing a support group for incarcerated husbands and their wives at San Quentin. The couple worked together to organize fundraisers and special events for the couples and their children, such as a Thanksgiving meal and Christmas gathering. The couple had a daughter, Samantha who was born 4-29-91. For several years Mrs. Cronk brought Samantha to visit Mr. Cronk weekly. The couple was very involved in the San Quentin Husbands and Wives group. Over time, Mr. Cronk noticed a change in his relationship with his wife during these visits. Then one day in 1994, she just stopped coming. He continued to wait for her to contact him or to resume visits, but she never did and has not contacted him to offer any explanation. Mr. Cronk filed for divorce without any direct contact with his wife. He has not had any contact with his daughter since Linda's visits ceased. Mr. Cronk seems puzzled by his ex-wife's behavior, and has some sense that she may have been seeking to have a child. He does not seem to have any hostile feelings toward her. He has some hope of having a relationship with his daughter one day. Because of the nature of his crime, he is respectful of the fact that his daughters may not want him to be a part of their lives. For that reason, he does not actively pursue contact with them.

## VII. MILITARY HISTORY:
Mr. Cronk does not have any military experience

## VIII. EMPLOYMENT:
Mr. Cronk had worked for International Harvester and as a manager for a waterbed company prior to incarceration. He describes himself as a conscientious and hardworking person who has always been able to succeed because of those traits. He believes he developed those traits as a young man, working alongside his father on the family farm. He has a good sense of organization and is quickly able to master work responsibilities and make contributions above what is required to complete an assignment. He has worked extensively in the correctional industry. Mr. Cronk has worked in the bookbindery, plumbing, kitchen maintenance, and as a steamfitter. He presently works in PIA at San Quentin. Mr. Cronk has received a Certificate in Cooling

Cronk, Jerry    C-87286    3.    San Quentin BPT    9-4-01

252

and Refrigeration and as an Ophthalmology Technician.    A complete review of vocational training and skills obtained by Mr. Cronk is beyond the scope of this report.

## IX. SUBSTANCE ABUSE HISTORY:

Mr. Cronk reported experimenting with alcohol and marijuana beginning at 18 years of age. He admits to trying most drugs on an experimental basis, but was not a regular user. His employer, who had a fast-growing waterbed business, introduced Mr. Cronk to cocaine. The owner of the company was in his mid-thirties and lived a life that involved elaborate parties, expensive cars and attractive women. When Mr. Cronk was promoted to service manager, his employer had a celebration at which Mr. Cronk was first offered cocaine. He remembers feeling euphoric and accepted as an insider in the upper circles of the company. Initially the drug helped him increase his ability to meet the demands of his job. He believed that the drug had no downside, as he was able to function normally at home and at work. He associated cocaine use with success as he admired those in the company who also used it. A year later, he had become dependent on the drug. His wife separated from his and moved back to stay with her mother in Wisconsin. Mr. Cronk continued working 14-15 hours a day and attended parties with company people. His cocaine use increased to the point where he was spending all of his money on the drug. He began coming in late for work. At this time, he also met a customer who became his cocaine source. In order to finance his cocaine addiction, he began stealing from the company and was eventually terminated from his job. Mr. Cronk and his confederate, Mr. Meyer began dealing cocaine and were getting large amounts of the drug fronted to them. They were unable to pay back the debt incurred, and Mr. Cronk knew that he was likely to be harmed if he was not able to pay it.

Mr. Cronk became aware "that his life was going to the bottom." He sought help from a crisis center in Sacramento where he stayed for 2 days. He remembers being told that he had a psychological dependence on cocaine, as there was no physical dependence on the drug. He did not seek further treatment. He was very worried about the debt and had been cut off from his supply of cocaine, when Mr. Meyer proposed that they commit robberies in order to get the money they needed. Mr. Meyer instructed Mr. Cronk on how to commit a robbery and provided him with a gun. Mr. Cronk believed that no one would be harmed and was surprised to learn how easy it was to intimidate others with a weapon. He initially felt terrified, as he had never been threatening to anyone in his life, was slightly built and looked young. That changed when he produced a gun and "was taken seriously." The two men were able to raise $600 to $700 in a robbery and were never questioned or arrested. To Mr. Cronk, crime began to "look like an easy way out." He trusted Mr. Meyer and was able to maintain his cocaine addiction and other financial responsibilities.

Mr. Cronk has attended Narcotics Anonymous and Alcoholics Anonymous in prison. He also participates in a Christian-based substance abuse treatment program, Overcomers Outreach. Mr. Cronk is thoroughly familiar with the philosophy of 12-step programs, and recognizes the destructive role cocaine has played in his life. He recognizes that

Cronk, Jerry   C-87286        4.        San Quentin BPT            9-4-01

253

drugs would be available to him in the community, if he were to parole and is committed to maintaining his drug-free status. He has been able to refuse drugs offered to him in prison.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

Mr. Cronk has no significant history of mental health treatment. Mr. Cronk took an overdose of aspirin at age 17 or 18 and acknowledges that he was deeply confused, angry and depressed after his father's death. That was the only time he remembers feeling a sense of despair or hopelessness.

He has not been eligible for mental health services through the Mental Health Service Delivery System (MHSDS), as he does not have symptoms of a serious mental disorder. After entering San Quentin Prison, Mr. Cronk was referred for evaluation by a staff psychiatrist, due to his offense. He was seen in November and December of 1984, and had complaints of anxiety, poor sleep and tension. His symptoms were assessed to be secondary to sentencing concerns and adjustment to prison. He was prescribed medication for anxiety, with noted improvement of symptoms by February of 1984. Medication was continued for several months. Mr. Cronk asked to be put back on medication in December 1984, for recurrent symptoms of tension and poor sleep. He has not sought or required any mental health treatment since that time.

Mr. Cronk's medical history is significant for degenerative disk surgery and Hepatitis C. He has no other significant medical conditions.

## XI. PLANS IF GRANTED RELEASE:

Mr. Cronk states that he would stay with a friend who is in recovery from substance abuse, if he is granted parole. Mr. Cronk has many skills and a number of contacts that would allow him to be employable in the community. He would need to finish his apprenticeship as an electrician by working one year in the community. He has many letters of support in his file, which indicate that he is an exemplary worker. He would continue with substance abuse treatment. Mr. Cronk has become an active Christian and would continue to be involved with a church in his community.

## XII. CLINICAL ASSESSMENT

### A. Current Mental Status Examination

Mr. Cronk was seen in a staff office in his housing unit at San Quentin. His manner was cooperative, pleasant and friendly. He was neatly groomed and dressed in clean, institution-issued uniform. His physical appearance was unremarkable and his posture was relaxed. No abnormal movements were noted. He was familiar with the process of Board review, and remains moderately hopeful that the Board will give him serious consideration for a parole date. Mr. Cronk spoke freely and spontaneously, and his thoughts were linear and well organized. His speech was normal in rate, volume and clarity. There was no evidence of a thought disorder or paranoid or delusional beliefs. Thought content was appropriate, and there was no evidence of bizarre or violent thought patterns. He denied experiencing perceptual disturbances such as visual, auditory or

Cronk, Jerry    C-87286        5        San Quentin BPT            9-4-01

254

tactile hallucinations at the present time, or in the past. He was fully alert throughout the interview and was oriented to time, person and place. He described his sleep and appetite as good. His mood was stable and euthymic. Affect was full range and appropriate to the topic discussed. He became tearful when discussing his feelings of sorrow about the harm he caused his victim and the victim's family. He denied any thoughts of wanting to harm himself or others. Judgment and insight were assessed to be good.

## B. Clinical Diagnoses and Level of Functioning

| | | |
|---|---|---|
| Axis I: | V71.09 | No Diagnosis or Condition |
| | 304.20 | Cocaine Dependence (in Full Remission) |
| | V71.01 | Adult Antisocial Behavior (Prior History) |
| Axis II: | V71.09 | No Diagnosis or Condition |
| Axis III: | | Hepatitis C, Degenerative disk condition |
| Axis IV: | | Incarceration, Alienation from family members |
| Axis V: | | GAF = 90 |

**C. Current Level of Care:** Not applicable, as Mr. Cronk has no current mental disorder.
**D. Treatment Activities:** Not applicable, as Mr. Cronk has no current mental disorder.
**E. Medications:** No present psychiatric medications.
**F. Prognosis:** Not applicable, as Mr. Cronk has no current mental disorder.

## XIII. REVIEW OF LIFE CRIME:

### A. Inmate's Version of the Offense

The following is a summary of the account of his offense, given to the present examiner by Mr. Cronk. Mr. Cronk had been using cocaine excessively and engaging in armed robberies to obtain money to support his cocaine addiction. His partner in crime, Mr. Meyer, aka "Butch" introduced him to another man, Terry Warren who was planning to rob a merchant, Mr. Allen, who owned a jewelry and coin business. The man took valuables from his store to his condo every evening. The 3 men decided to rob him in his home as other locations were too risky. The plan was to club him, tie him up and to take the contents of his brief case and an $80,000 ring that he wore. Mr. Cronk and Mr. Meyer entered the condo and began to look for valuables.

The third man was stationed outside and was to call the condo when he saw Mr. Allen approach. No phone call came and Mr. Cronk was exiting the kitchen when he saw Mr. Allen standing inside the front door of the condo with a gun drawn. Mr. Allen fired 6 shots, 3 of which wounded Mr. Cronc. Mr. Allen reached for another weapon. Mr. Cronc had a gun in the pocket of his jacket and shot at Mr. Allen who fell to the floor. Mr. Cronk fled from the condo. Mr. Meyer came down from the second floor of the condo and saw the victim. He took the contents of Mr. Allen's case and the ring from his finger and walked out to his car. He picked up Mr. Cronc and returned to his home where Mr. Cronc was given first aid and Mr. Warren made arrangements for the men to hide out.

Mr. Warren had connections in Las Vegas that he used to arrange for medical treatment, false identification, food and housing and sale of the items taken in the robbery. Mr. Cronc had not known of any of these connections in Las Vegas as he had only committed smaller cash robberies. Mr. Cronc and Mr. Meyer took their share of the cash and left. Mr. Warren was then stopped by the police on another matter and gave the police the information about Mr. Cronc and Mr. Meyer's role in the killing of Mr. Allen. Mr. Meyer took a plea shortly after his arrest. Mr. Cronc was prosecuted for First Degree Murder with Use of a Firearm. Mr. Cronc feels that he had the benefit of an exceptional Court appointed attorney. He acknowledges his responsibility in the crime, but denies that there was ever any intent to kill Mr. Allen. In Mr. Cronc's words, at the time, he was "guilty of using drugs, lying, cheating and robbery, but meaning to kill, no." His remorse and sense of responsibility seem quite genuine.

B. Relevance of mental condition to life crime/criminal behavior:

The diagnoses given to Mr. Cronk in this evaluation, indicate that he *does not* have a mental condition in which his perception of reality, thought processes, affective states, impulse or behavioral control are significantly impaired. It would also appear that Mr. Cronk had no history of serious antisocial or maladaptive behavior prior to his involvement with cocaine. The precipitous loss of his father, his early history of social isolation, and his longing to escape the poverty experienced by his family, combined with premature marriage and fatherhood made him vulnerable to fantasies of escape. It is the conclusion of this examiner that cocaine offered him such an escape and masked his sense of inadequacy. Unfortunately, he continued his involvement with cocaine and antisocial influences, until he no longer had any ability to make constructive decisions. His positive adjustment in prison and successful programming suggest that the maladaptive traits that expressed themselves in his commitment offense and other antisocial acts, do not dominate his present responses. He has been able to use his time in prison to learn a skilled trade, gain higher education, contribute to the function of the prison, raise money for charitable causes, and develop programs to benefit other inmates and the institution. Mr. Cronk is very modest about these achievements and his proven ability to resist the negative influences of incarceration.

Mr. Cronk does not have a mental condition that causes him to be mentally ill or require treatment or would cause him to be at increased risk of committing another violent offense. He seems to have overcome earlier patterns of maladaptive behavior that resulted in his striving to gain acceptance from more powerful males. Mr. Cronk was using illegal drugs and participating in a drug subculture at the time of the offense. There is no evidence from his life history that he engaged in any seriously antisocial behavior prior to his involvement with drugs. In fact, his lack of exposure to influences outside of his family may have restricted normal social development. As he has made an optimal adjustment to life in prison, it is highly possible that Mr. Cronk would be able to function well in a non-correctional setting. As with all life-term inmates, he is vulnerable to over-adaptation to the structure of institutional life. He would need to be provided opportunities for self-determination, long-term employment, and non-institutional social support in order to be adequately prepared for parole.

Cronk, Jerry    C-87286    7    San Quentin BPT    9-4-01

Mr. Cronk acknowledges that he was wrong to commit his offense and that he caused serious harm to his victim's family and takes responsibility for ending the victim's life. He wishes to be forgiven by society, his family and the victim's family, and at the same time feels no entitlement to forgiveness. He further understands that the positive gains he has made in his life while incarcerated have come at the cost of the victim's life. Mr. Cronc expresses gratitude for the insight and personal understanding he has gained and for the positive support that he has received from others during his incarceration. He states that he would like to be able to use what he has gained to benefit others, and his performance in prison demonstrates his intention and willingness to do so. His remorse seems genuine.

## XIV. Assessment of Dangerousness:

A. Within controlled setting: During his entire period of incarceration, Mr. Cronk has been free of disciplinary actions. He has been able to use his time in prison to learn a skilled trade, gain higher education, contribute to the function of the prison, raise money for charitable causes, and develop programs to benefit other inmates and the institution. Mr. Cronk is very modest about these achievements and his ability to resist the negative influences of incarceration. His values and outlook are pro-social and he actively seeks out ways to make positive contributions. There is no record of his committing any acts of aggression toward others during his incarceration.

B. If released to the community: Since causative factors for violence and criminal activity are multi-determined, violence potential is unpredictable. Mr. Cronk does not have a mental condition that causes him to be mentally ill or require treatment or would cause him to be at increased risk of committing another violent offense. He seems to have overcome earlier patterns of maladaptive behavior that resulted in his striving to gain acceptance from more powerful males. There is no evidence from his life history that he engaged in any seriously antisocial behavior prior to his involvement with drugs. He presently has no mental condition that would constitute a major risk factor for further violent offenses, by altering his perception of reality or level of behavioral or impulse control. Resumption of substance abuse, however, would be a major risk factor in increasing the potential for criminal activity.

C. Significant risk factors/precursors to violence:
Mr. Cronk seems dedicated to avoiding violence. He has been free of violent behavior during incarceration. The most significant risk factor would be resumption of substance abuse, which could jeopardize Mr. Cronk's ability to meet his financial obligations. He has a realistic understanding of the risk of relapse for anyone who has had a serious substance abuse problem. He is clear that he would seek treatment and acknowledges that this was difficult for him to do as a younger man.

## Clinician Observation/Comments/Recommendations:
As Mr. Cronk's records indicate, he has made impressive efforts at self-rehabilitation. He has succeeded in an apprenticeship program to become an electrician. He has

Cronk, Jerry    C-87286        8        San Quentin BPT            9-4-01

257

upgraded his educational level from a high school dropout to completion of an A.A degree and continuation toward a bachelor's degree. He has participated extensively in self-help and substance abuse interventions. He has also contributed considerable time and skills to fundraising and public relations efforts designed to help those in need. His accomplishments are indicative of pro-social values and interests. Mr. Cronk has been able to maintain an extended effort toward rehabilitation, with the goal of contributing to the general good. He seems to be, at this point, a sincerely altruistic person. Because his efforts at rehabilitation have come from an intrinsic motivation, he is likely to maintain his present positive social adjustment. After living in an institutional environment for approximately 20 years, he would face the challenges that would come with a radical change of environment. Given Mr. Cronk's level of job skill and education, and performance in prison, these challenges would likely be less than those for other parolees released after extended incarceration.

It is recommended that case factors other than mental disorder be considered to determine eligibility for parole to the community at this time.

Michel L. Inaba, PhD, Psy #15977.
CDC Contract Psychologist

Cronk, Jerry    C-87286        9        San Quentin BPT            9-4-01

258

15

| PERIOD OF CONFINEMENT | | | |
|---|---|---|---|
| *(RECORDS OFFICER USE ONLY)* | YR | MO | DAY |
| usted Period of Confinement .............................. | | | |
| e Life Term Begins ............................................. | + | | |
| Large Time ......................................................... | + | | |
| ROLE DATE ......................................................... | = | | |

## MISCELLANEOUS

Panel Recommendations and Requests:

_____ Become _____ Remain Disciplinary Free.
_____ Work Towards Reducing his/her Custody Level.
_____ Upgrade _____ Vocationally _____ Educationally.
_____ Participate In _____ Self-help (and) _____ Therapy.
_____ Transfer To _____ Cat. X _____ Cat. T. _AP. N/A_

Denied four years
1. Crime
2. Prior Crim + Socei
3. Need for Add'nal Progm

NAL CODE SECTION 3042 NOTICES ☒ SENT (Date) 12-4-96

WMENT OFFENSE

| PC 187, 12022.5 | MURDER 1st /w/use of F'Arm |
|---|---|
| (Code Section) | (Title) |

| SAC-66618 | 2 |
|---|---|
| (Case Number) | (Count Number) |

| te Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 6-13-84 | 6-13-84 | 11-8-95 |

| be of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☒ INITIAL ☐ SUBSEQUENT (Hearing No.) _____ | |

partment Representative

| nel for Prisoner   ED DUGGAN | Address   P.O. BOX 9839, SAN RAFAEL, CA. 94912 |
|---|---|
| strict Attorney Representative   Rob Gold | County   Sacramento |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a __proposed__ decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

| r: | |
|---|---|
| esiding (Name) | Date |
| oncurring (Name) | Date |
| oncurring (Name) | Date |

| AME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD E. | C 87286 | SAN QUENTIN | INITIAL | MARCH 1997 |

PT 1001 (REV. 1/91) PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

## LIFE PRISONER: PAROLE CONSIDERATION
## PROPOSED DECISION  (BPT §2041)

I.  [ X ] PAROLE DENIED  *four years*

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  PAROLE GRANTED

A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|----------|-----------|---------|

B.  Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------------|

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------------|

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------------|

D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

E.  Postconviction Credit From _____ To _____ − _____ Months
                                   (Date)           (Date)

F.  Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-ponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| Name | | Date |
|------|--|------|
| Name | | Date |
| Name | | Date |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|------|-----------|-------------|--------------|
| CRONK, DONALD E. | C 87286 | SAN QUENTIN | MARCH 1997 |

260

Distribution: White—C. File
Canary—BPT
Pink—Prisoner

BPT 1005 (Rev. 8/1/81)

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☒ INITIAL HEARING          ☐ SUBSEQUENT HEARING

| PRISONER'S NAME   CRONK, DONALD E. | CDC NUMBER   C 87286 |
|---|---|
| DATE OF HEARING   3-5-97 | LOCATION   SAN QUENTIN |

## LEGAL STATUS

| DATE RECEIVED   6-13-84 | DATE LIFE TERM STARTS (IF DIFFERENT)   6-13-84 | COUNTY   Sacramento |
|---|---|---|
| OFFENSE   Murder 1st w/use of F'arm | | CASE NUMBER   SAC-66618 |
| COUNT NUMBER(S)   2 | | PENAL CODE SECTION(S) VIOLATED   pc 187, 12022.5 |
| TERMS   25 to Life | | MEPD   ~~11-8-95~~  3-2-98 |

## OTHER COMMITMENT OFFENSES *OR* *STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER   Koenig | PANEL MEMBER   Schauer | PANEL MEMBER   Gillis |
|---|---|---|

OTHERS PRESENT:

☐ PRISONER (IF ABSENT, WHY?) _____

☐ ATTORNEY   Ed Duggan

☐ DEPUTY D. A.   Tom Johnson   Robert Gold   COUNTY OF   Saco

☐ OTHERS: _____

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____ .

☐ THE STATEMENT OF FACTS IS

☐ QUOTED FROM THE BOARD REPORT, DATED *Mar 1997*, PAGE(S) _____

☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT 1000 (Rev. 8/90)

261

55

1     CALIFORNIA BOARD OF PRISON TERMS

2     D E C I S I O N

3     PRESIDING COMMISSIONER KOENIG:  We're back on

4     the record in the hearing of Mr. Cronk.  All

5     participants are present who were present prior to the

6     recess.  The Panel unanimously finds the prisoner

7     unsuitable for parole and we do feel he would pose an

8     unreasonable risk of danger to society if released.

9     The reasons are, the primary reason, of course, is the

10    crime this prisoner committed.  It's a crime where the

11    prisoner and his two crime partners, after extensive

12    planning to rob the victim of his valuables, went to

13    the victim's residence, laid in wait for the victim to

14    return to his residence, and then when the victim

15    entered the residence and confronted the two criminals

16    a gunfight occurred, with the prisoner being shot, and

17    the prisoner in turn shooting and killing the victim.

18    The two then left the residence, stealing the

19    valuables worth approximately $100,000.  The prisoner

20    eventually left the state and was arrested some seven

21    months later.  The second reason is the prior

22    criminality and social factors of the prisoner.  It is

23    noted the prisoner began alcohol and drug usage at an

24    early age, which led to abuse and probably contributed

25    to the instant offense.  It is noted that at age 20 he

26    began criminality with a car theft.  He also committed

27    DONALD CRONK   C-87286        DECISION PAGE 1     3/5/97

262

56

1    three robberies using a gun, and forgery.  Society's

2    previous attempts to correct his criminality consisted

3    of jail -- jail time.  It's also noted, although the

4    charges were dropped, the prisoner, while in county

5    jail, had in possession of his cell weapons and

6    hypodermic syringe.  The prisoner has been

7    disciplinary free since he's been incarcerated.  He's

8    also completed electronics trade, and participated to

9    some degree in the self-help area, such as AA and NA,

10   and has exceptional work reports for his work as a

11   clerk, as a watch commander's clerk, lieutenant's

12   clerk, and a captain's clerk.  The prisoner -- the

13   Board report by Edwards, CC1, states that the prisoner

14   would pose an unpredictable degree of threat to

15   society if released.  The psych reports by Lee, Bruce

16   and Sullivan -- I believe that's Sullivan, 1990, Bruce

17   '93, and Lee in '97, all state that parole decisions

18   should be made on other than psychological grounds.

19   However, all of them also state that the prisoner

20   needs to program, continue his programming in the

21   various areas, particularly the self-help area.  And

22   Dr. Bruce, in '93, states that more in depth testing

23   is necessary to -- for an evaluation of the prisoner.

24   The Panel finds that when we consider the offense that

25   the prisoner committed, the planning of -- extensive

26   planning of the robbery of the victim, and then

27   DONALD CRONK  C-87286      DECISION PAGE 2     3/5/97

263

57

1   shooting to death the victim, when we consider his

2   prior criminal record, his social factors, his drug

3   and alcohol abuse which led to the offense, the Board

4   report here today, the psych reports, the need for

5   additional programming, there is not sufficient

6   evidence at this time that the prisoner would behave

7   differently if released from prison. In a separate

8   decision the Panel finds that it is not reasonable to

9   expect that the prisoner would receive a parole date

10  during the following four years. This is a four year

11  denial. The reason for the four year denial is the

12  crime he committed, his prior criminal history and

13  social factors, the need for additional programming.

14  In the ensuing four years we ask that the prisoner

15  remain disciplinary free, he upgrade educationally and

16  participate in self-help and therapy programming,

17  particularly AA and NA and the Twelve Step program.

18  These are very important that you do continue. I

19  would also suggest that you do something in the

20  educational area, even if it's self-study, in the

21  areas that you're interested in, and that would

22  probably be the vocation that you have, and any other

23  vocation. Anything you can get as far as programming

24  in the next four years you should do, so you come

25  before the Board and show them that you are still

26  progressing, and in a positive manner.

27  DONALD CRONK   C-87286        DECISION PAGE 3      3/5/97

264

58

1          INMATE CRONK:  Okay.

2          PRESIDING COMMISSIONER KOENIG:  This concludes

3    the hearing..  I want to wish you good luck.  You're

4    doing a good job.  Keep it up.

5          INMATE CRONK:  Thank you.

6                         -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED FOUR YEARS

26    EFFECTIVE DATE OF THIS DECISION _____JUL 0 8 1997_____

27    DONALD CRONK  C-87286        DECISION PAGE 4   3/5/97

59

# CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, LEE ROBB, a duly designated transcriber,
PETERS SHORTHAND REPORTING, do hereby declare and
certify under penalty of perjury that I have
transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 58, and which
recording was duly recorded at CALIFORNIA STATE
PRISON, SAN QUENTIN, SAN QUENTIN, CALIFORNIA, in the
matter of the INITIAL PAROLE CONSIDERATION HEARING OF
DONALD CRONK, CDC No. C-87286, on MARCH 5, 1997, and
that the foregoing pages constitute a true, complete,
and accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated May 4, 1997, at Fair Oaks, California.


*Lee Robb*

LEE ROBB, Transcriber

266

BPT D    ON REVIEW - CORRECTIVE    EET

| INMATE Donald Cronk | CDC NUMBER C 87286 |
|---|---|
| TYPE OF HEARING Snit | DATE OF HEARING 3 5 97 |

A review of the hearing transcript and parole decision by the Decision Review Unit (DRU) has revealed the following error(s):

Page 1 line 4 should read; 6/13/84

Recommendation: To correct the error(s) set forth above in the hearing transcript, read the following language into the record at the next scheduled parole consideration hearing:

See above

APPROVED BY: _____    Date: 7/8/97

[9/93]    PERMANENT ADDENDA

267

RECORDS CC

16

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
MARCH 1997 CALENDAR

<u>CRONK, DONALD</u>

C-87286

## I.  COMMITMENT FACTORS:

A. Life Crime:  Murder 1st, PC187(a) W/12022.5 (ct. 1) case #SAC66618 sentenced to serve a base term of 25 years to life with a 2 year enhancement, for a total term of 27 years to life. The victim's name was James Allen, age 50.

1. Offense Summary:        In the early evening of December 19, 1980, Donald Cronk and Glenn Meyer went to the victim's residence.  Mr. Cronk removed a screen from a window, opened the window and entered the apartment. He then opened the front door to allow Mr. Meyer to enter.  They then ransacked the house while waiting for Mr. Allen's return.  They were not concerned about being surprised by the victim's arrival as Christmas bells were hanging on the front door. Terry Warren waited outside and was to alert Cronk and Meyer upon Mr. Allen's arrival.

When Mr. Allen arrived at his residence, however, he some how became aware that something was amiss. He entered quietly, with his pistol drawn. Exactly what happened after that is unknown but it appears that Mr.Meyer was at or near the foot of the stairs with a wooden club in his hand, when he was confronted by the victim.  Mr. Cronk was in the kitchen and came out when he heard noises.  Mr. Allen turned and fired at Mr. Cronk.  Mr. Cronk suffered at least two gunshot wounds, one to the left side in the area of his ribs and one to his left arm.  The bullets passed through his body without lodging there and did not hit any vital organs.  Cronk returned gunshots, Mr. Allen was struck by a shot that killed him. The two culprits fled but Mr. Meyer apparently stopped long enough to pick up the victim's gun, briefcase and diamond ring.  Meyer fled to his truck, which was parked nearby.  He then stopped and picked up Mr. Cronk on an adjacent street. Mr.Cronk had disposed of his gun, described as a .38 caliber Colt Detective Special in some near-by bushes.  Meyer also disposed of the gun he'd taken from the victim.  Prisoner Cronk, nor any of his crime partners/accomplices were related to the victim and they too are unrelated.  The Coroner revealed that Allen had been shot in the posterolateral left chest in the posterior axillary line.  The bullet entered seven inches from the posterior midline and two and a quarter inches below the nipple line.  The track extended inward from left to right and slightly from back to front.  It entered the lower lobe of the left lung and traveled to the descending thoracic aorta.  It totally shattered the aorta in a large 3/4 inch irregular hole and the slug continued into the lower portion of the third dorsal spine.  The slug was recovered.  The pathologist testified that the victim bled to death within three to six minutes.

268

Life Prisoner Evaluation
Initial Parole Consideration Hearing
March 1997 Calendar
Page 2

This information is extracted from Probation Officers Report: pages 3,4,5,7 & 8.

2. Prisoner's Version:      Cronk stated that the whole incident was because of his involvement with cocaine. He stated "Cocaine destroyed me". He had a good job with possibilities of advancement, then began using cocaine. He was in debt approximately $10,000.00 and lost his job because he couldn't even coordinate his thoughts anymore. He became involved with cocaine through his job associates then became involved with Mr. Warren and Mr. Meyer through the cocaine dealing.

Mr. Cronk claims that Terry Warren was the main force behind the entire crime. He told them about Mr. Allen and stated that he wanted to rob the victim. The prisoner claims to have suggested that they burglarize his residence instead. They agreed to do that and he broke into the residence through an unlocked window, then let Mr. Meyer in the front door. Mr. Warren stayed outside and was to warn them if the occupant returned home. Mr. Cronk stated that he was in the kitchen and Mr. Meyer was upstairs. Mr. Cronk heard some thuds and opened the sliding door in the kitchen and saw Mr. Meyer standing on the stairs with the victim facing him, his back toward Cronk. Mr. Allen turned immediately and shot Cronk in the left arm. Mr. Cronk stated that he panicked and headed toward the door. He was then shot in the side and fell to the floor. Cronk drew his gun and fired. According to Cronk the victim then fell to the floor. Cronk fled and expected to be shot as he ran down the sidewalk. Cronk was bleeding profusely and lay down in some high grass across the street from the apartment complex. A short while later, Mr. Meyer came by in his truck, picked him up and took him to Terry Warren's house. He stated that things after the offense are very blurred as he was in a great deal of pain. Mr. Meyer, however, told him that he (Mr. Cronk) had shot the victim. He believed, for a long time, that he had shot the victim until they found that the bullet in the victim did not necessarily match the one in the gun that he used. He now believes that either Mr. Meyer or Terry Warren also had a gun and further believes that Mr. Warren told the victim, for reasons unknown, that he and Mr. Meyer were in the house. He believes this because when Mr. Allen came in, he came in with his gun drawn and prevented the bells on the Christmas wreath from ringing as he opened the door. Also, because Warren did not warn them of Allen's return, as planned. Mr. Cronk expressed deep regret for his actions and stated that he is deeply sorry for the victim and his family and the grief he has caused them. He stated that he knows what they are experiencing because he experienced the same kind of grief when his own father died. He feels he has disgraced his family. Everyone who knew him was shocked by the charges and he feels that his friends have disowned him since the offense. He acknowledged his culpability, however, and stated that he was ready to pled guilty at arraignment but the District Attorney would not accept his plea and filed an amended complaint alleging special circumstances. He has been fighting the charges ever since as he feels, despite his plea, that he is really only guilty of second degree murder.

269

Life Prisoner Evaluation
Initial Parole Consideration Hearing
March 1997 Calendar
Page 3

3.  Aggravating and Mitigating Circumstances:

Aggravating Circumstances:
None were delineated in Probation Officers Report dated 5-15-84.

A.      Cronk plotted over a period of time, to commit this crime, had ample opportunity to abort the plan, but did not.

B.      Cronk actively sought possible accomplices in that he reportedly discussed the plotting and planning with a number of individuals, several of whom became accomplices before and/or after the fact, inclusive of a juvenile female.

C.      The crime was planned, Cronk armed with a weapon and reasonably should have known that he might have to use the weapon.

D.      Subject fled, crossing state lines to avoid arrest/prosecution and was apprehended July 1, 1981 by FBI agents on a Wisconsin Warrant, in Rupert, Idaho using the name Donald Allen Palmer.   During interview subject acknowledged possession    of    forged    documents/identification establishing/supporting his false identity.  Cronk reports that Mr. Warren, through his contacts arranged and secured these documents.

Mitigating Circumstances:

None are delineated in Probation Officers Report dated 5-15-84 · reader is referred to Probation Officers Report pages 23,24 & 25 for information submitted by "Special" Investigation Agencies which may or may not qualify as mitigating circumstances in this case.

II.     **PRE CONVICTION FACTORS:**

A.      Juvenile Record:  No juvenile record noted.

B.      Adult Convictions:  Available information indicates Cronk suffered his first law enforcement contact at the age of 20, September 11, 1975 for theft from a car in Wallkesha, Wisconsin.  Three juveniles were implicated in this offense.  Cronk

**270**

Case 3:07-cv-05313-TEH    Document 11-8    Filed 06/30/2008    Page 91 of 98

Life Prisoner Evaluation.
Initial Parole Consideration Hearing
March 1997 Calendar
Page 4

pled guilty, was fined $200.00, plus cost or 60 days in County jail. The actual disposition is not indicated. Subject then, according to available information engaged in at least three known robberies between October 30, 1980 & December 11, 1980 as well as forgery of a check belonging to his brother while in Wisconsin, October 2,, 1980. No one was injured in these crimes, but reports indicate subject possessed a gun in each of the robberies and that he threatened to shoot some of the victims. Disposition in these cases was dismissal.

Additionally, it is noted that while housed in the Sacramento County jail, May 20, 1982, Cronk was charged with possession of contraband in prison & possession of a weapon in prison when two prison-made "shanks" and a hypodermic syringe were found in his cell. These charges were dismissed July 26, 1983. Subject was convicted in the Instant Offense 6-8-84 to serve a 27 year to life prison term. Subject has served no prior prison terms and there is no indication that he received any grants of probation.

Source of information: Probation Officer's Report, pages: 17 through 19; Minute Order action # 66618 dated 6-8-84; CDC 262 and Walworth County Sheriff's correspondence dated 9-6-84 and CI&I.

C. Personal Factors:    Cronk was born in Milwaukee, Wisconsin and reared in Paymyra, Wisconsin, a farming community by his mother and father, along with three siblings. His father died when he was 17 years of age. He dropped out of High School after his father's death, but reportedly obtained his GED sometime after. His mother reports that he suffered from deep depression after his fathers death. At age 18 Cronk married Mary Kreil, they lived with his wife's mother, for awhile, but that didn't work out. This union resulted in one female child. His wife left and moved to California with her father. Cronk later joined her, at her request. Apparently, there were martial difficulties as his wife returned to Wisconsin, but he remained in California for awhile.

In August of 1980 he returned to Wisconsin, but stayed only a couple of months. He is alleged to have suffered from a "nervous problem" that resulted in his being held in a crisis center prior to his return to Wisconsin. His employment history reflects experience as a service manager for LaBries Waterbeds between 1977 and 1980. Prior to that, he worked approximately 7 months as a warehousemen.

Cronk began abusing drugs approximately 1977, with a friend Shirley. The drug choice was cocaine, in which they indulged, on occasion, while having a "few drinks". Upon the termination of his marriage and subsequent divorce from Mary, September 1980, he had more opportunity to "party" with his friend. He remarried August 4, 1987. Linda Hartman, now has one child and the marriage

271

remains intact. Cronk, following separation from his first wife, reportedly developed a serious drug dependency by August 1978, at which time he also made the acquaintance of Glenn Meyer and Charles Lonley. Both are noted, to some extent, as involved in the instant offense. Meyers to a greater degree, in that, he too is serving a life term as crime partner in the instant offense.

While no sexual deviance is noted in Cronk's criminal history, Probation Officers Report page 26, line 22 indicates he was or had been involved in a relationship with a 16 year old female, at the time of the life crime.

There is no documented diagnosis as to a mental disorder, however, reader is referred to POR pages 22 and 23 relative to Psychological/Psychiatric/Medical Contacts.

III.  **POST CONVICTION FACTORS:**

Cronk's overall pattern of behavior in prison, inclusive of disciplinary record, work accomplishments, participation in self-help and religious programs as well as relationships with staff and inmates has been exemplary from date of reception 6-13-84 to present, a total of 12 years. There are no mental or mental concerns documented at this time, except to note that Cronk is a drug addict in remission.

Again, he married Linda in 1987 and the marriage remains intact. This is Cronk's Initial Parole Consideration Hearing Report, prior BPT review(s) 6-10-93, 6-25-90, 5-26-87 were Documentation Hearings during which the BPT reviewed his progress.

See Post Conviction Progress Reports for details.

IV.  **FUTURE PLANS:**

He plans to continue positive programming and participation in religious worship, self-help programs, as well as educational programs. Upon release, he plans to reside with his wife and daughter, Linda and Samantha at 2099 Blackwood Dr., San Pablo, A. 94806, telephone #(510) 724-9675. He is aware that approval to reside in Contra Costa County would be required because Sacramento County is his county of commitment, as well as prior county of residence. He advises that if transfer of parole supervision could not be accomplished, he and his wife are agreeable to relocating to the Sacramento area.

272

Life Prisoner Evaluatio.
Initial Parole Consideration Hearing
March 1997 Calendar
Page 6

## V.    SUMMARY:

A.    Considering the commitment offense, prior record and prison adjustment this writer believes the prisoner would pose an unpredictable degree of threat to the public at this time, if released from prison, primarily due to lack of knowledge relative to the underlying cause of his propensity toward drug abuse.

B.    Prior to release, Cronk could benefit from:    continued positive programming, participation in NA and psychological in-depth therapy programming.

C.    This Board report is based upon 4 hours of interview and Central file review.

D.    Cronk was given the opportunity to review his Central file in preparation of his March 1997 hearing and did so 1-9-97.

Prepared By:                Reviewed By:                Reviewed By:


CCI                    CCII (A)                C&PR (A)
M. Edwards                T. KLYCE                L. Weister

273

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6-10-93 to 6-10-94 | | | Cronk's last BPT Hearing/review was 6-10-93 at which time his #3 Documentation Hearing was held and his progress reviewed by BPT. It is noted that Psych. Report dated 4-27-93 recommended in-depth testing. This report will cover 6-10-93 thru 12-13-965, 3-1/2 years. Since his last appearance, subject has remained housed at SQII, under MED. A custody, as a lifer without a date, in the general population. He continued assignment as watch commanders clerk, 12-1-92 thru this period of review. There are no work performance evaluations of record. He remained disciplinary free. He continued self-help programming: Narcotics Anonymous 1-14-94 - 4-15-94, self-esteem enhancement certification 3-23-94. There are no laudatory chronos of record. |
| 6-11-94 to 6-11-95 | | | He remained housed at SQII under MED. A custody in the general population. He continued assignment as Watch Commander's clerk thru 3-9-95, at which time he began assignment as Inmate Assignment Lieutenant's clerk thru 3-22-95, at which time he began assignment as Reception Center Lieutenant's clerk, where he remained thru this period of review. His work performance was rated above average to exceptional for the period, 27 months preceding 3-1-95 and likewise in evaluation of 3-23-95. He remained disciplinary free. He continued self-help programming: Narcotics Anonymous 7-15-94, 11-10-94 and 2-1-95, Alcoholics Anonymous 6-2-95. Laudatory AA participation chrono is noted 5-19-95. |
| 6-12-95 to 6-12-96 | | | Subject remained housed at SQII, under Med. A custody, in the general population. He continued assignment as Reception Center Lieutenant's clerk, receiving overall performance rating of above average for the 11 month period of assignment. He continued self-help programming: Narcotics Anonymous 10-12-95, 1-24-96, 4-12-96 & 7-16-96. He remained disciplinary free. |

CORRECTIONAL COUNSELOR SIGNATURE

_M B Edwards_

DATE 1-9-97

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD | C 87286 | SAN QUENTIN | INITIAL | MARCH 1997 |

BPT 1004 (REV 7/86)

274

BOARD OF PRISON TERMS

# CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORN

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6-13-96 to 12-13-96 | | | Subject remained housed at SQ-II under Med. A custody, in the general population. He continued assignment as Reception Center Lieutenant's clerk thru 12-4-96 at which time he began assignment as Reception Center B-section Captain's clerk. There are no work evaluation reports of record, to date. Subject remained disciplinary free. He continued self-help programming: Narcotics/Alcoholics Anonymous 7-16-96, 10-11-96 and participated in San Quentin's College Program per 128B dated 11-1-96: Participation in Annual Victim's Awareness ceremony is noted 8-21-96. Cronk reports that he is actively involved in the ministry and involved in religious counseling. |

ORDER:

☐ BPT date advanced by _____ months.        ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.        ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.        **275**

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CRONK, DONALD | C 87286 | SAN QUENTIN | INITIAL | MARCH 1997 |

BPT 1004 (REV. 7/86)        PAGE 2 of 2

17

CRONK    C-87286

BOARD OF PRISON TERMS
PSYCHOLOGICAL EVALUATION
MARCH, 1997 LIFER CALENDAR

This is the fourth psychological evaluation for the Board of Prison Terms. Mr. Cronk is a 41 year old Caucasian male serving a life sentence for first degree murder.

Sources used in this report were two-one hour interviews, a review of the central file and medical records.  The social, psychiatric and criminal histories may be obtained from various documents in the charts and will not be repeated in this evaluation.

According to self-report, Mr. Cronk is a certified engineer and works as an audio engineer here at San Quentin. He has done work with the San Quentin Mass Choir as one of his projects.  He is also deeply involved in the Christian faith.  Both of these pursuits may suggest some degree of involvement in self-development.

MENTAL STATUS EXAMINATION:  At the time of the Mental Status Examination, Mr. Cronk appeared well groomed and appropriately dressed for the situation. He was alert, oriented, and responsive.  Mood appeared euthymic with affect appropriate to content.  Speech and response times were within normal limits.  Attention and concentration appeared unimpaired.  There was no evidence of suicidal ideation, auditory or visual hallucinations.  Mr. Cronk responded to all questions and comments in an open, non-defensive manner.  Thought processes and content were within normal limits.

DISCUSSION:  Previous diagnoses for the Board of Prison Terms evaluation were:  No diagnosis used (Bruce, Ph.D., 1993), drug addiction in remission (cocaine) (Sullivan, M.D., 1990) no psychiatric disorder, drug addiction, cocaine in remission,(Roudebush, M.D., 1987).

This writer is not in strong opposition with the above listed diagnoses and it is believed that reasonable arguments can be made in favor of these impressions.  However, alternative diagnoses were used by this writer.  The V-code diagnosis (not attributable to mental disorder) of Adult Antisocial Behavior was used by this writer due to the lack of symptoms or, at least, information to confirm a pattern of behaviors and/or attitudes fitting the criteria for a full blown personality disorder.  Further, his behavior within the prison has not been reflective of antisocial tendencies either. However, the V-Code was chosen to recognize the severity of the crime in addition to past robberies.

Moving away from the constricting aspects of diagnosis and towards a descriptive outline, Mr. Cronk presents as an educated man who has been thoughtful about his life including this crime.  All aspects of his interviews were articulated with a sense of reason and responsibility.  He appeared capable of sophisticated, abstract thought.  He appears to perceive himself as someone who, in the past, suffered from a great feeling of inferiority and inadequacy, much of which he attributes to his rural, low income upbringing.  Less central to Mr. Cronk was his relationship with his mother who appeared to be clinically depressed.  He had some tendency to minimize her depression, which may assist him in assuming responsibility for his well-being, but also serves to obstruct him from a deeper understanding of her impact.

276

CRONK,    C-87286        -1-      SAN QUENTIN        SL:bjw

CRONK,    C-87286

When discussing his history of relationships, romantic or otherwise, it appears that he has had a history of meaningful attachments. During the period of time that the crime occurred, he seemed to stray from these relationships seeking status and power with "upper-class jet setters" in California. This seems to be consistent with his description of himself as experiencing a feeling of inferiority. His current relationship with his wife in addition to his involvement with religion may suggest a return to relationships or involvements characterized by direction, stability, and meaning.

Mr. Cronk's dependence on cocaine appeared to be fairly well understood by him and, again, consistent with what he perceived to be the core of his conflicts. When under the influence, he seemed to feel "courage" and confident for the first time. Cocaine use and its surrounding social circle helped him feel "euphoric, energetic, social" without side effects.

Initially he used it when available and later found himself purchasing "little quantities" which led to dealing and finally owing "$10-15,000 for the big guy." Mr. Cronk does not blame his drug use for the murder. "I knew it was wrong, we knew what we were doing." When asked about what, in relation to the crime, had the most impact on him, he stated, "That I could be there doing that, shooting someone, I didn't mean to do this... I didn't mean to kill someone."

His understanding of the murder appeared comprehensive as evidenced by the manner in which the various elements of his life and drug addiction were portrayed. He did not seem to view the murder simply, but as a consequence of many historical and situational factors combined.

There is no known history of any serious 115's and his chart reflects his involvement in a variety of activities, most notable of which is audio engineering.

Diagnostic Impression   - Axis I:    V71.01 Adult Antisocial Behavior
                                      304.20 Cocaine Dependence
                                      305.00 Alcohol Abuse
                          Axis II:    799.9  Deferred
                          Axis III:   None reported
                          Axis IV:    Long Term Incarceration
                          Axis V:     57

CONCLUSIONS AND RECOMMENDATIONS:   If released to the community, Mr. Cronk plans to obtain work in the area of engineering and will reside with his wife. At the time of release it is recommended that he further develop a structured, reliable plan with greater detail to assist in his transition to the community.

STEPHANIE LEE, Ph.D.
Clinical Psychologist

CRONK,    C-87286          -2-    SAN QUENTIN    SL:bjw          277